No. 24-10277

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

INSURANCE MARKETING COALITION LIMITED,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

---

## OPENING BRIEF OF PETITIONER
## INSURANCE MARKETING COALITION LIMITED

---

Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
kking@cov.com

*Counsel for Insurance Marketing
Coalition Ltd.*

May 15, 2024

Case No. 24-10277

*Insurance Marketing Coalition Ltd. v. Federal Communications Commission*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-2(c) and 42-1(a), Petitioner Insurance Marketing Coalition Ltd. (IMC) hereby submits a full list of persons and entities known to IMC to have an interest in the outcome of this case:

1. Aggarwal, Sameer, associate, Covington & Burling LLP, counsel for Petitioner;

2. Boeglin, John A., associate, Covington & Burling LLP, counsel for Petitioner;

3. Citrin, Sarah E., Federal Communications Commission, counsel for Respondent Federal Communications Commission;

4. Covington & Burling LLP, counsel for Petitioner;

5. Dori, Yaron, partner, Covington & Burling LLP, counsel for Petitioner;

6. Dunne, Matthew J., Federal Communications Commission, counsel for Respondent Federal Communications Commission;

7. Ellison, P. Michele, Federal Communications Commission, counsel for Respondent Federal Communications Commission;

8. Federal Communications Commission, Respondent;

9. Glover, Matthew J., special counsel, Covington & Burling LLP, counsel for Petitioner;

Case No. 24-10277
*Insurance Marketing Coalition Ltd. v. Federal Communications Commission*

10. Insurance Marketing Coalition Limited, Petitioner;

11. King, Kevin F., partner, Covington & Burling LLP, counsel for Petitioner;

12. Lewis, Jacob Matthew, Federal Communications Commission, counsel for Respondent Federal Communications Commission;

13. Nicholson, Robert B., U.S. Department of Justice, counsel for Respondent United States of America;

14. United States of America, Respondent;

15. Wiggers, Robert J., U.S. Department of Justice, counsel for Respondent United States of America.

Pursuant to Circuit Rule 26.1-3(b), Counsel further certifies that, to the best of Counsel's knowledge, no publicly traded company or corporation has an interest in the outcome of the case or appeal. Counsel will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-4.

Counsel further certifies that IMC is a tax-exempt corporation incorporated in Delaware that has its principal place of business in Florida. IMC is an association that advocates on behalf of insurance industry stakeholders. IMC members interact with consumers to provide information, education, and meaningful choices related

Case No. 24-10277

*Insurance Marketing Coalition Ltd. v. Federal Communications Commission*

to their insurance coverage options.  Counsel further certifies that IMC is not a

publicly traded company or corporation, has no parent company or corporation, and

no publicly held company or corporation owns 10 percent or more of IMC's stock.

*/s/ Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

May 15, 2024

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Circuit Rule 28-1(c), Petitioner Insurance Marketing Coalition Ltd. (IMC) respectfully requests oral argument. Oral argument is warranted because this case presents important questions about the lawfulness of the Federal Communications Commission's *Order*,[*] including whether the *Order* exceeds the Commission's statutory authority under the Telephone Consumer Protection Act; whether the *Order* violates the First Amendment; and whether the *Order* is arbitrary and capricious in violation of the Administrative Procedure Act.

The *Order* will affect businesses and consumers across the nation, as illustrated by the 119 distinct comment letters filed in the underlying rulemaking proceeding. *See Order*, Appendix A. Oral argument would assist the Court in assessing the evidentiary record and determining whether the Commission acted unlawfully when it adopted the *Order*.

---

[*] Second Report and Order, *In re Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Dkt. Nos. 21-402, 02-178, 17-59 (released Dec. 18, 2023) (*Order*) (A1).

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE
DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS....................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iv

STATEMENT OF JURISDICTION .................................................................... xi

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................. 5

     A.    Statutory and Regulatory Background ................................................ 5

     B.    IMC and the Performance Marketing Industry .................................. 6

     C.    The Commission's Rulemaking Proceeding....................................... 9

     D.    The *Order* ........................................................................................ 12

     E.    Procedural History ........................................................................... 17

SUMMARY OF ARGUMENT ........................................................................... 19

LEGAL STANDARD......................................................................................... 21

ARGUMENT...................................................................................................... 22

I.    The *Order*'s Additional Consent Requirements Exceed the
Commission's Statutory Authority............................................................ 22

     A.    The *Order* Impermissibly Redefines "Prior Express Consent" to
Mean Two Different Things.............................................................. 22

     B.    The *Order* Redefines "Prior Express Consent" in a Way That
Conflicts with that Term's Ordinary Meaning.................................. 26

II.    The *Order*'s Discrimination Against Marketing Calls Violates the
       First Amendment. ........................................................... 31

       A.    The *Order* Is a Content-Based Restriction That Fails Under
             Strict Scrutiny. .................................................. 31

       B.    Alternatively, the *Order* Fails Intermediate Scrutiny ........................ 41

III.   The *Order* Is Arbitrary and Capricious. .................................... 43

       A.    The *Order* Fails to Show That Unwanted Lead-Generated Calls
             Are a Significant Problem or That the New Consent
             Restrictions Will Meaningfully Reduce the Number of
             Unwanted Automated Calls. ........................................... 44

       B.    The *Order* Does Not Meaningfully Respond to IMC's
             Comments or Adequately Consider Alternatives ............................. 48

       C.    The *Order* Ignores Its Impact on Small Businesses ......................... 50

       D.    This Court Should Vacate Part III.D of the *Order* ........................... 54

CONCLUSION ............................................................. 55

CERTIFICATE OF COMPLIANCE ..................................... 57

STATUTORY AND REGULATORY ADDENDUM .................................ADD-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases*

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
  699 F.2d 1209 (D.C. Cir. 1983) .......................................................47

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022)..........................................................................29

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) .......................................................47

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)..........................................................................40

*Autauga Cnty. Emergency Mgmt. Communication Dist. v. FCC*,
  17 F.4th 88 (11th Cir. 2021)..............................................................20

*Barr v. American Association of Political Consultants, Inc.*,
  140 S. Ct. 2335 (2020)....................................................... 3, 20, 32, 33

*Bidi Vapor LLC v. FDA*,
  47 F.4th 1191 (11th Cir. 2022)....................................................21, 43

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015)........................................................53

*Bloomberg L.P. v. SEC*,
  45 F.4th 462 (D.C. Cir. 2022) .........................................................47

*Blow v. Bijora, Inc.*,
  855 F.3d 793 (7th Cir. 2017)...........................................................25

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) (en banc) ......................................46

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011)..........................................................................35

---

* The authorities on which IMC primarily relies are identified with an asterisk.

*Cahaly v. Larosa*,
   796 F.3d 399 (4th Cir. 2015)............................................................38

*Calcutt v. FDIC*,
   598 U.S. 623 (2023).......................................................................24

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980).......................................................................40

*Chevron U.S.A. Inc. v. NRDC*,
   467 U.S. 837 (1984).......................................................................29

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
   596 U.S. 61 (2022).........................................................................33

*\*Clark v. Martinez*,
   543 U.S. 371 (2005)..........................................................2, 19, 22-25

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   139 S. Ct. 1507 (2019)...............................................................22, 25

*Dana's Railroad Supply v. Attorney General*,
   807 F.3d 1235 (11th Cir. 2015).......................................................33

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996).......................................................................34

*FEC v. Cruz*,
   596 U.S. 289 (2022).......................................................................35

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017)..................................................40, 42

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985).......................................................................43

*\*Fober v. Management & Technology Consultants, LLC*,
   886 F.3d 789 (9th Cir. 2018)...............................................27, 28, 36

*Ford Motor Co. v. United States*,
   715 F.3d 906 (Fed. Cir. 2013).........................................................22

*Gorss Motels, Inc. v. Safemark Sys., LP,
  931 F.3d 1094 (11th Cir. 2019) ............................................................ 26, 28, 29

Hewitt v. Comm'r,
  21 F.4th 1336 (11th Cir. 2021) .................................................................. 21, 47

Honeyfund.com, Inc. v. Governor,
  94 F.4th 1272 (11th Cir. 2024) .......................................................................... 31

Kennecott Utah Copper Corp. v. Dep't of the Interior,
  88 F.3d 1191 (D.C. Cir. 1996) .......................................................................... 24

Lawrence v. Bayview Loan Servicing, LLC,
  666 F. App'x 875 (11th Cir. 2016) .................................................................... 27

Lucoff v. Navient Sols., LLC,
  981 F.3d 1299 (11th Cir. 2020) ......................................................................... 26

Medley v. Dish Network, LLC,
  958 F.3d 1063 (11th Cir. 2020) ......................................................................... 26

Meisel v. SEC,
  97 F.4th 755 (11th Cir. 2024) ............................................................................ 21

Michigan v. EPA,
  576 U.S. 743 (2015) .......................................................................................... 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ...................................................................... 21, 42, 46, 52

Nat'l Ass'n of Mfrs. v. SEC,
  800 F.3d 518 (D.C. Cir. 2015) .......................................................................... 41

Nat'l Lifeline Ass'n v. FCC,
  921 F.3d 1102 (D.C. Cir. 2019) ........................................................................ 46

Nat'l Shooting Sports Found., Inc. v. Jones,
  716 F.3d 200 (D.C. Cir. 2013) .......................................................................... 53

Nat'l Tel. Coop. Ass'n v. FCC,
  563 F.3d 536 (D.C. Cir. 2009) .......................................................................... 50

*Nat'l Truck Equip. Ass'n v. NHTSA*,
    919 F.2d 1148 (6th Cir. 1990)..........................................................................50

*NLRB v. Fla. Steel Corp.*,
    586 F.2d 436 (5th Cir. 1978)..........................................................................46

*Ocheesee Creamery LLC v. Putnam*,
    851 F.3d 1228 (11th Cir. 2017)...............................................................41, 42

*Osorio v. State Farm Bank, F.S.B.*,
    746 F.3d 1242 (11th Cir. 2014).........................................................5, 26, 30

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020)..................................................................31, 32

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015).........................................................................................42

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)................................................................................22, 25

*\*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)............................................... 4, 31, 32, 37, 38

*Ryan v. United States*,
    725 F.3d 623 (7th Cir. 2013)..........................................................................22

*Schweitzer v. Comenity Bank*,
    866 F.3d 1273 (11th Cir. 2017)...........................................................6, 25, 36

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................................................24, 40, 47

*Sorenson Communications, Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) .................................................................46, 54

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)....................................................................................40, 41

*United States v. Bryant*,
    996 F.3d 1243 (11th Cir. 2021)..........................................................22, 25

*United States v. Home Concrete & Supply, LLC*,
    566 U.S. 478 (2012)......................................................................30

*United States v. Jackson*,
    55 F.4th 846 (11th Cir. 2022)...............................................22, 24

*United States v. Philip Morris USA Inc.*,
    855 F.3d 321 (D.C. Cir. 2017) ...................................................41

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000)....................................................31, 38, 40

*United States v. Santos*,
    553 U.S. 507 (2008)....................................................................25

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .................................................53

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)..........................................................4, 19, 29

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017)....................................................25

*Victory Processing, LLC v. Fox*,
    937 F.3d 1218 (9th Cir. 2019)....................................................38

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ................................41

*In re Woolsey*,
    696 F.3d 1266 (10th Cir. 2012)..................................................22

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014)......................................................37

**Statutes**

5 U.S.C. § 601 ............................................................................7

5 U.S.C. § 604 ..........................................................................50

5 U.S.C. § 706 ..........................................................21, 22, 42

28 U.S.C. § 2342................................................................................20

*47 U.S.C. § 227......................................................................1, 5, 23

**Regulations**

47 C.F.R. § 64.1200........................................................ 6, 12, 15, 32, 55

**Regulatory Materials**

FCC, *Report to Congress on Robocalls and Transmission of
    Misleading or Inaccurate Called Identification Information*,
    2022 WL 17958839 (F.C.C. Dec. 23, 2022)............................8, 15, 45

*In re GroupMe, Inc./Skype Communications S.A.R.L. Petition for
    Expedited Declaratory Ruling*,
    29 FCC Rcd. 3442 (Mar. 27, 2014).................................................28

*In re Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*,
    7 FCC Rcd. 8752 (Oct. 16, 1992)...................................................23

*In re Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*,
    27 FCC Rcd. 1830 (Feb. 15, 2012) .......................................6, 23, 32

*In re Rules & Regulations Implementing the Telephone Consumer
    Protection Act of 1991*,
    30 FCC Rcd. 7961 (July 10, 2015)..................................................23

*In re Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*,
    2024 WL 668031 (F.C.C. Feb. 15, 2024).........................................15

*In re Sumco Panama SA*,
    37 FCC Rcd. 15,427 (Dec. 23, 2022)....................................8, 14, 15

*In re Targeting and Eliminating Unlawful Text Messages*,
    38 FCC Rcd. 2744 (Mar. 17, 2023)...................................................9

*Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098 (Jan. 26, 2024)....................................................17

## Other Authorities

137 Cong. Rec. H11307-01, 1991 WL 250340 (Nov. 2, 1991) ............................37

Congressional Research Service, *Automated Political Telephone Calls ("Robo Calls") in Federal Campaigns: Overview and Policy Options* (Mar. 22, 2010)....................................................................16

*Express Consent*, *Black's Law Dictionary* (11th ed. 2019)...................................26

FCC, *Unwanted Communications* (July 19, 2022) ...............................................54

## STATEMENT OF JURISDICTION

The *Order* is a final order adopted by the Commission on December 13, 2023, and released to the public on December 18, 2023. A summary of the *Order* was published in the Federal Register on January 26, 2024. *See Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5098 (Jan. 26, 2024).

Insurance Marketing Coalition Ltd. (IMC) petitioned this Court for review of the *Order* on January 26, 2024. This Court has subject-matter jurisdiction to review the *Order* under 47 U.S.C. § 402(a) and 28 U.S.C. §§ 2342(1) and 2344. IMC has standing to assert the rights of its members because its members would have standing to sue in their own right, the interests at stake are germane to IMC's organizational purpose, and neither the claims asserted nor the requested relief requires the participation of individual members. *See S. River Watershed All., Inc. v. DeKalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023). IMC's members are aggrieved by the *Order* as explained in IMC's comments in the underlying proceeding and in the declarations of two IMC members filed in support of IMC's stay petition. *See* Doc. 20-2; Doc. 20-3.

## INTRODUCTION

Americans detest calls they did not ask for.  But this is not a case about unsolicited calls.  It is a case about the Federal Communications Commission's misguided efforts to make it harder for people to receive calls about things like insurance rates that they *want*, and have expressly *asked*, to receive.

The Commission's *Order* purports to implement provisions of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.  Under the TCPA, a caller generally must obtain "prior express consent" to place an automated call to a mobile number.[1]  For decades, courts and the Commission have interpreted that term in a way that allows comparison shopping websites to quickly and efficiently connect comparison shoppers with the businesses best positioned to meet their needs.  That framework has been beneficial for small businesses, such as local insurance offices and handyman services, because it has provided an inexpensive way to reach new customers and compete with larger, more sophisticated rivals.  Comparison shoppers have benefitted as well, due to the broader range of choices and better matches the consent rules have made possible.

The *Order* discards that longstanding framework and replaces it with a rigid scheme that will reduce consumer choice, drive small businesses from the market,

---

[1] This brief uses "calls" as shorthand for calls and text messages and "automated calls" for calls placed "using any automatic telephone dialing system or an artificial or prerecorded voice."  47 U.S.C. § 227(b)(1)(A).

and devastate many companies that partner with and rely on comparison shopping websites to connect with potential customers. In addition, the *Order* singles out only marketing calls for additional regulation—based solely on the content of the message shared on the call—even though the TCPA does not distinguish between marketing and nonmarketing calls in this context.

Specifically, the *Order* redefines the TCPA term "prior express consent" for marketing calls, and *only* marketing calls, to encompass two additional elements. *First*, consumers may provide consent to marketing calls only on a "one-to-one" basis, requiring consumers to separately consent to each business that might later contact them. *Second*, consumers may only consent to marketing calls that are "logically and topically related" to the website that solicits the consent, even if the website expressly informs the consumer about the subject of the call and the consumer expressly asks to receive it.

These additional requirements exceed the Commission's authority under the TCPA, violate the First Amendment, and are arbitrary and capricious under the Administrative Procedure Act (APA).

*First*, the *Order* exceeds the Commission's authority by interpreting the phrase "prior express consent" in a way that conflicts with the TCPA. The *Order* gives that phase two different meanings depending on the nature of a call, in violation of the rule that agencies "must interpret the statute consistently," *Clark v.*

2

*Martinez*, 543 U.S. 371, 380 (2005), and it compounds that error by imposing requirements that go well beyond the ordinary meaning of "prior express consent."

*Second*, the *Order* violates the First Amendment by applying content-based discrimination against commercial marketing calls. The Supreme Court invalidated another part of the TCPA on that basis in *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), and the same reasoning applies here. Moreover, even if addressed under intermediate scrutiny, the *Order* violates the First Amendment because the Commission has failed to show that its additional consent requirements would serve a substantial interest and are not more extensive than necessary.

*Third*, the *Order* flunks the APA's requirement of reasoned decisionmaking because its additional consent requirements are not supported by the record, it fails to meaningfully respond to comments from Petitioner Insurance Marketing Coalition Ltd. (IMC) and others (including proposals for more narrowly tailored alternatives), and it does not account for the adverse effects its new restrictions will have on small businesses. As Commissioner Simington recognized in dissent, "the factual record on the question of 1-to-1 consent is so thin, and the [*Order*] so impoverished in its reasoning … that it gives every appearance of an arbitrary and capricious action." Appendix (A) 70.

3

IMC recognizes that unwanted calls are a genuine problem that the Commission has authority to address through reasonable and constitutional regulations. But as the Supreme Court has emphasized, rulemaking authority is not a blank check: agencies must abide by the limits on their power and may not "rewrite clear statutory terms to suit [their] own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Nor can agencies implement content-based restrictions on speech unless they are able to satisfy strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

This Court should set aside Part III.D of the *Order* because the Commission failed to follow those bedrock principles. Granting that relief would help remedy the harm to IMC's members, while leaving the Commission many other enforcement tools—including significant new tools adopted in parts of the *Order* not challenged here—to prevent automated calls and texts from bad actors.

## STATEMENT OF THE ISSUES

1. Whether the *Order*'s redefinition of the statutory term "prior express consent" exceeds the Commission's authority.

2. Whether the *Order* violates the First Amendment by imposing a content-based restriction on protected speech.

3. Whether Part III.D of the *Order* should be set aside under the Administrative Procedure Act because it is not supported by the record, does not

4

meaningfully respond to significant comments, and fails to adequately consider its impact on small businesses.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

In 1991, Congress enacted the TCPA to protect Americans from unwanted calls made using automated telephone equipment.   Under the TCPA, a caller generally must obtain the recipient's "prior express consent" before making an automated call.   47 U.S.C. § 227(b)(1).   The TCPA also provides that the Commission may make certain exemptions from the "prior express consent" requirement "by rule or order."  *Id.* § 227(b)(2).  For example, the Commission may exempt any calls "not made for a commercial purpose," and it may exempt any commercial calls that it determines "will not adversely affect the privacy rights" the TCPA protects and "do not include the transmission of an unsolicited advertisement."  *Id.*

The TCPA does not define the term "prior express consent," and this Court has interpreted the statute as "incorporat[ing] the common law concept of consent." *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014).   The upshot is that each individual (rather than the government or any third party) controls his or her own consent and "may limit" the scope of consent in various ways—for example by "consen[ting] to one act but not another … or to acts under some

conditions but not others." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) (citation omitted).

In 2012, the Commission issued regulations interpreting "prior express consent" to mean "prior express *written* consent" where an automated call is made for marketing purposes. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830 (Feb. 15, 2012) (*2012 Order*) (emphasis added). Under these regulations, other types of automated calls may continue to rely on non-written consent, including verbal consent. *See* 47 C.F.R. § 64.1200(a)(2) (requiring "prior express written consent" only for calls that "includ[e] or introduc[e] an advertisement or constitut[e] telemarketing").

## B.    IMC and the Performance Marketing Industry

Performance marketing (sometimes referred to as "lead generation") often takes place on comparison shopping websites, which provide a one-stop means of comparing options for health insurance, auto loans, home repairs, and other services—thus sparing consumers the burden of identifying and consulting multiple vendors for information and offers. A107-08. Comparison shopping sites typically give visitors the option of requesting additional information—such as a quote for window installation or an insurance policy—from the listed businesses, and website operators often employ algorithms, questionnaires, or other means to connect consumers with the businesses that best match their needs. If a consumer consents

to receive a follow-up call or text message, the website transmits that "lead" to one or more of those businesses.  Because marketers and website operators typically cannot know in advance which businesses will be the best fit for a particular consumer, and because making a match before obtaining consent would delay the process by requiring the consumer to wait on a loading screen, performance marketers often list many potential businesses when seeking a consumer's consent for TCPA purposes, even when only a handful of businesses (or only a single business) ultimately will receive a lead or contact the consumer.

For example, consumers searching for home service repairs may visit a website like HomeOtter.com, which allows consumers to receive quotes from local service providers.  *See* Doc. 20-3 ¶ 7.  Once a consumer submits their request and consents to receive calls from the listed service providers, a performance marketer will use its software platform to determine which service provider (or group of providers) is best situated to meet the consumer's needs and will pass the consumer's request to the service provider(s)—thus allowing them to call the consumer and provide the requested quote.  *Id.*

IMC represents a cross-section of stakeholders in the insurance marketing industry, including large companies as well as "small entities" as that term is defined in the Regulatory Flexibility Act, 5 U.S.C. § 601.  For example, IMC's members include small insurers who depend on leads from comparison shopping websites to

7

reach new customers and compete with larger firms for business, as well as performance marketing companies that operate insurance comparison websites and lead brokers who have networks of performance marketing companies and use them to furnish leads to insurance providers. Collectively, IMC's members actively engage with millions of consumers each year and provide them with information, education, and meaningful choices related to their insurance coverage and other service needs. *See* A91-92; *see also* A106 (LendingTree has facilitated more than 3 million loans and assisted 111 million consumers over the last 26 years).

IMC and its members differ from entities that place calls without any consideration for whether the recipient has consented to the call or whether the calls otherwise comply with the TCPA. Such calls frequently originate overseas; as the Commission recently acknowledged in a report to Congress, "[f]oreign-originated calls are a significant portion, if not the majority, of illegal robocalls." FCC, *Report to Congress on Robocalls and Transmission of Misleading or Inaccurate Called Identification Information*, 2022 WL 17958839, at *6 (F.C.C. Dec. 23, 2022); *see also In re Sumco Panama SA*, 37 FCC Rcd. 15,427, 15,445-46 ¶¶ 42-45 (Dec. 23, 2022). In contrast, IMC's members invest significant resources into their TCPA compliance programs to ensure that all the calls they place are, in fact, wanted by consumers. *See, e.g.*, Doc. 20-2 ¶¶ 19-20.

8

### C.     The Commission's Rulemaking Proceeding

In March 2023, the Commission issued a Notice of Proposed Rulemaking seeking comment on new telephone and text messaging regulations. These proposals included a TCPA rule that would limit consumers to giving prior express consent "directly to one entity at a time," and a related rule that would allow consumers to grant consent only for "callers" whose messages are "logically and topically associated with the website that solicits consent." *In re Targeting and Eliminating Unlawful Text Messages*, 38 FCC Rcd. 2744 ¶ 61 (Mar. 17, 2023).

IMC submitted detailed comments on those proposed regulations. IMC agreed that people "should only receive calls that they agree to receive," A91-92, and proposed ways the Commission could help reign in bad actors with more narrowly targeted policies. Specifically, IMC proposed that the Commission require that, before consumers provide consent, they receive clear and conspicuous disclosures about (1) "the potential number of callers" for which consent is given, (2) "the maximum time period during which calls may be received," and (3) the "categories of goods or services that may be offered on such calls." A90.

IMC's comments further explained that some of the Commission's proposals threatened to limit consumer choice and stymie competition. For instance, requiring separate consent for each potential caller would result in consumers choosing large, recognizable brands over smaller, lesser-known companies that lack the advertising

budgets necessary to obtain the name recognition of their large competitors.  *See* A97, A150-51.  The one-to-one consent requirement would also require consumers to research and understand the offerings of each smaller service provider before providing consent, resulting in fewer consumers benefiting from direct competition between multiple service providers seeking their business.  A152-53.

After the Commission published a draft of the *Order*, IMC explained that the draft rested on several false assumptions and failed to account for its effect on small businesses.  For instance, IMC observed that the draft rested on a mistaken factual premise because "[t]here is zero evidence in the record that any appreciable number of unwanted calls are attributable to consent records that list more than one seller" or that are not "logically and topically related" to the website that solicited the consent.  A180.  Further, IMC alerted the Commission that the additional consent requirements would "not make a dent in overall volume of unwanted calls and texts," because such calls and texts "are primarily made without consent" in the first place.  A181.  For those reasons and others, IMC commented that the Commission's proposed redefinition of "prior express consent" would violate the TCPA, the First Amendment, and the Administrative Procedure Act.  A177-85.

Other parties raised similar concerns.  For example, Zillow reasoned that the draft *Order* was "not sufficiently tailored to allow for certain contacts that a consumer wishes to receive," and therefore recommended that the Commission

modify the draft to "protec[t] consumers while preserving an adequate degree of consumer choice and the flexibility to serve consumers in the speedy manner they expect in the digital age." A171. Another commenter explained that "[s]addling consumers looking to make considered comparisons with the obligation to do so one-product-at-a-time would not, on its face be pro-consumer." A159. Instead, that commenter proposed, the Commission could permit consumers to consent to receive calls from "a limited number of [service providers] to whom the consumer is matched" after those entities are identified and a notice is provided to the consumer. A160; *see also* A112-14 (proposing disclosure of "specific parties to whom the consent applies after a match has been made").

Several parties raised concerns about the *Order*'s effect on small businesses. For instance, SolarReviews, a comparison shopping website for solar panels, cautioned that small companies "cannot compete with the marketing departments of large corporate solar companies" and therefore "rely on SolarReviews and other lead generation firms for work and the continued existence of their businesses." A76, A107. SolarReviews also conducted a survey of its clients showing that "over 90% of them believed they would have to lay off staff" if they no longer received leads from comparison shopping websites. *Id.* Likewise, the Small Business Administration (SBA) Office of Advocacy highlighted uncertainty regarding the ability of small businesses "to purchase affordable sales leads, compared to larger

entities." A176. SBA believed the Commission's regulatory analyses "underestimate[d] the impact that the final rule would have on small entities." *Id.* SBA thus asked the Commission to seek additional comment from small entities about the one-to-one consent rule, and to "conduct a more extensive analysis of the economic impact the proposal could have on small entities before making a final decision." *Id.*

### D. The *Order*

On December 13, 2023, the Commission adopted the *Order*, with Commissioner Simington dissenting in part. Among other things, the *Order* requires mobile carriers to block all text messages from numbers identified as sources of illegal texts and clarifies that the Do-Not-Call List's protections apply to text messages. *Order* ¶¶ 16-29. Those aspects of the *Order* are not at issue in this suit.

Part III.D of the *Order*, which IMC challenges here, interprets the TCPA's "prior express consent" requirement to contain two additional requirements—on top of the written-consent requirement imposed by the *2012 Order*—for commercial marketing calls.[2]

*First*, the *Order* requires that prior express consent for marketing calls be provided on a "one-to-one" basis. *Order* ¶ 31. As a result, a consumer cannot consent to receive automated calls from a list of "marketing partners," even if that

---

[2] These new requirements are codified at 47 C.F.R. § 64.1200(f)(9).

list is clearly and conspicuously displayed to the consumer in advance of consent, and even if the list consists of only two or three businesses. *Id.* ¶ 32. Instead, a consumer must separately consent to each *individual* potential marketer that may or may not call the consumer. *Id.*

*Second*, the *Order* requires that "consent obtained on comparison shopping websites must be logically and topically related to th[e] website" from which it is obtained. *Id.* ¶ 36. For example, according to language in the *Order*'s preamble (but not in the Code of Federal Regulations), a visitor to "a car loan comparison shopping website" may not "consent to" automated calls or text messages "about loan consolidation." *Id.* That rule applies even if website visitors in fact have loans they wish to consolidate and expressly state their desire to receive calls about loan consolidation.

The *Order* acknowledges that "comparison shopping websites … benefit consumers by enabling them to quickly compare goods and services and discover new sellers." *Order* ¶ 30; *see also id.* ¶ 30 n.69 (describing lead generation as "a well-established industry that offers benefits to both consumers and advertisers"). These websites are necessary because "[c]hoosing the right product or service in a thriving competitive market with a sea of options can be an overwhelming task." A72 (Statement of Commissioner Anna Gomez). Comparison shopping websites are also a particularly useful tool for small businesses that "face larger competitors

for consumer attention" because the websites provide an efficient way of connecting with "potential customers." *Id.*

Nevertheless, the *Order* asserts that its prescriptive new consent requirements are necessary because lead generation is responsible for "a large percentage of unwanted [automated] calls and texts," and because such calls "often rely on flimsy claims of consent." *Order* ¶ 30.  The only evidence the *Order* cites in support of those assertions is a single comment letter from USTelecom.  *See id.* ¶ 30 n.68.[3] That letter contains no statistics about the prevalence of unwanted automated calls resulting from lead generation.  Instead, it simply asserts that "the robocalls consumers are most likely to receive are lead generation robocalls they do not want" and cites three news articles, none of which mentions lead generation.  A146.  Those articles discuss various robocall scams and never suggest that performances marketers contribute to or are in any way responsible for the scams.  *See id.*

The USTelecom letter is equally threadbare regarding the validity of consent for lead-generated marketing calls.  It cites only a single enforcement action (*Sumco*)

---

[3] Besides this lone comment letter, the *Order* does not cite any additional evidence to support its claims that lead generation yields "a large percentage of unwanted [automated] calls and texts" and that the underlying consent is often "flimsy."  *Order* ¶ 30 n.68.  While the *Order* elsewhere cites comment letters purporting to describe websites with hyperlinked lists that include several hundred partner companies, *id.* ¶¶ 30-31 nn.70-72, these comments do not provide evidence regarding the number of calls consumers actually receive from those websites, or that any such calls represent "a large percentage" of the overall number of unwanted calls.

14

on that issue, involving a fraudulent *overseas* enterprise that, in stark contrast to the comparison shopping websites IMC members operate and partner with, "intentionally violated, or at least ignored, the TCPA's consent requirements." A146; *Sumco*, 37 FCC Rcd. at 15,446-47 ¶¶ 45-47.   In *Sumco*, the overseas enterprise "placed more than five billion prerecorded voice messages" in a three-month span, and the evidence showed that the enterprise lacked consent for its calls. 37 FCC Rcd. at 15,445-46 ¶¶ 43-45; *see also* FCC, *Report to Congress*, 2022 WL 17958839, at *6 (addressing problems posed by "[f]oreign-originated calls").

The *Order* applies the one-to-one-consent and logically-and-topically-related requirements only to automated marketing calls.  Other types of solicitations, such as fundraising calls from political or charity organizations, and "informational" calls are not covered by the new regulations.  *See* 47 C.F.R. § 64.1200(a)(2)-(3) (requiring "prior express consent" or no consent at all, rather than "prior express *written* consent," for certain classes of calls).[4]  As a result, the *Order* will have no effect on the volume of unwanted calls and texts from political organizations, even though some voters have "reporte[d] receiv[ing] 20 [such] calls in a single day."

---

[4] The Commission's rules generally divide calls into two groups: marketing calls and "informational" calls, which are subject to fewer restrictions and include calls and text messages from political campaigns, advocacy organizations, charities, and other non-commercial entities.  *See, e.g.*, 47 C.F.R. § 64.1200(a)(2)-(3); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 2024 WL 668031, ¶¶ 29-30 (F.C.C. Feb. 15, 2024).

15

Congressional Research Service, *Automated Political Telephone Calls ("Robo Calls") in Federal Campaigns: Overview and Policy Options* 9 (Mar. 22, 2010), https://crsreports.congress.gov/product/pdf/RL/RL34361/15.

Despite the comments from the SBA, IMC, and others regarding the draft *Order*'s harmful effect on small businesses, the Commission did not modify the substance of the one-to-one consent requirement in any respect to account for those concerns.

Commissioner Simington partially dissented from the *Order*. While he agreed with other parts of the *Order*, he "strongly dissent[ed]" from the Commission's "approach to 1-to-1 consent in the lead generation context." A71. Commissioner Simington reasoned that "the factual record on the question of 1-to-1 consent is so thin," and the *Order*'s reasoning is "so impoverished," "that it gives every appearance of an arbitrary and capricious action." A70. This is so because, rather than "develop[ing] a fulsome record," the Commission relied on a handful of unsubstantiated assertions by third-party commenters, such as USTelecom—thus creating a "mess" for small businesses to clean up. *Id.* Commissioner Simington also explained that the one-to-one consent requirement would not achieve the Commission's stated goal of impeding bad actors because those entities do not "buy leads" and paternalistic consent rules "d[o] nothing to prevent their abusive

behavior. At all. Nothing." *Id.* The *Order*'s one-to-one consent rule is thus solely a "paper consumer victory for [the] Commission." *Id.*

The one-to-one consent and "logically and topically related" provisions of the *Order* are scheduled to take effect on January 27, 2025. 89 Fed. Reg. at 5105.

### E.    Procedural History

The Commission published the *Order* on its website on December 18, 2023. On January 26, 2024, the *Order* was published in the *Federal Register*, 89 Fed. Reg. 5098. Later that day, IMC petitioned this Court for review of the *Order*. Doc. 1.

On March 20, 2024, IMC petitioned the Commission for a partial stay of the *Order* pending judicial review. A191. The Commission has not acted on that request. On April 3, 2024, following the Commission's inaction, IMC moved this Court to stay the *Order* pending this appeal. Doc. 20. In support of its stay request, IMC submitted declarations from two of its members—Ideal Concepts, Inc. and Blue Ink Digital—describing the effects the *Order* is having and will continue to have on their businesses. *See* Doc. 20-2; Doc. 20-3.

Ideal Concepts explained that the leads it purchases "are essential to its business," but if the *Order* takes effect, all of Ideal Concepts' existing leads will "become worthless," even though they were obtained in good-faith reliance on the Commission's existing interpretation of the TCPA. Doc. 20-2 ¶¶ 9, 11, 18. The *Order* also forces Ideal Concepts to compete on an uneven playing field against

larger companies with stronger brand identification and hinders Ideal Concepts from connecting with customers who would benefit from its services. *Id.* ¶¶ 12, 14-17. Ideal Concepts cannot offset these loses by placing live calls (rather than automated calls) with its existing leads because automated calls permit agents responding to consumer inquiries "to bypass the time spent dialing each of the calls and waiting as the phone rings to see whether anyone answers," thus allowing agents to "handle inquiries from many more prospective customers in a given day." Doc. 26-2 ¶ 5.

Blue Ink Digital will face similar challenges because of the *Order*. While Blue Ink Digital currently uses its technology to match consumers with the ideal service provider after the fact (*i.e.*, after a consumer grants consent to be contacted), Blue Ink will no longer be able to do so if the *Order* takes effect. Doc. 20-3 ¶¶ 7-10. Instead, Blue Ink Digital will be forced to develop new technology that would allow it to make these matches in real-time, while consumers wait on a loading screen so that they can eventually provide consent—an inconvenience that will lead to many fewer consumers ultimately giving consent. *Id.* ¶¶ 11-13. These development costs will increase the prices of leads, making them unaffordable for many of Blue Ink Digital's clients, most of whom are small businesses. *Id.* ¶¶ 17-19. Because these companies depend on leads to reach potential customers, many of them will exit the market due to the *Order*. *Id.*

The Commission opposed IMC's motion for a stay.  Doc. 24-1.  Briefing on IMC's motion was completed on April 22, 2024.

## SUMMARY OF ARGUMENT

The *Order* is unlawful and should be vacated in relevant part for three reasons. *First*, the *Order*'s redefinition of the term "prior express consent" for marketing calls, and only marketing calls, flouts the Commission's statutory authority twice over.  The *Order* impermissibly assigns different meanings to the statute depending on the type of call at issue, providing one definition of "prior express consent" for marketing calls and a different definition for all other types of automated calls.  By giving "th[e] same words" in a single statutory provision "different meaning[s]," the *Order* "invent[s] a statute rather than interpret[ing] one."  *Clark*, 543 U.S. at 378. Furthermore, the *Order*'s one-to-one and logically-and-topically related requirements are contrary to the ordinary meaning of "prior express consent."  For example, parties often grant consent to multiple parties through a single act, and courts (including this Court) have held that multiparty consent is valid under the TCPA.  The Commission's attempt to engraft new one-to-one and logically-and-topically-related requirements onto the TCPA's "prior express consent" provision violates the rule that agencies "may not rewrite clear statutory terms to suit [their] own sense of how the statute should operate."  *Util. Air Regul. Grp.*, 573 U.S. at 328.

*Second*, the *Order* violates the First Amendment by applying content-based discrimination against commercial marketing calls.  Marketing calls are subject to the *Order*'s additional consent requirements, but "informational calls"—including calls and texts from political campaigns and advocacy groups—are not.  Under *Barr*, strict scrutiny applies where, as here, a TCPA regulation favors some kinds of protected speech over others.  The *Order* cannot satisfy strict scrutiny because the Commission fails to show that the *Order* is an effective or appropriately tailored means of preventing unwanted automated calls.  For similar reasons, the *Order* violates the First Amendment even if intermediate scrutiny applies.

*Third*, the *Order* fails to comply with the Administrative Procedure Act's requirement of reasoned decisionmaking.  Among other flaws, the *Order* provides an inadequate basis for concluding that unwanted lead-generated calls are a significant problem; does not explain how its additional consent requirements would meaningfully reduce the number of unwanted automated calls; fails to address significant comments from IMC and others; and does not justify the devastating impact it will have on small businesses.  As Commissioner Simington explained in dissent, "the factual record" supporting the one-to-one consent requirement "is so thin" and the Commission's reasoning is "so impoverished" that the *Order* "gives every appearance of an arbitrary and capricious action."  A70.

## LEGAL STANDARD

When this Court reviews an agency order under the Hobbs Act, 28 U.S.C. § 2342, it "appl[ies] the standards from the Administrative Procedure Act." *Autauga Cnty. Emergency Mgmt. Communication Dist. v. FCC*, 17 F.4th 88, 98 (11th Cir. 2021). Under the APA, courts will "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022). An agency's legal conclusions are reviewed *de novo*. *Meisel v. SEC*, 97 F.4th 755, 761 (11th Cir. 2024).

"[A]gency action is lawful only if it rests on a consideration of the relevant factors," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the scope of review is narrow, this Court "do[es] not rubber stamp the action of the agency." *Hewitt v. Comm'r*, 21 F.4th 1336, 1342 (11th Cir. 2021). Instead, it "determine[s] whether the decision was based on a consideration of the relevant factors and whether there was a clear judgment error." *Id.*

21

**ARGUMENT**

## I. THE *ORDER*'S ADDITIONAL CONSENT REQUIREMENTS EXCEED THE COMMISSION'S STATUTORY AUTHORITY.

The *Order* redefines the term "prior express consent" for marketing calls (and *only* for marketing calls) in a way that exceeds the Commission's statutory authority twice over. *First*, the *Order* assigns different meanings to the same statutory term without any basis for doing so. *Second*, the *Order* defines "prior express consent" for marketing calls to include additional requirements—*i.e.*, that the consent be (1) obtained on a one-to-one basis and (2) logically-and-topically related to the website where it was obtained—that are not encompassed within that term's ordinary meaning. Part III.D of the *Order* is thus "not in accordance with law." 5 U.S.C. § 706(2)(A).

### A. The *Order* Impermissibly Redefines "Prior Express Consent" to Mean Two Different Things.

Generally, "an agency may not simultaneously interpret the same statute in two different ways." *Ford Motor Co. v. United States*, 715 F.3d 906, 915-16 (Fed. Cir. 2013); *see also Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019); *United States v. Bryant*, 996 F.3d 1243, 1258 (11th Cir. 2021). This presumption hardens into an outright prohibition where the agency seeks to define the same term in two different ways within a single provision. *See Clark*, 543 U.S. at 378; *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (applying

rule against "[a]scribing various meanings to a single iteration of" a statutory term (citation omitted)); *United States v. Jackson*, 55 F.4th 846, 858-59 (11th Cir. 2022) (courts "must construe the definition of" the same term in the same provision to mean the same thing); *Ryan v. United States*, 725 F.3d 623, 627 (7th Cir. 2013) (applying this rule). "'[G]iv[ing] th[e] same words [of a statute] a different meaning for each category' of cases" is "not just frowned upon but methodologically incoherent and categorically prohibited." *In re Woolsey*, 696 F.3d 1266, 1277 (10th Cir. 2012) (Gorsuch, J.) (quoting *Clark*, 543 U.S. at 371) (brackets omitted). Agencies "must," in short, "interpret the statute consistently." *Clark*, 543 U.S. at 380.

The *Order* violates that rule. According to the *Order*, before a marketer may make an automated call, it must obtain (1) one-to-one consent that is (2) logically-and-topically related to the website where consent was obtained. *Order* ¶¶ 30-36. Neither of these conditions applies to consent for political fundraising calls or any other type of automated call—even though the TCPA requires "prior express consent" to be obtained for those calls as well.

Nothing in the TCPA grants the Commission authority to define "prior express consent" in different ways depending on the type of call at issue. True, the TCPA permits the Commission to "prescribe regulations," including certain "exemptions" from the consent requirement. 47 U.S.C. § 227(b)(2). But the *Order*

23

does not invoke the Commission's authority to craft exemptions, as the Commission has done when exercising that authority in the past.[5]  Nor does the *Order* purport to redefine the term "prior express consent" generally and then promulgate an exemption negating the consent requirement for non-marketers.  Thus, the Commission may not defend (and this Court may not sustain) the *Order* on those grounds.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency").  A defense premised on the Commission's exemption authority would fail in any event because the *Order* simply provides that "prior express consent" means one thing for marketers and another very different thing for everyone else, such as political campaigns and advocacy groups.  That approach is unlawful.  *See, e.g.*, *Clark*, 543 U.S. at 378; *Jackson*, 55 F.4th at 858-59.[6]

　　　In its Opposition to IMC's stay motion, the Commission asserted that the *Order* does not adopt two definitions for "prior express consent," but merely allows

---

[5] *See 2012 Order*, 27 FCC Rcd. at 1837; *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8023 (July 10, 2015) (*2015 Order*); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8755 (Oct. 16, 1992).

[6] That the Commission has required "prior express written consent" for marketing calls since 2012 does not insulate the *Order*'s expansion of that requirement from judicial review.  *See Kennecott Utah Copper Corp. v. Dep't of the Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) ("[J]udicial review of a long-standing regulation is not barred when an agency … changes its interpretation.").

the meaning of that term to vary depending on "context." Doc. 24-1 at 15. Part III.D of the *Order* does not make this context argument; indeed, it does not even *mention* the word context. The Commission's defense is therefore barred by the *Chenery* rule. *See* 332 U.S. at 196; *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (agency action may not be sustained based on new "legal rationale").

Regardless, the context argument fails because it relies on a distinction without a difference. Allowing a statutory term's meaning to change based on "context" would swallow the rule against defining the same term differently, because an agency could always recast its decision to use multiple definitions as instead allowing that term's meaning to vary depending on considerations like the nature of the party or conduct at issue. *See, e.g.*, *Clark*, 543 U.S. at 382 (rejecting "novel interpretive approach" that "would render every statute a chameleon, its meaning subject to change" based on the circumstances of "each individual case"); *Ratzlaf*, 510 U.S. at 143 (allowing variable meaning "would open Pandora's jar"). Courts, including this one, have rightly rejected that logic. *See United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality opinion) (Supreme Court has "forcefully rejected" the notion that courts may "giv[e] the same word, *in the same statutory provision*, different meanings *in different factual contexts*." (emphasis in original)); *Cochise Consultancy*, 139 S. Ct. at 1512 (term "should [not] be read" differently "when the Government is a party"); *Bryant*, 996 F.3d at 1258 ("[W]e should not interpret" a

25

term—"which is only used in the statute once—[to have] different meanings depending on who files a motion.").[7]

### B.    The *Order* Redefines "Prior Express Consent" in a Way That Conflicts with that Term's Ordinary Meaning.

The TCPA does not define "prior express consent."  *Medley v. Dish Network, LLC*, 958 F.3d 1063, 1069-70 (11th Cir. 2020) ("[T]he TCPA is silent regarding the means of providing or revoking consent" (quotation marks omitted)).  That term should thus be given its ordinary meaning, as informed by the surrounding statutory context and the common-law understanding of what consent entails.  *See Lucoff v. Navient Sols., LLC*, 981 F.3d 1299, 1304 (11th Cir. 2020) ("We use common law principles to interpret whether a party gave … their 'prior express consent' to receive calls under the TCPA."); *Osorio*, 746 F.3d at 1255 ("Congress intended for the TCPA to incorporate the common-law meaning of consent[.]").

"Under the common law understanding of consent, the basic premise of consent is that it is given voluntarily."  *Id.* at 1253 (quotation marks omitted).  That

---

[7] Although the Commission cited several cases in support of its context argument, *see* Doc. 24-1 at 14-15, those cases assess the scope of a consumer's consent as a *factual* matter rather than the threshold *legal* interpretation of the phrase "prior express consent."  *See, e.g.*, *Schweitzer*, 866 F.3d at 1279 (analyzing scope of consumer's revocation of consent); *Blow v. Bijora, Inc.*, 855 F.3d 793, 804-05 (7th Cir. 2017) (using context to conclude that consumer consented to receive texts); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1046 (9th Cir. 2017) (similar). These cases do not support an argument that the Commission can apply different interpretations of "prior express consent" in different contexts.

understanding accords with the ordinary meaning of "express consent" as simply "[c]onsent that is clearly and unmistakably stated." *Express Consent*, *Black's Law Dictionary* (11th ed. 2019); *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (consulting Black's Law Dictionary regarding related TCPA term "prior express … permission").

This ordinary understanding of "express consent" does not encompass the additional conditions the *Order* imposes on marketing calls—*i.e.*, that consent be one-to-one and logically-and-topically related to the website where it was obtained. Express consent can be "clearly and unmistakably stated" to multiple individuals at once and on a website with no logical or topical relationship to the call being consented to. As this Court explained in *Lawrence v. Bayview Loan Servicing, LLC*, 666 F. App'x 875, 879 (11th Cir. 2016), "[n]o specific method is required under the TCPA for a caller to obtain prior consent to place automated calls."

The Ninth Circuit's decision in *Fober v. Management & Technology Consultants, LLC*, 886 F.3d 789 (9th Cir. 2018), is illustrative. *Fober* involved a TCPA claim against a company that made an automated survey call regarding healthcare issues. The court affirmed the award of summary judgment against the plaintiff because she had *agreed* that her health care provider could disclose her phone number to intermediaries for purposes of "quality improvement." *Id.* at 793. As the court noted, the TCPA "does not require any one method for obtaining 'prior

express consent.'" *Id.*   Given the principle that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary," and given the plaintiff's consent to calls from unnamed "[e]ntities" affiliated with her healthcare provider, the court concluded that the plaintiff had consented to the call. *Id.* at 791-92.

If prior express consent can be given to multiple *unnamed* intermediaries at once, as in *Fober* and as the Commission has previously concluded,[8] it follows that consent can also be given to multiple *named* intermediaries at once, contrary to the *Order*'s one-to-one consent requirement.   Indeed, this Court has already held as much regarding the related TCPA term "prior express … permission."   *See Gorss Motels*, 931 F.3d at 1100-01.   In *Gorss Motels*, hotel franchisees signed agreements that provided "prior express … permission" for marketing faxes from the franchisor's affiliates.   *Id.*   Because the franchisees "gave express permission to receive fax advertisements from affiliates," they "c[ould] not complain that an affiliate sent them that kind of information."   *Id.*   The *Order*'s one-to-one consent requirement cannot be reconciled with this precedent.

---

[8] The Commission has concluded that "a consumer's prior express consent may be obtained through and conveyed by an intermediary," such as the organizer of a group text message, in part because "Congress did not expect the TCPA to be a barrier to normal, expected, and desired business communications."   *In re GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, 29 FCC Rcd. 3442, 3444, ¶¶ 6-8 (Mar. 27, 2014).

The *Order*'s logically-and-topically related requirement strays even further from the ordinary meaning of "prior express consent."  On its face, that requirement serves only to *prevent* consumers from consenting to calls that they would like to receive.  According to the *Order*, for example, a consumer on a car loan comparison website can *never* consent to calls about loan consolidation—even if the consumer has multiple loans and unmistakably states a desire to learn about consolidating them.  *See Order* ¶ 36 n.93.  No ordinary understanding of "prior express consent" would bar a consumer from being able to consent to such a call.

The *Order* does not justify its redefinition of the term "prior express consent" for marketing calls as an ordinary interpretation of those words.  Instead, it relies on policy grounds.  *See Order* ¶¶ 30-36.  But precedent establishes that the Commission "cannot impose a limitation that Congress did not include," *Gorss Motels*, 931 F.3d at 1102, regardless of whether doing so would be good policy.  Rewriting statutory language is a job for *Congress*—not the Commission.  *See Util. Air Regul. Grp.*, 573 U.S. at 328.

In its Opposition to IMC's stay motion, the Commission argued that its reinterpretation of "prior express consent" is entitled to *Chevron* deference.  *See* Doc. 24-1 at 11-13.  Even assuming *Chevron*'s vitality,[9] the Commission's argument

---

[9] The Supreme Court is reconsidering *Chevron* in *Loper Bright Enterprises v. Raimondo*, No. 22-451, and *Relentless, Inc. v. Department of Commerce*, No. 22-1219.

29

fails. *Chevron* applies where a statute is "ambiguous" and the agency's interpretation is "reasonable." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984). Neither condition is met here.

While the TCPA does not define "prior express consent," that term is not ambiguous. Courts find ambiguity only "after employing the traditional tools of statutory interpretation." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 739 (2022). As just discussed, those tools confirm that "express consent" means "consent that is clearly and unmistakably stated," and precedent confirms that such consent can be given to more than one party at a time, and for more than one topic.

Furthermore, even if "prior express consent" were ambiguous (it is not), it unambiguously does *not* encompass the *Order*'s additional requirements. There is no basis to conclude that the phrase "prior express consent"—standing alone— provides the Commission carte blanche to restrict consumers' ability to receive information they have affirmatively requested or on businesses' ability to provide that information. As this Court has recognized, "the basic premise of consent is that it is 'given voluntarily,'" *Osorio*, 746 F.3d at 1253, and the Commission's interpretation cannot place excessive restrictions on that concept. *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 493 n.1 (2012) (Scalia, J., concurring) ("It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'").

## II.    THE *ORDER*'S DISCRIMINATION AGAINST MARKETING CALLS VIOLATES THE FIRST AMENDMENT.

The *Order* should also be set aside because it imposes content-based discrimination on marketing calls in violation of the First Amendment.  By applying more rigorous consent requirements to marketing calls than to other types of calls, the *Order* unconstitutionally infringes on the speech of performance marketers and service providers like IMC's members.

### A.    The *Order* Is a Content-Based Restriction That Fails Under Strict Scrutiny.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163.[10]  "[T]his standard, known as strict scrutiny, is a notoriously difficult test, one that few laws survive."  *Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024); *see also United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000).  Where strict scrutiny applies, the Commission "carries the burden of proof and, 'because it bears the risk of uncertainty, ambiguous proof will not' satisfy the 'demanding standard' it must meet."  *Otto v. City of Boca*

---

[10] "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.*

*Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011))).

The *Order* is a content-based regulation subject to strict scrutiny. Its one-to-one consent and logically-and-topically-related requirements only restrict marketing calls and do not apply to other types of solicitations (*e.g.*, requests for donations to political campaigns or charities) or so-called "informational calls,"—a category the Commission interprets to include "calls by or on behalf of tax-exempt non-profit organizations; calls for political purposes, including political polling calls and other calls made by politicians or political calling campaigns; and calls made for other noncommercial purposes." *2012 Order*, 27 FCC Rcd. at 1837; *see also* 47 C.F.R. § 64.1200(a)(3). In other words, the *Order* disfavors some types of automated calls—marketing calls—solely based on the "topic discussed" in those calls. *Reed*, 576 U.S. at 163. Indeed, the Commission would be forced to "'examine the content of the message that is conveyed' to know whether" a call is subject to the *Order*. *Otto*, 981 F.3d at 862 (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)).

The Supreme Court has already recognized that this type of classification is content based. In *Barr*, the Court held that the TCPA's government-debt exception (which excepts calls to recover debts owed to the federal government from the prior express consent requirement) is a content-based regulation of speech. 140 S. Ct. at 2347 (plurality opinion). That statute's treatment of calls turns on "whether the

32

caller is *speaking* about a particular topic," which "is about as content-based as it gets."  *Id.* at 2346-47 (emphasis in original).  Because the government-debt exception favors government-debt collection calls over "other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, *commercial advertising*, and the like," it had to satisfy strict scrutiny (which the Government conceded it could not).  *Id.* (emphasis added).

In its Opposition to IMC's stay motion, the Commission argued that strict scrutiny does not apply here because the *Order* favors *non-commercial* speech over *commercial* speech.  The Commission based this argument on *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), which according to the Commission "disclaim[s]" IMC's "reading" of *Barr*.  Doc. 24-1 at 22.  But *City of Austin* never even mentions *Barr*.  Instead, *City of Austin* reaffirms that regulation of *all* solicitations—*e.g.*, a restriction that "applie[s] evenhandedly to all who wish … to solicit funds, *whether for commercial or charitable reasons*"—is content-neutral, whereas regulation of only *some* solicitations is content-based.  596 U.S. at 72-73 (emphasis added).  Because the *Order* does not apply its additional consent requirements to all solicitations, but only to commercial marketing calls, it is content-based and subject to strict scrutiny.[11]

---

[11] To the extent dicta in *Dana's Railroad Supply v. Attorney General*, 807 F.3d 1235 (11th Cir. 2015), suggests that intermediate scrutiny applies to content-based (continued…)

The *Order* cannot satisfy strict scrutiny.  Even assuming that the Commission has a compelling interest in restricting unwanted automated calls generally, the Commission has failed to show either that unwanted lead-generated calls involving legitimate businesses like IMC's members are a genuine problem or that discriminating against marketing calls would be a narrowly tailored way of addressing that problem if it existed.  The *Order* is thus unconstitutional as applied to IMC and its members.

*First*, the *Order* contains no evidence that unwanted marketing calls resulting from comparison shopping websites are especially common.  In fact, the *Order*'s only support for the idea that "[l]ead-generated communications are a large percentage of unwanted calls and texts," *Order* ¶ 30 & n.68, is a single citation to a comment letter that itself includes no evidence about the prevalence of such calls, *see supra* pp. 14-15.  This barebones statement is not a sufficient basis for restrictions that target *only* marketing calls.  *See Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 760 (1996) (finding record insufficient to justify statute and corresponding Commission regulations that were "overly restrictive, sacrificing important First Amendment interests for too speculative a gain" (cleaned up)).

---

restrictions on commercial speech, it is not binding and has been superseded by *Barr* and *City of Austin*. *Id.* at 1246 (declining to answer what level of scrutiny applied where regulation "collapses under any level of heightened scrutiny").

In its Opposition to IMC's stay motion, the Commission suggested that the prevalence of unwanted lead-generated calls is supported by a letter from state attorneys general asserting that, by "requesting an insurance quote," an "unwitting consumer" could receive "thousands upon thousands" of automated calls. Doc. 24-1 at 7. But that letter does not show that consumers *actually* receive thousands of calls from a single instance of consent. Instead, the letter notes only that one *particular* company listed over 2,000 marketing partners and speculates that, if the company sold a lead to *all of* those partners, and if *all of* those partners made an automated call, an individual could theoretically receive thousands of calls. Such "mere conjecture" is not "adequate to carry a First Amendment burden." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (cleaned up). Nor is that how IMC's members actually operate. *See* Doc. 20-3 ¶¶ 7-9; *see also infra* pp. 46-47.

The *Order* likewise fails to explain how its requirements would reduce the number of unwanted automated calls. *See* A70 ("[T]he factual record on the question" of how mandating "1-to-1 consent" will ward off unwanted automated calls is "thin" and its "reasoning" is "impoverished"); *see also infra* pp. 44-46. The *Order*'s inability to establish that lead-generated calls are a significant portion of unwanted calls is fatal to its conclusion that closing the so-called "lead-generator loophole" will result in fewer unwanted calls. Tellingly, the *Order* does not even attempt to quantify the percentage of lead-generated calls that is alleged to be

35

unwanted or the extent to which the new regulations would reduce the volume of unwanted calls. Even if the *Order* would reduce the number of unwanted calls by some unknown amount, that would still not be enough to justify content-based discrimination against marketing calls. *See Brown*, 564 U.S. at 803 n.9 ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced.").

*Second*, the *Order* is both over- and under-inclusive. *See Brown*, 564 U.S. at 805 (laws subject to strict scrutiny "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"). The *Order* is overinclusive because many calls affected by its redefinition of "prior express consent" are in fact *wanted* by the consumer that authorizes them. *See, e.g.*, A127 & n.16; *see also Schweitzer*, 866 F.3d at 1276 ("The TCPA … is designed to protect consumers from receiving *unwanted* and intrusive telephone calls." (emphasis added)); *Fober*, 886 F.3d at 792 (TCPA "aims to curb a particular type of *uninvited* call" and "omits from its ambit those calls that a person agrees to receive") (emphasis in original).

For example, consumers can currently authorize comparison shopping websites to match them with service providers who meet their needs, and performance marketers use their technology and expertise to select the best matches. *See* A106-07; Doc. 20-3 ¶¶ 7-8; Doc. 20-2 ¶¶ 15-16. But under the *Order*'s one-to-one consent requirement, performance marketers can no longer perform this

36

mutually beneficial matching process unless they develop new technology that makes the match in real-time while the consumer waits on a loading screen, so that the consumer can provide consent separately for each selected business—a step many consumers inevitably will not take. Doc. 20-3 ¶ 12. By limiting automated marketing calls to instances where consumers have individually consented to each service provider, the *Order* prohibits calls for which customers have given their "prior express consent" under any ordinary meaning of that term. *See supra* pp. 26-28.

The *Order* is also underinclusive because the one-to-one consent and logically-and-topically-related restrictions only target *marketing* calls and do nothing to prevent unwanted informational calls, such as barrages of calls and text messages from political organizations. *See supra* pp. 15-16. Put differently, the *Order* fails to advance its stated interest in preventing unwanted calls because "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)); *see also Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and

putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all.").

Here, the *Order* only affects one category of automated calls—commercial marketing calls—even though the legislative findings in support of the TCPA confirm that Americans "consider [unwanted] automated or prerecorded telephone calls, *regardless of the content or the initiator of the message*, to be a nuisance and an invasion of privacy." 137 Cong. Rec. H11307-01, 1991 WL 250340, at *1 (Nov. 2, 1991) (emphasis added). Indeed, the *Order* does not explain why its heightened consent requirements apply only to marketing calls and not to "informational" calls from political committees, advocacy groups, fundraisers, or similar entities. *See Reed*, 576 U.S. at 172 (striking down law differentiating between different types of street signs because its "distinctions" were "hopelessly underinclusive," as "[t]he Town has offered no reason to believe that directional signs pose a greater threat to safety than do ideological or political signs"). "By singling out" automated marketing calls for new restrictions, the *Order* "leaves consumers open to an 'unlimited proliferation' of robocalls on other topics" that would present the same purported harms cited by the Commission. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1229 (9th Cir. 2019); *see also Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015).

*Third*, there were numerous less-restrictive measures (some of which are content neutral) that the Commission could have adopted to address its concerns about unwanted automated calls. *See Playboy*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."). To rebut these alternatives, the Commission was required to "point to evidence in the … record or present other evidence that demonstrates why the challenged restriction, rather than a less restrictive alternative, is necessary to further its significant interests." *Victory Processing*, 937 F.3d at 1228 (citing *Playboy*, 529 U.S. at 820-22).

For instance, IMC proposed requiring prior express consent agreements to clearly and conspicuously disclose, in advance: (1) the number of callers who may rely on a single provision of consent; (2) the maximum time period after consent is given during which calls may be made; and (3) the types of goods or services that may be offered on such calls. *See* A178. Other commenters also provided suggestions, such as permitting website operators to collect TCPA consent at an initial step (when the consumer submits an inquiry) and disclose the specific service providers after performance marketers have completed the matching process. *See* A160-61 (describing "Matched Consent Notice" process through which "a

consumer's consent will apply only to those entities identified … to the consumer once the matching process occurs"); A112 (similar).

The *Order* does not meaningfully address most of these alternatives,[12] nor does it otherwise explain why clear and conspicuous disclosures would not satisfy the Commission's interest in limiting unwanted calls while still permitting comparison shopping websites to match consumers with service providers in an efficient manner. The Commission's failure to adopt these alternatives—or explain why they are not adequate—dooms any argument that the *Order* is narrowly tailored. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) ("Absent a showing that the proposed less restrictive alternative would not be as effective, … the more restrictive option … could not survive strict scrutiny."); *Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use [it]."); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017) (invalidating law that "disregarded numerous and obvious less-burdensome alternatives").[13]

---

[12] The *Order* rejects IMC's proposal for clear and conspicuous disclosures in a cursory footnote without substantive reasoning. *Order* ¶ 34 n.85. As for QuinStreet's match notice proposal, the Commission believed it would require consumers to consent to calls from potentially irrelevant entities. *Order* ¶ 33. That rationale overlooks the evidence showing that matching systems seek to connect consumers with the most relevant service providers. *See, e.g.*, A160-61.

[13] The Commission cannot save the *Order* by offering new rationales for why those less-restrictive alternatives would not suffice. *See Chenery*, 332 U.S. at 196.

### B.    Alternatively, the *Order* Fails Intermediate Scrutiny.

Even if the *Order* were assessed under the commercial-speech doctrine, it would still be unconstitutional.  When that doctrine applies, the government must show that its asserted interest is "substantial" and that its regulation of commercial speech "directly advances" and "is not more extensive than is necessary to serve that interest."  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  Even assuming that the Commission has a substantial interest in restricting *unwanted* automated calls, the Commission "must do more than simply posit the existence of the disease sought to be cured."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion).  It also "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Id.*; *see also Wollschlaeger v. Governor*, 848 F.3d 1293, 1312 (11th Cir. 2017) (en banc) (adopting *Turner*'s standard).  The Commission further must show that "less restrictive means would fail," *United States v. Philip Morris USA Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017); it "cannot rest on 'speculation or conjecture.'"  *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526 (D.C. Cir. 2015) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).  As with strict scrutiny, "the burden is on the government to produce evidence to support its restriction."  *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1236 (11th Cir. 2017).

The Commission has not carried that burden. As explained above, the *Order* does not show that lead-generated calls represent "a large percentage" of unwanted automated calls. *See supra* pp. 14-15. This failure alone dooms the *Order*'s new mandates, because "[t]he requirement to produce evidence is essential, otherwise [the government] could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Ocheesee Creamery*, 851 F.3d at 1236 (cleaned up).

The Commission has also failed to show that its additional consent requirements are not more extensive than necessary to serve its interest in preventing unwanted calls. While the commercial-speech doctrine does not require the least-restrictive means, it does not permit "completely disregarding obvious less-burdensome alternatives." *FF Cosmetics FL*, 866 F.3d at 1300. As shown above, IMC and other commenters presented less burdensome alternatives that could have reduced the number of unwanted calls while still protecting commercial speech. *See supra* pp. 38-40. Rather than explaining why those alternatives would not serve its interests, the Commission plowed ahead with its more restrictive proposal. When the government "ignor[es] far less restrictive and precise means, it is likely that [a regulation] burdens substantially more speech than necessary." *FF Cosmetics FL*, 866 F.3d at 1301 (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 479

(1989)); *see also Ocheesee Creamery*, 851 F.3d at 1240 (similar).  Because that is what the Commission did here, the *Order* cannot satisfy intermediate scrutiny.

### III.    THE *ORDER* IS ARBITRARY AND CAPRICIOUS.

The *Order*'s additional consent regulations should also be vacated because they are arbitrary, capricious, and unsupported by the record.  5 U.S.C. § 706(2)(A).  The Administrative Procedure Act requires reasoned decisionmaking:  The Commission must provide a reasoned justification for the choices it has made and offer meaningful responses to material comments (*i.e.*, comments that, if credited, would justify a change in the *Order*).  *See State Farm*, 463 U.S. at 43; *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015).  "If the record before the agency does not support the" *Order*, or "if the agency has not considered all relevant factors," the *Order* is arbitrary and capricious.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 244 (1985); *see Bidi Vapor*, 47 F.4th at 1202.

Here, the *Order* fails the requirements of reasoned decisionmaking in three key respects:  the *Order* (1) provides an inadequate factual basis for concluding that unwanted lead-generated calls are a significant problem or that the new restrictions will address the problem; (2) neglects to meaningfully respond to material comments; and (3) fails to justify the devastating impact it will have on small businesses.

**A.    The *Order* Fails to Show That Unwanted Lead-Generated Calls Are a Significant Problem or That the New Consent Restrictions Will Meaningfully Reduce the Number of Unwanted Automated Calls.**

The record does not support the Commission's conclusions that lead-generated calls represent a significant proportion of all unwanted automated calls, and that the *Order*'s new restrictions would meaningfully address the number of unwanted automated calls.

The entire basis for the *Order*'s one-to-one-consent and logically-and-topically-related restrictions is its premise that "lead-generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts." *Order* ¶ 30. But remarkably, the *only* evidence the *Order* points to in support of that proposition is USTelecom's comments. *Id.* ¶ 30 n.68. As discussed above, *supra* pp. 14-15, the lone paragraph USTelecom devotes to this issue provides no evidence about the prevalence of unwanted lead-generated automated calls. USTelecom's comments identify only a single enforcement action concerning the lack of valid consent for lead-generated marketing calls, which involved a fraudulent overseas entity. *See* A146; *supra* pp. 14-15. In other words, the *Order* does not identify *a single instance*

44

in which a comparison shopping website abused consumers' consent through the so-called "lead generator loophole."[14]

The *Order* makes a similar error in asserting that its one-to-one consent requirement will (1) "end the current practice of consumers receiving" unwanted calls "from tens, or hundreds, of sellers—numbers that most reasonable consumers would not expect to receive," *Order* ¶ 31; and (2) "stop the practice of buried, barely visible disclosures that … appear in fine print on a website or [are] only accessible through a hyperlink, burdening the consumer with yet another step to be fully informed," *id.* ¶ 32. Once again, the *Order* provides nothing but conjecture to support these assertions.

There is zero evidence that, under the pre-*Order* consent rules, consumers who provided consent on comparison shopping websites received "tens" or "hundreds" of calls as a result. And there is significant evidence that this is *not* how comparison shopping websites operate. *See* A187 (LendingTree "matches consumers with up to five (5) named entities that have the best offers for the criteria provided by the consumer during the match process"); Doc. 20-3 ¶¶ 7-9 (Blue Ink

---

[14] The *Order*'s citations to sources describing hyperlinked lists, *see Order* ¶¶ 30-31 nn.70-72, do not establish that lead generation websites have used those lists to *actually place* a substantial volume of unwanted calls. As a result, these sources cannot fill the void left by the USTelecom letter.

Digital "sell[s] each lead to only one service provider").[15]    Instead, as the Commission has recognized, "a significant portion, if not the majority," of unwanted automated calls originate from overseas bad actors that make no effort to comply with the TCPA and cannot be expected to abide by the *Order*.  FCC, *Report to Congress*, 2022 WL 17958839, at *6; *see also supra* pp. 8, 15.  IMC and others made this point repeatedly during the rulemaking proceeding, explaining that the one-to-one consent requirement "will not make a dent in the overall volume of unwanted calls and texts" because "[s]cammers that bombard consumers with unsolicited calls and texts will continue their bombardment."  A181; *see also* A127.  Commissioner Simington did so as well, observing that bad actors are not "conscientious respecters of regulation" and they do not "buy leads."  A70; *see also id.* (discussing "abusive behaviors" by entities like an "offshore Cayman-funded organization with a call center in Belize" that ignores the TCPA's requirements).    But despite the Commission's awareness of the true problem, the *Order* does not consider the effect

---

[15] *See also* A180 ("[I]t is common practice in the Insurance industry for contracts between sellers and performance marketers to expressly prohibit or limit other calls to a consumer based on a single [consent] agreement.  The number of potential marketing partners on a list thus cannot be used to assume the number of potential callers that may contact the consumer based on the [consent] agreement.  The reason for the lengthy list of potential sellers" is "to [address] compliance concerns." (citations omitted)); A124-25 & nn.8-9 (performance marketers exist to bridge gaps because "there is no simple, universal way to connect" all the publishers, advertisers, and consumers in many consumer-services markets).

of these overseas robocalls, and thus overlooks "an important aspect of the problem." *State Farm*, 463 U.S. at 43.

As Commissioner Simington summarized, "the factual record on the question" whether the "1-to-1 consent" requirement is warranted "is so thin, and the Report and Order so impoverished in its reasoning … that it gives every appearance of an arbitrary and capricious action."  A70.  Absent a more concrete basis for concluding that lead-generated marketing calls are a meaningful problem or that the *Order*'s restrictions will help solve the problem, the Commission's decision to impose its burdensome new consent requirements on these calls (and only these calls) is arbitrary and capricious.  *See NLRB v. Fla. Steel Corp.*, 586 F.2d 436, 445 (5th Cir. 1978) (administrative findings "based on pure speculation, conjecture, and surmise" violate the Administrative Procedure Act);[16] *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113 (D.C. Cir. 2019) (vacating rule after Commission "referred to no evidence" to support its decision); *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 707-09 (D.C. Cir. 2014) (vacating rule where Commission relied on "speculation" and "offer[ed] no evidence suggesting there [wa]s fraud to deter" or that rule's mandate would deter fraud).

---

[16] This pre-1981 Fifth Circuit decision is binding precedent in this Court.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

**B.     The *Order* Does Not Meaningfully Respond to IMC's Comments or Adequately Consider Alternatives.**

The *Order* is also arbitrary and capricious because it fails to meaningfully address the concerns raised in comments from interested parties, including IMC. Agencies have a duty to consider and meaningfully respond to comments during the rulemaking. *See Hewitt*, 21 F.4th at 1342.[17] It is not enough that an agency merely *respond* to comments. Instead, "it must respond *in a reasoned manner*" by "explain[ing] how the agency resolved any significant problems raised by the comments" and "show[ing] how that resolution led the agency to the ultimate rule." *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) (quotation marks omitted, emphasis added); *see also Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022) (similar). In addition, the agency is "required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (citation omitted).

The *Order* does not adequately address two sets of comments: IMC's comments about the breadth of the logically-and-topically-related requirement, and the comments by IMC and others proposing less-restrictive alternatives.

---

[17] The Commission cannot cure this omission by offering new rationales during litigation. *See Chenery*, 332 U.S. at 196.

On the logically-and-topically-related requirement, IMC explained that the *Order* "mandate[s] an arbitrary nexus between a website's general content and other content (including, for example, an advertising webform) that is presented on that website." A178. Under the *Order*, "a consumer could *never* be permitted to provide consent to receive calls about loan consolidation simply due to the fact that the website generally promotes loan comparison." *Id.* The *Order* offers only a flawed tautology in response: the Commission "disagrees with IMC's contention that on a loan comparison website a consumer can be solicited about loan consolidation," because "a consumer giving consent on a car loan comparison shopping website does not consent to" calls "about loan consolidation." *Order* ¶ 36 & n.93. But that tautology ignores IMC's key point. If consumers on a car loan comparison website are *asked* whether they are interested in receiving an automated call about loan consolidation—and expressly state that they *are* interested in receiving such a call— there is no basis to conclude that the consumers have nevertheless failed to provide valid consent simply because the website concerns car loans.

The *Order* also failed to adequately consider the less-restrictive alternatives proposed by IMC and others. For example, the Commission summarily dismissed IMC's proposal to require clear, *ex ante* disclosure of the number of callers who may rely on a single provision of consent, the maximum period after consent is given during which calls may be made, and the types of goods and services that may be

offered on such calls. *Order* ¶ 34 n.85; *see supra* pp. 38-40. The *Order* suggests that limiting the number of sellers a comparison shopping website can list—a proposal different than IMC's proposal—would not "provide consumers with sufficient control" and would otherwise limit businesses' decisions about how to operate their websites. *Order* ¶ 34. But the *Order* does not address why IMC's proposal—which would include a time limit on automated calls and restrict the types of goods and services those calls could feature—would not address the Commission's concerns about consumers retaining sufficient control. Nor does the *Order* meaningfully address other comments offering alternative approaches that would increase consumer control while permitting performance marketers to continue matching consumers with the businesses best suited to their needs. *See* A160-61, A112; *supra* pp. 38-40. The Commission's failure to meaningfully address these comments renders the *Order* arbitrary and capricious.

### C.    The *Order* Ignores Its Impact on Small Businesses.

Finally, the *Order* fails to justify its adverse impact on small businesses. The Regulatory Flexibility Act requires the Commission to consider the effect of its regulations on small businesses, including by consulting with SBA and responding to its concerns. *See* 5 U.S.C. § 604. While the Regulatory Flexibility Act itself "does not permit judicial review," the fact that a rule subject to the Act would have "a great impact on small businesses" can "weigh in [the] determination that a

regulation is arbitrary, capricious, or contrary to law." *Nat'l Truck Equip. Ass'n v. NHTSA*, 919 F.2d 1148, 1157 (6th Cir. 1990). In other words, the "require[ment] that a rule's impact on small businesses be reasonable and reasonably explained … is, for APA purposes, part of an agency's explanation for its rule," and thus a basis for concluding that the rule is arbitrary and capricious. *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).

Here, SBA expressed deep reservations about the *Order*. Specifically, SBA cited "unease" among small businesses "regarding their future ability [under the *Order*] to purchase affordable sales leads, compared to larger entities." A176. SBA thus asked the Commission to seek additional comment from small entities about the one-to-one consent rule, and to "conduct a more extensive analysis of the economic impact the proposal could have on small entities before" finalizing the *Order*. These steps were necessary, SBA reasoned, because the Commission's regulatory analyses "underestimate[d] the impact that the [*Order*] would have on small entities." *Id.* Commissioner Simington echoed these concerns, explaining that the *Order* will "break the backs of American small business that rely on lead generation," and suggesting that the *Order* "fail[s] regulatory flexibility analysis" because it does not "account for the impact this action will have on small American businesses." A70. And Senators Tillis and Blackburn also explained to the Commission that comparison shopping "allows smaller businesses to compete on a level field against

larger entities," and that "[t]he American consumer wins from this competitive enterprise." A189.

The Commission rebuffed SBA's requests, adopting the *Order* without any material modifications. The *Order* offers two justifications for that obstinate approach. *First*, in the Commission's view, small businesses "can obtain the requisite consent" by "using easily-implemented methods," such as "offer[ing] a check box list that allows the consumer to choose each seller that they wish to hear from." *Order* ¶ 41. *Second*, the Commission suggests the *Order* does not "restrict the ability of businesses, including small businesses, from relying on leads generated by third party lead generators" because they can make manual calls, rather than automated calls. *Id.* ¶ 39.

Neither of these rationales holds water. As IMC's comments explained, small businesses cannot compete in a single seller consent market. *See* A97, A152-53. Requiring consumers to provide individual consent for each potential caller would inevitably result in consumers choosing large, recognizable brands over smaller companies because, as Senators Tillis and Blackburn pointed out, consumers "may not know about and, resultingly, have not previously considered [smaller and midsize businesses'] offerings." A189; *see also* A133 & n.26. The *Order*'s scheme would also burden consumers by requiring them to research and understand the offerings of each smaller service provider before providing consent, resulting in

fewer consumers benefiting from competition between multiple service providers seeking their business. *See supra* pp. 9-10. These increased transaction costs will choke off small businesses' access to potential customers and eventually force small businesses to lay off workers or leave the market altogether. A76, A174.

The *Order* never grapples with these problems and seeks to excuse that omission by opening a new round of comments about ways the Commission *might* alleviate the *Order*'s effects on small businesses. *See Order* ¶ 87. That "maybe later" approach is inadequate. Under the Administrative Procedure Act, the Commission was required to address "important aspect[s] of the problem" *in the Order* itself, *see State Farm*, 463 U.S. at 43, not in a future, hypothetical further action. Indeed, allowing agencies to defer analysis of challenging issues to future proceedings would eviscerate the duty of reasoned decisionmaking.

The Commission also misses the mark in suggesting that small businesses could easily adapt to the *Order* by switching from automated to manual calls. Automated calls allow small businesses in particular—which otherwise would lack the required personnel and resources—to reach many more potential customers than they could with manual calling alone, thus allowing them to compete with larger, more established rivals. *See* Doc. 26-1 at 11; Doc. 26-2 ¶ 5. The *Order* "recogniz[es] that" its requirements "may impact some business models more than others," *Order* ¶ 47, but does not even attempt to marshal evidence showing that

switching to manual calls would be a viable approach for small businesses.  Instead, the Commission's rationale consists of pure *ipse dixit*—and is thus arbitrary and capricious.  *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) ("We do not defer to an agency's conclusory or unsupported suppositions." (quotation marks omitted)).

### D.    This Court Should Vacate Part III.D of the *Order*.

Because Part III.D of the *Order* is arbitrary and capricious, the Court should vacate it.  As this Court has recognized, "vacatur is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).  And while courts occasionally remand a deficient order without vacatur, they only do so after considering "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Id.* (citation omitted); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (remand without vacatur is reserved for "rare cases").

Vacatur is the appropriate remedy here.  As explained above, the challenged regulations suffer from several defects, including that the Commission failed to consider important issues presented by the *Order*, lacked supporting evidence for its conclusions, did not meaningfully respond to significant comments and alternatives, and ignored the *Order*'s effect on small businesses.  Those deficiencies are serious

not only because they are numerous, but also because they concern foundational aspects of the *Order*, such as whether lead generation poses a problem worthy of regulation in the first place and whether the new rules would do anything to cure that problem if it existed. *See Sorenson Communications*, 755 F.3d at 707-10 (vacating rule for similar reasons). Vacatur of Part III.D would also be the less disruptive course because it would avoid the *Order*'s devastating effects on regulated businesses, *see* Doc. 20-2 ¶¶ 23-24; Doc. 20-3 ¶¶ 22-23, while still leaving all of the *Order*'s other provisions and the Commission's preexisting enforcement tools intact.[18] IMC's members structured their businesses around that preexisting regulatory framework, which has been in place since 2012, *see* Doc. 20-2 ¶¶ 10-11, 18-19; Doc. 20-3 ¶ 16, and the Commission's decision to delay Part III.D's effective date by one year (until January 2025) suggests that vacating the challenged regulations would not hinder the Commission's TCPA enforcement efforts.

## CONCLUSION

The Court should grant IMC's petition for review and vacate Part III.D of the *Order* and the corresponding revisions to 47 C.F.R. § 64.1200.

---

[18] *See* FCC, *Unwanted Communications* (July 19, 2022), https://www.fcc.gov/enforcement/topics/unwanted-communications (describing Commission's existing TCPA enforcement efforts).

Respectfully Submitted,

*/s/ Kevin King*
Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488
kking@cov.com

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

May 15, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

| | | |
|---|---|---|
| INSURANCE MARKETING COALITION LIMITED, | ) ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | No. 24-10277 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | ) ) ) ) | |
| *Respondents*. | ) ) ) | |

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 12,863 words. I further certify that the brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman font.

*/s/ Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

May 15, 2024

# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

**Statutes**

5 U.S.C. § 706      Scope of Review ............................................................ADD-1

47 U.S.C. § 227    Restrictions on use of telephone equipment ...................ADD-2

47 U.S.C. § 402    Judicial review of Commission's orders and decisions....ADD-5

**Regulations**

47 C.F.R. § 64.1200   Delivery restrictions. ..................................................ADD-6

**5 U.S.C. § 706**          **Scope of Review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**47 U.S.C. § 227**     **Restrictions on use of telephone equipment**

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

\*          \*          \*

(2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

> (A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

> (B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

>> (i) calls that are not made for a commercial purpose; and

>> (ii) such classes or categories of calls made for commercial purposes as the Commission determines—

>>> (I) will not adversely affect the privacy rights that this section is intended to protect; and

>>> (II) do not include the transmission of any unsolicited advertisement;

\*            \*            \*

> (I) shall ensure that any exemption under subparagraph (B) or (C) contains requirements for calls made in reliance on the exemption with respect to—

>> (i) the classes of parties that may make such calls;

>> (ii) the classes of parties that may be called; and

>> (iii) the number of such calls that a calling party may make to a particular called party.

(3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

ADD-3

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

(4) Civil forfeiture

(A) In general

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title.

(B) Violation with intent

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection with the intent to cause such violation shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be equal to an amount determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title plus an additional penalty not to exceed $10,000.

\*          \*          \*

**47 U.S.C. § 402**          **Judicial review of Commission's orders and decisions**

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

**47 C.F.R. § 64.1200        Delivery restrictions.**

(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

*              *              *

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message that includes or introduces an advertisement or constitutes telemarketing without the prior express written consent of the called party, or that exceeds the applicable numerical limitation on calls identified in paragraphs (a)(3)(ii) through (v) of this section without the prior express consent of the called party. A telephone

call to any residential line using an artificial or prerecorded voice to deliver a message requires no consent if the call:

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103, and the caller makes no more than one call per day to each patient's residential line, up to a maximum of three calls combined per week to each patient's residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section.

\*          \*          \*

(f) As used in this section:

\*          \*          \*

(9) The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the

signatory authorizes such advertisements or telemarketing messages to be delivered.

    (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

        (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

        (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

    *       *       *