No. 24-10277

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

INSURANCE MARKETING COALITION LIMITED,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

_____

## APPENDIX OF PETITIONER
## INSURANCE MARKETING COALITION LIMITED

_____

<div style="margin-left:50%">

Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
kking@cov.com

*Counsel for Insurance Marketing
Coalition Ltd.*

</div>

May 15, 2024

# INDEX TO APPENDIX OF
# PETITIONER INSURANCE MARKETING COALTITION LTD.

| Document | Tab Number | App. Page |
|---|---|---|
| Second Report and Order, *In re Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Dkt. Nos. 21-402, 02-278, 17-59 (Dec. 18, 2023) (*Order*) | A | A1 |
| Comments of SolarReviews (Apr. 19, 2023) | B | A73 |
| Comments of Insurance Marketing Coalition Ltd. (May 8, 2023) | C | A90 |
| Comments of LendingTree, LLC (May 8, 2023) | D | A99 |
| Comments of QuinStreet, Inc. (May 8, 2023) | E | A118 |
| Comments of USTelecom – The Broadband Association (May 8, 2023) | F | A145 |
| Reply Comments of Insurance Marketing Coalition Ltd. (June 6, 2023) | G | A151 |
| Letter from Yaron Dori, Counsel to QuinStreet, Inc., to Marlene H. Dortch (Aug. 30, 2023) | H | A158 |
| Letter from Luke Bell, Zillow Group, to Marlene H. Dortch, FCC (Oct. 27, 2023) | I | A169 |
| Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, FCC (Nov. 16, 2023) | J | A173 |
| Letter from Major L. Clark III, U.S. Small Business Administration, to Marlene H. Dortch, FCC (Dec. 1, 2023) | K | A175 |
| Letter from Insurance Marketing Coalition Ltd., to FCC (Dec. 6, 2023) | L | A177 |
| Letter from Steven A. Augustino, Counsel to LendingTree, LLC, to Marlene H. Dortch, FCC (Dec. 6, 2023) | M | A186 |
| Letter from Senator Thom Tillis and Senator Marsha Blackburn, to Chairwoman Jessica Rosenworcel, FCC (Dec. 6, 2023) | N | A188 |
| Petition of Insurance Marketing Coalition, Ltd. for Partial Stay Pending Judicial Review (Mar. 20, 2024) | O | A191 |

# TAB A

Second Report and Order, *In re Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Dkt. Nos. 21-402, 02-278, 17-59 (Dec. 18, 2023) (*Order*)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Advanced Methods to Target and Eliminate | ) | CG Docket No. 17-59 |
| Unlawful Robocalls | ) | |
| | ) | |
| | ) | |
| | ) | |

**SECOND REPORT AND ORDER,**
**SECOND FURTHER NOTICE OF PROPOSED RULEMAKING IN CG DOCKET NOS. 02-278**
**AND 21-402, AND WAIVER ORDER IN CG DOCKET NO. 17-59**

**Adopted:  December 13, 2023**                    **Released:  December 18, 2023**

**Comment Date:  [30 days after Federal Register publication]**
**Reply Date:  [45 days after Federal Register publication]**

By the Commission:  Chairwoman Rosenworcel and Commissioners Starks and Gomez issuing separate statements; Commissioner Simington approve in part, dissent in part and issuing a separate statement.

**TABLE OF CONTENTS**

Heading                                                                     Paragraph #

I.   INTRODUCTION ................................................................................................................1
II.  BACKGROUND ................................................................................................................5
     A.  The Commission's Multi-Pronged Approach to Unwanted and Illegal Calls ................7
     B.  Combating Unwanted and Illegal Texts ......................................................................12
III. SECOND REPORT AND ORDER....................................................................................14
     A.  Mandatory Blocking Following Commission Notification ..........................................16
     B.  National Do-Not-Call Registry ..................................................................................26
     C.  Email-to-Text Messages ............................................................................................29
     D.  Closing the Lead Generator Loophole ........................................................................30
     E.  Text Message Authentication and Spoofing ................................................................54
     F.  Summary of Benefits and Costs ..................................................................................56
     G.  Legal Authority .........................................................................................................62
IV.  SECOND FURTHER NOTICE OF PROPOSED RULEMAKING ......................................67
     A.  Text Blocking ...........................................................................................................68
         1.  Expanding the Mandatory Text Blocking Requirement to Originating Providers and

           Adding a Downstream Provider Blocking Requirement .........................................69
      2.  Requiring Blocking of Texts Based on Reasonable Analytics ...............................75
      3.  Alternative Approaches ........................................................................................79
      4.  Protections Against Erroneous Blocking .............................................................80
   B.  Text Message Authentication .....................................................................................81
   C.  Traceback ...................................................................................................................84
   D.  E-Mail-To-Text Messages .........................................................................................86
   E.  Further Efforts to Assist Small Businesses with Compliance ....................................87
   F.  Benefits and Costs ......................................................................................................88
   G.  Digital Equity and Inclusion ......................................................................................89
   H.  Legal Authority ..........................................................................................................90
V.  WAIVER ORDER .............................................................................................................93
VI.  PROCEDURAL MATTERS ..............................................................................................97
VII. ORDERING CLAUSES .....................................................................................................108
Appendix A List of Commenters
Appendix B Final Rules
Appendix C Proposed Rules
Appendix D Final Regulatory Flexibility Analysis
Appendix E Initial Regulatory Flexibility Analysis

# I.    INTRODUCTION

1.    Consumers increasingly rely on text messaging to stay in touch with friends and family, to do business, communicate with their child's school, and get information from their government.  On many devices, people immediately see some or all of the messages once received on the device, whereas they have the option to ignore unwanted calls.  This causes consumers to open their texts quickly because texts are an expected trusted source of communications, not annoyance and scams.[1] The rise of junk texts jeopardizes consumer trust in text messaging.  The increase of unwanted and illegal texts[2] also frustrate consumers, and scam texts can cause serious harm.  Scam texts can contain links to phishing campaigns and load malware onto unsuspecting consumers' phones, leading to fraud and other harms.[3]  The Federal Trade Commission (FTC) reports that text messaging scams cost

---

[1] *See* CTIA, Messaging, https://www.ctia.org/homepage/messaging-channel ("The text messaging platform is one of the most trusted forms of communication because consumers have choice and control over their text message experience.") (last visited Oct. 26, 2023); CTIA, Protecting Yourself from Spam Messages, https://www.ctia.org/consumer-resources/protecting-yourself-from-spam-text-messages ("Overall, text messaging is one of the most trusted and widely used forms of communication by consumers. In fact, Americans send over 63,600 text messages per second.") (last visited Oct. 26, 2023).

[2] The rules we adopt today focus on stopping illegal calls or texts, which in many cases also are unwanted.  A call or text may be illegal for a number of reasons, including those that violate the Telephone Consumer Protection Act (TCPA) or Do-Not-Call (DNC) protections.

[3] SMS phishing, or smishing, is the practice of sending text messages to someone in order to trick the person into revealing personal or confidential information which can then be used for criminal purposes.  Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/smishing (last visited Nov. 3, 2023).

**Federal Communications Commission** FCC 23-107

consumers $86 million in 2020 and $326 million in 2022.[4]  Other estimates show higher losses, e.g., over $20 billion in 2022.[5]

2.    We take action today to stop this trend and ensure consumers can continue to trust text messaging.  We do so by building on our recent text blocking requirements.  First, we require terminating mobile wireless providers[6] to block text messages[7] from a particular number following notification from the Commission unless their investigation determines that the identified text messages are not illegal.  Next, we codify that the National DNC Registry's protections apply to text messages.  Third, we encourage providers to make email-to-text, a major source of illegal texts, a service that consumers proactively opt into.  Next, we close the lead generator loophole by prohibiting lead generators, texters, and callers from using a single consumer consent to inundate consumers with unwanted texts and calls when consumers visit comparison shopping websites.

3.    And we propose further steps to stop illegal texts.  First, we propose a stronger blocking requirement following Commission notification and seek comment on other options for requiring providers to block unwanted or illegal texts.  Second, we seek further comment on text message authentication, including the status of any industry standards in development.  Finally, we propose to require, rather than simply encourage, providers to make email-to-text services opt in.

4.    We also adopt a limited waiver to allow providers to use the Reassigned Numbers Database (RND) to determine whether a number that the Commission has ordered to be blocked has been permanently disconnected.  This waiver will help prevent blocking of lawful texts from a new subscriber to the number.

## II.    BACKGROUND

5.    While combating unwanted and illegal calls has long been one of the Commission's top consumer protection priorities, combating unwanted and illegal text messages is a comparatively new

---

[4] FTC, Consumer Sentinel Network Data Book 2020 at 12 (2021), https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2020/csn_annual_data_book_2020.pdf (2020 Consumer Sentinel Data Book); FTC, Consumer Sentinel Network Data Book 2022 at 12 (2023), https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Data-Book-2022.pdf (2022 Consumer Sentinel Data Book).  *See also* FTC, Consumer Sentinel Network Data Book 2021 at 12, https://www.ftc.gov/reports/consumer-sentinel-network-data-book-2021 (2022) (2021 Consumer Sentinel Data Book).  As the Joint Consumer Commenters observe, the FTC data are based solely on reports made by consumers and represent only a fraction of the universe of losses from text scams; the actual losses to consumers from text-initiated frauds are, undoubtedly, exponentially greater.  Joint Consumer Commenters at 3.

[5] Robokiller, The Robokiller Phone Scam Report: 2022 Insights & Analysis, at 4 (2023), https://assets.website-files.com/61f9a8793a878d7f71c5505d/6400e06e514500224ad26830_The%20Robokiller%20phone%20scam%20report%20-%202022%20insights%20%26%20analysis.pdf (Robokiller 2022 Report).  Robokiller observes that, in 2022, 225.7 billion spam texts were sent, a 157% increase from 2021's then-record 87.8 billion. *Id.* at 5.  Robokiller estimates the loss to robotext scams at $13 billion, for the first half of 2023, a $4 billion increase from the first half of 2022. Robokiller, The Robokiller Phone Scam Report:  2023 Midyear Insights & Analysis, at 4 (2023), https://assets.website-files.com/61f9a8793a878d7f71c5505d/64ca6ccf1f5e962fae3e55e3_Robokiller%20Mid-Year%20Report%202023.pdf (Robokiller 2023 Report).

[6] In this order, we use "provider" to mean a mobile wireless provider that provides text messaging services.  Where we refer to providers of voice calls, we use the term "voice service provider," which may include originating, intermediate, or terminating voice service providers.

[7] We use the definition of text message in section 64.1600(o) of our rules in this proceeding.  The scope of our decision regarding text messages is limited to those originating from North American Numbering Plan (NANP) numbers that use the wireless networks, e.g., SMS and MMS, not over-the-top (OTT) messaging, such as iMessage and WhatsApp, or Rich Communications Services (RCS); 47 CFR § 64.1600(o) *et seq.*

3

**Federal Communications Commission**                    **FCC 23-107**

focus.[8]  Just like unwanted and illegal calls, unwanted and illegal texts defraud and harass consumers.
Robokiller estimates that these texts increased by over 300% between 2020 and 2022.[9]  These texts can
result in real financial loss to consumers.[10]

6.    Robocalls and robotexts can both annoy and defraud consumers, but robotexts can be
particularly pernicious.  Robotexts are delivered directly to consumers phones and can include links to
phishing websites that look identical to legitimate websites, easily tricking potential victims into
providing personal or financial information.[11]  Or, the link itself may be the threat.[12]  Simply clicking on
a scam link could load malware onto phones that provides opportunities for theft of passwords,
personally identifiable information, and other credentials, without consumer consent or knowledge.[13]

### A.    The Commission's Multi-Pronged Approach to Unwanted and Illegal Calls

7.    Unwanted and illegal texts reach the same consumers and may even come from the same
sources as unwanted and illegal calls.  Our long-standing work on robocalls thus informs our new work
on robotexts.

8.    *Telephone Consumer Protection Act and National Do-Not-Call Registry*.  The TCPA and
the Commission's implementing rules require callers to obtain consumer consent for certain calls and
texts sent using an automatic telephone dialing system (autodialer) or made using a prerecorded or
artificial voice.[14]  If a robocall or robotext includes or introduces an advertisement or constitutes
telemarketing, the prior express consent must be in writing.[15]  The Commission has clarified that

---

[8] Since 2003, the Commission has interpreted "call" in section 227(b)(1)(A) of the Communications Act of 1934, as
amended (Act or Communications Act) to include both voice calls and text messages.  This order distinguishes
"calls" (voice) from "texts" for purposes of our blocking and other actions today even though they are both "calls"
under the statute.

[9] Robokiller 2022 Report at 4.  Robokiller observes that, in 2022, fraudsters sent 225.7 billion spam texts, a 157%
increase from 2021's then-record 87.8 billion.  *Id.* at 5.  According to Robokiller, Americans received 78 billion
robotexts in the first half of 2023, an increase of 18% from the first half of 2022.  Robokiller 2023 Report at 4.

[10] *See, e.g.*, 2020 Consumer Sentinel Data Book at 12; 2021 Consumer Sentinel Data Book at 12; 2022 Consumer
Sentinel Data Book at 12; Robokiller 2022 Report at 4; Robokiller 2023 Report at 4.

[11] *See, e.g.*, FTC, Consumer Advice, *How to Recognize and Avoid Phishing Scams,*
https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited Nov. 3, 2023); AT&T,
Cyber Aware, *Text Message Scams*, https://about.att.com/pages/cyberaware/ni/blog/text_scams (last visited Nov. 3,
2023); Verizon, Account Security, *Smishing and Spam Text Messages*, https://www.verizon.com/about/account-
security/smishing-and-spam-text-messages (last visited Nov. 3, 2023).

[12] FTC, Consumer Advice, *How to Recognize and Avoid Phishing Scams,* https://consumer.ftc.gov/articles/how-
recognize-and-avoid-phishing-scams (last visited Nov. 3, 2023).

[13] FTC, Consumer Advice, *How to Recognize, Remove, and Avoid Malware*, https://consumer.ftc.gov/articles/how-
recognize-remove-avoid-malware (last visited Nov. 6, 2023).

[14] 47 U.S.C § 227(b)(1)(A); 47 CFR § 64.1200(a)(1); *see also* 47 CFR § 64.1200(a)(9) (providing exemptions to
(a)(1)(iii) and noting that "the term 'call' includes a text message, including a short message service (SMS) call").
This restriction applies to calls directed to wireless numbers, as well as to emergency numbers and other specified
locations.  For autodialed or prerecorded-voice telemarketing calls to wireless numbers, prior express consent must
be written.  *See* 47 CFR § 64.1200(a)(2); *Rules and Regulations Implementing the Telephone Consumer Protection
Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1838, para. 20 (2012) (*2012 TCPA
Order*).  The seller bears the "burden of demonstrating that a clear and conspicuous disclosure was provided and that
unambiguous consent was obtained."  *2012 TCPA Order*, 27 FCC Rcd at 1844, para. 33.  In the *Facebook v. Duguid*
decision, the Supreme Court clarified that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity
to use a random or sequential number generator to either store or produce phone numbers to be called."  *Facebook,
Inc. v. Duguid*, 141 S.Ct. 1163, 1173 (2021) (*Facebook*).

[15] *See* 47 CFR § 64.1200(a)(2).

Internet-to-phone text messages, which are sent via the Internet to a provider and then routed to a consumer's phone over the provider's wireless network, are also covered by the TCPA.[16]  The Commission's DNC rules protect consumers from unwanted telephone solicitations or telemarketing calls to wireless[17] and wireline phones when the consumer has added the number to the National DNC Registry.[18]

9.    *Call Blocking, Robocall Mitigation, and Caller ID Authentication.*  To better protect consumers from bad actors that do not comply with the restrictions under the TCPA and National DNC Registry or otherwise place illegal calls or texts, the Commission has taken further steps to combat illegal calls.  This includes ensuring consumers have a say in which calls ring their phones, restoring faith in caller ID and making callers easier to identify, and holding voice service providers responsible for the calls they originate or transmit.

10.    Of particular interest here, the Commission has authorized providers to block calls in certain instances,[19] adopted safe harbors to ensure that providers are not subject to liability for blocking within certain constraints,[20] and in some cases mandated blocking of certain categories of calls that are highly likely to be illegal.[21]  These rules require certain voice service providers to block calls following notification of illegal traffic by the Commission and that providers immediately downstream block their traffic if they fail to do so.[22]  And the Commission has adopted rules mandating that voice service providers respond to traceback requests[23] and requiring originating, terminating, and intermediate voice

---

[16] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 30 FCC Rcd 7961, 8019-20, paras. 113-15 (2015) (*2015 TCPA Declaratory Ruling and Order*) (describing services that allow senders to initiate texts via the Internet rather than via an individual phone where those texts look functionally equivalent to the recipient).

[17] In the *2003 TCPA Order*, the Commission concluded that the National DNC Registry should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14037-38, para. 33 (2003) (*2003 TCPA Order*).

[18] *2003 TCPA Order*, 18 FCC Rcd at 14033-39, 14116, paras. 25-36, 166; 47 CFR § 64.1200(c)(2), (e).  The National DNC Registry currently protects over 249 million telephone numbers from telemarketing sales calls, or "telephone solicitations."  *See* FTC, Reports, National Do Not Call Registry Data Book for Fiscal Year 2023, (Nov. 2023) https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2023 .  The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" but not including calls or messages made with prior express invitation or permission, to any person with whom the caller has an established business relationship, or by a tax exempt nonprofit organization.  47 U.S.C. § 227(a)(4).

[19] *See* 47 CFR § 64.1200(k)(1), (2).

[20] *See* 47 CFR § 64.1200(k)(3), (4), (11).

[21] *See* 47 CFR § 64.1200(o).

[22] 47 CFR § 64.1200(n)(5), (n)(6).

[23] 47 CFR § 64.1200(n)(1).  Traceback is the process of following the call path back to the point of origin.  In the *Gateway Provider Order and Further Notice*, the Commission enhanced the existing traceback requirement to require gateway providers to respond to traceback requests within 24 hours.  *Advanced Methods to Target and Eliminate Unlawful Robocalls, Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No. 17-97, Sixth Report and Order in CG Docket No. 19-59, Fifth Report and Order in WC Docket No. 17-97, Order, Seventh Further Notice of Proposed Rulemaking in CG Docket No. 17-59 & Fifth Further Notice of Proposed Rulemaking in WC Docket No. 17-97, 37 FCC Rcd 6865, 6894-97, paras. 65-71 (2022) (*Gateway Provider Order and Further Notice*).  In the *May 2023 Call Blocking Order*, we expanded that enhanced requirement to cover all domestic voice service providers.  *Advanced Methods to Target and Eliminate Unlawful Robocalls, Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No . 17-97, paras. 21-28 (*May 2023 Call Blocking Order*).

service providers to implement the STIR/SHAKEN caller ID authentication framework in the IP portions of their networks.[24]  Taken together, these requirements help identify bad actors—both callers and voice service providers—and stop these calls at their source.

11. *Enforcement*.  The Commission has also taken enforcement action to protect consumers against illegal calls.  For example, the *Sumco Forfeiture Order* found that certain robocall campaigns violated the TCPA for reasons including the telemarketers' failure to obtain prior express written consent before initiating telemarketing calls to wireless phones and residential lines.[25]  And the Commission recently required all voice service providers immediately downstream from a specific gateway provider to block and cease accepting all traffic from that gateway provider after it repeatedly allowed transmission of illegal robocalls into the United States.[26]

### B.    Combating Unwanted and Illegal Texts

12. The Commission for the first time required providers to block certain texts that are highly likely to be illegal in March of 2023.[27]  The Commission required providers to block—at the network level—texts purporting to be from North American Numbering Plan (NANP)[28] numbers on a reasonable

---

[24] *See Call Authentication Trust Anchor, Implementation of TRACED Act Section 6(a)—Knowledge of Customers by Entities with Access to Numbering Resources*, WC Docket Nos. 17-97 and 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3252, para. 24 (2020) (*First Caller ID Authentication Order*) (requiring originating and terminating providers to implement STIR/SHAKEN); *Call Authentication Trust Anchor*, WC Docket No. 17-97, Second Report and Order, 36 FCC Rcd 1859, 1876-97, paras. 36-73 (*Second Caller ID Authentication Order*) (providing implementation extensions to certain providers); *Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6886-894, paras. 51-63 (requiring gateway providers, a subset of intermediate providers, to implement STIR/SHAKEN); *Call Authentication Trust Anchor*, WC Docket No. 17-97, Sixth Report and Order and Further Notice of Proposed Rulemaking, FCC 23-18 (Mar. 17, 2023) at paras. 15-27 (*2023 Caller ID Authentication Order*) (requiring non-gateway intermediate providers that receive unauthenticated calls directly from originating providers to authenticate calls with STIR/SHAKEN by December 31, 2023); 47 CFR §§ 64.6301, 64.6302, 64.6304. STIR/SHAKEN caller ID authentication helps confirm that the caller ID is not spoofed, or otherwise provides information regarding what the signing voice service provider knows to be true about the caller and its right to use the number.  Protocols developed by the Secure Telephony Identity Revisited (STIR) working group of the Internet Engineering Task Force (IETF) work with the Signature-based Handling of Asserted information using toKENs (SHAKEN) implementation standards created by the Alliance for Telecommunications Industry Solutions (ATIS) and the SIP Forum.  *See First Caller ID Authentication Order*, 35 FCC Rcd 3241, 3244-46, paras. 5-10.

[25] *Sumco Panama SA, et al*, EB File No. EB-TCD-21-00031913, Forfeiture Order, FCC 23-64, at 12-13, paras. 25-26 (Aug. 3, 2023) (*Sumco Forfeiture Order*).

[26] *One Eye LLC*, EB Docket No. 22-174, Final Determination Order, DA 23-389, at 1, 2-3, paras. 1, 5 (May 2023) (*One Eye*).  More recently, the Enforcement Bureau issued an Initial Determination Order against One Owl Telecom for the apparent transmission of illegal traffic.  *One Owl Telecom Inc.*, EB Docket No. 22-174, Initial Determination Order, DA 22-174 (Sept. 2023).

[27] *See generally Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 21-402, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (Mar. 17, 2023) (*Text Blocking Order and Further Notice*).  Previously, the Commission's Enforcement Bureau had investigated instances of robotexting.  *See, e.g.*, *Emanuel (Manny) Hernandez, Click Cash Marketing, LLC, and Rock Solid Traffic*, Citation and Order, Unauthorized Text Message Violations, 33 FCC Rcd 12382 (EB 2018) (*Hernandez*); Public Notice, FCC Enforcement Advisory, *Robotext Consumer Protection, Text Message Senders Must Comply With The Telephone Consumer Protection Act*, 31 FCC Rcd 12615 (EB 2016).

[28] The NANP is the basic numbering scheme for the telecommunications networks located in American Samoa, Anguilla, Antigua, Bahamas, Barbados, Bermuda, British Virgin Islands, Canada, Cayman Islands, Dominica, Dominican Republic, Grenada, Jamaica, Montserrat, Saint Maarten, St. Kitts & Nevis, St. Lucia, St. Vincent, Turks & Caicos Islands, Trinidad & Tobago, and the United States (including Puerto Rico, the U.S. Virgin Islands, Guam, and the Commonwealth of the Northern Mariana Islands).  47 CFR § 52.5(d).

**Federal Communications Commission**                                    **FCC 23-107**

Do-Not-Originate (DNO) list, which includes numbers that purport to be from invalid, unallocated, or unused numbers, and NANP numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked.[29]  The Commission also took steps to ensure that any erroneous blocking can be quickly remedied, by requiring providers to maintain, or ensure that entities that block texts on their networks maintain, a point of contact for texters to report erroneously blocked texts.[30]

13.  The Commission also proposed a number of rules and revisions to further address the issue of unwanted and illegal texts, including: requiring terminating providers to block texts from a sender after they are on notice from the Commission that the sender is sending illegal texts; codifying that the National DNC Registry's protections extend to text messages; and banning the practice of marketers purporting to have written consent for numerous parties to contact a consumer, based on one consent.[31]

## III.    SECOND REPORT AND ORDER

14.  In this Second Report and Order, we take further steps to protect consumers from unwanted and illegal text messages and calls.  First, we require terminating providers to block texts from a particular number following Commission notification of illegal texts.  Second, we codify that the National DNC Registry protections apply to text messages.  Third, we encourage providers to make email-to-text an opt-in service.  Next, we close the lead generator loophole by requiring that texters and callers get written consumer consent for robocalls or robotexts from one seller at a time, and thus prohibit abuse of consumer consent by comparison shopping and other websites.  Finally, we decline at this time to adopt specific text authentication requirements.

15.  At the outset, we acknowledge the voluntary efforts providers have made to protect consumers from unwanted and illegal text messages, including blocking significant numbers of unwanted and illegal texts.[32]  We believe those efforts have gone a long way to protect consumers.  At the same time, the rapid increase in consumer losses resulting from scam texts makes clear that consumers need more protection.  As the Joint Consumer Commenters observe, the numbers of text-borne scams and the direct losses to consumers resulting from them have escalated dramatically in recent years.[33]

### A.    Mandatory Blocking Following Commission Notification

16.  We adopt, with some changes, our proposal[34] to require terminating providers to block  all texts from a particular number or numbers when notified by the Enforcement Bureau of illegal texts from that number or numbers.  Upon receipt of the notice, a provider must block all texts from the

---

[29] 47 CFR § 64.1200(p).

[30] 47 CFR § 64.1200(r).

[31] *Text Blocking Order and Further Notice*, at paras. 48-62.

[32] For example, CTIA has reported that, between 2015 and 2020, the number of provider-blocked spam text messages grew 10 times, from an estimated 1.4 billion in 2015 to 14 billion in 2020.  CTIA Comments at 2.  CTIA observes that, "[t]o further protect consumers and the integrity of the text messaging platform, the wireless industry leverages best practices along with filtering software, machine learning tools, and other analytics that help curb unwanted or unlawful text messages."  CTIA, Messaging, *Protecting Consumers from Spam Messages*, https://www.ctia.org/homepage/messaging-channel (last visited Nov. 3, 2023).

[33] Joint Consumer Commenters at 2.

[34] *Text Blocking Order and Further Notice*, at paras. 50-53.

number(s) and respond to the Enforcement Bureau indicating that the provider has received the notice and is initiating blocking.[35]

17. We agree with commenters that support requiring terminating providers to block in these instances.[36]  As one commenter noted, "[i]t is imperative that the Commission use every available tool to stop bad actors from sending texts to consumers that are illegal" and when a provider is on notice from the Commission it should block illegal texts.[37]  A similar model has worked well in the call blocking context[38] and allows the Enforcement Bureau to take clear, decisive action to protect consumers.

18. We thus disagree with commenters that argue a blocking mandate is inappropriate because either providers already block texts or that the mandate may not otherwise significantly reduce the volume of illegal texts.[39]  These commenters offer no specific or compelling evidence that providers consistently block all text traffic the Enforcement Bureau might identify as illegal.[40]  Undisputed public data makes clear that unwanted and illegal texts are rising as is the financial loss that accompanies them.[41]  If providers' voluntary efforts alone were enough to protect consumers, we would not see that trend.  Thus, we believe that, just as with call blocking, a block-upon-notice requirement complements, rather than supplants, the work providers already do.  The rule we adopt serves as an important backstop to ensure that consumers are protected against illegal texts.

19. Our experience with call blocking demonstrates that the Enforcement Bureau can act quickly and identify illegal traffic that providers have not blocked, and we see no reason to believe that it cannot do so here.  We thus disagree with commenters who argue that the blocking process we adopt today may be slower, and thus less effective, than voluntary blocking measures by providers.[42]  Nothing we require slows voluntary blocking – providers can (and we expect them to) continue to block and to improve their blocking going forward.  Our new requirements instead will ensure they block texts their current blocking fails to capture, a necessary complement to their existing work.  Providers that argue texters will have moved on to new numbers by the time the Enforcement Bureau identifies their texts

---

[35] We disagree with CTIA's assertion that requiring a provider to investigate prior to blocking would constitute "inappropriately delegating the Commission's investigatory responsibilities and determinations of lawfulness to wireless providers."  Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278and 21-402, at 3 (filed Dec. 4, 2023) (CTIA Dec. 4 *ex parte*).  However, we recognize that terminating providers "are not the 'choke point' for the suspect illegal traffic," that requiring terminating providers to investigate may in some cases impose a significant burden, and that it may lead to differing approaches for different providers.  *Id.* at 4.  We therefore do not require a provider to investigate before initiating blocking.  We do, however, require providers to respond to the Enforcement Bureau's notice unless the Enforcement Bureau expressly exempts providers from that requirement in a particular situation.  That could be as simple as an acknowledgement of receipt and indication that the provider will initiate blocking.

[36] *See, e.g.*, ECAC Comments at 2-3; Bankers Joint Commenters Reply at 9; State Attorneys General Reply at 19-20; VON Comments at 3-4 (supporting requiring blocking but also urging the Commission to add a traceback component and ensure that traffic is illegal before requiring blocking).

[37] Bankers Joint Commenters Reply at 9.

[38] *See, e.g., One Eye*.

[39] *See, e.g.*, CTIA Comments at 7-8 & Reply at 5; M³AAWG Comments at 4; T-Mobile Reply at 2-5; Twilio Reply at 3-7; Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 1-2 (July 25, 2023) (CTIA July 25 *ex parte*).

[40] *See, e.g.* CTIA Comments at 7-8 & Reply at 5; T-Mobile Reply at 2-5; Twilio Reply at 7.

[41] *See, e.g.*, 2020 Consumer Sentinel Data Book at 12; 2021 Consumer Sentinel Data Book at 12; 2022 Consumer Sentinel Data Book at 12; Robokiller 2022 Report at 4; Robokiller 2023 Report at 4.

[42] *See, e.g.*, M³AAWG Comments at 4; NetNumber Comments at 2-6; T-Mobile Reply at 3-4.

**Federal Communications Commission**                                    **FCC 23-107**

point to no specific evidence to that effect. Indeed, we believe that some texters undoubtedly use numbers until their texts no longer reach recipients at all. And, as detailed further below, we disagree with the comment that our requirements would unduly increase costs.[43] We believe that providers are already familiar with the similar call blocking requirements and extending those to texting should not represent a material additional burden.

20. We adapt the call blocking rule to text blocking to recognize important differences. First, we agree with commenters that there may not be a provider directly analogous to a gateway voice service provider in texting.[44] We therefore we require only terminating mobile wireless providers to block. Second, we do not require text blockers to also block traffic "substantially similar" to the traffic the Enforcement Bureau identifies to avoid blocking based on analytics that could lead to over blocking.[45] Texters that run afoul of this rule and find all texts from a particular number blocked can obtain a new number and, as long as they do not then use that number to send illegal texts, will not be blocked under this rule. This approach addresses record concerns about liability for blocking incorrectly, as well as potential burdens if we adopted a more expansive rule.[46] We also believe blocking based on a specific number or numbers identified by the Enforcement Bureau will be competitively neutral.[47] Additionally, we modify the process the Enforcement Bureau must follow, including not requiring an Initial Determination Order or Final Determination Order. These steps are unnecessary, because there is no requirement for downstream providers to block, and in fact no downstream providers at all, so a provider does not lose access to the network if it fails to comply.

21. *Notification of Illegal Texts*. Under our new rules, the Enforcement Bureau may notify terminating providers of illegal texts from a number or numbers. The Notification of Illegal Texts shall: (1) identify the number(s) used to originate the illegal texts and the date(s) the texts were sent or received; (2) provide the basis for the Enforcement Bureau's determination that the identified texts are unlawful;[48] (3) cite the statutory or regulatory provisions the illegal texts violate; (4) direct the provider receiving the notice that it must comply with section 64.1200(s) of the Commission's rules; and (5) provide a point of contact to be used by a subscriber to a listed number to dispute blocking. The Notification of Illegal Texts shall specify a reasonable time frame for the notified provider to respond to the Enforcement Bureau and initiate blocking.[49] The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418.

---

[43] CCA Comments at 2-3.

[44] *See, e.g.*, CTIA Comments at 10.

[45] *See, e.g.*, ECAC Comments at 4 (The common use of content analysis in text message blocking means that there is more opportunity and risk for overly broad interpretations of "substantially similar traffic."); CTIA Reply at 13 ("A bright-line rule requiring mandatory blocking based on the content of certain text messages (e.g., URLs) would only increase the incidences of blocking legitimate text messages.").

[46] CCA Comments at 2-3.

[47] *See, e.g.*, INCOMPAS Comments at 5; VON Comments at 3-4.

[48] The Notification should include any relevant nonconfidential evidence from credible sources.

[49] In our call blocking rules, we require the Enforcement Bureau to specify a timeframe of no fewer than 14 days for a notified gateway provider to complete its investigation and report its results. 47 CFR § 64.1200(n)(5)(i)(A). Here, however, we allow the Enforcement Bureau discretion to select a different response time, as providers are not required to investigate and the consequences of a terminating mobile wireless provider failing to comply with the deadline are less significant than in call blocking, where the ultimate consequence of a gateway provider failing to comply with our blocking rule is that immediate downstream providers will block all of the provider's traffic. *See id.* § 64.1200(n)(6). We note that the Enforcement Bureau will need to be able demonstrate that whatever timeframe it establishes, if shorter than 14 days, is reasonable.

9

**Federal Communications Commission**    **FCC 23-107**

22. *Responses to a Notification of Illegal Texts*.  Upon receiving such notice, the provider must promptly begin blocking all texts from the identified number(s) within the timeframe specified in the Notification of Illegal Texts.  The provider must respond to the Enforcement Bureau, including a certification that it is blocking texts from the identified number(s).

23. If the provider learns that some or all of the numbers have been reassigned, the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates the number has been reassigned.[50]  If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking.  In such instances, we encourage providers to continue to use other available methods to protect their customers.  Providers are not required to monitor whether any numbers subject to this blocking requirement have been reassigned, but are required to notify the Commission and cease blocking if the provider learns of a number reassignment.  We encourage providers that are able to monitor for number reassignments to do so.[51]

24. We do not adopt any additional protections in case of erroneous blocking, but any individual or entity that believes its texts are being blocked under this rule in error can make use of the point of contact required under section 64.1200(r) of the Commission's rules.[52]  If the provider determines that blocking should cease, it should notify the Enforcement Bureau of that finding, including any evidence that supports that finding.

25. This rule shall be effective 180 days after publication of this Order in the Federal Register, to allow providers additional time to ensure that they are prepared to comply.  However, we disagree that this rule requires Paperwork Reduction Act (PRA) approval[53] as it falls under the exception for collections undertaken "during the conduct of . . . an administrative action or investigation involving an agency against specific individuals or entities."[54]

## B.    National Do-Not-Call Registry

26. We adopt our proposal to codify the National DNC[55] Registry's existing protections to text messages.[56]  Texters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry.  The Commission previously concluded that

---

[50] We strongly encourage providers to make an effort to determine whether a number has been reassigned in order to avoid blocking lawful texts from a different source.  The Reassigned Numbers Database (RND) should be a useful tool for accomplishing this, and we are adopting a waiver to permit such use of the RND.  *See infra* paras. 100-103.

[51] CTIA argued that requiring "providers to constantly monitor" the RND would impose an "unnecessary burden" and that we therefore did not account "for the significant and substantial burdens and costs of this obligation on wireless providers."  CTIA Dec. 4 *ex parte* at 5-6.  We clarify that monitoring the RND or any other source for number reassignments is not required and, instead, is a voluntary step that providers may take to help more quickly remedy issues where a number has been reassigned.  We believe that some providers may wish to take this step, and may already have contracts with the RND for their own telemarking divisions, to better protect their customers.  We do, however, require a provider that learns that a number has been reassigned to notify the Commission, so that the Commission can inform other providers that may also be required to block.

[52] 47 CFR § 64.1200(r).

[53] Letter from Alexandra Mays, Assistant General Counsel & Director, Regulatory Affairs, CCA, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402 (filed Dec. 6, 2023) (CCA Dec. 6 *ex parte*); CTIA Dec. 4 *ex parte* at 8-9.

[54] 44 USC § 3518(c)(1)(B)(ii); *see also* 5 CFR § 1320.4(a)(2).

[55] The Commission stated in the *2003 TCPA Order* that "wireless subscribers may participate in the national do-not-call list" and "we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers'" for purposes of our DNC rules.  *2003 TCPA Order*, 18 FCC Rcd at 14039, para. 36.

[56] *Text Blocking Order and Further Notice* at paras. 55-57.

the national database should allow for the registration of wireless telephone numbers and that such action will further the objectives of the TCPA and the Do-Not-Call Act.[57] Our action is consistent with federal court opinions[58] and will deter both illegal texts and make DNC enforcement easier.

27. Commenters generally support this step.[59] As the Joint Consumer Commenters observe, section 64.1200(e) of the Commission's rules explicitly applies its DNC regulations to wireless telephone numbers and it would be anomalous to conclude that text messages to wireless numbers are "calls" for one part of the Commission's TCPA rules but not for the DNC protections.[60]

28. We disagree with a commenter that our proposal could undermine basic security protections because third-party, two-factor authentication providers could be prohibited from contacting end users whose numbers are on the National DNC Registry.[61] Two-factor authentication providers can simply avoid including solicitation or telemarketing in their texts. Such parties have other ways to contact their customers who may be on the DNC registry, such as obtaining their written consent for a text or call, or through email.

### C. Email-to-Text Messages

29. We encourage providers to make email-to-text an opt-in service as a way to reduce the number of fraudulent text messages consumers receive.[62] We do so in response to several commenters that observe texts originating from email addresses, rather than telephone numbers, account for a significant percentage of fraudulent text messages.[63] For example, ZipDX states that email-to-text gateways enable anyone to send a text message to a mobile subscriber in relative anonymity.[64] Commenters state that the email-to-text messages process allows the sender to be anonymous because the text is sent from an email account on a computer, not a phone number.[65] Commenters also observe

---

[57] *2003 TCPA Order*, 18 FCC Rcd at 14037-38, para. 33. In the *2003 TCPA Order*, the Commission, pursuant to section 227(c) of the Communications Act, adopted a national do-not-call registry, maintained by the FTC, to provide residential consumers with a one-step option to prohibit unwanted telephone solicitations. *2003 TCPA Order*, 18 FCC Rcd at 14034-35, para. 28.

[58] *See, e.g., Barton v. Temescal Wellness, LLC*, 525 F. Supp.3d 195 (D. Mass. 2021) (*Barton*); *Sagar v. Kelly Auto. Group, Inc.*, No. 21-cv-10540-PBS, 2021 WL 5567408 (D. Mass. Nov. 29, 2021) (*Sagar*); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023) (*Hall*).

[59] *See, e.g.*, State Attorneys General Reply at 21 (stating that this is a common-sense approach to eliminate any potential confusion in the industry and has the added benefit of providing protection to consumers regardless of whether the texting party utilizes an autodialer); Joint Consumer Commenters at 13-15; M³AAWG Comments at 4; CCA Comments at 5; Dobronski Comments at 9; Subbaiah Comments at 1; Shields Reply at 1-3.

[60] Joint Consumer Commenters at 13-15.

[61] INCOMPAS Comments at 6.

[62] The Commission previously concluded that the equipment used to originate Internet-to-phone text messages to wireless numbers via email or via a wireless carrier's web portal is an "automatic telephone dialing system" as defined in the TCPA, and therefore calls made using the equipment require consent. *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8017-8022, paras. 111-122.

[63] ZipDX Comments at 2; Somos Reply at 5; Bankers Joint Commenters Reply at 8.

[64] ZipDX Comments at 2.

[65] ZipDX Comments at 2; Somos Reply at 5 (brand impersonation scams are increasingly widespread form of text scam).

a spike in text impersonation scams originating from email-to-text gateways.[66]  Below we seek comment on requiring providers to make this service opt-in.

### D.   Closing the Lead Generator Loophole

30.  We now make it unequivocally clear that texters and callers must obtain a consumer's prior express written consent to robocall or robotext the consumer soliciting their business.  We also make it unequivocally clear that this requirement applies a single seller at a time, on the comparison shopping websites that often are the source of lead generation, thus closing the lead generator loophole.[67]  Lead-generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts.[68]  While many comparison shopping websites that involve lead generation (i.e., websites that generate a consumer "lead" for a seller) benefit consumers by enabling them to quickly compare goods and services and discover new sellers,[69] the record is clear that new protections are necessary to stop abuse of our established consent requirements.[70]  We also require that the consent must be in response to a clear and

---

[66] Somos Reply at 5; Bankers Joint Commenters Reply at 8 (observing that bad actors are distributing large volumes of SMS phishing messages from email addresses (which convert the e-mail message to an SMS text message).

[67] The TCPA generally requires callers to get consumer consent before making certain calls to consumers using an "automatic telephone dialing system" (also known as an "autodialer") or an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1)(A).  Since 2003, the Commission has applied the consent requirement to text messages using an autodialer and "made to a telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged."  *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.  This encompasses both voice calls and text calls to wireless numbers including, for example, SMS calls, provided the call is made to a telephone number assigned to such service.  *Id.*  In the Further Notice of Proposed Rulemaking, we sought comment on a proposal that for TCPA consent "prior express written consent to receive calls or texts must be made directly to one entity at a time."  *Text Blocking Order and Further Notice* at para. 61. IMC contends that we do not have statutory authority to adopt or revise the definition of prior express written consent.  Letter from Insurance Marketing Coalition to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 5-7 (Dec. 6, 2023) (IMC Dec. 6 *ex parte*).  We disagree and note that the Commission adopted a definition of prior express written consent in the *2012 TCPA Order*.  *2012 TCPA Order*, 27 FCC Rcd at 1838-1844, paras. 20-34 (requiring prior express written consent for telemarketing robocalls to wireless numbers and residential lines).

[68] USTelecom Comments at 2.

[69] *See* Federal Trade Commission, Follow The Lead:  An FTC Workshop On Lead Generation (Oct. 30, 2015) at 5 (available at https://www.ftc.gov/system/files/documents/videos/follow-lead-ftc-workshop-lead-generation-part-1/lgw-transcript-pt1.pdf) (noting that lead generation is a well-established industry that offers benefits to both consumers and advertisers).  *But see also* Federal Trade Commission, "Follow the Lead" Workshop, a Staff Perspective (Sept. 2016) (available at https://www.ftc.gov/system/files/documents/reports/staff-perspective-follow-lead/staff_perspective_follow_the_lead_workshop.pdf) (observing that consumers who fill out web forms may not realize they are operated by lead generators, i.e., not merchants, or may not know that this information can be sold and re-sold multiple times).  Commenters contend that comparison shopping saves consumers money.  *See, e.g.*, Letter from United States Senators Thom Tillis and Marsha Blackburn, to Jessica Rosenworcel, Chairwoman, FCC, at 1 (Dec. 6, 2023) (Dec. 6 Congressional); Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, Attach. at 3 (Dec. 6, 2023) (LendingTree Dec. 6 *ex parte*).  There is no evidence that unequivocally requiring one-to-one consent would reduce this benefit to consumers.  IMC contends that each year millions of satisfied consumers provide prior express consent to comparison shopping sites and are satisfied with the calls they receive and thus do not file complaints with regulators. IMC Dec. 6 *ex parte* at 2.  This, of course, does not rebut arguments in the record that consent abuse by comparison shopping websites harms consumers.

[70] Several commenters describe such abuses, *see, e.g.*, Connors Comments at 1 (discussing Coverage Vista, https://www.coverage-vista.com/, with a list of hundreds of "partners" in a hyperlink (https://coverage-vista.com/disclaimer.php) that the consumer would "consent" to by asking for insurance information from the

(continued....)

**Federal Communications Commission**       **FCC 23-107**

conspicuous disclosure to the consumer and that the content of the ensuing robotexts and robocalls must be logically and topically associated with the website where the consumer gave consent.[71]

31. *One-to-One Consent.* As an initial matter, we agree with the several commenters, including consumer groups, State Attorneys General, and members of Congress that we must take action to close the lead generator loophole and stop consent abuse by unscrupulous robotexters and robocallers.[72] We agree with the Joint Consumer Commenters, who argue that the "resale of consumer data by lead generators and lead aggregators significantly contributes to the problem of illegal calls."[73] We agree with commenters that requiring one-to-one consent obtained with a clear and conspicuous disclosure to the consumer is the way to close this loophole.[74] Unequivocally requiring one-to-one

---

[71] Coverage Vista insurance site); USTelecom Comments at 4 (USTelecom also notes that this was discussed in the *Sumco NAL* at paras. 45-48); Joint Consumer Commenters at 4 & Reply at 8; Presley Comments at 1; Dobronski Comments at 3; Shields Reply at 3-5 (observing that the LendingTree partner list contains marketer EverQuote which has more than 2247 partners on its own list of partners; similarly, the QuoteWizard list also contains companies that have nothing to do with insurance such as auto warranty companies, lead generators, and marketers); Keller Reply at 1-3; Douglas Reply at 1; State Attorneys General Reply at 2-4 (describing the Assurance IQ list of over 2000 "partner companies," some of which were other lead generation and telemarketing companies). For a description of the chain of lead generators and telemarketers associated with QuoteWizard, *see Mantha v. QuoteWizard.com, LLC*, No. 19-12235-LTS, 2022 WL 325722 (D. Mass. Feb. 3, 2022) (*Mantha*) at *10 (QuoteWizard alleged that it obtained consent when the plaintiff visited the Snappy Auto website operated by Fenix Media, and the lead was sold by Fenix Media to Plural, then to RevPoint, and then to QuoteWizard; however, the IP addresses associated with such consent did not belong to the plaintiff and the "lead identification" number for the consent was not associated with the plaintiff or with Snappy Auto.).

[71] Under our existing rules, prior express written consent under the TCPA means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. 47 CFR § 64.1200(f)(9). A similar rule, to obtain prior express invitation or permission for a telemarketing call to a DNC line, the caller must meet the requirements of section 64.1200(c)(2)(ii) of the Commission's rules: "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." We did not seek comment on, and we are not revising, section 64.1200(c)(2)(ii). We disagree with the assertion made by IMC that requiring one-to-one consent is a content-based restriction on speech subject to strict scrutiny. IMC Dec. 6 *ex parte* at 7-9. On the contrary, the rule we adopt here (and the requirements of section 64.1200(c)(2)(ii), which we are not revising) are clear that consent must be between the consumer and seller; we are making it unequivocal that such consent for TCPA purposes must be one-to-one between the consumer and seller. This is also consistent with the FTC's Telemarketing Sales Rule which requires one-to-one consent. Requiring that a consumer consent to be contacted by each seller (if applicable) is not a content-based restriction on IMC's speech, but a logical and consistent measure of consumer protection.

[72] *See, e.g.*, Joint Consumer Commenters at 2; USTelecom Comments at 2; State Attorneys General Reply at 5;; Letter from Alexander H. Burke, Burke Law Offices, LLC, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402 (Dec 5, 2023) (Burke Dec. 5 *ex parte*); Letter from United States Senators Ben Ray Luján, Edward J. Markey, Peter Welch, Chris Van Hollen, Elizabeth Warren, Angus S. King, Jr., Richard J. Durbin, Martin Heinrich, Mark R. Warren, Gary C. Peters, Ron Wyden, Amy Klobuchar, to Jessica Rosenworcel, Chairwoman, FCC, at 1 (Aug. 7, 2023) (Aug. 7 Congressional).

[73] Joint Consumer Commenters Reply at 10, (citing Shields Comments at 4; Connors Comments at 1; Presley Comments at 2). *See also* USTelecom Comments at 2-3.

[74] *See, e.g.*, USTelecom Comments at 3; State Attorneys General Reply at 13; Presley Comments at 2; Dobronski Comments at 9-10; Subbaiah Comments at 1; Joint Consumer Commenters at 15-17. The Joint Consumer Commenters state that, instead of revising the TCPA consent rule, the Commission should affirm the single-seller interpretation of section 64.1200(f)(9) and take enforcement action against telemarketers making use of illegitimately obtained consumer "consent." Joint Consumer Commenters at 15. *See also* Aug. 7 Congressional at 1

(continued….)

consent will end the current practice of consumers receiving robocalls and robotexts from tens, or hundreds, of sellers—numbers that most reasonable consumers would not expect to receive.[75]

32. Our requirement stops the practice of buried, barely visible disclosures that, as USTelecom explains, appear in fine print on a website or only accessible through a hyperlink, burdening the consumer with yet another step to be fully informed.[76]  This requirement ensures that consumers consent only to sellers they wish to hear from[77] and will stop the abuses we saw, for example, in *Urth Access*, where the websites at issue included TCPA consent disclosures whereby the consumer "consented" to receive robocalls from "marketing partners."[78]  Those "marketing partners" were only visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of 5,329 entities.[79]  With this requirement we make it clear that sharing lead information with a daisy-chain of "partners" is not permitted.  Our action is also consistent with the FTC's Telemarketing Sales Rule (TSR), which some commenters observe requires one-to-one consent.[80]  As the State Attorneys General argue, it is not necessary to require a consumer to agree to

---

("Both the [DNC and the TCPA rules] clearly set out the types of protections intended by Congress to eliminate unwanted telemarketing calls.  Both of these regulations allow robocalls *only if* the call recipients sign a written agreement relating to calls from a *single seller*.").  Instead, we find that the rule we adopt here will make it unequivocally clear that texters and callers must obtain a consumer's prior express written consent for calls or texts from a single seller at a time.

[75] Zillow contends that its process for connecting an agent to a prospective customer could be problematic under our revision to prior express written consent under the TCPA because Zillow would not have the name of the agent until after the customer consents to be so contacted.  Letter from Luke Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1-3 (Dec. 8, 2023) (Zillow Dec. 8 *ex parte*).  However, based on Zillow's description of the contact between the agent and the customer, it appears to be a live call (where Zillow adds the agent to the call), and not autodialed, or using a prerecorded or artificial voice, and therefore a process appropriate under the TCPA prior to and after the subsequent changes to the regulations contained in this Order, and thus our rule change would not be relevant to that interaction.

[76] USTelecom Comments at 2.  *See also* State Attorneys General Reply at 5 (explaining how telemarketers typically collect consent forms and then sell the consumers' data to intermediaries that then compile and sell the data to other telemarketers); Presley Comments at 1 (observing that the lead generation industry is in the business of selling leads, not selling goods or services to consumers).

[77] Joint Consumer Commenters at 21.  In addition, as commenters observe, allowing consent to multiple sellers at a time may make revocation of consent to multiple sellers difficult.  Joint Consumer Commenters at 18-19; State Attorneys General Reply at 12-13.  A called party may revoke consent at any time and through any reasonable means.  A caller may not limit the manner in which revocation may occur.  *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-90, para. 47.  Consent is granted from a consumer to a seller to be contacted at a particular wireless phone number or residential line.  *2012 TCPA Order*, 27 FCC Rcd at 1838, para. 20.  Revocation of consent is instruction that the caller no longer contact the consumer at that number.  We also disagree with the contention that if a consumer revokes consent for autodialed text messages from a seller on one text messaging chain, the seller can continue to send that consumer texts or calls through a different program or chain.  RILA Reply at 15.  The Commission has never bifurcated consent in such a manner and does not endorse it here.

[78] *Urth Access, LLC*, EB File No. EB-TCD-22-00034232, Order, DA 22-1271 (Dec. 8, 2022) (*Urth Access*).  Similarly, in the *Avid Telecom Notice*, the Enforcement Bureau observed that two of Avid's websites were devoid of any language stating that the consumer was agreeing to receive telemarking calls and, to the extent the callers are disclosed elsewhere through a hyperlink, such disclosures would be insufficient to establish consent.  Letter from Loyaan Egal, Chief, Enforcement Bureau, FCC, to Michael Lansky, Chief Executive Officer, Avid Telecom (June 7, 2023) (*Avid Telecom Notice*), available at https://www.fcc.gov/document/fcc-orders-avid-telecom-cease-and-desist-robocalls (last visited Nov. 3, 2023).

[79] *Urth Access* at para. 16.

[80] *See, e.g.*, Joint Consumer Commenters at 22 (citing the FTC Business Guidance); State Attorneys General Reply at 10-11; Burke Dec. 5 *ex parte* at 2 (contending that the best way to provide true clarity to industry groups and

(continued….)

**Federal Communications Commission**                    **FCC 23-107**

receive robocalls or robotexts from multiple, potentially hundreds, of other callers in order for them to access the services of comparison-shopping website.[81]  We believe that adopting the revised rule is the best way to make unequivocally clear that one-to-one consent is required under the TCPA and to stop large numbers of robocalls and robotexts from many different entities based on a single grant of consumer consent.[82]

33.  Grounded in our authority under the TCPA, our rule requires consent to one seller at a time.  Comparison shopping websites can provide additional information about sellers or a list of sellers that a consumer can affirmatively select in order to be contacted.  In adopting our requirement, we reject the proposal to permit consent to a hyperlinked list of sellers, effective for a limited number of sellers to whom the consumer is matched only after already having provided consent to robocall and robotext.[83]  We find that this proposal would unnecessarily require consumers to consent to a potentially lengthy list of entities that may not be relevant to the product or service the consumer is seeking.  The commenters advocating for this proposal have not explained why they could not implement one-to-one consent for each seller.[84]  In other words, such commenters failed to articulate why, under their current lead generation processes, a consumer should be deprived of the opportunity to consent to robocalls and robotexts after the "match" between consumer and seller is made.

34.  We do not prescribe the number of sellers that a comparison shopping website can list for purposes of the prior express written consent rule.[85]  We believe that this is an important business

---

consumers is to conform the Commission's rules to the FTC's one-to-one seller-to consumer consent rule); LendingTree, however, disagrees and observes that under the FTC rule, calls or texts delivered using an autodialer are not subject to the same requirement.  Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Dec. 6, 2023) (LendingTree Dec. 6 *ex parte* Burke Response).  *See also* Federal Register, Vol. 73, No. 169, 51164, 51182 (Aug. 29, 2008); FTC, Business Guidance, "Complying with the Telecommunications Sales Rule," https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#writtenagreement (last visited Oct. 18, 2023).

[81] State Attorneys General Reply at 17.  IMC contends that a lengthy hyperlinked list does not necessarily mean that the consumer will get called by all the sellers on the list.  IMC Dec. 6 *ex parte* at 4.  However, the record has evidence of unrelated companies, including other lead generators, on such hyperlinked lists.  *See, e.g.*, State Attorneys General Reply at 2-4 (describing the Assurance IQ list of over 2,000 "partner companies," some of which were other lead generation and telemarketing companies).

[82] *See, e.g.*, Joint Consumer Commenters at 15-16; USTelecom Comments at 5; State Attorneys General Reply at 7.  Commenters also suggest that the Commission issue guidance restating the rules regarding telemarketing calls.  Aug. 7 Congressional.  These commenters also request that we issue guidance on the requirements of the federal E-Sign Act.  *Id.*  That topic, however, is outside the scope of this rulemaking.

[83] LendingTree Comments at 3 (contending that comparison-shopping providers should be permitted to disclose the specific companies to whom the consumer's consent extends after the comparison-shopping service has matched the consumer to potential providers); LendingTree Dec. 6 *ex parte*, attach. At 10; QuinStreet Nov. 30 *ex parte* at A-1 (suggesting that we amend the definition of prior express written consent to specify that if a hyperlink is used to identify potentially matched sellers, then consent will apply only to those entities identified in a "match notice" subsequently transmitted to the consumer).

[84] *See, e.g.*, Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 30, 2023) (LendingTree Nov. 30 *ex parte*) (contending that it undermines the premise of the comparison shopping platform to require the consumer to give consent multiple times in order to engage in the comparison); IMC Dec. 6 *ex parte* at 3-4.  As ZipDX observes, after the specific matches are displayed, the consumer could review the matches and grant consent individually to each seller from which it wished to hear.  Email from David Frankel, ZipDX, to FCC, CG Docket Nos. 02-278 and 21-402, (Dec. 3, 2023) (ZipDX Dec. 3 *ex parte*).

[85] *See, e.g.*, NAMIC Comments at 4 (proposing no more than 10); AAAB Comments at 1 (specify the maximum number); SEIA Comments at 3 (proposing three); Chandler Comments at 2 (proposing five); LendingTree Dec. 6 *ex*

(continued….)

15

**A15**

decision that belongs to those websites and other lead generators and would not close the lead generator loophole. We do not believe that it would provide consumers with sufficient control over which parties they consent to receive robocalls or robotexts from, and would still deprive consumers of the ability to grant consent only to those sellers from which they wish to receive robocalls or robotexts. Consumers would be forced to consent to all callers on the list without the ability to limit that list for purposes of their comparison shopping. Further, this alternative would not prevent the daisy-chaining of consents whereby a seller on the initial list would then resell or otherwise share their consent to another lead buyer and so on potentially hundreds of times.[86] If the comparison shopping website seeks to obtain prior express written consent from multiple sellers, the webpage must obtain prior express written consent separately for each seller.[87] In addition, other sellers can be included on the web page for reasons other than obtaining consent, e.g., for contact that does not require TCPA prior express written consent, or with information allowing the consumer to contact the seller directly.[88] These commenters have not offered any data on why the number of sellers they suggest is better than a different number of sellers.

35. *Clear and Conspicuous Disclosure and Logically and Topically Related.* We adopt two additional protections to further guard against consent abuse and protect consumers from unwanted robocalls and robotexts. First, the one-to-one consent must come after a clear and conspicuous disclosure to the consenting consumer that they will get robotexts and/or robocalls from the seller. "Clear and conspicuous" means notice that would be apparent to a reasonable consumer.[89] In addition,

---

[*parte*, attach. at 10 (proposing five). We also do not adopt the proposal to add to the definition of consent the types or categories of property, goods, or services about which the person agrees to be called, the total number of callers that may call the person, or the maximum time period(s) in which such callers may call the person. IMC Comments at 3; IMC Dec. 6 *ex parte* at 1-2 & n.4. We also decline to limit how many times one seller can call a consumer, as the issue is outside the scope of this proceeding. Drip Comments at 3-4 (proposing five calls in 24 hours).

[86] Joint Consumer Commenters Reply (citing REACH Comments at 3, where REACH explained that the lead generator industry works to facilitate telemarketing robocalls in that "once the consumer has submitted the consent form the company seeks to profit by reselling the "lead" multiple—perhaps hundreds—of times over a limitless period of time.); Shields Reply at 3-5 (observing that the LendingTree partner list contains marketer EverQuote which has more than 2247 partners on its own list of partners).

[87] *See infra* para. 41, (noting that "the website may offer a consumer a check box list that allows the consumer to choose each individual caller that they wish to hear from").

[88] Our rules also require that the written consent agreement "include a clear and conspicuous disclosure" providing certain information to the person signing, 47 CFR § 64.1200(f)(9), an additional requirement website publishers must follow.

[89] 47 CFR § 64.2401(e). We use the same definition for junk fax opt-out notice requirements. *See Rules and Regulations Implementing the Telecommunications Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket 02-278, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787, 3801, para. 26 (2006) (Consistent with the definition in our truth-in-billing rules, "clear and conspicuous" for purposes of the opt-out notice means a notice that would be apparent to a reasonable consumer.).

**Federal Communications Commission**　　　　　　　　　　FCC 23-107

if compliance with the federal Electronic Signatures in Global and National Commerce Act (the E-Sign Act)[90] is required for the consumer's signature, then all the elements of E-Sign must be present.[91]

36.　Second, we adopt our proposal that robotexts and robocalls that result from consumer consent obtained on comparison shopping websites must be logically and topically related to that website.[92]　Thus, for example, a consumer giving consent on a car loan comparison shopping website does not consent to get robotexts or robocalls about loan consolidation.[93]　We therefore agree with commenters who argue that consumers deserve protection against calls that go beyond the scope of consent, a scope that can be reasonably inferred from the purpose of the website at which they gave that consent.[94]　We believe that texters and callers are capable of implementing this standard and, when in doubt, will err on the side of limiting that content to what consumers would clearly expect.　As a result, we decline to adopt a definition of "logically and topically" at this time as some commenters suggest.[95]

37.　*Preserving Comparison Shopping and Protecting the Needs of Small Businesses.*　The rule we adopt today best balances the desire of businesses to utilize lead generation services to call and text potential customers with the need to protect consumers, including small businesses, from a deluge of unwanted robocalls and robotexts.　We recognize the value that comparison shopping offers to consumers who seek specific goods and services, and the value that lead generators offer to businesses, including small businesses, seeking new customers.[96]

38.　We understand the concerns of commenters like SBA's Office of Advocacy who note that certain small businesses rely on purchasing sales leads from lead generators and who share their "unease" with our rule.[97]　Taking that concern into consideration, we make clear that the rule we adopt today only limits sellers, of any size, from robocalling or robotexting consumers who did not explicitly

---

[90] Pub. L. No. 106-229, 114 Stat. 464 (2000) (codified at 15 U.S.C. §§ 7001-7006).　The E-Sign Act establishes rules for satisfying a requirement for a writing or a signature with their electronic equivalents.　Joint Consumer Commenters Reply at 5-7 (observing that the rules of the federal E-Sign Act apply whenever agreements consenting to telemarketing calls are entered into online); Aug. 7 Congressional at 1 ("Although telemarketers routinely ignore the requirements of the E-Sign Act, the legislation's mandate for E-Sign consent before writings can be provided in electronic records in 15 U.S.C. § 7001(c) is fully applicable.").

[91] *See, e.g.,* Joint Consumer Commenters at 31-32 & Reply at 5-7; State Attorneys General Reply at 14-15.　In the *2012 TCPA Order*, the Commission concluded that consent obtained in compliance with the E-Sign Act will satisfy the requirements of our rule, including permission obtained via an email, web site website form, text message, telephone keypress, or voice recording.　*2012 TCPA Order*, 27 FCC Rcd at 1844, para. 34.　Although we are amending our prior express written consent TCPA rule here, we continue to find that compliance with the federal E-Sign Act will satisfy the requirements of our revised rule.

[92] *Text Blocking Order and Further Notice* at para. 61.

[93] Thus, we disagree with IMC's contention that on a loan comparison website a consumer can be solicited about loan consolidation.　IMC Dec. 6 *ex parte* at 2-3.

[94] *See, e.g.,* USTelecom Comments at 5; VON Comments at 7-8; Chandler Comments at 1; QuinStreet Comments at 7; Letter from Lucas Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Oct. 27, 2023) at 3 (Zillow Oct. 27 *ex parte*).

[95] *See, e.g.,* UHC Comments at 5; PACE Comments at 5; Bankers Joint Commenters Reply at 13-16.

[96] *See, e.g.,* OLA Comments at 3 (observing that small-dollar lead generators often connect underserved consumers with credit providers willing to quickly help solve the needs of the credit challenged); REACH Comments at 4 (lead generators can be "an engine that drives a huge number of small and independent companies that do not have their own robust marketing team"); Dec. 6 Congressional at 2 ("Comparison shopping … allows smaller businesses to compete on a level field against larger entities.").

[97] Letter from Major L. Clark III and Jamie Belcore Saloom, Small Business Administration Office of Advocacy, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 1-2 (Dec 1, 2023) (SBA Dec. 1 *ex parte*).

**Federal Communications Commission**    FCC 23-107

consent to receive such communications from a particular seller. As the Joint Consumer Commenters point out, "[l]ead generators can still…conduct business as they are currently with minimal changes: they can collect and share leads to consumers interested in products and services, they just will not be able to collect and share the consents for telemarketing calls that included an artificial or prerecorded voice or made with an automatic dialer."[98] Moreover, sellers that wish to use robocalls and robotexts for such communications may still do so—provided they obtain consent consistent with the reasonable limits codified in today's rule.

39. Our rule does not restrain comparison shopping, nor does it unnecessarily constrain a businesses' ability to rely on leads purchased from lead generators.[99] For example, consumers may reach out to multiple businesses themselves or ask to be contacted only by businesses through means other than robocalling and robotexting. Further, sellers may avail themselves of other options for providing comparison shopping information to consumers.[100] They may initiate calls or texts consumers without using an autodialer or prerecorded or artificial voice messages. [101] They may use email or postal mail, both to provide information and to solicit further one-to-one consent to robocall or robotext. Nothing in our rule restricts the ability of businesses, including small businesses, from relying on leads generated by third party lead generators.[102]

40. Furthermore, while the record suggests that comparison shopping can benefit consumers and businesses alike, no commenter provides specific evidence that the limit we establish today would have any deleterious effect on the ability of consumers to comparison shop or businesses to assist consumers in doing so. Indeed, commenters that tout the benefits of comparison shopping (and we do not doubt those benefits),[103] make no effort to tie those benefits exclusively to comparison shopping websites or to sellers that use robocalls or robotexts through consent that is not one-to-one to reach consumers.

41. Additionally, we find that, even under our new rule, comparison shopping websites can obtain the requisite consent for sellers to robocall and robotext consumers using easily-implemented methods. For instance, a website may offer a check box list that allows the consumer to choose each seller that they wish to hear from.[104] Alternatively, a comparison shopping website may offer the consumer a clickthrough link to a business so that it may obtain requisite consent from the consumer directly. Our rule does not prohibit websites from obtaining leads and merely codifies reasonable limits on when those leads allow sellers to use robocalls and robotexts to reach consumers.

---

[98] Letter from Margot Saunders, Senior Counsel, National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 4 (Dec 1, 2023) (Joint Consumer Commenters Dec. 1 *ex parte*).

[99] SBA Dec. 1 *ex parte* at 2.

[100] *See, e.g.,* Joint Consumer Commenters Dec. 1 *ex parte* at 4.

[101] However, if the calls or text messages are sent to lines that are registered with the DNC Registry, compliance with our regulations regarding those messages is required.

[102] SBA Dec. 1 *ex parte* at 2.

[103] *See, e.g.*, LendingTree Dec. 6 *ex parte* attach. At 3 (explaining that comparison shopping saves consumers money).

[104] Joint Consumer Commenters Reply at 13; State Attorneys General Reply at 17. We disagree with the commenters who oppose check boxes, contending that customers could miss them, particularly on a mobile device. *See, e.g.*, Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, Attach. at 5 (Dec. 5, 2023) (LendingTree Dec. 5 *ex parte*). There is no indication in the record that such check boxes are unworkable, particularly in light of the extended implementation period we are providing to affected parties to implement solutions.

**A18**

42. We disagree with commenters who suggest that requiring one-to-one consent would be detrimental to consumers and small businesses.[105] First, while we agree that some businesses may have to alter their business practices to provide more transparency upfront to consumers, commenters have not explained why such changes to their current business practices will result in their inability to continue doing business. Nowhere in the record has any commenter provided specific evidence to demonstrate that such a rule would harm their businesses in a way that would outweigh the need to protect consumers, including small businesses, from the "nuisance" and "invasion of privacy" resulting from unwanted automated and prerecorded calls.[106] These commenters have not, for example, offered evidence of what fraction of their business involves robocalls and robotexts and thus how much of their total business would be affected by the new rule. Nor do they indicate how much it would cost to modify their websites and processes to disclose to the consumer who will call and get consent for each such caller. Nor do they quantify the cost to small businesses of disclosing their names before consumers consent. More broadly, none of these parties account for possible offsetting benefits to businesses, including small businesses, of disclosing the business name before consent. In short, the record is devoid of any evidence that leads us to conclude the cost of implementation for all businesses, large and small, is material.

43. Our existing rules already require that callers and texters demonstrate that they have obtained valid consent from the called party.[107] Thus, we also find that the new rule will assist callers and texters in at least two ways. First, the rule protects callers who rely on leads generated by third parties by ensuring that such callers operate pursuant to legally sufficient consent from the consumers. A caller who is unable to meet its burden of proof in demonstrating that it had valid consent to initiate and robocall or robotext to the individual consumer would be liable under the TCPA for making such a call. The rule we adopt today helps callers and texters, including small businesses, by providing legal certainty as to how to meet their burden of proof when they have obtained consent via a third-party. In other words, businesses

---

[105] Several commenters generally oppose one-to-one consent and contend that it would hurt small businesses, but they have not shown that any of the businesses would actually be harmed by complying with the TCPA consent requirements (if applicable). *See, e.g.*, SolarReviews Comments at 3-4; OLA Comments at 3-4; Wagoner Comments at 1; Harvey Comments at 3; REACH Comments at 8; Letter from Yaron Dori and Jorge Ortiz, counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 2 (Aug. 30, 2023) (QuinStreet Aug. 30 *ex parte*); Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Sept. 20, 2023) (REACH Sept. 20 *ex parte*); SBA Dec. 1 *ex parte* at 1-2); Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Sept. 15, 2023) (REACH Sept. 15 *ex parte*); Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 16, 2023) (EXP Realty *ex parte*); Letter from Jonathan Thessin, Vice President, Senior Counsel, American Bankers Association, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 30, 2023) (ABA Nov. 30 *ex parte*); IMC Dec. 6 *ex parte* at 3; Dec. 6 Congressional at 1-3.

[106] *See* Pub. L. No. 102-243, § 2, at ¶¶ 5-6, 9-10, 13-14, 105 Stat. 2394 (1991); 137 Cong. Rec. S16206 (1991) (statement of Sen. Warner in support of the TCPA) ("Indeed the most important thing we have in this country is our freedom and our privacy, and this is clearly an invasion of that…."); S. Rep. No. 102-178, at 5 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services."). *See also* Joint Consumer Commenters Dec. 1 *ex parte* at 3. Robokiller 2022 Report at 4 (estimating the financial losses from text scams alone to be approximately $20 billion in 2022, and this figure does not include the nuisance costs of spam texts); Robokiller 2023 Report at 9 (estimating the financial losses due to robocall scams to be $33 billion for the first half of 2023).

[107] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-7993, paras. 47-54. We also note that to obtain prior express invitation or permission for a telemarketing call to a DNC line, the caller must meet the requirements of section 64.1200(c)(2)(ii) of the Commission's rules: "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." We did not seek comment on, and we are not revising, section 64.1200(c)(2)(ii).

**Federal Communications Commission**            FCC 23-107

relying on such leads will have an easier and more certain way to demonstrate that they have obtained valid consent to call.

44. Second, we agree with the Joint Consumer Commenters that small businesses themselves will benefit from the protections we adopt. Small businesses also may use comparison shopping services when comparison shopping for businesses services. As the Joint Consumer Commenters note, our prior express written consent requirements are not limited to residential lines.[108] Rather, these requirements extend to and protect business phones from having their own phones inundated with unwanted calls and texts. Such calls to these businesses may tie up small business phones, annoy small business employees, and subject them to the same type of fraud as consumers generally. As the Joint Consumer Commenters argue, "[t]his is especially helpful for small business owners who feel they must answer all of their calls because each call may be from a potential customer. So, they are unable to ignore calls from strange numbers."[109]

45. We also heard from commenters who contend that our rule would harm small businesses because consumers will not choose them if given a transparent choice.[110] We disagree with those comments and note that commenters provided no evidence that consumers will choose larger businesses over smaller or more regional businesses. As the Joint Consumer Commenters argue, "[s]ome consumers may prefer to receive offers from large, well-known businesses and others may prefer to receive offers from small, local businesses. Consumers may also want to receive offers from both and compare the offers."[111] We agree with the Joint Consumer Commenters that there is no basis in the record "on which to assume that consumers will never consent for telemarketing calls from small businesses if they are pitched at the same time as large businesses."[112] Indeed, even if this were the case, we believe that consumers have the right to make that determination and to choose those callers for which they consent to receive autodialed and/or prerecorded calls or texts.

46. *Assisting Businesses with Compliance.* We want this important consumer protection rule to be successfully implemented by comparison shopping websites and lead generators. While we find that our rule does not unduly burden callers or comparison shopping websites, we nonetheless give sellers, texters, and callers, and any third-party websites they obtain consent through, a 12 month implementation period to make the necessary changes to ensure consent complies with our new requirement.[113] We agree with the Online Lenders Alliance that this implementation period will help mitigate some challenges to

---

[108] Joint Consumer Commenters Dec. 1 *ex parte* at 2.

[109] *Id.*

[110] *See, e.g.*, QuinStreet Aug. 30 *ex parte* at 2 (contending that the likely result would be that one or two large advertisers would come to dominate the online search results for products and services).

[111] Joint Consumer Commenters Dec. 1 *ex parte* at 5.

[112] *Id.*

[113] This period for implementation will be 12 months following Federal Register publication of this Report and Order or 30 days after announcement in the Federal Register of the Paperwork Reduction Act approval of the information collection in this new rule, whichever is later. The Consumer and Governmental Affairs Bureau will announce the effective date for section 64.1200(f)(9) by Public Notice. OLA had requested a 12 to 18 month implementation period. Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 2 (Dec. 4, 2023) (OLA Dec. 4 *ex parte*).

**Federal Communications Commission**                    **FCC 23-107**

implementation of our new rules[114] and we believe that such period should provide both lead generators and the callers who rely on the leads they generate ample time to implement our new requirements.[115]

47.    *Further Efforts to Assist Small Businesses.*  We recognize that, as some parties assert, a one-to-one consent requirement may impact some business models more than others.[116]  We are particularly cognizant of the Small Business Administration's request that the Commission obtain further comment and conduct further economic analysis on the impact of this proposal on small entities.[117]  We observe that no party objecting to our proposal provided specific evidence on the potential economic impact of our proposal and that our own analysis suggests that the harm of unwanted and illegal calls is at least $13.5 billion annually.[118]  Additionally, the evidence in the record indicates that lead generators and lead aggregators are a significant contributor to this problem.[119]

48.    We will continue to monitor the impact that our rule has on small businesses.  In the accompanying *Second Further Notice*, we seek comment on ways that the Commission may continue to refine our one-to-one consent rule to further mitigate any burdens it may create for businesses, especially small businesses.  Additionally, we delegate to the Consumer and Governmental Affairs Bureau to conduct outreach and education focusing on compliance with our rules for small business lead generators as well as for small business lead buyers.

49.    *Burden of Proof for Valid Consent.*  We take this opportunity to reiterate that the TCPA and our existing rules already place the burden of proof on the texter or caller to prove that they have obtained consent that satisfies federal laws and regulations.[120]  They may not, for example, rely on comparison websites or other types of lead generators to retain proof of consent for calls the seller makes.  And, in all cases, the consent must be from the consumer.  "Fake leads" that fabricate consumer consent do not satisfy the TCPA or our rules.[121]  In addition, the consumer's consent is not transferrable or subject to sale to another caller because it must be given by the consumer to the seller.[122]

50.    *Relationship to ACA Declaratory Ruling.*  We find that the rule we adopt today does not

---

[114] OLA Dec. 4 *ex parte* at 2.

[115] We are not adopting LendingTree's proposal to postpone adoption of the new rule and "act incrementally to ensure that a one-to-one rule does not harm consumers or businesses."  LendingTree Dec. 6 *ex parte*, attach. at 10.  The extended implementation period we adopt should be sufficient for smaller entities to comply with our rules.

[116] *See, e.g.*, REACH Sept. 20 *ex parte* at 2 (while "big tech" may be able to profit from one-to-one consent and an end to consent transfers, small players will not be able to—there is simply no alternative to the leads they rely on); EXP Realty *ex parte* at 1-2 (explaining that real estate agents rely on online sources and leads; although, no information was provided in this *ex parte* that the real estate agents are engaging in marketing practices that require TCPA consent or if it would be burdensome for them to obtain one-to-one consent, if required.); ABA Nov. 30 *ex parte* at 3 (arguing that the proposal could harm consumers by making it more burdensome to use comparison☐shopping websites); IMC Dec. 6 *ex parte* at 3 (contending that there would be a serious impact on small businesses).

[117] SBA Dec. 1 *ex parte* at 2.

[118] *See* section III F for a discussion of benefits and costs.

[119] *See, e.g.*, USTelecom Comments at 4; Joint Consumer Commenters at 4 & Reply at 8.

[120] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-7990, para. 47.

[121] *See, e.g.*, Dobronski Comments at 3-10; Joint Consumer Commenters at 2-6 & Reply at 7-12; State Attorneys General Reply at 2-5; USTelecom Comments at 2; Letter from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 10-11 (May 15, 2023) (ZipDX May 15 *ex parte*).

[122] Section 64.1200(f)(9) provides that prior express written consent for a call or text message must be directly to one individual seller at a time.  Consumer consent to be contacted by one seller is not consent to be contacted by another seller who purchased the lead from the first seller.

upset the precedent established in our *ACA Declaratory Ruling*.  In the *ACA Declaratory Ruling*, the Commission determined that "the provision of a cell phone number to a creditor . . . reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."[123]  The Commission emphasized that such consent would be deemed granted "only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."[124]

51.  Further, the Commission concluded that the creditor would be responsible for demonstrating that the consumer had provided consent because the "creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications."[125]  Therefore, "[c]alls placed by a third-party collector *on behalf of* that creditor are treated as if the creditor itself placed the call."[126]  In other words, the *ACA Declaratory Ruling* concerned calls regarding a specific transaction for which calls would be related solely to that specific transaction.  The Commission determined that calls made *on behalf of* the creditor would be treated as if they were placed by the creditor itself because the creditor would have kept the best records of consent related to that specific transaction.

52.  By contrast, the rule we adopt today for prior express written consent concerns the precursor to a transaction.  We therefore disagree with LendingTree that the revised TCPA prior express written consent requirement is inconsistent with the *ACA Declaratory Ruling*.[127]  That is, the lead generator is not otherwise engaged in business with the consumer for which another entity is calling on behalf of the lead generator, in the way that a creditor and third-party collector calling on behalf of the creditor were in the *ACA Declaratory Ruling*.  Rather, the lead generator is merely facilitating consent for another business to engage in marketing of a potential future specific transaction with the called party.  Because the calling party has not engaged in a specific transaction on which to base its consent, we find that our rule—and specifically, placing the burden on the caller—is consistent with the *ACA Declaratory Ruling* as well as other Commission precedent.[128]

---

[123] *Rules and Regulations Implementing the Telephone Consumer Protection Act Of 1991, Request of ACA International for Clarification and Declaratory Ruling*, Declaratory Ruling, 23 FCC Rcd 559, 564, para. 9 (2008) (*ACA Declaratory Ruling*).

[124] *Id.* at 564-65, para. 10.

[125] *Id.* at 565, para. 10.

[126] *Id*.

[127] LendingTree Dec. 6 *ex parte*, attach. at 9.  We also disagree with LendingTree that the rule we adopt here undermines the TCPA exemption for calls subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), that may be made without the prior express written consent of the called party.  In the *2015 TCPA Declaratory Ruling and Order*, the Commission explained that that provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls subject to HIPAA by a HIPAA-covered entity and business associates acting on its behalf, as defined by HIPAA, if the covered entities and business associates are making calls within the scope of the consent given, and absent instructions to the contrary.  *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8029, para. 141.  The HIPPA exemption is, for example. for calls for which there is exigency and that have a healthcare treatment purpose, such as appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions. *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8028-32, paras. 140-148.  Neither the *ACA Declaratory Ruling* situation nor the HIPAA exemption are for marketing calls to prospective customers, but are for calls made on behalf of the creditor or health care entity.

[128] *See, e.g., GroupMe, Inc./Skype Communications S.A.R.L Petition For Expedited Declaratory Ruling, Rules and Regulations Implementing the Telephone Consumer Protection Act Of 1991*, CG Docket No. 02-278, Declaratory Ruling, 29 FCC Rcd 3442, 3446, para. 11 (2014) (finding that, while consent may be obtained and conveyed

(continued….)

53.     We also disagree with LendingTree that our action, in making it unequivocally clear that one-to-one consent is required for TCPA prior express written consent, is arbitrary and capricious.[129]  The Commission sought comment on this issue, i.e., "Public Knowledge's request that prior express consent to receive calls or texts must be made directly to one entity at a time" in the *Further Notice*.[130]  The Commission specifically discussed the issue of hyperlinks in a comparison shopping website, and illustrated the problem by describing Assurance IQ, a website that purports to enable consumers to comparison shop for insurance.[131]  The Assurance IQ site sought consumer consent for calls and texts from insurance companies and other various entities, including Assurance IQ's "partner companies," that were listed when accessing a hyperlink on the page seeking consent (i.e., they were not displayed on the website without clicking on the link) and included both insurance companies and other entities that did not appear to be related to insurance.[132]  The Commission also sought comment on "amending our TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page."[133]  Numerous commenters supported these proposals.[134]  Thus, our findings in this *Second Report and Order* are reasonably and rationally based on the issues for which the Commission sought comment and the comments filed in this proceeding.  The lead generator commenters disagree with our conclusion, but such disagreement does not mean that our conclusion is arbitrary and capricious.

### E.    Text Message Authentication and Spoofing

54.  We decline to adopt at this time caller ID authentication requirements for text.  We agree with commenters that number spoofing in the SMS/MMS domain is rare at this time and that providers that originate texts generally permit their customers to initiate those texts only from numbers for which they are the assignee.[135]

55.  In addition, several commenters observe that the wireless industry is evaluating authentication technologies that could address text-specific issues.  For example, there is active work by the Internet Engineering Task Force on text authentication standards, and ATIS's IP-NNI Task Force is exploring whether technical standards that work to enhance existing mitigations should be pursued.[136]  For these reasons, we decline to adopt caller ID authentication requirements for text messages.  We seek further comment below on the issues of number spoofing and new technical standards for caller ID authentication.

---

through an intermediary, the caller remains liable for initiating or making autodialed text messages to wireless numbers in the event consent was not actually obtained).

[129] LendingTree Nov. 30 *ex parte*.

[130] *Report and Order and Further Notice of Proposed Rulemaking* at para. 61.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *See, e.g.*, Joint Consumer Commenters at 2; USTelecom Comments at 2; State Attorneys General Reply at 5; Aug. 7 Congressional at 1.

[135] *See, e.g.*, CTIA Comments at 12-15; ECAC Comments at 6; M³AAWG Comments at 5; NetNumber Comments at 7; ZipDX Comments at 1; CTIA Reply at 7-9; T-Mobile Reply at 5-6 (explaining that message sender authentication is already happening and the Commission does not need to mandate a technology solution); Twilio Reply at 7-8.

[136] *See, e.g.*, INCOMPAS Comments at 5; CTIA Reply at 8-9; T-Mobile Reply at 6.

Federal Communications Commission                    FCC 23-107

### F.    Summary of Benefits and Costs

56.  Our conservative estimate of the total loss from unwanted and illegal texts is $16.5 billion annually, which reflects both a substantial increase in the number of spam texts in recent years (the nuisance cost), and an increase in financial losses due to text scams.  We continue to estimate the nuisance cost of spam texts to be 5 cents per text.[137]  This cost is multiplied by 225.7 billion spam texts sent annually[138] and the result is $11.3 billion in total nuisance cost.  In addition, we estimate financial losses due to text scams to be $5.2 billion.  This figure is based on the $2 billion financial loss figure estimated previously,[139] scaled up to reflect the increased volume of spam texts.[140]  Our estimate is conservative; for example, Robokiller estimates the financial losses from text scams alone to be approximately $20 billion in 2022, and this figure does not include the nuisance costs of spam texts.[141]  Further, the total loss from unwanted and illegal calls is relevant for our consideration of the benefit generated by closing the lead generator loophole.  Even relying on the TrueCaller data provided by CTIA, which provides a more conservative estimate of 5.47 billion spam texts over a 12 month period, at 5 cents per text the potential nuisance cost is 273.5 million.[142]  It is unclear why CTIA considers TrueCaller a more accurate estimate than Robokiller, but even assuming the correct estimate is somewhere between TrueCaller's data and Robokiller's data, the potential loss to consumers is significant.  We reiterate the harm of unwanted and illegal calls to be at least $13.5 billion annually.[143]  We note that this is also a conservative estimate; for example, Robokiller estimates the financial losses due to robocall scams to be $33 billion for the first half of 2023.[144]

57.  We expect the actions we take today will impose minimal costs on mobile wireless providers and comparative shopping websites.  Nothing in the record demonstrates that requiring terminating providers to block texts when notified by the Commission of illegal texts would impose significant costs on mobile wireless providers.  The only argument CTIA presents for a particularly high burden is to state that wireless providers will have "to constantly check for reassigned numbers to unblock" but as we made clear above, that is not a requirement and CTIA has not adequately defined the burden they claim.[145]  Further, we expect that terminating providers aim to minimize texts that subject their customers to nuisance and receiving notifications from the Commission would assist in that effort and help providers improve customer satisfaction.  With respect to our action codifying that text messages are covered by the National DNC Registry's protections, we see no additional cost to providers.

58.  Various commenters assert consumer benefits from comparison shopping websites will be lost as a result of these rules.[146]  We note that these rules do not prohibit comparison shopping

---

[137] *Text Blocking Order and Further Notice* at para. 45.

[138] Robokiller 2022 Report at 5.

[139] *Text Blocking Order and Further Notice* at para. 45.

[140] The number of spam texts was estimated to be 86 billion when the Commission first estimated the financial harm of text scams to be $2 billion.  *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, 37 FCC Rcd 11618, 11632, at paras. 43-44 (2022) (*Text Blocking NPRM*).  The Robokiller 2022 Report states that the number of spam texts has increased to 225.7 billion, as of 2022, an amount 2.62 times the original amount.  Robokiller 2022 Report at 5.

[141] Robokiller 2022 Report at 4.

[142] CTIA Dec. 4 *ex parte* at 9-10.

[143] *First Caller ID Authentication Order*, 35 FCC Rcd at 3263, paras. 47-48.

[144] Robokiller 2023 Report at 9.

[145] CTIA Dec. 4 *ex parte* at 10.  *See supra* para. 23, n.50.

[146] *See, e.g.*, LendingTree Dec. 6 *ex parte* at 2; QuinStreet Dec. 5 *ex parte* at 2; OLA Dec. 4 *ex parte* at 2.

24

websites, only the use of robocalls and robotexts without one-to-one consent.  Nonetheless, we conclude that these commenters have not established a cost that outweighs the reduction in harm.  The SBA Office of Advocacy notes that small businesses have stated that the proposal to require sellers to obtain consent to robocall or robotext from one consumer at a time could increase costs significantly for small businesses that both buy and sell sales leads.[147]  The SBA did not offer any evidence to support this contention and did not address the benefit to consumers and to small businesses in having a reduction of unwanted calls and texts.  This rule makes it unequivocally clear that prior express written consent under the TCPA must be to one seller at a time, but does not prevent small businesses from buying and selling leads nor does it prevent small businesses from contacting consumers.  As the Joint Consumer Commenters observe, the requirements for prior express written consent for the telemarketing calls covered by the TCPA will also protect business phones from the floods of unwanted prerecorded telemarketing calls.[148]  We agree with the Joint Consumer Commenters that our rule is especially helpful for small business owners who are incentivized to answer all incoming calls because each call may be from a potential customer and are unable to ignore calls from unfamiliar numbers.[149]  In addition, this requirement will help small businesses because it will provide legal certainty as to how callers and texters can demonstrate valid consent when that consent was obtained via a third party.

59.    Our decision to make unequivocally clear that prior express written consent under the TCPA must be one-to-one consent may raise costs for some businesses that use robocalling, including those that fall under the definition of small businesses.[150]  No party has presented any specific data to substantiate such possible additional costs.  Further, the benefits of making it unequivocally clear that one-to-one consent is required for prior express written consent under the TCPA, will accrue to millions of individuals and businesses, including small businesses, and will outweigh any such costs to those businesses currently using multi-party "consent" for robocalls and robotexts.  Over time, it may be possible for technological solutions to lower the costs to businesses that use robocalls or robotexts for seeking one-to-one prior express written consent, and maintaining consent records.  Any effort to create an exception for particular businesses, including small businesses, has the potential to undermine the effectiveness and intent of the policy, which is to provide consumers (including small businesses) the ability to determine when and how they are contacted in a transparent manner.

60.  We also see very little cost to providers as a result of our encouragement to make email-to-text an opt-in service.  Providers who do not take up this option will incur no additional cost and, for those providers who do so, we assume that the benefits of making email-to-text an opt-in service, e.g., more satisfied customers, outweighs the costs of setting up an opt-in program and marketing it to their subscribers.  Similarly, we believe closing the lead generator loophole so that prior express written consent can only be given directly from a consumer to a single seller-caller at a time will result in only small additional costs for comparative shopping websites.  Such practices should lead to greater customer satisfaction that may benefit such websites.

61.  Based on the analysis of the anticipated benefits and costs discussed above, we believe the benefits of the rules adopted in this Report and Order significantly outweigh their costs.  Even if these rules eliminate only a small share of unwanted and illegal texts and calls, the benefits would be substantial, given the magnitude of the likely losses from such texts and calls.

---

[147] SBA *ex parte* at 2.

[148] Joint Consumer Commenters Dec. 1 *ex parte* at 2.

[149] *Id.*

[150] The TCPA generally requires callers to get consumer consent before making certain calls to consumers using an "automatic telephone dialing system" (also known as an "autodialer") or an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1)(A).

### G.      Legal Authority

62. We rely on the TCPA to adopt rules applicable to mobile wireless text messaging providers,[151] including our blocking requirement.  First, the TCPA gives the Commission authority over the unsolicited text messages within the scope of this order.[152]  The TCPA, in relevant part, restricts certain autodialed calls to wireless telephone numbers absent the prior express consent of the called party.[153]  The Commission has found that, for the purposes of the TCPA, texts are included in the term "call."[154]  Because the Commission has authority to regulate certain text messages under the TCPA, particularly messages sent using an autodialer and without the consent of the called party, we have legal authority to require providers to block text messages violate the TCPA.  The TCPA also provides authority for our consent requirements and our codification that text messages are covered by the National DNC Registry.[155]

63. We therefore disagree with RILA that we do not have the legal authority to expand the DNC restrictions to text messages because Congress did not include text messages in the statute and no appellate court has construed the National DNC Registry's restrictions to include text messages.[156]  The DNC restrictions have long applied to wireless phones[157] and the Commission and courts have long held that text messages are calls under the TCPA.[158]  Further, we are codifying that text messages are included in the National DNC Registry's protections—a position that the Commission and several courts have previously taken[159]—we are not expanding the National DNC Registry's restrictions.

64. To the extent that the Commission may direct providers to block texts where an autodialer has not been used, we further find authority under section 251(e)(1) of the Communications Act.  Section 251(e)(1) provides us independent jurisdiction to prevent the abuse of NANP resources, regardless of the classification of text messaging.[160]  Requiring blocking of a particular number that has

---

[151] CTIA specifically supported use of the TCPA, as well as the Truth-in-Caller ID Act for this purpose.  CTIA Comments at 11-12.

[152] The Commission stated in the *2003 TCPA Order* that the authority to regulate telemarketing derives from the TCPA.  *2003 TCPA Order*, 18 FCC Rcd at 14070, para. 95.  The Commission also observed that Congress anticipated "that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id*. at 14092, para. 132.

[153] 47 U.S.C. § 227(b)(1)(A).

[154] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[155] 47 U.S.C. § 227(c) (granting the Commission rulemaking authority to protect residential telephone subscribers' privacy rights).

[156] RILA Reply at 5-8.

[157] *See* 47 CFR § 64.1200(e); *2003 TCPA Order*, 18 FCC Rcd at 14115-16, paras. 165-66.

[158] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165; *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA.").

[159] *See, e.g., Hernandez*, 33 FCC Rcd at 12386, para. 10; *Barton*, 525 F. Supp.3d 195; *Mantha*, 2022 WL 325722; *Visco v. Creditors Relief, LLC*, No. 20-cv-12303-DJC, 2022 WL 488495 (D. Mass. Feb. 17, 2022); *Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023); *Pariseau v. Built USA, LLC*, 619 F. Supp.3d 1203 (M.D. Fla. 2022); *Sagar*, 2021 WL 5567408; *Hall*, 72 F.4th at 986.

[160] *See May 2023 Call Blocking Order* at para. 66.  There, the Commission noted that "this particularly applies where callers spoof caller ID for fraudulent purposes and therefore exploit numbering resources, *regardless of whether the voice service provider is a common carrier.*"  *Id*. (emphasis added).  While the Commission

(continued….)

**Federal Communications Commission** FCC 23-107

sent known illegal texts will help ensure that entities sending illegal texts cannot continue to abuse NANP resources to further their illegal schemes. We therefore disagree with CTIA, which has argued that reliance on section 251(e) "would raise unnecessary questions about the scope of the Commission's authority, given that text messaging is an information service."[161] We also find each of the other arguments raised by CTIA to be unpersuasive. First, CTIA asserts that the Commission "has never used Section 251(e) without a direct nexus to voice calls" and that the "FCC and courts have understood that numbering administration authority under Section 251(e) pertains only to numbers used for routing of voice calls in the U.S., not numbers used for text messaging."[162] The fact that Commission has not previously exercised its authority under section 251(e)(1) to address similar issues in texting does not limit our authority under that section. Furthermore, the fact that the court cases cited by CTIA pertained to voice calls merely reflects that those cases involved voice calls and pre-dated the widespread use of texting, nothing more. Second, CTIA asserts that "Section 251(e) authority is limited to services that connect with the public switched telephone network."[163] Although NANP numbers are used for routing calls on the public switched telephone network (PSTN), the authority granted in section 251(e)(1) is not restricted to voice calls routed via the PSTN.[164] Rather, section 251(e)(1) is a clear grant of authority "over those portions of the North American Numbering Plan that pertain to the United States"[165] and the underlying technology does not change the fact that the numbers in question are portions of the NANP that pertain to the United States. We further disagree that section 251(e)(1) "is also inapplicable because problems with illegal text messages are not numbering problems."[166] Here, we exercise our section 251(e)(1) authority to prevent the abuse of NANP resources by sending illegal texts, regardless of whether the number is spoofed.[167] This is consistent with our approach in calling, where we have found that our authority under this section does not hinge on whether a call is spoofed.[168] CTIA further asserts that we do not spell out what authority outside of the TCPA we may rely on when determining that a text is illegal.[169] The specific reason for a text to be illegal will vary on a case-by-case basis and, as with calls, may be based on violation of any number of state or federal

---

stated that section 251(e) "particularly applies" where numbers are spoofed, it did not find that the authority in section 251(e) was limited to spoofing, and we find no reason to construe section 251(e)(1) in that manner.

[161] CTIA Comments at n. 37; *see also* CTIA Dec. 4 *ex parte* at 6-8.

[162] CTIA Dec. 4 *ex parte* at 7 (citing *New York v. FCC*, 267 F.3d 91 (2d Cir. 2001) and *Sprint Corp. v. FCC*, 331 F.3d 952 (D.C. Cir. 2003)).

[163] CTIA Dec. 4 *ex parte* at 7.

[164] As CTIA notes, "text messages may be routed using ten-digit NANPA [sic] numbers." CTIA Dec. 4 *ex parte* at 7. We note that the paragraph of the 2021 order cited by NTIA for support was discussing whether to require cost sharing under section 251(e)(2). *See id.* (citing *Implementation of the National Suicide Hotline Improvement Act of 2018*, WC Docket No. 18-366, Second Report and Order, 36 FCC Rcd 16901, 16930, n.211 (2011). That order did not discuss the Commission's authority under section 251(e)(1).

[165] 47 U.S.C. § 251(e)(1).

[166] CTIA Dec. 4 *ex parte* at 8. This argument is inconsistent with CTIA's own suggestion that we rely on the Truth in Caller ID Act. CTIA Dec. 4 *ex parte* at 6-8. If section 251(e)(1), which does not address spoofing on its face, is inapplicable because spoofing is rare in texting, then the Truth in Caller ID Act, which is expressly about misleading or fraudulent caller ID, would also be inapplicable in most cases.

[167] This is distinct from the blocking the Commission required in the *Text Blocking Order and Further Notice*. There, the Commission required blocking of numbers that should never be used to originate calls. *Text Blocking Order and Further Notice* at paras. 16-26. In such cases, the likelihood the numbers is spoofed is high, even if spoofing is generally rare in text messaging. The blocking rule we adopt today, however, addresses situations where the sender has the right to use the number, but is using it to send illegal texts. *Supra* paras. 16-25.

[168] *See, e.g.*, *May 2023 Call Blocking Order* at para. 66.

[169] CTIA Dec. 4 *ex parte* at 6-7.

statutes.[170]  That fact in no way diminishes our authority to rely on section 251(e)(1) to prevent the abuse of NANP resources by robotexters.

65.  We also find that we have authority under Title III of the Act to adopt these measures. Title III "endow[s] the Commission with 'expansive powers' and a 'comprehensive mandate to "encourage the larger and more effective use of radio in the public interest."'[171]  Section 303 of the Act grants the Commission authority to establish operational obligations for licensees that further the goals and requirements of the Act if such obligations are necessary for the "public convenience, interest, or necessity" and are not inconsistent with other provisions of law.[172]  In particular, section 303(b) authorizes the Commission to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within each class," and that is what our notice requirement and blocking rule addresses here.[173]  In addition, sections 307 and 316 of the Act allow the Commission to authorize the issuance of licenses or adopt new conditions on existing licenses if such actions will promote public interest, convenience, and necessity.[174]  We find the requirements we adopt for mobile wireless providers after they are on notice of illegal text messages are necessary to protect the public from illegal text messages and that such a requirement is in the public interest.

66.  Because we find that the sources of authority identified above provide sufficient authority for the rules we adopt today, we find it unnecessary to address other possible sources of authority to adopt these rules.

## IV.    SECOND FURTHER NOTICE OF PROPOSED RULEMAKING

67.  Because bad actors continue to evolve in their methods of defrauding consumers, in this Second Further Notice of Proposed Rulemaking, we seek comment on a number of additional steps to better protect consumers from unwanted and illegal texts.  First, we seek comment on additional blocking requirements and related approaches.  Second, we seek further comment on text message authentication.  Finally, we seek comment on whether to make email-to-text an opt-in service.

### A.    Text Blocking

68.  We propose and seek comment on additional text blocking options to better protect consumers from illegal texts.  Specifically, we first propose and seek comment on extending the text blocking requirement we adopt in the Report and Order[175] to include originating providers, and to require all immediate downstream providers to block the texts from providers that fail to block after Commission notification.  We also seek additional comment on whether to require this blocking to be

---

[170] *See Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6868, n.7 ("Fraudulent calls may violate any of a number of state or federal statutes.  *See, e.g.*, Telemarketing Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108; Credit Card Fraud Act of 1984, 18 U.S.C. § 1029; 18 U.S.C. §§ 1343, 1344.").

[171] *Cellco Partnership v. FCC*, 700 F.3d 534, 542 (D.C. Cir. 2012) (*Cellco Partnership*) (upholding the Commission's authority under Title III to adopt data roaming rules) (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) (*Nat'l Broad Co.*) (quoting 47 U.S.C. § 303(g)).

[172] 47 U.S.C. § 303.

[173] *See Cellco Partnership*, 700 F.3d at 543 ("Like other rules that govern Title III services, the data roaming rule merely defines the form mobile-internet service must take for those who seek a license to offer it.").  We find several other provisions of section 303 relevant here.  *See* 47 U.S.C. § 303(g) (requiring the Commission to "encourage the larger and more effective use of radio in the public interest"); *id.* § 303(r) (authorizing the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act").

[174] *See* 47 U.S.C. §§ 307, 316; *see also Cellco Partnership,* 700 F.3d at 543 (recognizing section 316 as additional Title III authority for our data roaming rules).

[175] *See* 47 CFR § 64.1200(s); *supra* paras. 16-25.

based on number, source, the "substantially similar" traffic standard,[176] or some other standard. Next we seek comment on requiring providers to block texts based on content-neutral reasonable analytics. Third, we seek comment on traceback for text messaging, including whether to adopt a traceback response requirement for text messaging. Fourth, we seek comment on any other rules we could adopt to effectively protect consumers from illegal texts. Finally, we seek comment on any additional protections that may be necessary in case of erroneous blocking.

### 1. Expanding the Mandatory Text Blocking Requirement to Originating Providers and Adding a Downstream Provider Blocking Requirement

69.    *Requiring Originating Provider Blocking*. We propose and seek comment on extending the requirement to block following Commission notification of illegal texts to other providers generally, and originating providers specifically. We believe that originating providers are similar to gateway or originating voice service providers in that they are the first U.S.-based provider in the text path and that applying an analogous rule to originating providers could help ensure that these providers are properly incentivized to stop illegal texts even before we send any notice. We seek comment on this view.

70.    We seek comment on whether and, if so, how to define originating providers here. Is the originating provider the first provider in the text path, and therefore in a similar position to a gateway or originating voice service provider? Are there other providers in the path that are more similar to a gateway provider? Alternatively, should we apply these rules to some other entity in the chain to better protect consumers? The call blocking rules help hold bad-actor voice service providers responsible for the calls they allow onto the network by denying those voice service providers access to the network entirely when they have demonstrated noncompliance. Is there a particular type of entity in the texting ecosystem that is more likely to either intentionally or negligently shield those sending illegal texts?

71.    *Blocking Standard*. We propose to require originating providers to block all texts from a particular source following Commission notification. We seek comment on this proposal. Is this an appropriate standard for blocking? How might originating providers determine the source of a particular text or texts in order to comply with this rule? Alternatively, should we require blocking based on the number or numbers, as we do for terminating providers in the Report and Order?[177] If so, how effective is such a requirement? If not, should we also change the standard for terminating providers to match the standard for originating providers, or do originating providers have access to more information, making a broader requirement to block based on source appropriate?

72.    Should we limit the length of time for which blocking is required? If so, how long should we require providers to block? Alternatively, should we require originating and/or terminating providers to block using the "substantially similar" standard applied in our call blocking rules?[178] We believe that texting may present concerns unique from calling that justify a different standard, or require additional guidance for compliance. For example, while a voice service provider will not have the content of a particular call prior to that call reaching the recipient, a texting provider likely does have access to this information. Given that, should we require that blocking be content as well as competitively-neutral? Are there any other standards we should consider?

73.    *Blocking Process*. We seek comment on whether the process for voice service providers should be applied here to texting. Our current rules for call blocking lay out a detailed process that must be followed before requiring all immediate downstream providers to block all of an identified

---

[176] 47 CFR § 64.1200(n)(5), (n)(6); *see also Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6897-6901, paras. 74-86; *May 2023 Call Blocking Order*, at paras. 29-48 (effective Jan. 8, 2024).

[177] *Supra* paras. 16-25.

[178] *See* 47 CFR § 64.1200(n)(5), (n)(6).

voice service provider's traffic.[179]  Is this process appropriate for the texting environment, or are the differences between texting and calling that justify modifications?  Several commenters expressed concerns about the delays inherent in this process.[180]  While the process works well for calling,[181] delays may have different consequences in the texting context.

74.  Is a delay particularly significant when dealing with texts compared to calls?  Why or why not?  If so, are there changes we could make to address this issue while still ensuring that providers are afforded sufficient due process?  For example, should we, as we do in the calling context, allow 14 days for the originating provider to investigate and respond following the Notification of Suspected Illegal Texts or should we change that time frame?  Should we establish a different docket for text blocking Orders, or use the same docket used for call blocking Orders?

## 2.    Requiring Blocking of Texts Based on Reasonable Analytics

75.  We seek comment on requiring or incentivizing providers to block texts based on reasonable analytics.  Our call blocking rules provide a safe harbor for the blocking of unwanted calls based on reasonable analytics on an opt-out basis.[182]  In addition, our call blocking rules provide a safe harbor for the blocking of calls without consumers' consent and calls that are highly likely to be illegal based on reasonable analytics.[183]  In both cases, we require that analytics are applied in a non-discriminatory, competitively neutral manner.[184]  The Commission also recently sought comment on requiring terminating voice service providers to offer opt-out blocking services for calls that are highly likely to be illegal.[185]  We have not yet addressed text blocking based on reasonable analytics.

76.  *Blocking Standard*.  We seek comment on whether and how to define reasonable analytics for this purpose.  The record indicates that many providers already make use of analytics or other techniques to block illegal texts.[186]  What analytics do providers use to identify unwanted or illegal texts?  If providers are reluctant to share specifics to avoid tipping off bad actors we seek comment on broad criteria that providers may use.  For example, a call-blocking program might block calls based on a combination of factors, such as: large bursts of calls in a short timeframe, low average call duration, low call completion ratios, invalid numbers placing a large volume of calls, etc.[187]

77.  We seek comment on whether, and to what extent, providers use volumetric triggers to identify bad traffic.  Do any of the call-blocking reasonable analytics factors apply to text and, if so, which ones?  Are there other content-neutral factors that are more likely to indicate that a text is illegal that do not apply in the calling context?  If we adopt such a rule, are there any necessary modifications

---

[179] These steps include a Notification of Suspected Illegal Traffic, time for the provider to investigate and respond, and an Initial Determination Order with additional time to respond before the Enforcement Bureau may adopt a Final Determination Order requiring all immediate downstream providers to block.  47 CFR § 64.1200(n)(5)-(6).

[180] *See, e.g.*, M³AAWG Comments at 4; NetNumber Comments at 4-6 & Reply at 2-3; T-Mobile Reply at 3-4.

[181] *See, e.g.*, *One Eye*; *see also Urth Access*, *Sumco Forfeiture Order*.

[182] 47 CFR § 64.1200(k)(3).

[183] 47 CFR § 64.1200(k)(11).

[184] *See* 47 CFR § 64.1200(k)(3)(iv), (k)(11)(v).

[185] *May 2023 Call Blocking Order*, at paras. 71-75.

[186] *See, e.g.*, CTIA Comments at 7-8; M³AAWG Comments at 4; NetNumber Reply at 3; Twilio Reply at 3-6.  CTIA explains that considerations involved in investigating and blocking potentially illegal messages are different from those involved in imposing similar obligations on international gateway voice providers, for a variety of reasons, including the ever-evolving tactics used by bad actors to send spam text messages (e.g., brand impersonation, SIM boxes, snowshoe messaging, etc.).  CTIA Comments at 10.

[187] *See 2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4888, para. 35.

**Federal Communications Commission**                              FCC 23-107

we should make to accommodate small businesses? As we noted above, the content of a text is available to the provider at the time that blocking occurs, which is not generally true for calls.[188] If we require providers to block based on reasonable analytics, should we therefore require that these analytics be content-neutral? Should we also require that the blocking be non-discriminatory and competitively neutral? Alternatively, are there ways we could encourage this blocking without requiring it? Are there any other issues we should consider?

78. *Safe Harbor*. Because texting is currently classified as an information service, we do not believe that providers need safe harbor protections to engage in this type of blocking. We seek comment on this belief. Do providers risk liability when they block erroneously? If so, what can we do to reduce that risk while still ensuring that wanted, lawful texts reach consumers?

### 3. Alternative Approaches

79. We seek comment on alternative blocking or mitigation rules we could adopt to target unwanted and illegal texts and better protect consumers. Are there approaches we have not considered here that would stop illegal texts and protect consumers? What can the Commission do to encourage or require providers to adopt these approaches? For example, can the Commission take steps to encourage information sharing between providers?

### 4. Protections Against Erroneous Blocking

80. If we adopt additional text blocking requirements, should we also adopt additional protections against erroneous text blocking? Our rules already require providers to provide a point of contact for blocking issues.[189] Considering that providers can and do block texts, is this sufficient, or are other protections necessary? If so, what protections should we adopt? For example, should we do as one commenter suggests and create a white list for "legitimate research organizations and/or research campaigns"[190] or other entities, or would doing so raise legal or policy concerns? Similarly, should we require some form of notification when texts are blocked,[191] similar to our requirement when calls are blocked based on reasonable analytics? If so, how can providers send a notification technically? Should we require notification only to certain categories of blocking? Or, should we, as one commenter suggests, require providers to give "advance notice when a number is flagged as suspicious and may be blocked" along with several other protections?[192] Alternatively, should we adopt the same protections already in place for erroneous blocking of calls?[193] What are the risks and benefits of each approach?

### B. Text Message Authentication

81. We seek additional comment on text message authentication and spoofing. We have so far declined to adopt authentication requirements for texting.[194] The record thus far is mixed on the feasibility of such a requirement, with commenters noting that the STIR/SHAKEN caller ID

---

[188] *See supra* para. 72.

[189] 47 CFR § 64.1200(r).

[190] AAPOR Comments at 3-5.

[191] *See, e.g.*, CCA Comments at 5; INCOMPAS Comments at 4; RMAI Comments at 3; Bankers Joint Commenters Reply at 12-13.

[192] RMAI Comments at 3.

[193] ABA Nov. 30 *ex parte* at 2.

[194] *See Text Blocking Order and Further Notice*, at para. 37; *supra* paras. 44-45.

authentication system is designed to work only on IP networks.[195]  Further, the record indicates that number spoofing is comparatively rare in SMS and MMS.[196]

82.  We believe it is important to continue to build a record on these issues and ensure that we are aware of any new developments or concerns.  We therefore seek further comment on the need for and feasibility of text authentication.  In particular, commenters should address whether number spoofing is an issue in text messaging and, if so, the extent of the problem.  If number spoofing is uncommon, are there steps we can take to ensure that it remains the exception rather than the rule?  Do bad actors use other spoofing techniques, such as identity spoofing?  If so, what can we do to address this problem?  Commenters should also discuss any new or in-process technical standards for authentication in text messaging, including their current status and any timelines for development.  What issues will these new tools address?  If the new technical standards are designed to prevent number spoofing, is this evidence of a more significant spoofing issue than commenters[197] acknowledged in response to the *Further Notice*?  If so, should the Commission act more quickly in this area, rather than waiting for the standards bodies to finish their work?

83.  We seek comment on whether we should require industry to regularly update us with its progress on text authentication.  We believe doing so would ensure that we have the most up-to-date information available without having to adopt further Notices of Proposed Rulemaking covering this topic.  Is this belief correct?  If so, how often should we require industry to update us and how should we determine when further updates are no longer required?  For example, should we set a six-month cycle for updates over the next two years?  Or should we require some other update cycle and endpoint?

### C.    Traceback

84.  Traceback has been a key part of our strategy for combating illegal calls.[198]  We seek comment on whether we should require a response to traceback requests for texting.  We seek comment on requiring providers to respond to traceback requests from the Commission, civil or criminal law enforcement within 24 hours, consistent with our existing rule for gateway voice service providers and our recently adopted rule for all voice service providers that will take effect on January 8, 2024.[199]  Should we also include the industry traceback consortium as an entity authorized to conduct traceback of texts, or is there some other entity that should be included?  Is traceback for texting similar enough to traceback for calls for such a requirement to be effective?  Are there any changes we should make to the rule to ensure that traceback works for texts?  How should we handle aggregators and cloud platforms?  Are there industry efforts that are already in operation, such as CTIA's Secure Messaging Initiative, that could replace or complement a traceback requirement?[200]  Are there other issues we should consider in adopting a traceback requirement?

85.  We seek comment on the specifics of the traceback process for texts, as well as any obstacles to industry-led traceback efforts that may work alongside or in place of rules we may establish.  Are tracebacks typically conducted for texting?  If so, what does the process look like?  Are there types of providers that are routinely reluctant to respond to these requests?  Is information from

---

[195] *Text Blocking Order and Further Notice* at para. 37 & note 107.

[196] *See, e.g.*, ECAC Comments at 6; M³AAWG Comments at 5; NetNumber Reply at 6-8; ZipDX Comments at 1; Twilio Reply at 7-8.

[197] Such commenters argue that number spoofing in the text message domain is comparatively rare.  *See, e.g.*, ZipDX Comments at 1-2; CTIA Comments at 12-14 & Reply at 7-8; M³AAWG Comments at 5; ECAC Comments at 6; NetNumber Comments at 7; Twilio Reply at 7-8.

[198] 47 CFR § 64.1200(n)(1).

[199] *Id*.

[200] CTIA Dec. 4 *ex parte* at 10-11.

**Federal Communications Commission**                    **FCC 23-107**

traceback processes shared and then incorporated into blocking decisions?  Are there network modifications, standards, or changes to software or hardware that would enable efficient texting traceback? If we adopt a traceback requirement for texting, are there any necessary modifications we should make to accommodate small business?  Is there anything else we should know about traceback for texting?

### D.    E-Mail-To-Text Messages

86. In the Order, we encourage providers to make email-to-text an opt in service.  We now propose to require providers to do so, so that subscribers wishing to receive these types of messages would first have to opt in to the service.[201]  Would such a rule reduce the quantity of fraudulent text messages consumers receive?  Does the anonymity of email-to-text make it more attractive to fraudulent texters?  Commenters should discuss any drawbacks to requiring providers to block such messages if the consumer has not opted in to such service.  For example, would this result in blocking important or urgent messages?  If so, how could we reduce this risk?  Are there alternatives to making this service opt in that would have a similar effect?  If so, what are they and how would they compare? Commenters should discuss how we should define "email-to-text service."  Are there analogous services that should be covered, e.g., voicemail-to-text?  We seek comment on the details of any opt-in requirement and if the opt-in should be in writing.  Must it be stand-alone and conspicuous?  Will providers have the burden of demonstrating opt-in decisions?  Are there any other issues we should consider in adopting a rule?

### E.    Further Efforts to Assist Small Businesses with Compliance

87. We seek further comment on how the Commission can refine and expand its efforts to assist businesses, particularly small businesses, in complying with our one-to-one consent requirement. In the *Further Notice*, the Commission sought comment on how our proposal might affect the value of comparison-shopping websites to consumers and whether there were alternatives to our proposals.[202] As explained in the *Order*, we have determined based on the record that prior express written consent required under the TCPA must be given to one seller at a time.[203]  The Order recognizes, however, some commenters' concerns that this requirement will increase costs or otherwise disadvantage small business lead generators and/or small business lead buyers.[204]  We, therefore, are committed to monitoring the impact that our rule has on these businesses and to assisting small businesses with complying with the one-to-one consent rule.[205]  We seek comment on whether and how the Commission can further minimize any potential economic impact on small businesses in complying with our one-to-one consent requirement for prior express written consent under the TCPA.  Are there ways to further clarify or refine this requirement to further minimize any compliance costs?  What impact would such refinements have on consumers?  Are there further outreach efforts or other ways the Commission can assist small businesses in complying with our one-to-one consent rule?

---

[201] Commenters state that the email-to-text messages process allows the sender to be anonymous because the text is sent from an email account on a computer, not a phone number.  ZipDX Comments at 2; Somos Reply at 5 (observing a spike in text impersonation scams originating from email-to-text gateways, which permit a message to appear as sent from someone else's number or from an email address, and stating they are an increasingly popular method for scammers to impersonate brands using the text messaging channel).

[202] *Text Blocking Report and Order and Further Notice* at para. 61.

[203] *See supra* paras. 30-53.

[204] *See supra* paras. 38, 42..

[205] *See supra* para. 48

### F.    Benefits and Costs

88. We estimate that the total harm of unwanted and illegal texts is at least $16.5 billion. As discussed in the Order,[206] Robokiller estimates that Americans received 225.7 billion spam texts in 2022.[207] Assuming a nuisance harm of 5 cents per spam text, we estimate total nuisance harm to be $11.3 billion (i.e., 5 cents multiplied by 225.7 billion spam texts). Further, we estimate that an additional $5.3 billion of harm occurs annually due to fraud. Previously, we estimated the harm due to fraud from scam texts at $2 billion.[208] In the Order, we revised this figure upward in proportion with the increase in spam texts, resulting in an estimate of $5.3 billion.[209] We believe this estimate is conservative, given that Robokiller estimates financial losses due to fraud through text messaging to be $20 billion, and this figure does not include the nuisance costs of spam texts.[210] We seek comment on these estimates of harm and on the costs of the proposals to reduce the harm of unwanted and illegal texts outlined in this FNPRM. The Commission will analyze any detailed cost data received in comments.

### G.    Digital Equity and Inclusion

89. The Commission, as part of its continuing effort to advance digital equity for all,[211] including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, invites comment on any equity-related considerations[212] and benefits (if any) that may be associated with the proposals and issues discussed herein. Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.

### H.    Legal Authority

90. In the Second Further Notice of Proposed Rulemaking, we seek comment on several issues: (i) additional blocking requirements and related approaches to protect consumers from illegal texts; (ii) text message authentication; and (iii) whether to make email-to-text an opt-in service. We seek comment on our authority to adopt each of these three measures. The Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party. We seek comment on whether we have legal authority to adopt rules addressing these issues under the TCPA or the TRACED Act. For example, is

---

[206] *See supra* para. 56.

[207] Robokiller 2022 Report at 5.

[208] *Text Blocking Order and Further Notice* at para 43. *See also Text Blocking NPRM* , 37 FCC Rcd at 11632, para 44.

[209] The volume of spam texts in 2022 (225.7 billion) was 2.62 times the previous annual amount (86 billion per year). Our calculation scales up the $2 billion fraud harm by this factor, resulting in an estimated harm of $5.3 billion.

[210] Robokiller 2022 Report at 4.

[211] Section 1 of the Communications Act provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[212] We define the term "equity" consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

Federal Communications Commission    FCC 23-107

our TCPA jurisdiction sufficient to support our blocking proposals, and does the TRACED Act provide us with additional authority to adopt these rules?

91. Similarly, does the TCPA grant us sufficient authority to adopt the rules we discuss regarding requiring email-to-text to be an opt-out service? Commenters should also discuss whether we have authority for our proposals under section 251(e) of the Act, which provides us "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States,"[213] particularly to adopt any authentication, traceback, or blocking requirements. The Commission found authority to implement STIR/SHAKEN for voice service providers under section 251(e) of the Act in order to prevent the fraudulent exploitation of numbering resources.[214] Does section 251(e) of the Act grant us authority to adopt implementation of authentication for text messages?

92. We seek comment on our authority under the Truth in Caller ID Act for these proposals. The Commission found that it has authority under this statute to adopt a blocking requirement in the *Text Blocking Order and Further Notice*.[215] The Commission also found authority under this provision to mandate STIR/SHAKEN implementation, explaining that it was "necessary to enable voice service providers to help prevent these unlawful acts and to protect voice service subscribers from scammers and bad actors."[216] We seek comment on whether that same reasoning applies here. We also seek comment on whether we have authority for these proposals under Title III of the Act. Are there any other sources of authority we could rely on to adopt any of the rules we discuss in this Second Further Notice of Proposed Rulemaking?

## V.    WAIVER ORDER

93. We adopt a waiver, *sua sponte*, for a period of 12 months, to commence on the effective date of section 64.1200(s) of the Commission's rules, specifically to allow mobile wireless providers to access the RND to determine whether a number has been permanently disconnected since the date of the illegal text described in the Notification of Illegal Texts. We delegate authority to the Consumer and Governmental Affairs Bureau to extend the term of this waiver, if needed. The Commission established the RND to allow callers to determine whether a telephone number has been permanently disconnected after a date certain and therefore is no longer assigned to the party the caller wants to reach.[217] The Commission's rules require providers ensure the efficient use of telephone numbers by reassigning a telephone number to a new consumer after it is disconnected by the previous subscriber.[218] When a number is reassigned, callers may inadvertently reach the new consumer who now has the reassigned number (and may not have consented to calls from the calling party). To mitigate these occurrences, in the *Reassigned Numbers Report and Order*, the Commission established a single, comprehensive database to contain reassigned number information from each provider that obtains North American Numbering Plan (NANP) U.S. geographic numbers, which enables any caller to verify whether a telephone number has been reassigned before calling that number.[219]

94. We strongly encourage providers to determine whether a number has been reassigned in order to avoid blocking lawful texts from a different source using the number. One way to make this

---

[213] 47 U.S.C. § 251(e).

[214] *STIR/SHAKEN Order*, 35 FCC Rcd at 3260-61, para. 42.

[215] *Text Blocking Order and Further Notice*, at para. 39.

[216] *STIR/SHAKEN Order*, 35 FCC Rcd at 3262, para. 44.

[217] *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, 33 FCC Rcd 12024, 12029, para. 11 (2018) (*Reassigned Numbers Report and Order*).

[218] *Id.* at 12027, para. 5 (citing 47 CFR § 52.15); *see* 47 CFR § 52.15(f)(1)(ii) (addressing aging of numbers).

[219] *Reassigned Numbers Report and Order*, 33 FCC Rcd at 12031, para. 19; *see also id.* at 12033-34, paras. 24-25.

determination is through use of the RND.  However, the use of the RND in this manner is outside of the original scope of the RND and disallowed by the *Reassigned Numbers Report and Order*, which states that the RND is "available only to callers who agree in writing that the caller (and any agent acting on behalf of the caller) will use the database solely to determine whether a number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts."[220]

95.  However, when it adopted the *Reassigned Numbers Report and Order*, the Commission stated that it would address requests to access to the database for other lawful purposes through its waiver process.[221]  Under this process, the Commission may waive its rules for good cause shown.[222]  Good cause for a waiver may be found if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest.[223]  We find that permitting providers to access the RND for the purpose of determining if a number has been permanently disconnected after the date of an illegal text described in a Notification of Illegal Texts would prevent erroneous blocking of text messages (if the number had been reassigned) and is good cause to grant this waiver, *sua sponte*.  A subsequent user of the number that had previously been used for illegal texts should not be subject to erroneous blocking, particularly as this can be avoided by such access to the RND, and this consequent reduction in erroneous blocking would serve the public interest.  We thus find good cause for such a waiver, for accessing the RND for this purpose.

96.  We therefore adopt a waiver, *sua sponte*, for a period of 12 months, to commence on the effective date of section 64.1200(s) of the Commission's rules, specifically for accessing the RND to determine whether a number has been permanently disconnected since the date of the illegal text described in the Notification of Illegal Texts.  Providers may access the RND for this purpose in the same manner as they would to determine whether a number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts.[224]

## VI.    PROCEDURAL MATTERS

97.  *Paperwork Reduction Act*.  This document may contain new and modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4), we previously

---

[220] *Id*. at 12034, para. 26.

[221] *See id*. at n.68.

[222] *See* 47 CFR § 1.3; *Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990).  Our rules also expressly provide that any rule may be waived by the Commission on its own motion.  *See* 47 CFR § 1.3.

[223] *See Northeast Cellular*, 897 F.2d at 1166.  Courts have recognized that the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.  *See WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969).

[224] The certification statement for use of the RND will need to be modified to cover this use.  We anticipate that the certification would be substantially similar to "The user agrees and warrants that it, and any agent acting on its behalf, will access and use the reassigned numbers database to: 1) determine whether a number has been permanently disconnected since a date selected by the user, or its agent, for the purpose of making lawful calls or sending lawful texts.  The date selected will be a date that the user, or its agent, reasonably and in good faith believes the person it intends to call or text could be reached at that number; or 2) Determine if a number that the Commission's Enforcement Bureau has directed a provider to block has been permanently disconnected and therefore if such blocking should cease.  The date selected will be the latest date given for an illegal text from the number by the Commission's Enforcement Bureau in its Notification of Illegal Texts."

sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this present document, we have assessed the effects of our requirement that providers block texts following notification from the Enforcement Bureau of fraudulent texts from a particular source. We find that, to the extent this requirement constitutes an information collection, such collection will not present a substantial burden for small business concerns with fewer than 25 employees and that any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.

98. This document may also contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on any proposed information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

99. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA),[225] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[226] Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the impact of the rule changes contained in the Report and Order on small entities. The FRFA is set forth in Appendix D.

100. We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of the rule and policy changes contained in the *Second Further Notice of Proposed Rulemaking*. The IRFA is set forth in Appendix E. Written public comments are requested on the IRFA. Comments must be filed by the deadlines for comments on the *Second Further Notice of Proposed Rulemaking* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

101. *Congressional Review Act.* The Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, has concurred that this rule is "major" under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

102. *Ex Parte Rules.* The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[227] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or

---

[225] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601, *et seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).

[226] 5 U.S.C. § 605(b).

[227] 47 CFR §§ 1.1200 *et seq.*

other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b) of the Commission's rules.  In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.[228]

103.    *Filing of Comments and Reply Comments*.  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

• Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS: www.fcc.gov/ecfs.

• Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

• Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings.  This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.  *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy*, Public Notice, 35 FCC Rcd 2788 (OMD 2020).

104.    *People with Disabilities*.  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

105.    *Availability of Documents*.  Comments, reply comments, *ex parte* submissions, and the Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order will be available via ECFS.  Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat.  When the FCC Headquarters reopens to the public, documents will also be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 45 L Street NE, Washington, D.C. 20554.

106.    *Providing Accountability Through Transparency Act*:  The Providing Accountability Through Transparency Act requires each agency, in providing notice of a rulemaking, to post online a brief plain-language summary of the proposed rule.[229]  Accordingly, the Commission will publish the required summary of this Second Further Notice of Proposed Rulemaking on

---

[228] 47 CFR § 1.49(f).

[229] 5 U.S.C. § 553(b)(4).  The Providing Accountability Through Transparency Act, Pub. L. No. 118-9 (2023), amended section 553(b) of the Administrative Procedure Act.

https://www.fcc.gov/proposed-rulemakings.

107.  *Additional Information*.  For additional information on this proceeding, contact Jerusha Burnett, jerusha.burnett@fcc.gov, 202 418-0526, or Mika Savir, mika.savir@fcc.gov, 202 418-0384, both of the Consumer and Governmental Affairs Bureau, Consumer Policy Division.

## VII.    ORDERING CLAUSES

108.    Accordingly, **IT IS ORDERED**, pursuant to sections 4(i), 4(j), 227, 251(e), 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 251(e)(1), 301, 303, 307, and 316, that this Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order IS ADOPTED.

109.  **IT IS FURTHER ORDERED** that this Second Report and Order **SHALL BE EFFECTIVE** 60 days after publication in the Federal Register, except that the amendments to section 47 CFR § 64.1200(f)(9), which may contain new or modified information collection requirements, will not become effective until 12 months after publication in the Federal Register or 30 days after notice that the Office of Management and Budget has completed review of any information collection requirements that the Consumer and Governmental Affairs Bureau determines is required under the Paperwork Reduction Act, whichever is later and the amendments to 47 CFR § 64.1200(s) which shall be effective 180 days after publication in the Federal Register. The Commission directs the Consumer and Governmental Affairs Bureau to announce the effective date for section 64.1200(f)(9) by subsequent Public Notice.

110.  **IT IS FURTHER ORDERED**, that, the Commission's rule restricting access to the Reassigned Numbers Database only to callers to determine whether a number has been permanently disconnected for the purpose of making lawful calls or sending lawful texts **IS WAIVED** to the extent described in the Waiver Order (Section V) to allow mobile wireless providers to access the Reassigned Numbers Database to determine whether a number has been permanently disconnected since the date(s) of the illegal texts described in a Notification of Illegal Texts.

111.  **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Second Report and Order and Second Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.**IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Second Report and Order in a report to be sent to Congress and to the Governmental Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

Federal Communications Commission                                    FCC 23-107

## APPENDIX A

### List of Commenters

|   | Commenter | Abbreviated Name | Date Filed |
|---|-----------|------------------|------------|
| 1 | American Association of Ancillary Benefits | AAAB | 5/5/23 |
| 2 | American Association for Public Opinion Research | AAPOR | 5/2/23 |
| 3 | (Anonymous) Small Business | Small Business | 4/7/23 |
| 4 | Assurance IQ, LLC | Assurance | 5/8/23 |
| 5 | Balboa Digital/Kevin Wagoner | Balboa Digital | 4/17/23 |
| 6 | Campaign Verify, Inc. | Campaign Verify | 5/8/23 |
| 7 | Chandler, Corey | Chandler | 5/8/23 |
| 8 | Competitive Carriers Association | CCA | 5/8/23 |
| 9 | Concerned Citizen | Concerned Citizen | 5/8/23 |
| 10 | Connors, James | Connors | 4/17/23 |
| 11 | Consumer Consent Council | C3 | 5/8/23 |
| 12 | CTIA —The Wireless Association® | CTIA | 5/8/23 |
| 13 | Dobronski, Mark W. | Dobronski | 5/8/23 |
| 14 | Drips Holdings, LLC | Drips | 5/8/23 |
| 15 | Earl, William J. | Earl | 5/3/23 |
| 16 | Enterprise Communications Advocacy Coalition | ECAC | 5/8/23 |
| 17 | Harvey, Brian | Harvey | 5/8/23 |
| 18 | Haskins, Hayden | Haskins | 5/8/23 |
| 19 | High Tech Forum/Richard Bennett | High Tech Forum | 4/16/23 |
| 20 | INCOMPAS | INCOMPAS | 5/8/23 |
| 21 | Insurance Marketing Coalition | IMC | 5/8/23 |
| 22 | Keller, Richard | Keller | 5/9/23 |
| 23 | LendingTree, LLC | LendingTree | 5/8/23 |

40

| 24 | Messaging Malware Mobile Anti-Abuse Working Group | M³AAWG | 5/4/23 |
|----|---------------------------------------------------|--------|--------|
| 25 | National Association of Mutual Insurance Companies/Thomas Karol | NAMIC | 5/8/23 |
| 26 | National Consumer Law Center, on behalf of its low-income clients, Electronic Privacy Information Center, Appleseed Foundation, Consumer Action, Consumer Federation of America, National Association of Consumer Advocates, National Association of State Utility Consumer Advocates, National Consumers League, Public Citizen, Public Knowledge, U.S. PIRG | Joint Consumer Commenters | 5/8/23 |
| 27 | NetNumber, Inc. | NetNumber | 5/8/23 |
| 28 | Online Lenders Alliance/Michael Day | OLA | 5/8/23 |
| 29 | Professional Association for Customer Engagement | PACE | 5/8/23 |
| 30 | Pain, Edmond and Stodolak, David | Pain and Stodolak | 5/8/23 |
| 31 | Presley, Richard | Presley | 4/11/23 |
| 32 | QuinStreet, Inc. | QuinStreet | 5/8/23 |
| 33 | Receivables Management Assoc International | RMAI | 5/8/23 |
| 34 | Responsible Enterprises Against Consumer Harassment, Mutual Benefit Corporation/Eric Troutman | REACH | 5/8/23 and 5/9/23 (amendment to comments to correct spellings, etc.) |
| 35 | Rubenstein, Mark | Rubenstein | 3/28/23 |
| 36 | Schwab, Thomas J. (filed in 02-278) | Schwab | 4/17/23 |
| 37 | Shields, Joe | Shields | 5/9/23 |
| 38 | Solar Energy Industries | SEIA | 5/8/23 |

|   | Association |   |   |
|---|---|---|---|
| 39 | SolarReviews | SolarReviews | 4/19/23 |
| 40 | Subbaiah, Kelly | Subbaiah | 3/28/23 |
| 41 | UnitedHealthcare | UHC | 5/8/23 |
| 42 | USTelecom – The Broadband Association | USTelecom | 5/8/23 |
| 43 | Voice on the Net Coalition | VON | 5/8/23 |
| 44 | Williamson, Sydney | Williamson | 3/28/23 |
| 45 | ZipDX, LLC | ZipDX | 5/8/23 |

|   | Reply Commenter and Ex Parte | Abbreviated name | Date Filed |
|---|---|---|---|
| 1 | 28 State Attorneys General (Steve Marshall, Alabama; Treg Taylor, Alaska; Kristin K. Mayes, Arizona; Rob Bonta, California; Philip J. Weiser, Colorado; William Tong, Connecticut; Brian L. Shwalb, District of Columbia; Kwame Raoul, Illinois; Aaron M. Frey, Maine; Anthony G. Brown, Maryland; Andrea Joy Campbell, Massachusetts; Dana Nessel, Michigan; Keith Ellison, Minnesota; Lynn Fitch, Mississippi; Matthew J. Platkin, New Jersey; Josh Stein, North Carolina; Drew H. Wrigley, North Dakota; Dave Yost, Ohio; Gentner Drummond, Oklahoma; Ellen F. Rosenblum, Oregon; Michelle A. Henry, Pennsylvania; Alan Wilson, South Carolina; Jonathan Skrmetti, Tennessee; Charity R. Clark, Vermont; Jason Miyares, Virginia; Bob Ferguson, | State Attorneys General | 6/6/23 |

| | | | |
|---|---|---|---|
| | Washington; Joshua L. Kaul, Wisconsin; Bridget Hill, Wyoming) | | |
| 2 | American Bankers Association, ACA International, American Financial Services Association, Bank Policy Institute, Credit Union National Association, Mortgage Bankers Association, National Association of Federally-Insured Credit Unions, National Council of Higher Education Resources, and Student Loan Servicing Alliance | Bankers Joint Commenters | 6/6/23 |
| 3 | Competitive Carriers Association | CCA | 6/6/23 |
| 4 | Connors, James | Connors | 6/7/23 |
| 5 | Contact Care Compliance | Contact Care Compliance | 5/18/23 |
| 6 | Crisp, Marcus | Crisp | 6/7/23 |
| 7 | CTIA —The Wireless Association® | CTIA | 6/6/23 |
| 8 | Dobronski, Mark | Dobronski | 6/7/23 |
| 9 | Douglas, John | Douglas | 6/6/23 |
| 10 | Insurance Marketing Coalition | IMC | 6/6/23 |
| 11 | Keller, Richard | Keller | 6/4/23 (two replies filed, one is an express comment) |
| 12 | LendingTree, LLC | LendingTree | 6/6/23 |
| 13 | Madame Mohawk | Madame Mohawk | 6/26/23 |
| 14 | National Consumer Law Center, on behalf of its low-income clients, Electronic Privacy Information Center, Appleseed Foundation, Consumer Action, Consumer Federation of America, National | Joint Consumer Commenters | 6/6/23 |

43

**A43**

| | Association of Consumer Advocates, National Association of State Utility Consumer Advocates, National Consumers League, Public Citizen, Public Knowledge, U.S. PIRG | | |
|---|---|---|---|
| 15 | NetNumber, Inc. | NetNumber | 6/6/23 |
| 16 | Powell, William J. | Powell | 5/9/23 |
| 17 | Email from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC (May 15, 2023) | ZipDX May 15 *ex parte* | 5/15/23 |
| 18 | Provenant | Provenant | 6/6/23 |
| 19 | Responsible Enterprises Against Consumer Harassment, Mutual Benefit Corporation/Eric Troutman | REACH | 6/5/23 |
| 20 | Retail Industry Leaders Association | RILA | 5/9/23 |
| 21 | Rural Wireless Association, Inc. | RWA | 6/6/23 |
| 22 | Shields, Joe | Shields | 6/6/23 |
| 23 | Solar Energy Industries Association | SEIA | 6/6/23 |
| 24 | Somos, Inc. | Somos | 6/6/23 |
| 25 | Subbaiah, Kelly | Subbaiah | 6/5/23 |
| 26 | T-Mobile USA, Inc. | T-Mobile | 6/6/23 |
| 27 | Twilio, Inc. | Twilio | 6/6/23 |
| 28 | Westbrook, Ken | Westbrook | 7/26/23 |
| 29 | Williams, Marjorie | Williams | 6/6/23 |
| 30 | ZipDX, LLC | ZipDX | 6/5/23 |
| 31 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (July 25, 2023) | CTIA July 25 *ex parte* | 7/25/23 |
| 32 | Letter from Scott | CTIA Aug. 2 *ex parte* | 8/2/23 |

**A44**

| | | | |
|---|---|---|---|
| | Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Aug. 2, 2023) | | |
| 33 | Letter from United States Senators Ben Ray Luján, Edward J. Markey, Peter Welch, Chris Van Hollen, Elizabeth Warren, Angus S. King, Jr., Richard J. Durbin, Martin Heinrich, Mark R. Warren, Gary C. Peters, Ron Wyden, Amy Klobuchar, to Jessica Rosenworcel, Chairwoman, FCC (Aug. 7, 2023) | Aug. 7 Congressional | 8/7/23 |
| 34 | Letter from Missy Meggison, Co-Executive Director, Consumer Relations Consortium, to FCC (Aug. 9, 2023). | CRC Aug. 9 *ex parte* | 8/9/23 |
| 35 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Aug. 23, 2023) | CTIA Aug. 23 *ex parte* | 8/23/23 |
| 36 | Letter from Yaron Dori and Jorge Ortiz, counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC (Aug. 30 2023) | QuinStreet Aug. 30 *ex parte* | 8/30/23 |
| 37 | Letter from Steven A. Augustino and Josh Myers, counsel to LendingTree, LLC to Marlene H. Dortch, Secretary, FCC (Sept. 8, 2023) | LendingTree Sept. 8 *ex parte* | 9/8/23 |
| 38 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 15, 2023) | REACH Sept. 15 *ex parte* | 9/15/23 |
| 39 | Letter from Michael H. Pryor, Brownstein, Hyatt, | ABA Sept. 18 *ex parte* | 9/18/23 |

| | Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Sept. 18, 2023) | | |
|---|---|---|---|
| 40 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 20, 2023) | REACH Sept. 20 *ex parte* | 9/20/23 |
| 41 | Letter from Steven A. Augustino and Josh Myers, counsel to NetNumber, Inc. to Marlene H. Dortch, Secretary, FCC (Sept. 21, 2023) | NetNumber *ex parte* | 9/21/23 |
| 42 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023) | REACH Sept. 26 *ex parte* | 9/26/23 |
| 43 | Letter from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023 | ZipDX Sept. 26 *ex parte* | 9/26/23 |
| 44 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023) | ABA Sept. 26 *ex parte* | 9/26/23 |
| 45 | Letter from Lucas Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC (Oct. 27, 2023) | Zillow Oct. 27 *ex parte* | 10/27/23 |
| 46 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Oct. 31, 2023) | REACH Oct. 31 *ex parte* | 10/31/23 |
| 47 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC | REACH Nov. 2 *ex parte* | 11/2/23 |

| | (Nov. 2, 2023) | | |
|---|---|---|---|
| 48 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Nov. 9, 2023) | Credit Union National Association Nov. 9 *ex parte* | 11/9/23 |
| 49 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Nov. 15, 2023) | ABA Nov. 15 *ex parte* | 11/15/23 |
| 50 | Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, Secretary, FCC (Nov. 16, 2023) | EXP Realty *ex parte* | 11/16/23 |
| 51 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Nov. 20, 2023) | REACH Nov. 20 *ex parte* | 11/20/23 |
| 52 | Email from David Frankel, ZipDX, to FCC (Nov. 29, 2023). | ZipDX Nov. 29 *ex parte* | 11/29/23 |
| 53 | Letter from Yaron Dori and Jorge Ortiz, Counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC (Nov. 30 2023) | QuinStreet Nov. 30 *ex parte* | 11/30/23 |
| 54 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Nov. 30, 2023). | LendingTree Nov. 30 *ex parte* | 11/30/23 |
| 55 | Letter from Jonathan Thessin, Vice President/Senior Counsel, American Bankers Association, to Marlene H. Dortch, Secretary, FCC (Nov. 30, 2023) | ABA Nov. 30 *ex parte* | 11/30/23 |
| 56 | Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, | Joint Consumer Commenters Dec. 1 *ex parte* | 12/1/23 |

| | Secretary, FCC (Dec 1, 2023). | | |
|---|---|---|---|
| 57 | Letter from Major L. Clark III and Jamie Belcore Saloom, Small Business Administration Office of Advocacy, to Marlene H. Dortch, Secretary, FCC (Dec 1, 2023). | SBA Dec. 1 *ex parte* | 12/1/23 |
| 58 | Email from David Frankel, ZipDX, to FCC (Dec. 3, 2023). | ZipDX Dec. 3 *ex parte* | 12/3/23 |
| 59 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Dec. 4, 2023) | CTIA Dec. 4 *ex parte* | 12/4/23 |
| 60 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 4, 2023) | OLA Dec. 4 *ex parte* | 12/4/23 |
| 61 | Letter from Alexander H. Burke, Burke Law Offices, LLC, to Marlene H. Dortch, Secretary, FCC (Dec. 5, 2023) | Burke Dec. 5 *ex parte* | 12/5/23 |
| 62 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 5, 2023). | LendingTree Dec. 5 *ex parte* | 12/5/23 |
| 63 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023). | LendingTree Dec. 6 *ex parte* Burke Response | 12/6/23 |
| 64 | Letter from Alexandra Mays, Assistant General Counsel and Director, Regulatory Affairs, Competitive Carrier Association, to Marlene H. Dortch, Secretary, FCC | CCA Dec. 6 *ex parte* | 12/6/23 |

| | | | |
|---|---|---|---|
| | (Dec. 6, 2023) | | |
| 65 | Letter from Insurance Marketing Coalition to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | IMC Dec. 6 *ex parte* | 12/6/23 |
| 66 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | CTIA Dec. 6 *ex parte* | 12/6/23 |
| 67 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023). | LendingTree Dec. 6 *ex parte* | 12/6/23 |
| 68 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | OLA Dec. 6 *ex parte* | 12/6/23 |
| 69 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023) | OLA (Carr) Dec. 7 *ex parte* | 12/7/23 |
| 70 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023) | OLA (Starks) Dec. 7 *ex parte* | 12/7/23 |
| 71 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023). | LendingTree CGB Dec. 7 *ex parte* | 12/7/23 |
| 72 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023). | LendingTree Dec. 7 *ex parte* | 12/7/23 |
| 73 | Letter from Luke Bell, Director, Government | Zillow Dec. 8 *ex parte* | 12/8/23 |

**Federal Communications Commission**                                    **FCC 23-107**

|  | Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC (Dec. 8, 2023) |  |  |
|---|---|---|---|
| 74 | Letter from United States Senators Thom Tillis and Marsha Blackburn to Jessica Rosenworcel, Chairwoman, FCC (Dec. 6, 2023) | Dec. 6 Congressional | 12/6/23 |

**A50**

**APPENDIX B**

**Final Rules**

The Federal Communications Commission amends Parts 0 and 64 of Title 47 of the Code of Federal Regulations as follows:

PART 0—COMMISSION ORGANIZATION

Subpart A—Organization

1.        Amend section 0.111(a) by revising paragraph (27) to read:

(27) Identify suspected illegal calls and illegal texts and provide written notice to voice service or mobile wireless providers.  The Enforcement Bureau shall: (1) identify with as much particularity as possible the suspected traffic or texts; (2) cite the statutory or regulatory provisions the suspected traffic appear to violate or illegal texts violate; (3) provide the basis for the Enforcement Bureau's reasonable belief that the identified traffic or the determination that the illegal texts are unlawful, including any relevant nonconfidential evidence from credible sources such as the industry traceback consortium or law enforcement agencies; and (4) direct the voice service provider receiving the notice that it must comply with section 64.1200(n)(2) of the Commission's rules or direct the mobile wireless provider receiving the notice that it must comply with 64.1200(s) of the Commission's rules.

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

2. Amend § 64.1200 by revising paragraph (e) to add "or text messages," to read as follows:

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

3. Amend § 64.1200 by revising the first full paragraph of paragraph (f)(9) to read as follows:

(f)(9) The term prior express written consent means an agreement, in writing, that bears the signature of the person called or texted that clearly and conspicuously authorizes no more than one identified seller to deliver or cause to be delivered to the person called or texted advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice.  Calls and texts must be logically and topically associated with the interaction that prompted the consent and the agreement must identify the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls or texts using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.  The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

51

**Federal Communications Commission**    FCC 23-107

4. Amend § 64.1200 by adding paragraph (s) to read as follows:

(s) A terminating mobile wireless provider must, upon receipt of a Notification of Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s), including, when required, blocking all texts from the identified number or numbers.  The Enforcement Bureau will issue a Notification of Illegal Texts that identifies the number(s) used and the date(s) the texts were sent or received; provides the basis for the Enforcement Bureau's determination that the identified texts are unlawful; cites the statutory or regulatory provisions the identified texts violate; directs the provider receiving the notice that it must comply with this section; and provide a point of contact to be used by a subscriber to a listed number to dispute blocking.  The Enforcement Bureau's Notification of Illegal Texts shall give the identified provider a reasonable amount of time to comply with the notice.  The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418 at *https://www.fcc.gov/ecfs/search/search-filings*.  The provider must include a certification that it is blocking all texts from the number or numbers and will continue to do so unless the provider learns that the number has been reassigned, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned.  If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking.  The provider is not required to monitor for number reassignments.

**A52**

# APPENDIX C

# Proposed Rules

The Federal Communications Commission amends Part 64 of Title 47 of the Code of Federal Regulations as follows:

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1.      Amend section 64.1200 by revising paragraph (s) to reread:

(s) A mobile wireless provider must:

(1) A terminating mobile wireless provider must, upon receipt of a Notification of Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s)(1), including, when required, blocking all texts from the identified number or numbers.  The Enforcement Bureau will issue a Notification of Illegal Texts that identifies the number(s) used and the date(s) the texts were sent or received; provide the basis for the Enforcement Bureau's determination that the identified texts are unlawful; cite the statutory or regulatory provisions the identified texts violate; direct the provider receiving the notice that it must comply with this section; and provide a point of contact to be used by a subscriber to a listed number to dispute blocking.  The Enforcement Bureau's Notification of Illegal Texts shall give the identified provider a reasonable amount of time to comply with the notice.  The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418 at *https://www.fcc.gov/ecfs/search/search-filings*.  The provider must include a certification that it is blocking all texts from the number or numbers and will continue to do so unless the provider learns that the number has been reassigned, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned.  If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking.  The provider is not required to monitor for number reassignments.

(2) If an originating provider, upon receipt of a Notification of Suspected Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s)(2), including, when required, blocking all texts from  the source.  The Enforcement Bureau will issue a Notification of Suspected Illegal Texts that identifies with as much particularity as possible the suspected illegal texts including the number(s) used and the date(s) the texts were sent or received; provides the basis for the Enforcement Bureau's reasonable belief that the identified texts are unlawful; cites the statutory or regulatory provisions the identified texts appear to violate; and directs the provider receiving the notice that it must comply with this section.  The Enforcement Bureau's Notification of Suspected Illegal Texts shall give the identified provider a minimum of 14 days to comply with the notice.  Each notified provider must promptly investigate the identified texts and report the results of that investigation to the Enforcement Bureau within the timeframe specified in the Notification of Suspected Illegal Texts.

(i) The provider must include a certification that it is blocking all texts from the source, and will continue to do so unless:

(A) the provider determines that the identified texts are not illegal, in which case it shall provide an explanation as to why the provider reasonably concluded that the identified texts are not illegal and what steps it took to reach that conclusion; or

(B) the provider learns that the number has been reassigned and the source cannot be otherwise identified in a content-neutral and competitively-neutral manner, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned.  If, at any time in the future, the provider determines that the number has been reassigned, it should notify the Enforcement Bureau and cease blocking unless further blocking of the source can be done in a content-neutral and competitively-neutral manner.

(ii) If an originating mobile wireless provider fails to respond to the Notification of Suspected Illegal Texts, the Enforcement Bureau determines that the response is insufficient, the Enforcement Bureau determines that the provider is continuing to originate texts from the same source that could be blocked after the timeframe specified in the Notification of Suspected Illegal Texts, or the Enforcement Bureau determines based on the evidence that the texts are illegal despite the provider's assertions, the Enforcement Bureau may issue an Initial Determination Order to the provider stating the Bureau's initial determination that the provider is not in compliance with this section.  The Initial Determination Order shall include the Enforcement Bureau's reasoning for its determination and give the provider a minimum of 14 days to provide a final response prior to the Enforcement Bureau making a final determination on whether the provider is in compliance with this section.

(1) If an originating mobile wireless provider does not provide an adequate response to the Initial Determination Order within the timeframe permitted in that Order or continues to originate texts from the same source onto the U.S. network, the Enforcement Bureau may issue a Final Determination Order finding that the provider is not in compliance with this section.  The Final Determination Order shall be published in EB Docket No. 22-174 at.  A Final Determination Order may be issued up to one year after the release date of the Initial Determination Order, and may be based on either an immediate failure to comply with this rule or a determination that the provider has failed to meet its ongoing obligation under this rule to block all texts from the identified source.

(2) When notified by the Commission through its Enforcement Bureau that a Final Determination Order has been issued finding that an originating mobile wireless provider has failed to block as required under paragraph (s)(1) of this section, block and cease accepting all texts received directly from the identified originating provider beginning 30 days after the release date of the Final Determination Order. This paragraph (s)(2) applies to any provider immediately downstream from the originating provider. The Enforcement Bureau shall provide notification by publishing the Final Determination Order in EB Docket No. 22–418 at *https://www.fcc.gov/ecfs/search/search-filings*. Providers must monitor EB Docket No. 22–174 and initiate blocking no later than 30 days from the release date of the Final Determination Order.

**APPENDIX D**

**Final Regulatory Flexibility Analysis**

1.  As required by the Regulatory Flexibility Act of 1980 (RFA),[1] as amended, an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in *Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Further Notice of Proposed Rulemaking* (*FNPRM*), released March 2023.[2]  The Federal Communications Commission (Commission) sought public comment on the proposals in the *FNPRM*, including comment on the IRFA.  The Commission received no comments in response to the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.    Need for, and Objectives of, the Second Report and Order

2.  The *Second Report and Order* continues the Commission's efforts to stop the growing tide of unwanted and illegal texts by building on the text blocking requirements from the March 2023 *Text Blocking Order*.[4]  While mobile wireless providers voluntarily block a significant number of unwanted and illegal texts, many of these harmful texts still reach consumers.  The *Second Report and Order* requires terminating mobile wireless providers to block texts from a particular source following notification from the Commission; codifies that the National Do-Not-Call (DNC) Registry protections apply to text messages; encourages mobile service providers to make email-to-text an opt-in service; and revises our definition of prior express written consent making clear that consent must be to one seller at a time, and the seller must be logically and topically related to the content of the website on which consent is obtained.

### B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA

3.  There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

### C.    Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

4.   Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.

5.  The Chief Counsel did not file comments in response to the proposed rules in this proceeding; however, the Chief Counsel filed an *ex parte* letter on December 1, 2023.  The SBA contends that small businesses have stated that the proposal to require sellers to obtain consent to call or text from one consumer at a time could increase costs significantly for small businesses that both buy and sell sales leads.  The SBA did not offer any evidence to support this contention and did not address the benefit to consumers and to small businesses in having a reduction of unwanted calls and texts.

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 21-402, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (Mar. 17, 2023) (*Text Blocking Order and Further Notice*).

[3] *See* 5 U.S.C. § 604.

[4] *Text Blocking Order and Further Notice* at 7-14,-paras. 13-31.

6.    This rule makes it unequivocally clear that prior express written consent under the TCPA must be to one seller at a time, but does not prevent small businesses from buying and selling leads or prevent small businesses from contact with consumers.  The requirements for prior express written consent for the telemarketing calls covered by the TCPA will also protect business phones from the floods of unwanted prerecorded telemarketing calls. This is especially helpful for small business owners who are incentivized to answer all incoming calls because each call may be from a potential customer and are unable to ignore calls from unfamiliar numbers.  In addition, this requirement will help small businesses because it will provide legal certainty as to how callers and texters can demonstrate valid consent when that consent was obtained via a third party.

7.    The Commission acknowledges that the decision to make unequivocally clear that prior express written consent under the TCPA must be one-to-one consent may raise costs for some businesses, including those that fall under the definition of small businesses, in that direct consent between a consumer and a seller requires more labor and administration than a blanket authorization for affiliated companies to contact an individual.  However, the benefits of this policy, which accrue to millions of individuals and businesses, including small businesses, outweigh the costs to those businesses currently benefiting from multi-party "consent."  Over time, it may be possible for technological solutions to lower the costs to businesses for seeking one-to-one prior express written consent and maintaining consent records.  Any effort to create an exception for particular businesses, including small businesses, has the potential to undermine the effectiveness and intent of the policy, which is to provide consumers (including small businesses) the ability to determine when and how they are contacted in a transparent manner.

### D.    Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

8.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules and policies adopted herein.[5]    The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]

9.    *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[9]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[10]  These types of

---

[5] *Id.* § 604 (a)(4).

[6] 5 U.S.C. § 601(6).

[7] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[8] 15 U.S.C. § 632.

[9] *See* 5 U.S.C. § 601(3)-(6).

[10] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf. (Mar. 2023)

small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[11]

10. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[12] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[13] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[14]

11. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[15] U.S. Census Bureau data from the 2017 Census of Governments[16] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[17] Of this number, there were 36,931 general purpose governments (county,[18] municipal, and town or township[19]) with populations of less than 50,000 and 12,040 special purpose governments—independent school

---

[11] *Id.*

[12] *See* 5 U.S.C. § 601(4).

[13] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[14] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

[15] *See* 5 U.S.C. § 601(5).

[16] 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7". *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[17] U.S. Census Bureau, 2017 Census of Governments – Organization Table 2. Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts). *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[18] *See id.* at tbl.5. County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 2,105 county governments with populations less than 50,000. This category does not include subcounty (municipal and township) governments.

[19] *See id.* at tbl.6. Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

districts[20] with enrollment populations of less than 50,000.[21]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[22]

12.  *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[23]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[24]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[25]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[26]  Of that number, 2,837 firms employed fewer than 250 employees.[27]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[28]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[29]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13.  *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[30]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or

---

[20] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State Census Years 1942 to 2017.

[21] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[22] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[23] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[24] *Id.*

[25] 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[26] U.S. Census Bureau, *2017 Economic Census of the United States, Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[27] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[28] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[29] *Id.*

[30] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[31]  Providers of Internet services (e.g., dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[32]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[33]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[34]  Of those firms, 1,039 had revenue of less than $25 million.[35]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

E.    **Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities**

14.  The *Second Report and Order* includes new or modified reporting, recordkeeping, and compliance requirements for small and other entities.  This includes requiring terminating mobile wireless providers to block texts from a particular number or numbers following notification from the Commission.  Providers must promptly begin blocking the identified texts if illegal, and respond to the notice.  If the provider is unable to block further texts from that number because it has learned that the number has been reassigned the provider should promptly notify the Enforcement Bureau.  If the provider determines at a later date that the number has been reassigned, it should notify the Enforcement Bureau, and cease blocking.  Providers that fail to comply may be subject to enforcement penalties, including monetary forfeiture.

15.  The *Second Report and Order* also codifies that the National DNC Registry protections apply to text messages, and encourages mobile service providers to make email-to-text an opt-in service.  Additionally, it revises our definition of prior express written consent making clear that consent must be only to one single seller-caller to one single consumer at a time, and the seller must be logically and topically related to the content of the website on which consent is obtained.  Small entities may comply with the Telephone Consumer Protection Act (TCPA) and contact consumers by obtaining consent from the consumer to one seller at a time.  The Commission expects that small and other providers already taking significant measures to block illegal texts and will not find it burdensome to comply with these new obligations.  Any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.

F.    **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

16.  The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the

---

[31] *Id.*

[32] *Id.*

[33] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[34] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, Selected Sectors: *Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[35] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

**Federal Communications Commission** FCC 23-107

other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[36]

17. In the *Second Report and Order*, the Commission adopted text blocking rules modeled after the call blocking rules, but modified the new rules to account for the differences in the technology and delivery of text messages, and adopted requirements similar to those service providers were already familiar to reduce any additional burdens.[37] For example, a terminating provider will be required to block text messages only after it has received notice from the Commission's Enforcement Bureau. Second, text blockers are not required to block traffic "substantially similar" to the traffic the Enforcement Bureau identifies to avoid blocking on content analysis, which could lead to over blocking.[38] This modification will reduce concerns about liability for blocking incorrectly, as well as potential burdens if the Commission adopted a more expansive rule. While commenters suggested a blocking mandate is inappropriate because providers already take action to block text messages,[39] the Commission found commenters made general assertions, but offered no compelling evidence that they consistently block all traffic the Enforcement Bureau might identify.

18. In the *Second Report and Order*, the Commission also modified the prior express written consent requirement for TCPA consent to protect consumers while preserving the ability of comparison shopping websites to provide consumers with comparison shopping opportunities. This rule revision does not change the longstanding requirement that callers, including small businesses, must have consent from the called party, to comply with the TCPA. This modification makes it unequivocal that one-to-one consent is required under the Commission's TCPA consent rules. Such a requirement should not burden small entities that use lead generators to reach out to potential customers, because websites, including comparison shopping websites, can use a variety of means for collecting one-to-one consent for sellers to comply with the consent rule. For example, a website may offer a consumer a check box list that allows the consumer to specifically choose each individual seller that they wish to hear from or may offer the consumer a clickthrough link to a specific business so that the business itself may gather express written consent from the consumer directly. A website publisher could also reach out to a consumer for consent after the consumer has provided certain requested information and the site has subsequently selected a specific seller or sellers to contact the consumer.

19. The adopted modification does not prohibit comparison shopping websites from obtaining leads through valid consent and provides opportunities for such sites to obtain leads for potential callers (including small businesses) and texters. Further, this rule modification should help small businesses in reducing the number of unwanted and illegal calls and texts they receive, particularly if they cannot screen calls from unknown numbers. This rule modification best balances the needs of businesses, including small businesses, to utilize lead generation services to make calls to potential buyers with protecting consumers from a deluge of unwanted robocalls and robotexts. This will also help callers and texters, including small businesses, by providing legal certainty as to how to meet their burden of proof when they have obtained consent via a third party. Further, callers and texters may avail themselves of other options for providing comparison shopping information to consumers, e.g., manually dialed or non-prerecorded or artificial voice calls or texts, email, or information displayed directly on the third party website.

---

[36] 5 U.S.C. § 604(a)(6).

[37] *Second Report and Order* paras. 16-25.

[38] *Id.*

[39] *Id.*

**A60**

### G.    Report to Congress

20.  The Commission will send a copy of the *Second Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[40]  In addition, the Commission will send a copy of the *Second Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  The *Second Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[41]

---

[40] 5 U.S.C. § 801(a)(1)(A).

[41] *Id.* § 604(b).

Federal Communications Commission                                      FCC 23-107

**APPENDIX E**

**Initial Regulatory Flexibility Analysis**

1.  As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *Second Further Notice of Proposed Rulemaking* (*Second Further Notice*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments in the *Second Further Notice* The Commission will send a copy of this entire *Second Further Notice*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *Second Further Notice* and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

A.    **Need for, and Objectives of, the Proposed Rules**

2.  In the *Second Further Notice*, the Commission proposes additional action to stop unwanted and illegal text messages that may harass and defraud consumers.  Specifically, the Commission proposes extending the call blocking requirements to require all downstream providers to block the texts from upstream providers that fail to block after Commission notification.  The Commission  also seeks comment on requiring providers to block texts based on content-neutral analytics, and on whether it is appropriate to adopt a 24-hour traceback response requirement for text messaging.  The *Second Further Notice* also requests comment on alternative approaches to protect consumers from unwanted texts, and any additional protections that may be necessary in case of erroneous blocking.  In addition, we seek comment on the viability of text authentication, and whether we should require industry updates on its feasibility.  Finally, the Commission proposes requiring providers to make email-to-text an opt-in service,.

B.    **Legal Basis**

3.  The proposed action is authorized pursuant to sections 4(i), 4(j), 227, 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 301, 303, 307, and 316.

C.    **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

4.  The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small

---

[1] 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996)

[2] 5 U.S.C. § 603(a).

[3] *Id*.

[4] *Id.*§ 603(b)(3).

[5] *Id.* § 601(6).

[6] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public
(continued….)

business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

5.  *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[8]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[10]

6.  Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

7.  Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14]  U.S. Census Bureau data from the 2017 Census of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of

---

comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

[8] *See* 5 U.S.C. § 601(3)-(6).

[9] SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf. (Mar. 2023)

[10] *Id.*

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file,"https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

[15] 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

general purpose governments and special purpose governments in the United States.[16]  Of this number, there were 36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

8.  *Wireless Carriers and Service Providers.*  Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard applicable to these service providers.[22]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[23]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[24]  Of this number, 2,837 firms employed fewer than 250 employees.[25]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the

---

[16]  U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[17]  *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18]  *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19]  *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20]  While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21]  This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[22]  *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23]  *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[24]  *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[25]  *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

provision of wireless services.[26]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[27]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

9.  *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[28]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[29]  Providers of Internet services (e.g. dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[30]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[31]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[32]  Of those firms, 1,039 had revenue of less than $25 million.[33]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

D.  **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.  The *Second Further Notice* includes proposals that may alter the Commission's current information collection, reporting, recordkeeping, or compliance requirements for small entities. Specifically, the proposal to extend call blocking mandates to require all downstream providers to block the texts from upstream providers that fail to block after Commission notification, and requiring providers to block texts based on content-neutral analytics would create new obligations for small entities and other providers.  Similarly, establishing a 24-hour traceback response requirement for text messaging and requiring providers to make email-to-text an opt in service would also impose new compliance obligations on all providers, including small businesses.

11.  Additional blocking requirements, if adopted, such as requiring originating providers to block texts after notification from the Commission that the texts are likely to be illegal should not be a burden for small entities due to the fact that mobile wireless providers are currently blocking texts that are likely to be illegal.  We anticipate the information we receive relating to cost and benefit analyses will help the Commission identify and evaluate relevant compliance matters for small entities, including

---

[26] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[27] *Id.*

[28] *See* U.S. Census Bureau, *2017 NAICS Definition,* "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[29] *Id.*

[30] *Id*.

[31] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[32] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[33] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

compliance costs and other burdens that may result from the proposals and inquiries we make in the *Second Further Notice*.

**E.   Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

12.  The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others: "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities." [34]

13.  In the *Second Further Notice* the Commission considered and seeks comment on several alternatives that may significantly impact small entities. As we evaluate additional blocking requirements to protect consumers from illegal texts, we seek comment on how to define originating providers, and whether we should apply these rules to some other entity in the chain to better protect consumers. We propose blocking messages based on their source, but consider alternatively whether they should be blocked on other criteria such as traffic that is "substantially similar" to blocked texts. In addition, we seek comment on alternatives to requiring providers to block texts based on content-neutral reasonable analytics. We also request comment on alternatives to the proposed blocking or mitigation rules that would help to protect consumers from unwanted and illegal texts. The Commission expects to fully consider whether any of the costs associated with the proposed text blocking requirements can be alleviated for small entities and any alternatives to minimize the economic impact for small entities following the review of comments filed in response to the *Second Further Notice*.

**F.   Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

14.  None.

---

[34] 5 U.S.C. § 603(c)(1)–(4).

# STATEMENT OF
# CHAIRWOMAN JESSICA ROSENWORCEL

Re:    *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

It's the holiday season.  This is the time of year when we are ramping up our online shopping, donating to charities, and maybe, if we are lucky, planning for some downtime visiting with family and friends.  But it is also a time when scammers are coming up with new schemes to cheat us through our phones.  They know that sending us a message about a package we never ordered or a payment that never went through along with a link to a shady website is a quick and easy way to get us to fall prey to fraud. These messages make a mess out of our phones.  But they do more than that; they erode trust in the networks we all count on to communicate.

We need to find every way we can under the law to stop these junk robocalls and robotexts from reaching us on our devices.  And because scam artists are nimble—during the holidays and throughout the year—we need to regularly update our policies to stop this stuff from coming over the line.

The changes we make today matter.  We make clear that when the Federal Communications Commission identifies a number sending this junk, carriers must block texts from that number before they reach your phone.  Likewise, we make clear that the national registry to prevent unwanted calls applies not only to calls but also to texts.

Then we go one step further and shut down a loophole that is a significant source of a growing number of robocalls and robotexts.  This loophole has been identified as a problem by countless consumer groups, members of Congress, and State Attorneys General because it creates a marketplace for our numbers, with companies buying and selling access to our phones and in the process cranking up the number of unwanted calls and texts we receive.

Let me explain.

Imagine you are shopping online.  You give a business your number and in a single click you are also giving that business the right to sell and share your number with hundreds if not thousands of other businesses that may use it to send you robocalls and robotexts that you never asked for, do not want, and do not need.  They bury it in the fine print, so you do not realize when you make that one click you are authorizing all kinds of incoming junk to your phone.  This is called the lead generator loophole.  And it is a big reason why unwanted robocalls and robotexts are multiplying on our phones.  So today we put an end to this loophole.  We make clear that any company that wants to use robocalls and robotexts in their businesses obtain consent one-to-one.  That means consumers get back the power to pick who they want to communicate with and when.

Then, to make sure we can keep updating our efforts to stop unwanted calls and texts, we seek comment on some additional ideas we have to address them, including blocking through originating service providers, using authentication practices for texting, and requiring texting response to traceback requests.

I look forward to the record that develops.  I look forward to putting an end to illegal robocalls and robotexts.  We are not going to stop until we do.

67

**A67**

Thank you to those at the agency who worked on this effort, including Mark Stone, Aaron Garza, Wesley Platt, Kristi Thornton, Zac Champ, Jerusha Burnett, Mika Savir, Rebecca Maccaroni, Robert Aldrich, Kimberly Wild, and James Brown from the Consumer and Governmental Affairs Bureau; Kristi Thompson, Daniel Stepanicich, Caitlin Barbas, and Jane van Benten from the Enforcement Bureau; Jonathan Lechter, Connor Ferraro, Elizabeth Drogula, Adam Copeland, Jodie May, Melissa Droller Kirkel, Chris Laughlin, and Zachary Ross from the Wireline Competition Bureau; Kenneth Carlberg and David Furth from the Public Safety and Homeland Security Bureau; Kari Hicks, Susannah Larson, Jennifer Salhus, Barbara Esbin, Arpan Sura, Garnet Hanly, and John Lockwood from the Wireless Telecommunications Bureau; Joy Ragsdale, Joycelyn James, and Chana Wilkerson from the Office of Communications Business Opportunities; Michelle Schaefer, Patrick Brogan, Emily Talaga, Kim Makuch, Andrew Wise, Eugene Kiselev, Eric Ralph, and Mark Montano from the Office of Economics and Analytics; and Andrea Kearney, Rick Mallen, Derek Yeo, Jeffrey Steinberg, Kathleen Fulp, Anjali Singh, Michael Janson, Karen Schroeder, Douglas Klein, Marcus Maher, and Chin Yoo from the Office of General Counsel.

**Federal Communications Commission**                                   **FCC 23-107**

# STATEMENT OF
## COMMISSIONER GEOFFREY STARKS

Re:     *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

Combatting robocalls and robotexts is like whack-a-mole.  We shut down one scam, another arises.  We close one pathway for illegal and unwanted calls, fraudsters create another.  But this is no game, and the FCC has not backed down.

We are also adapting our tactics and adopting new ones.  That's what today's order does.  First, we impose additional text blocking requirements on providers, building on those we adopted in March of this year.  Second, we target the "lead generator loophole."  Consumers have a right to control who contacts them.  And just because you want to comparison shop doesn't mean you agree to provide a blanket consent to be robocalled and robotexted by strange, unrelated parties looking to prey.  And finally, we ask questions about what other steps we can take to stay ahead of scammers, including whether and how to impose certain parts of our robocall playbook – including traceback and authentication – onto our robotext efforts.  Here, as always, we will benefit from the knowledge and input of our industry and public interest partners.

Thank you to the FCC staff who worked on this item.  It has my support.

### STATEMENT OF COMMISSIONER NATHAN SIMINGTON, APPROVE, DISSENTING IN PART

Re:     *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls,* CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

I, like everyone in this building, and everyone on earth, hate receiving illegal and unwanted robotexts. I am pleased to approve every word of this item that does not relate to our approach to so-called "1-to-1 consent" for robotexts in the lead generation context. Unsurprisingly, the rest of the item is more-or-less well-trod regulatory territory that members of the Commission and staff are trained to understand.

However, as to our approach to 1-to-1 consent in the lead generation context, we are over our skis, and I dissent. I would have been pleased to support the approach, laid out in the NPRM, to constrain consumer consent to robotexting to only those entities "logically and topically related" to the predicate of the consumer inquiry. I voted for that because it made sense. That is: if I give consent to be robotexted about car insurance offers, I expect to receive texts about car insurance, not about garage doors—and, indeed, not even about car loans. Great. Makes sense. That proposal aligns typical consumer expectations around in what their consent to be robotexted consists, and it would eliminate the abusive practices contemplated in the NPRM.

I even supported asking about 1-to-1 consent in a further notice, because there is, possibly, a way to accomplish 1-to-1 consent that doesn't break the backs of American small business that rely on lead generation. Not probably, but at least possibly. We could have developed a fulsome record that actually contemplated that issue, instead of parachuting in an approach at the eleventh hour that caught American small businesses flat-footed and risks benefiting only the plaintiffs' bar. Unfortunately, by adopting 1-to-1 consent on a factually thin record, we today clumsily rush to save the American consumer from herself by sticking our finger in yet another new pie, vigorously stirring, calling the resulting mess a cobbler, insisting that it's healthier, and leaving the janitorial staff of brick-and-mortar, Main Street mortgage lenders, insurance brokers, real estate agents, and the like to clean up.

My colleagues worry that if we relax 1-to-1 consent, predatory lenders will rush into the regulatory gap left. Ah, yes. Predatory lenders, those conscientious respecters of regulation. If we regulate robotext consent hard enough, surely an offshore Cayman-funded organization with a call center in Belize relying principally on home-rolled SEO to dominate SERP visibility and using algorithmic approaches to beating Google's ad restrictions will be brought to heel. Give me a break. These people do not need to buy leads, and our action today does nothing to prevent their abusive behavior. At all. Nothing. It is another paper consumer victory for a Commission at least as interested in appearances as reality.

Speaking of appearances, the factual record on the question of 1-to-1 consent is so thin, and the Report and Order so impoverished in its reasoning supporting a rule upending the consumer financial products industry, that it gives every appearance of an arbitrary and capricious action by the Commission. But listen, I'm not the only one with concerns. Don't take the word of the Republican minority Commissioner. It is easy for me to take pot shots.

Consider instead the word of the Small Business Administration, who admonished the Commission to rethink today's Report and Order and to further consider our approach to 1-to-1 consent. The SBA's Office of Advocacy indicated not just that the small businesses of America are deeply concerned by today's action, but that it may indeed formally fail regulatory flexibility analysis in that it fails to account for the impact this action will have on small American businesses. Quite so, and no amount of last-second wordsmithing can rehabilitate a requirement this ill-considered and unsupported.

**Federal Communications Commission** **FCC 23-107**

Again, as to the rest of the item, I approve.  But as to this narrow issue, that easily could have been fixed by a further notice, I strongly dissent.

Federal Communications Commission                              FCC 23-107

# STATEMENT OF
# COMMISSIONER ANNA GOMEZ

Re:     *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

Choosing the right product or service in a thriving competitive market with a sea of options can be an overwhelming task. That is why consumers turn to comparison shopping websites. To make the process of choosing the right product or service – be it a loan, medical insurance, or real estate – easier, and less overwhelming. But when what seemed like a solution to staying afloat in a sea of too many choices turns into a tsunami of unwanted robocalls and robotexts, it is our job to step in to help.

The Order we adopt today makes clear that businesses interested in robocalling and robotexting consumers will need to receive specific consent from a consumer in order to send those types of communications. Importantly, this decision does not foreclose other marketing options.

In considering this item, I thought deeply about its effect on small businesses. The sea of product and service options can also be challenging for small businesses to navigate from a marketing perspective, because they face larger competitors for consumer attention. That is why small businesses turn to lead generators, to get leads on potential customers. I pay close attention when our rules impact small businesses. And, in this instance, they continue to have various options to work with lead generators. First, as long as a consumer provides prior express written consent to receiving marketing through robocalls or robotexts, a small business can still use leads obtained through lead generators to make robocalls and robotexts. And small businesses will continue to be able to contact customer leads via non-autodialed calls and non-autodialed texts—provided the customers are not on the Do Not Call List, email, and even mail.

While this Order alters the way some lead generator websites have operated, we believe that reducing the harm to consumers resulting from a tsunami of robotexts and robocalls to which they did not consent outweighs the discomfort of the change we adopt in this Order.

I want to thank the Office of the Chairwoman for accepting our edits to this item incorporating concerns from the small business community and highlighting the marketing options that remain available for small businesses. Also for directing the Consumer and Governmental Affairs Bureau to conduct outreach and provide education focusing on compliance to small business lead generators and small business lead buyers. And thank you to the Bureau for your hard work on this important item. I approve.

# TAB B

Comments of SolarReviews, FCC CG Dkt. Nos. 21-402, 02-278 (Apr. 19, 2023)



19th April 2023

Jessica Rosenworcel
Commissioner
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

**SolarReviews Comments on FCC Further Notice of Proposed Rulemaking**
CG Docket Nos. 21-402 and 02-278

SolarReviews welcomes the opportunity to comment on CG Docket 21-402 and CG Docket 21.402 and provide the Commission additional information for its consideration.  As further detailed below, our comments include four proposed regulations:

1.     ***Allow consumers to restrict sale of their contact details to a maximum number of Service Providers.*** *For a TCPA Opt-In to be valid, consumers must be given a choice of how many service providers they want the third-party marketing organization ("TPMO") to contact when giving this consent. The regulation would prohibit a TPMO from selling a consumers' details to more than the number of service providers that the consumer requests."*

2.     ***Restriction on sale of leads to service providers only.*** *TPMO's (lead generation and comparison-shopping websites) should only be able to sell leads to companies that actually provide the service that the consumer is requesting.*

3.     ***Restriction on origin numbers to call consumers from.*** *In our proposal, a TCPA Opt-In should only allow a service provider to call the consumer from the same phone number every time, and only up to the point that the service provider has had a conversation with the consumer, or the consumer has further consented to a call from another number.*

**4.**     ***Regulation of TCPA tracking scripts.*** *Where a tracking script is included in a TPMO lead generation website, the consumer must be advised that their details will be shared with this third-party organization and a consumer must be given an option to refuse to share their details with the owner of such scripts.*

We would be happy to speak with you if you have any questions or would like any additional information.

**A73**



About SolarReviews

SolarReviews is a consumer reviews website that has grown to become the largest supplier of sales leads to the residential solar industry.  For over 10 years, SolarReviews has operated a lead generation business to support its solar journalism and industry advocacy efforts.

Our website, https://www.solarreviews.com/, is a trusted source of both consumer reviews of solar companies and information on all aspects of the solar industry.  Consumers can browse articles and review companies before deciding whether solar is right for them.  SolarReviews is an independent voice advocating for and informing residential solar consumers across America.

SolarReviews provides online calculators to assist consumers.  These calculators provide a path to allow consumers to get quotes from solar installation companies.

In 2022, SolarReviews generated nearly one million solar leads and yet, to the best of the company's knowledge, there has never been a single complaint to the FCC about its activities.

SolarReviews believes the reason for this result is that SolarReviews has self-regulated the way it uses consumer TCPA consents to balance the consumers' competing desires for maximum price competition and privacy.

SolarReviews agrees with the wider sentiment of the Public Knowledge submission that the lead generation industry needs to be better regulated and that the harm from over-calling consumers' needs to be eliminated.  SolarReviews also agrees with the view that a TCPA Opt-In should only permit calls from service providers that offer the specific service that the consumer has requested.

*Example: A consumer might go to a comparison website to get comparative quotes for moving house. A third-party marketing organization (TPMO) might sell this lead to 3 local moving companies, which may be beneficial for the consumer and the 3 service providers.  Based on our experience, current industry practice would also see this lead sold to internet service providers, cable TV providers, home and contents insurance providers, and possibly more. SolarReviews believes that this extended use of consumers' data should not be allowed unless the consumer consents individually to being called about each of these things separately.*

Nevertheless, SolarReviews believes that the Public Knowledge proposal (paragraph 60 & footnote 176) is overbroad because it does not recognize the value of the lead generation industry to both consumers and the millions of businesses that rely on this industry to provide their customers.

The Public Knowledge submission appears to ask for much more than is necessary to reduce the overuse of TCPA consents.



SolarReviews believes that if the lead generation industry was regulated in the same way that SolarReviews has chosen to regulate itself, America can have both a viable lead generation industry and a significant reduction in overuse of consumers' telephone numbers.


<u>The SolarReviews Proposal</u>

This SolarReviews submission outlines the proposed regulations that could allow the lead generation industry to exist and also protect consumers by limiting the use of their information to the reasonable and necessary use of their TCPA consent.

What's more, the regulatory changes would be relatively simple.

We have not included in this submission a detailed analysis of the benefits that the lead generation industry provides to both consumers and businesses because we thought many other industry participants would make comprehensive submissions and offer ample evidence on this point.

SolarReviews would be happy to provide such a submission if requested by the FCC.



Elements of the Public Knowledge submission that SolarReviews opposes

**Opposed Submission 1: That a consumer must give a TCPA Opt-In directly to each Service Provider**

This proposed rule could have the effect of outlawing lead generation and comparative shopping websites. We believe that this restriction is overbroad and goes far beyond what is necessary to reduce the overuse of consumers' telephones after a TCPA Opt-In.  It could also adversely affect consumers' ability to conduct price comparisons and obtain relevant information for informed decision-making, while harming small businesses.

**Lead generation firms are very important to small businesses**.

In any one year, SolarReviews supplies leads to over 500 independent solar companies covering most of the country. Most of its clients are small or medium-sized, family-owned, solar companies.

Such companies cannot compete with the marketing departments of large corporate solar companies as they cannot afford to employ specialists for Google AdWords, YouTube Advertising, Facebook Advertising, etc. These customers rely on SolarReviews and other lead generation firms for work and the continued existence of their businesses.

A survey of our clients conducted in March 2023 showed that over 90% of them believed they would have to lay off staff if lead generation companies were not able to supply them with leads. Thirty of our clients have provided written submissions to this effect.

If lead generation is made illegal, then Americans would be put out of work and it would almost certainly trigger an economic hardship, especially when a more tailored regulatory approach could benefit both consumers and small businesses.

**When operated responsibly, lead generation websites benefit consumers**

Consumers want the convenience of being able to generate price competition for a service they are considering purchasing by filling in just one form ("one-stop shopping").  Best practice regulation should allow this result but reduce or eliminate the potential for overuse and oversharing of the consumers details.

Consumers value this advice and information about suppliers who can meet their needs.  If one reviews the comments on the hundreds of Google reviews on the SolarReviews business, you will see how much consumers appreciate this advice. In fact, SolarReviews does not transfer information of over half of the consumers that enter their details on our site, because a conversation with one of our consultants determines that solar is not a good fit for the client. SolarReviews has always operated very differently from the rest of the lead generation industry. Our practices can now serve as a model for a new regulatory regime because our model has



been tested and works for both consumers and service providers, by providing price competition for consumers while protecting their privacy yet allowing SolarReviews to show a profit every year.

**Opposed Submission 2: Compulsory identification of specific Service Providers at the time of TCPA Opt-In**

SolarReviews opposes the view that a TCPA Opt-In needs to identify the specific service providers that calls will come from, and that Third Party Marketing Organizations (TPMOs) be restricted from calling consumers.

**The Reasons SolarReviews opposes this proposed regulation**

There are three reasons why SolarReviews opposes this proposed restriction:

- First, SolarReviews and other high quality lead companies such as aplaceformom.com and many other health care lead generation businesses actually avoid a lot of unnecessary cold calling by using a QA process and a discussion with the consumer to direct the consumers to the service providers that can meet the consumers' stated needs. This process often means the consumer only gets called once rather than many times.

- Second, it creates a logistical difficulty for lead generators like SolarReviews because lead buyers usually have limited daily budgets, job-capacity, or availability (i.e., the latter is important for jobs requiring an emergency call-out e.g. plumbers).  It is not always possible to know at the time a lead is generated who will be available to service it once it passes QA and is ready to be shared with service providers.

- Third, there are less restrictive and more beneficial alternative regulations that could be implemented that provide significant improvement over this proposed overuse of TCPA consent.  We have provided these proposed regulations in the next section of this document, along with summaries of the benefits of these proposed regulations.

**How this proposal works in the SolarReviews context**: Solar energy is quite complex because the best service provider for a specific consumer depends on what type of system the consumer wants, what brands of equipment they want to buy, and how they want to pay for the system.

For example, some consumers can use income tax credits and some cannot. SolarReviews speaks to many of the consumers that request quotes before SolarReviews provides the lead to any service provider. In fact, approximately 50% of the leads generated by the SolarReviews website are actually not sold to any service provider and so attract no phone calls, often

SolarReviews

because of this QA process, advising the client that solar will not be a good fit for their circumstances.

In other words, hundreds of thousands of consumers received no calls in 2022 because SolarReviews, a TPMO, was allowed to speak to leads first and either disqualify them or send them to the service providers whose offering best suited their needs.

**How this proposal might work in the context of a lead generation service for adult children looking for residential care for elderly relatives[1]:** In this case, the assessment of the care needs of the patient is often not straightforward and so it is not possible to know what care facility the TPMO will connect the consumer with until after a screening process.

In both cases, if the TCPA Opt-In had to nominate specific service providers, then the TPMO would have had to have sold this lead to many providers and the consumer would have had to receive many phone calls, and have many more conversations to get the same knowledge and outcome as what the above processes delivered.

We believe this result would be a net detriment to these consumers.


**Opposed Submission 3: That a TPMO cannot call the consumer directly**

As stated above, a TPMO can add a lot of value to a consumer by calling them and both answering the consumers' initial questions or by asking the consumer about their preferences, such that the consumer can then either opt out of all further phone calls (in which case the TPMO never sells the lead) or be directed to a smaller number of service providers that are likely to suit the consumer's buying preference.

Some of the reasons why a TPMO might need to contact a consumer include:
- clarifying purchase needs - scope of product or service
- understanding the consumer's budget
- discussing purchase types such as lease, rent or buy, or directing to Community Solar
- determining eligibility for a specific product or service
- understanding other purchase considerations, such as wait-times, delivery costs, after-sales, servicing, permitting, etc.
- discussing eligibility for government grants or tax credits

Furthermore, a TPMO (such as SolarReviews) is an independent agent and so it allows the TPMO to offer objective, unbiased advice.

---

[1] Some examples of this would be https://caring.com/ and http://aplaceformom.com/

**A78**



As stated above, this operation of this screening process at SolarReviews meant that nearly half a million consumers in 2022 avoided the need to share their details or receive calls from any service provider. Our process is highly efficient for both the consumer and the service providers because it provides both with the most relevant information.

SolarReviews

## Alternative regulations regarding lead generation

SolarReviews has been aware of the existence of bad actors in the lead generation ecosystem for many years and welcomes the Commission's attempts to limit the harm to consumers and to protect compliant businesses.  The proposed regulatory changes below come from many years of frustration from having to deal with the fallout from bad actors abusing the consumers' trust. We believe these changes both strengthen the protections for consumers and encourage an ethical business model that can support the lead generation ecosystem going forward.

**Regulatory Changes Recommended by SolarReviews: New Regulation 1**

***Allow consumers to restrict sale of details to a maximum number of Service Providers***

*"For a TCPA Opt-In to be valid consumers must be given a choice of how many service providers they want the TPMO to contact by when giving this consent. It becomes illegal for a TPMO to sell a consumers' details to more than the number of service providers that the consumer requests."*

Among the hundreds of millions of people that choose to use comparison shopping websites are people with very different views of how many calls they regard as reasonable when they give a TCPA consent.

Some people want 10 or more quotes when buying a big-ticket item like a solar panel system for their home, but others just want to speak with one or two service providers to ask a few questions to inform their decision as to whether they want to buy the product or service at all.

Therefore, we believe it is appropriate to allow consumers to have a say as to how many service providers are allowed to call them when they give a TCPA consent.

**Reasons why this is sensible regulation**

SolarReviews has been allowing consumers to choose the number of quotes they want to receive for about 5 years, and we have been limiting lead sales to the number of service providers the consumer has requested.

If we compare Figures 1 and 2 on the following pages and if we assume this consumer only wanted to speak with two or three service providers, then this simple change would reduce the phone calls and texts from an estimated 50 calls and 30 texts down to 3 calls. Note that the consumer has obtained the information they required.

**A80**

SolarReviews

Figure 1.[2]



## Current underregulated **exploitative** lead generation ecosystem

- Consumer does not select how many quotes they want
- TPMO's can sell leads to other TPMO's - Affiliate networks (AN)
- Service providers routinely calling from 5 different numbers

Consumer gives details and TCPA consent **not knowing** how many people **their data will be shared with.** (Lead gen website has 3 direct service providers).

Service Provider 1 — Service Provider 2 — Service Provider 3 — Affiliate Network 1 — Affiliate Network 2

1 call, consumer arranges to have a measure & quote

1 call, consumer arranges zoom proposal

10 calls & 6 texts using 5 different numbers

Service Provider client of Affiliate Network 2 — Affiliate Network 5

Consumer realizes she doesn't want to go any further and so does not want any more calls. Consumer is happy with 2 proposals

Service Provider client of AN 1 — Service Provider client of AN 1 — Affiliate Network 3 — 10 calls & 6 texts using 5 different numbers

?

10 calls & 6 texts using 5 different numbers — 10 calls & 6 texts using 5 different numbers

Possibly more spread of lead data & most phone harassment

Service provider client of Affiliate Network 3 — Affiliate Network 4

?

### The result

Consumer gets as many as **50 calls** and **30 text** messages *after* their needs were met. A terrible result for the consumer.

10 calls & 6 texts using 5 different numbers

---

[2]The numbers expressed in this figure are examples based on the experience of SolarReviews.

SolarReviews

Figure 2.[3]

# How a **comparison shopping network** would work if:

1. Consumers were given a choice of how many proposals they want.
2. TPMO's were only allowed to sell to direct service providers.
3. Service providers were only permitted to call a consumer from one number.



## The result

Consumer receives as few as three calls but a maximum of **9 calls** and **9 text** messages, if they do not answer initial dials from each of the service providers. The consumer now has **valuable information** from a service provider that has **informed their purchasing decision.**

The process means there is:

- A tight chain of custody of the consumers personal data.
- No resale to the other affiliate networks or their clients.
- An appropriate balance of advice, price competition & privacy.
- In short, all the benefit of comparison shopping without the overuse of their phone number.

---

[3] The numbers expressed in this figure are examples based on the experience of SolarReviews.



**Why claims of lack of profitability are not supported**

The lead generation industry currently profits from selling information about consumers who give a TCPA consent, and those sales sometimes result in consumers being called far more times than the consumers wish.

The industry may argue that this proposed regulation will cost the industry money and will increase the price of leads. This result is not necessarily true because the industry can price leads based on the number of quotes that the consumer wishes to receive.

SolarReviews has been following this practice for many years. SolarReviews has both gained market share and become a very profitable business by doing this because service providers have noticed that SolarReviews' leads convert at higher rates and are prepared to pay more for them.

This higher conversion rate is because the consumer is hassled less. Both lead generation companies and large service providers apparently have failed to realize that the overcalling is actually putting consumers off buying products that they might otherwise have bought if they were not inundated with unwanted calls.

**A83**



**Regulatory Changes Recommended by SolarReviews: New Regulation 2**

***Restriction on sale of leads to service providers only***

*TPMO's (lead generation and comparison-shopping websites) should only be able to sell leads to companies that provide the service that the consumer is requesting. If such a service requires a license, then it must only sell to licensed service providers holding a license in the consumer's location. Whether a license to provide the service is required or not, the TCPA consent should only cover a service provider that sells or provides the product or service. This limitation is intended to prevent TPMO's from simply gaining licenses themselves to bypass this rule.*

If we consider Figure 1 and Figure 2, we see the enormous reduction in calls that can happen when the lead generation company (TPMO) only sells their leads (i.e., the TCPA Opt-In can only transfer consent) directly to service providers.

In the case of Figure 1, where the lead generation website (TPMO) sold to both direct service providers and other TPMO's (Affiliate Lead Networks), the consumer received 50 phone calls and 30 texts[4] after they were satisfied with the amount of price competition they had.

In Figure 2, because the consumer could select how many quotes they wanted (SolarReviews proposed Regulation 1) and the TPMO could only sell to direct service providers (SolarReviews proposed Regulation 2), the consumer only receives 3 calls if they answer each one on the first ring and a maximum of 9 calls if they do not answer[5] the first two dials from each service provider.

Importantly, the consumer gets no calls after their comparison-shopping needs are met.  This model shows how lead generation networks can benefit consumers and service providers.

---

[4] Based on the experience of SolarReviews
[5] Based on the experience of SolarReviews

**A84**

SolarReviews

**Regulatory Changes Recommended by SolarReviews: New Regulation 3**

***Restriction on origin numbers to call consumers from***

*In our proposal, a TCPA Opt-In should only allow a service provider to call the consumer from the same phone number every time, and only up to the point that the service provider has had a conversation with the consumer, or the consumer has further consented to a call from another number.*

This proposal is an anti-avoidance provision.

There are already rules that limit the number of calls and texts that a service provider may make under a TCPA Opt-In, but these rules are being flouted by service providers setting up automated systems that call the consumer from many different numbers such that neither the consumer, the TPMO that sold the lead, nor the FCC knows which service provider is overcalling a specific consumer's phone.

These actors maintain anonymity by not leaving a voice message and using VOIP numbers. Sometimes returning a call to these numbers will identify the source but often it will not, because some service providers deliberately do not answer incoming calls to these VOIP numbers.

This overcalling from multiple numbers leads the consumer to suspect that their details have been sold or transferred to many more companies that is in fact the case, which hurts both consumer confidence and the lead generation industry as a whole.

**SolarReviews**

**Regulatory Changes Recommended by SolarReviews: New Regulation 4**

*Regulation of TCPA tracking scripts*

*Where a tracking script is included in a TPMO lead generation website, the consumer must be advised that their details will be shared with this third-party organization and a consumer must be given an option to refuse to share their details with the owner of such scripts.*

A TCPA tracking script is a computer code added to a lead generation website creating a video or other record of the consumer clicking on the TCPA acceptance and identifying the website on which a lead is initiated, the time it was initiated, and the IP address of the consumer.  This practice has led to a number of lawsuits regarding the failure to disclose or obtain consumer consent to this technology.

TCPA tracking scripts were developed to allow service providers buying leads from affiliate lead networks, who in turn buy leads from many individual websites, to be able to see that a consumer had agreed to a TCPA consent on the specific website that originated the lead.

The tracking scripts were necessary because there was an intermediary (the affiliate lead network) between the service provider calling the lead and the original site on which the lead was created. Often, service providers calling consumers do not even know when or how a lead was originally created and where or how the TCPA Opt-In was given.

The advantage of the TCPA tracking script is that the lead buyer can refer to the TCPA Opt-In tracking record if there is ever a claim by the consumer that they did not give a TCPA consent.

A proliferation of TCPA litigants made lead buyers insist that lead origination websites use such scripts to protect them from such litigants.  Today, most lead generation sites that sell their leads through affiliate networks have one or more TCPA tracking scripts built into them.

The robocall epidemic continues. The fact that many people seem to miss is that TCPA tracking scripts protect the service provider making the calls and not the consumer being called.

SolarReviews believe TCPA tracking scripts create their own problems and contribute to the epidemic of overcalling because the scripts further share consumer data to a party that the consumer may not even be aware exists.

The owner of the TCPA tracking script may obtain the consumer's personal details without the consumer even knowing that the tracking scripts are in the lead generation website they are using, or that the consumer's name, email, street address and phone number are then held by the owner of the tracking script.

If a consumer fills out a call to action on a website, the consumer knows they are giving consent to that website, and the service providers that the website sells leads to, but consumers may not

**A86**



know their details are also being shared with the owners of each of the TCPA tracking scripts that are in the lead generation website that the consumer is using.

The concern of SolarReviews is that there is no transparency of what the owners of TCPA compliance tracking scripts do with the data they harvest.

For this reason, SolarReviews has refused to have third party TCPA tracking scripts in its solar websites. Instead, we developed our own internal system to provide similar functionality but without sharing data with any third party.

TCPA tracking script providers sometimes state they are not selling the data because their clients already have the consumers data in their database. Effectively they are claiming that "insights about data" is not the same as selling the data itself. Nevertheless, SolarReviews believes that if communication of this insight leads to unwarranted and unexpected calls to consumers, then this behavior should be regulated.

It could be argued that TCPA tracking scripts are almost like another type of affiliate network and even more opaque to consumers than regular lead generation networks.

In the view of SolarReviews, third-party TCPA tracking scripts are an insidious collection device between the owners of these scripts and large service providers. The owner of the script effectively becomes a lead generation company without having to pay to generate leads and the large service providers may call consumers without having to buy leads.

SolarReviews is vehemently against any attempts to legislate the required use of third party TCPA tracking scripts.

A87



## Summary of Regulatory Changes Recommended by SolarReviews

The regulations proposed by SolarReviews strengthen consumer protections but also improve the behavior of both the lead generation industry and the service providers that interact with the consumer.  SolarReviews supports the proposals it recommends already (where relevant) and has built a strong and viable business without resorting to the sort of actions that the NPRM is seeking comment on.  A diagram of the effect of the proposed regulatory changes is shown below in Figure 3.

We believe the proposed rulemaking in the Public Knowledge proposal is excessively broad and would be damaging to the lead generation industry and the consumers that depend on them for information.  The Public Knowledge proposal that consumers can only agree to be contacted on a service provider's website individually forces both the consumer and smaller business to be at the mercy of larger firms who have the skills and staff to spend on SEO and advertising.  Lead generation companies such as SolarReviews provide a valuable service, educating consumers whilst allowing smaller companies to compete on the internet with much larger competitors.

We believe SolarReviews' proposed regulatory changes provide a way to both protect consumers and regulate the lead generation and service provider industries effectively.

SolarReviews

Figure 3. [6]

# A comparison of **current regulation** to **SolarReviews proposed regulation**

- Consumers were given a choice of how many proposals they want.
- TPMO were only allowed to sell to direct service providers.
- Service providers were only able to call consumers from a single number.

## Current TCPA rules

**Consumers** unaware when giving TCPA opt in how many service providers will use their phone numbers.

Currently **consumer details shared** with service providers & other TPMO's (affiliate lead networks).

### The result

Consumer gets **50 calls** and **30 text** messages *after* their needs were met. (Refer to Figure 1)

## Ideal comparison shopping network

Consumer is given a choice of **how many service providers** they would like quotes from. **They select 3.** Not sold to affiliate.

Service Provider **1**

Service Provider **2**

Service Provider **3**

1 call, consumer realizes he's no longer interested in service after getting more information

Max of 3 calls & 3 texts, but consumer can opt out by answering first call.

Max of 3 calls & 3 texts, but consumer can opt out by answering first call.

### The result

Consumer receives as few as three calls but a maximum of **9 calls** and **9 text** messages, and now has **valuable information** from a service provider that has **informed their decision** not to purchase or shop.

The process means there is:
- A tight chain of custody of the consumers personal data.
- No resale to the other affiliate networks or their clients.
- An appropriate balance of advice, price competition & privacy.

---

[6] Based on the experience of SolarReviews

# TAB C

Comments of Insurance Marketing Coalition Ltd., FCC CG Dkt. Nos. 21-402, 02-278 (May 8, 2023)

**imc**

Insurance Marketing Coalition

May 8, 2023

Federal Communications Commission
45 L Street NE
Washington, DC 20554

Submitted via http://apps.fcc.gov/ecfs

    Re:     CG Docket No. 21-402 (Targeting and Eliminating Unlawful Text Messages) and CG Docket No. 02-278 (Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991)

Dear FCC Commissioners,

    The Insurance Marketing Coalition ("IMC") submits these comments on certain aspects of the Commission's Further Notice of Proposed Rulemaking in CG Docket Nos. 02–278 and 21–402; FCC 23–21, adopted on March 16, 2023 and released on March 17, 2023 ("FNPRM"). As explained in more detail in the Comments Section below, IMC takes the following positions with respect to the FNPRM:

I.    IMC supports enhancing the requirements of "prior express written consent" ("PEWC") under § 64.1200(f)(9) (the "PEWC standard") to ensure that consumers have transparency about the calls they may agree to receive. Specifically, IMC supports amending § 64.1200(f)(9)(i) to clarify that the following items be added to the clear and conspicuous disclosure that is already required in a PEWC agreement: (1) the potential number of callers, (2) the maximum time period during which calls may be received, and (3) the types or categories of goods or services that may be offered on such calls.

II.    IMC is concerned with vague or arbitrary proposals that would hurt consumer choice and competition. Specifically, IMC is concerned with various changes to the PEWC standard proposed by the Commission and certain commentators, including proposals to add an overbroad and undefined "logically and topically associated" standard and to limit consumer choice as to the type or number of calls they can agree to receive through a single PEWC agreement.

III.    Although clarifying the PEWC standard will help to solve the problem of consumers receiving unexpected calls in response to a single PEWC agreement, any ultimate solution to that problem will not make much of a dent in the overall volume of unwanted calls and texts, which are primarily made without any consent.

<u>**OVERVIEW OF IMC**</u>

    The IMC is a consortium of over twenty entities, representing a cross section of insurance industry stakeholders, whose mission is to help protect the best interests of consumers by, among other things, promoting compliant, best practices in insurance marketing and services. Our members include large companies as well as "small entities'' as defined under the Regulatory Flexibility Act. In the past year, we interacted collectively with millions of consumers by providing information, education and meaningful choices related to their insurance coverage options. Some of our members are licensed agencies and brokers, some are marketing and advertising companies, some are consumers, and some are technology companies that provide platforms and services to support brokers, agents, and marketers. Using "lead generator" terminology, the IMC's members include sellers that rely on lead generators for promoting their goods and services to consumers, lead generators that strive to raise genuine interest in goods and services of sellers, consumers who rely on lead generators to learn about and compare

**IMC**

Insurance Marketing Coalition

goods and services, and technology companies that support the insurance industry. IMC is thus uniquely positioned to comment on aspects of the FNPRM that would have broad implications on various stakeholders.

<u>STATEMENT ON PERFORMANCE MARKETING</u>

Performance marketers, or lead generators, play a critical role in the marketing and sales process for a variety of products and services, including personalized products such as insurance where consumers often seek one-on-one consultations with licensed professionals to understand options, terms, and pricing prior to purchase. Performance marketers help make consumers aware of the broad array of product choices and sellers available to them, as opposed to promoting a single product or service, and empower consumers to explore their coverage options easily and quickly from multiple licensed agents if they choose. Many performance marketers rely on digital marketing, which requires a specialized skill set. Digital ad markets are extremely competitive and expensive to participate in. Performance marketers use their expertise in digital advertising and ad buying to permit participation in digital ad markets by companies that otherwise would not have the expertise or resources to do so. For small businesses in particular, such as mom-and-pop insurance brokers, performance marketing is the lifeblood of their businesses as it allows them to reach new customers on equal footing as national companies that have multi-million-dollar marketing budgets. This in turn benefits consumers by providing them with significant additional choice from a variety of different businesses at a glance. Performance marketing also provides an alternative avenue for digital advertising to tech giants like Facebook and Google, thereby helping to promote competition more broadly in the digital world. Performance marketers thus play an important role in fostering consumer choice and market competition.

Although IMC recognizes that there are bad actors within the performance marketing industry, as is true with any industry, it is grossly unfair to lump the vast majority of responsible, law-abiding performance marketers into the same bucket as those bad actors.[1] The members of IMC collectively interact with millions of consumers each year, either as performance marketers or as users of their services, and note that the overwhelming majority of consumers appreciate these experiences and find them valuable. Given the valuable services that performance marketers provide to both consumers and businesses, the performance marketing industry should be commended, not maligned, and caution should be taken not to take actions that would hurt consumer choice and competition in favor of larger corporate organizations. IMC thus supports reasoned, objective regulation that is appropriately tailored to stop bad actors, but urges the Commission to avoid overly broad, vague or arbitrary regulation that would do more harm than good.

<u>COMMENTS</u>

I.      <u>IMC supports clarifying the term "prior express written consent" ("PEWC") under § 64.1200(f)(9) (the "PEWC standard") to ensure that consumers have transparency about the calls they may agree to receive.</u>

IMC strongly supports the proposition that consumers should only receive calls that they agree to receive. Bait-and-switch, hide-the-ball, dark patterns, and other deceptive tactics should be outlawed, and violators punished. IMC posits that the most direct way to address such abuses is to require clear and conspicuous disclosures to consumers of the potential number of callers, maximum time period during which calls may be received, and the types or categories of goods or services that may be offered on such calls.

---

[1] The deluge of illegal and unwanted calls received by consumers on a daily basis may lead one to make a rash assumption that the practice of making such calls is widespread and that performance marketers are to blame. But this is not so. The vast majority of performance marketers expend significant effort and resources in ensuring a positive consumer experience, and strictly adhere to laws and industry standards. While bad actors within the performance marketing industry should be eradicated, even that will not stop unwanted and illegal calls. As explained below in Section III fraudsters use technology to bombard consumers with illegal calls, and a single bad actor can alone generate billions of illegal calls.

**IMC**

Insurance Marketing Coalition

The most effective way to provide this information to consumers is to require that it be included in the "clear and conspicuous disclosure" that is required under existing regulations to be included in a PEWC written agreement. Specifically, IMC proposes that § 64.1200(f)(9)(i) be amended as follows (proposed text to add in **bold green font**; proposed text to remove in ~~red strike-through font~~):

> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing ~~that~~:
>
>> (A) **That** ~~Bb~~y executing the agreement, such person authorizes the seller caller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; ~~and~~
>> (B) **That** ~~T~~the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services ~~.~~ **;**
>> **(C) Of the types or categories of property, goods or services that the person agrees to be called about;**
>> **(D) Of the total number of callers that may call the person; and**
>> **(E) Of the maximum time period(s) that such callers may call the person, unless the person sooner provides a request not to receive calls, in which case the caller receiving such request must honor it as set forth under 47 C.F.R. § 64.1200(d)(6).**

This proposed amendment would directly address the problem of multiple callers unexpectedly contacting a consumer in response to a single PEWC agreement by clearly explaining the scope of the calls that consumers may receive. For example, a PEWC agreement under this proposed standard might look like this:

> [  ]    By clicking the box on the left and submitting your telephone number, you agree to receive calls from Acme Quote Co. and up to [#] of its <u>marketing partners</u> about [X product]. You agree that these calls may be placed to your number for up to [#] weeks from today's date using an automatic telephone dialing system, even if your number is on a do-not-call registry. Your consent is not necessary to receive any goods or services, and to proceed without providing consent to receive such calls you may dial 1-800-XXXX.

Specifically, by requiring disclosure of the types or categories of goods or services that a person agrees to be called about, the problem of a consumer being duped into receiving calls about Y product when they thought they were going to get calls about X product is solved. By requiring disclosure of the maximum number of potential callers, the problem of a consumer being surprised about how many of the listed "marketing partners" may call is solved. And by requiring the maximum time period that such callers may call, the problem of consumers being surprised by calls at a later date than expected is solved.

For consumers who don't want to receive such calls, they can simply choose not to agree. For consumers who do want to receive such calls, they can confidently agree knowing the scope of the calls they may receive. As discussed below, this proposal to include objective criteria within the PEWC standard is superior to vague or arbitrary proposals that would hurt consumer choice and competition.

**II.    <u>IMC is concerned with vague or arbitrary proposals that would hurt consumer choice and competition.</u>**

Although IMC shares the Commission's and other commentators' goals of ensuring consumers only receive calls that they agree to, IMC believes the best solution is to enhance the existing PEWC standard with objective disclosure requirements, as proposed above in Section I, rather than to impose vague or arbitrary rules.

IMC

Insurance Marketing Coalition

**(A)  IMC is concerned with the Commission's proposed revisions to § 64.1200(f)(9) for the following reasons:**

**i.     List of Entities.**              As an initial matter, IMC is concerned with the use of the term "entities" because callers may be natural persons, not entities.[2] To the extent the Commission intends to regulate the behavior of callers, which may be entities or natural persons, IMC respectfully submits that the Commission simply refer to them as "callers." IMC also is concerned with the proposal that the "entire list of entities" to whom permission may be given to call be disclosed because it adds unnecessary complexity and lacks relevance to consumers. The identity of potential callers is generally irrelevant to consumers because those callers typically call with offers of sellers whose identities are more likely to be known by consumers. The identity of sellers already must be disclosed, so there is little to add but confusion with adding the name of callers. A more meaningful piece of information to supply to consumers, as proposed above, is the total number of callers that may call the person. This way, consumers understand better the scope of calls they may receive If they choose to agree to receive them.

**ii.     Web Page Disclosures.**              To the extent the Commission promulgates any rule requiring disclosure of information, IMC opposes mandating that such disclosure be on a "web page" as contained in the current proposal. There are at least three reasons why this is suboptimal for consumers. First, written agreements are frequently captured offline, so it would be unreasonable to require that such offline disclosures be made on a "web page." Second, even in an online environment, "web page" is too narrow as it does not account for clearer ways (including through technology) to make disclosures. For example, a sequence of concise web pages that are navigated without scrolling may be clearer and easier to understand than a single web page that does require scrolling. As another example, content may be displayed to consumers that visually appears to be on the same web page, but from a technology standpoint that content may actually be drawn from a source other than the web page that the person is on. And, third, with changes in technology, the term "web page" itself may be obsolete sooner than the Commission can adjust its rules. Indeed, what is a "web page" in the context of the metaverse?

**iii.     Hyperlinks.**         IMC opposes prohibiting hyperlinks in online PEWC agreement because hyperlinks enhance transparency and consumer comprehension when used correctly. Hyperlinks are universally well understood by consumers and their use throughout the Internet, including by government agencies, to organize information and present it in an easily digestible format is ubiquitous. And hyperlinks currently play a critical role in making meaningful disclosures to consumers who want to receive calls about insurance offers, such as those offered by IMC members.

To understand the value of hyperlinks, we first provide a typical example of a consumer's experience on an insurance comparison website. A consumer who is shopping for auto insurance visits a website that offers the consumer the opportunity to receive a call within minutes to be connected with a licensed insurance agent. The consumer doesn't need to search the yellow pages for an agent, make an appointment, get dressed, drive across town, and meet in person at an office (or invite an agent into the consumer's home). The consumer reaches a webform on an internet site hosted by Acme Quote Co.[3] that requests the consumer's telephone number and includes the following PEWC agreement:

---

[2] Although it is true that most natural persons who call are likely to do so as agents of an entity (and thus the entity would be the caller in such circumstances), there are also instances where natural persons may be individuals without any entity association (e.g., a "sole proprietor" without any formal corporate structure), and thus regulation should contemplate that callers may be either entities or natural persons.

[3] This is a fictional company name. Any similarity to the name of an actual company is unintended.

imc

Insurance Marketing Coalition

[ ]        By clicking the box on the left and submitting your telephone number, you agree
to receive calls from Acme Quote Co. and its marketing partners to connect you with a
licensed insurance agent to provide an insurance quote. You agree that the calls may be
placed using an automatic telephone dialing system, even if your number is on a do-not-
call registry. Your consent is not necessary to receive any goods or services, and to
proceed without providing consent to receive such calls you may dial 1-800-XXXX.

Behind the "marketing partners" hyperlink, there may be names of hundreds of insurance agents
and brokers that are displayed if the link is clicked. The consumer enters their phone number, checks the
box, and submits the form.

The consumer may also be asked a series of questions that are necessary to identify an insurance
agent who is currently available to provide an appropriate insurance quote (for example, zip code, current
carrier, the type of vehicle, etc.). These questions may be asked in the online web form, or Acme Quote Co.
may place a call to the consumer to ask these questions. Based on the consumer's responses, Acme Quote
Co. identifies a licensed agent who is available at that moment in time to provide a quote and is one of
those listed on the hyperlinked marketing partners list that was provided in the PEWC agreement. Acme
Quote Co. then sends the consumer's information to that licensed agent to place a call to the consumer or,
if the responses were provided to Acme Quote Co. over the telephone, it immediately offers to transfer the
consumer to that licensed agent. The consumer is pleased because, within a matter of minutes of visiting
the website, and without any cost, they have connected with a licensed insurance agent who can provide
an insurance quote that they can use to compare their coverage options[4]

Now let's dissect the use of the hyperlink in the above example. Why is the hyperlink used? An
uninformed outside observer looking at the hyperlink (without actual understanding of what is happening
behind the scenes) may say: "look-they just tricked the consumer into receiving calls from potentially
hundreds of callers!"[5] But that is not the case. Instead, the reason that companies such as the fictional Acme
Quote Co. above include lengthy lists of marketing partners is generally because of a desire to maintain
compliance with current TCPA regulations and case law, which require that the name of the seller (which,
in the example above, may be different from the name of the caller) be provided to the consumer. In
markets for products such as insurance it is not unusual for there to be hundreds of potential sellers offering
differentiating products. Performance marketing of competitive offers is like matchmaking in that, the more
options you offer, the better chance of making a good "connection" with a seller who is offering what the
consumer is looking for at the right time. In order to be able to offer a wide range of product selection and
availability, and because Acme Quote Co. does not know until the request is made which partner will have
the right insurance product for the consumer and which partner will have an insurance agent available at
the time of the request, Acme Quote Co. provides a list of every possible partner to which the consumer
could be matched. This gives Acme Quote Co. the ability to choose a marketing partner that most closely
matches what the consumer says they want.  If Acme Quote Co. doesn't include this lengthy list, it opens
the door to lawsuits and demands from litigants seeking recovery of statutory damages.[6] However, just like

---

[4] The example above is realistic and represents the experience of millions of consumers each year, who find these services
valuable and welcome. While there are certainly some dissatisfied consumers, as there are in any industry, the vast majority of
these consumers are satisfied with their experiences.

[5] *See, e.g.,* FCC 23-21 at Paragraph 60.

[6] Acme Quote Co. and the licensed agent it transfers the call to face very real risks of demands and lawsuits from TCPA litigants
if the PEWC agreement fails to include all potential sellers. Indeed, due to the availability of uncapped statutory damages of up
to $1,500 per violation under the TCPA, and the ability to assert claims on a putative class-wide basis, there is a vibrant community
of litigants and lawyers who seize on any perceived technical violation of the TCPA to demand extraordinary sums of money from
callers and recipients of call transfers. Knowing that the costs of defending even the most specious of claims can rapidly pile up
for companies, and for some businesses can push them to bankruptcy, these litigants and lawyers will frequently file first and ask

IMC
Insurance Marketing Coalition

a matchmaker doesn't send a client out on a date with every potential candidate available in its database, Acme Quote Co. won't match a consumer with every entity on its list of marketing partners; rather, it will select the appropriate option for the consumer based on the information provided by the consumer. And, under the IMC's proposal, the number of marketing partners selected will be limited to the number disclosed and agreed to in the consent form.

Faced with a decision as to how to present the list of potential marketing partners, Aceme Quote Co. must decide whether to present the list inline or through a hyperlink. If Acme Quote Co. provides the list of hundreds of marketing partners inline with the PEWC agreement, it makes the PEWC agreement unwieldy, complex, and almost indecipherable, as shown in this example with only 100 marketing partners listed:

[ ]     By clicking the box on the left and submitting your telephone number, you agree to receive marketing calls from Acme Quote Co. and its marketing partners, which may include: potential marketing partner # 1, potential marketing partner # 2, potential marketing partner # 3, potential marketing partner # 4, potential marketing partner # 5, potential marketing partner # 6, potential marketing partner # 7, potential marketing partner # 8, potential marketing partner # 9, potential marketing partner # 10, potential marketing partner # 11, potential marketing partner # 12, potential marketing partner # 13, potential marketing partner # 14, potential marketing partner # 15, potential marketing partner # 16, potential marketing partner # 17, potential marketing partner # 18, potential marketing partner # 19, potential marketing partner # 20, potential marketing partner # 21, potential marketing partner # 22, potential marketing partner # 23, potential marketing partner # 24, potential marketing partner # 25, potential marketing partner # 26, potential marketing partner # 27, potential marketing partner # 28, potential marketing partner # 29, potential marketing partner # 30, potential marketing partner # 31, potential marketing partner # 32, potential marketing partner # 33, potential marketing partner # 34, potential marketing partner # 35, potential marketing partner # 36, potential marketing partner # 37, potential marketing partner # 38, potential marketing partner # 39, potential marketing partner # 40, potential marketing partner # 41, potential marketing partner # 42, potential marketing partner # 43, potential marketing partner # 44, potential marketing partner # 45, potential marketing partner # 46, potential marketing partner # 47, potential marketing partner # 48, potential marketing partner # 49, potential marketing partner # 50, potential marketing partner # 51, potential marketing partner # 52, potential marketing partner # 53, potential marketing partner # 54, potential marketing partner # 55, potential marketing partner # 56, potential marketing partner # 57, potential marketing partner # 58, potential marketing partner # 59, potential marketing partner # 60, potential marketing partner # 61, potential marketing partner # 62, potential marketing partner # 63, potential marketing partner # 64, potential marketing partner # 65, potential marketing partner # 66, potential marketing partner # 67, potential marketing partner # 68, potential marketing partner # 69, potential marketing partner # 70, potential marketing partner # 71, potential marketing partner # 72, potential marketing partner # 73, potential marketing partner # 74, potential marketing partner # 75, potential

---

questions later. While there certainly are some genuine claims brought under the TCPA, the harsh reality is that there are far too many fabricated claims and claims brought for immaterial technical violations (as an example, an IMC member reports having faced a claim where the claimant, seeking statutory damages, argued that their consent was invalid because the seller was incorrectly identified as Acme LLM instead of Acme LLC due to a typo in the PEWC Agreement). This is yet another reason why any new regulations should be based on objective criteria (such as those proposed by IMC above in Section I) rather than on vague and ambiguous standards that will throw fuel on the fire of "gotcha" lawsuits and demands.

marketing partner # 76, potential marketing partner # 77, potential marketing partner # 78, potential marketing partner # 79, potential marketing partner # 80, potential marketing partner # 81, potential marketing partner # 82, potential marketing partner # 83, potential marketing partner # 84, potential marketing partner # 85, potential marketing partner # 86, potential marketing partner # 87, potential marketing partner # 88, potential marketing partner # 89, potential marketing partner # 90, potential marketing partner # 91, potential marketing partner # 92, potential marketing partner # 93, potential marketing partner # 94, potential marketing partner # 95, potential marketing partner # 96, potential marketing partner # 97, potential marketing partner # 98, potential marketing partner # 99, and potential marketing partner # 100 to connect you with a licensed insurance agent to provide an insurance quote. You agree that the calls may be placed using an automated telephone dialing system and artificial or prerecorded voice, even if your number is on a do-not-call registry. Your consent is not necessary to receive any goods or services, and to proceed without providing consent to receive such calls you may dial 1-800-XXXX.

As can be seen in the PEWC agreement immediately above, including the marketing partner list inline, rather than in a hyperlink as in the previous example, decreases readability and comprehension by pushing information about the types of technology that may be used and alternative means of receiving a quote to the end of a very lengthy list of information. So naturally, Acme Quote Co. chooses to use a hyperlink, which makes the PEWC agreement significantly easier to read and understand. This also helps ensure consumer understanding of the activities they are providing consent to perform.

Although most industry uses of marketing partner list is similar to the above (where only one or a small number of callers may actually call the consumer despite a lengthy list of partners),[7] and meets consumer expectations, IMC recognizes that there may be instances of abuses by tricksters who take advantage of hyperlinks to hide information or lure consumers into receiving more calls than reasonably expected. For this reason, IMC advocates for enhancing the PEWC standard as proposed above in Section I, which would require clear and conspicuous disclosure of the potential number of callers, the maximum time period during which calls may be received, and the types of goods or services that may be offered on such calls.

    **iv.**    **Logically and Topically Associated.**    IMC is concerned with the proposed terminology "logically and topically associated" because that terminology is vague and ambiguous. Although paragraph 61 of FCC 23-21 suggests that the Commission intended for "logically and topically associated" to require a nexus between (a) callers and (b) the website that solicits consent, the actual proposal does not specify any such nexus but instead states that "Prior express written consent for a call or text may be to a single entity, or to multiple entities logically and topically associated." As drafted, it appears that the proposed regulation would require that the entities be "logically and topically associated" to each other; rather than to the website as contemplated in paragraph 61 of FCC 23-21.

Regardless of what the Commission intends to be the nexus – i.e., entities to entities, or entities to websites—the language "topically and logically associated" itself is vague and ambiguous. What is a "logical" association? What is a "topical" association? And how are those two types of associations different

---

[7] Indeed, it is common practice in the Insurance industry for contracts between sellers and performance marketers to expressly prohibit or limit other calls to a consumer based on a single PEWC agreement. The number of potential "marketing partners" on a list thus cannot be used to assume the number of potential callers that may contact the consumer based on the PEWC agreement. To improve transparency, IMC proposes requiring disclosure of the total potential number of callers as explained above in Section I.

**IMC**

Insurance Marketing Coalition

from each other? There is no hyperbole or speculation in observing that these questions will take hundreds of millions of dollars and years of litigation to be resolved by the court system.

Rather than imposing vague and ambiguous adjectives that provide little guidance to industry, IMC advocates for objective criteria to ensure transparency with consumers, as set forth in its proposal above. Nevertheless, to the extent that the Commission proceeds with the "logically and topically associated" language, IMC proposes the following definition that would focus on avoiding deceptive tactics while remaining neutral as to offline or online interactions:

> The term **logically and topically associated** means of sufficient similarity to the information or advertising presented in conjunction with the prior express written consent so that a consumer acting reasonably under the circumstances is unlikely to be misled as to the calls that the consumer may receive.

If such definition were adopted by the Commission, IMC believes that the the amendment to Section § 64.1200(f)(9) should be limited to addition of the sentence "*Prior express written consent for a call or text may be to a single entity, or to multiple entities logically and topically associated.*" without any of the other language proposed in the FNPRM to avoid the problems identified above regarding the limitations of "web pages" and the use of hyperlinks. The addition of this definition and sentence could be coupled with the disclosures proposed by IMC above in Section I.

**(B)  IMC opposes the arbitrary proposal by another commentator that prior express consent to receive calls must be made directly to one entity at a time.**

Digital advertising is expensive and complex. If consumers are limited to providing consent to a single entity at a time, this will have the effect of making digital ad markets inaccessible and unaffordable to small businesses, new market entrants, and regional providers, thereby tilting the commercial playing field in favor of massive corporate entities. Established, dominant players in existing markets have the benefit of multi-million-dollar advertising budgets and brand recognition that are not available to small or even midsize businesses. Requiring that consent be provided to a single entity at a time will change consumer behavior to prioritize the most recognizable brands, effectively reducing fair competition and consumer choice as smaller companies are priced out of being included on digital advertising offers to consumers. This would change the resulting economics of digital advertising in such a way to entrench those dominant players and to make digital ad markets all but inaccessible to new market entrants or small businesses. If the priority is to support broad consumer choice and markets with diverse competition, it is necessary to oppose the proposal to limit consent to a single entity at a time.

Further, there is no statutory basis for the Commission to mandate that prior express consent may only be provided to a single entity or person at a time, and any such regulation would be arbitrary and capricious. The Telephone Consumer Protection Act ("TCPA") itself imposes no such limitation, IMC is unaware of any trace of it in the legislative history, and there are many common scenarios where consumers seek, through a single written agreement, to receive calls from multiple callers. For example, in the insurance context, consumers often want to discuss insurance options with various licensed agents due to the personalized nature of insurance products. Comparison sites allow consumers to receive calls from multiple competing licensed agents to compare quotes and coverage options. A consumer may visit a website that promotes the opportunity to "receive quotes from up to three agents licensed in your area" and sign a PEWC agreement that similarly states that the consumer agrees to receive calls from up to three callers (which are included in a marketing partner list that is provided through a conspicuously formatted hyperlink). The consumer knowingly fills out the form, receives the calls from the three different licensed

**IMC**

Insurance Marketing Coalition

agents, and is pleased with the experience. This consumer-friendly experience, which is provided without cost to the consumer, should not be outlawed. While IMC condemns the fringe practice of tricking consumers into receiving calls from an unexpected number of callers, that practice can be addressed through the IMC's proposal in Section I above to require disclosure of the number of potential callers in the PEWC agreement.

III.    <u>Although clarifying the PEWC standard will help to solve the narrow problem of unexpected calls based on a single PEWC agreement, solving that problem will not make much of a dent in overall volume of unwanted calls and texts, which are primarily made without consent.</u>

IMC supports the Commission's efforts to enhance the requirements of the PEWC standard under § 64.1200(f)(9), and believes that IMC's proposal in Section I will have the intended effect of preventing an unexpected number of callers, or types of calls, from arising under a single PEWC agreement. But, unfortunately, solving that narrow problem will not put a dent in combating the much larger problem of unsolicited and unwanted calls. The unwanted and annoying calls that bombard consumers (including IMC members) on a daily basis are by and large made without consent by foreign actors, not U.S. businesses.[8] There is no evidence in the record to suggest that any appreciable number nuisance calls are attributable to multiple callers responding to a single PEWC agreement. Indeed, the Commission and other government agencies have brought actions involving billions of illegal calls which actions were not related to the issue of multiple or unexpected callers dialing based on a single PEWC agreement.[9] Enhancing the PEWC standard is thus a noble battle, but it will gain little ground in the war on nuisance calls.

What can stem the tide of obnoxious and unsolicited calls? Only enforcement by regulators (aided by initiatives such as stir/shaken to identify the source of such calls) against illegal callers is likely to have any appreciable impact. After all, no amount of traffic laws will reduce accidents unless there is regular and consistent enforcement. IMC recognizes that enforcement is easier said than done. Many illegal callers operate outside of U.S. regulators' jurisdictional reach[10] so thoughtful network/carrier rules, and coordination with international government agencies, may be necessary. Federal and state regulators have limited resources, and those resources should be used where likely to have the greatest impact. Unfortunately, while updates to the PEWC standard are relatively easy to make, it will not help appreciably with the scourge of unwanted calls.

<u>CONCLUSION</u>

The IMC appreciates the opportunity to comment. We support the Commission's effort to provide consumers with transparency and protect them from unwanted telephone calls. IMC supports setting clear, objective standards for PEWC, as set forth above, while preserving consumer choice and protecting competition.

Thank you for your time and consideration of our coalition's response.

---

[8] *See, e.g.,* FCC December 23, 2022 Report to Congress (noting that "Foreign-originated calls are a significant portion, if not the majority, of illegal robocalls . . . " and referencing multiple enforcement actions involving billions of illegal calls made without consent), available at https://docs.fcc.gov/public/attachments/DOC-390423A1.pdf.

[9] *See, e.g.,* "FTC Crackdown Stops Operations Responsible for Billions of Illegal Robocalls" at https://www.ftc.gov/news-events/news/press-releases/2019/06/ftc-law-enforcement-partners-announce-new-crackdown-illegal-robocalls and "FCC Fines Telemarketer $225 Million for Spoofed Robocalls" at https://www.fcc.gov/document/fcc-fines-telemarketer-225-million-spoofed-robocalls. (Finding In its Forfeiture Order that the illegal calls were made without consent and noting that Commission staff spoke with 52 consumers, none of which recalled having provided consent and 41 of which affirmatively stated that they did not give consent.)

[10] *See* "Who's Making All Those Scam Calls?", NY Times, available as of May 6, 2023 at https://www.nytimes.com/2021/01/27/magazine/scam-call-centers.html.

# TAB D

Comments of LendingTree, LLC, FCC CG Dkt.
Nos. 21-402, 02-278 (May 8, 2023)

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| | **)** | |
| Targeting and Eliminating Unlawful Text | **)** | CG Docket No. 21-402 |
| Messages | **)** | |
| | **)** | |
| Rules and Regulations Implementing the | **)** | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | **)** | |

**COMMENTS OF LENDINGTREE, LLC.**

Steven A. Augustino
Josh Myers
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
101 Constitution Avenue, NW
Suite 900
Washington, DC 20001
(202) 689-2947
steven.augustino@nelsonmullins.com
josh.myers@nelsonmullins.com

*Counsel to LendingTree, LLC*

May 8, 2023

## SUMMARY

LendingTree, LLC ("LendingTree") is one of the nation's largest and leading online marketplace for loans. LendingTree operates industry-leading online consumer platforms in several financial sectors and connects consumers with financial products that they are actively seeking. At no cost to the consumer, LendingTree's online platforms provide potential borrowers with a means to effectively compare financial products, including mortgage purchase and refinance loans, home equity loans and lines of credit, personal loans, business loans, credit cards, and home and automobile insurance, among different lenders or providers at one time.

LendingTree supports the FCC's goal of ensuring that consumers know to whom they are providing their consent to initiate calls or text messages with them when they use comparison-shopping websites and/or applications ("apps"). Consumers should maintain control over the types of calls and texts that they receive when comparison shopping. LendingTree believes that consumers using LendingTree's comparison websites already receive recommendations and marketing communications related to their requests and expects that its websites will comply with the "logically and topically associated" rule change if the Commission adopts it. Consumers benefit from the convenience and savings of online comparison-shopping websites.

However, the Commission should modify at least one element of its proposal. Comparison-shopping websites, including those LendingTree operates, match consumer requests across hundreds, and sometimes thousands, of potential providers in order to identify the best matches and offers for a specific consumer's needs. It therefore is impractical – and potentially confusing to consumers – for online comparison-shopping sites to identify the specific providers that will contact a consumer at the time consent is collected. The Commission should modify its proposal to clarify that comparison-shopping providers may disclose the specific companies to

**A100**

whom the consumer's consent extends <u>after</u> the comparison-shopping service has matched the consumer to potential providers.   Alternatively, the Commission should allow a website to provide a weblink identifying the specific type of entities to whom the consent would reach, with a limit on the number of entities to whom the consumer's information could be shared.

These changes will enable consumers to continue to receive the benefits of online comparison-shopping while maintaining a transparent, consumer-friendly TCPA consent process.

## TABLE OF CONTENTS

SUMMARY ................................................................................................ 1

I.    BACKGROUND & INTRODUCTION ....................................................... 4

      A.  An Overview of LendingTree ........................................................... 4

      B.  Comparison-Shopping Marketplaces in General ............................. 5

II.   THE "LOGICALLY AND TOPICALLY ASSOCIATED" REQUIREMENT ................. 7

III.  DISPLAYS ON THE SAME WEBPAGE ..................................................... 9

      A.  Issues with a Same Webpage Requirement ..................................... 9

      B.  Alternative Solutions ................................................................... 10

IV.   THE FCC SHOULD REJECT MORE EXTREME LIMITATIONS ON TCPA
      CONSENT, INCLUDING THE "SINGLE-ENTITY" STANDARD ............................ 12

V.    CONCLUSION ................................................................................... 14

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Targeting and Eliminating Unlawful Text Messages | **)** | CG Docket No. 21-402 |
| | **)** | |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | **)** | CG Docket No. 02-278 |

## <u>COMMENTS OF LENDINGTREE, LLC.</u>

LendingTree, LLC ("LendingTree"), one of the nation's largest and leading online marketplace for loans, hereby provides comments in response to the Further Notice of Proposed Rulemaking ("FNPRM") issued by the Federal Communications Commission ("FCC" or "Commission") in the above referenced dockets.[1]  Founded in 1996, LendingTree operates industry-leading online consumer platforms in several financial sectors and connects consumers with financial products that they are actively seeking.  At no cost to the consumer, LendingTree's online platforms provide potential borrowers with a means to effectively compare financial products, including mortgage purchase and refinance loans, home equity loans and lines of credit, personal loans, business loans, credit cards, and home and automobile insurance, among different lenders or providers at one time.

As the leading online source for comparison shopping for loan products, LendingTree offers these comments on the Commission's proposed rule to "require that [TCPA] consent be

---

[1] *Targeting and Eliminating Unlawful Text Messages*, CG Docket Nos. 21-402 and 02-278, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (rel. Mar. 17, 2023) ("FNPRM").

considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page."[2]  In addition, these comments are offered to address the Commission's proposed ban on "the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent."[3]

LendingTree supports the FCC's goal of ensuring that consumers know to whom they are providing their consent to initiate calls or text messages when they use comparison-shopping websites and/or applications ("apps").  Consumers should maintain control over the types of calls and texts that they receive when comparison shopping.  LendingTree believes that consumers using its comparison websites already receive recommendations and marketing communications related to their requests and expects that its websites will comply with the "logically and topically associated" rule change if the Commission adopts it.  In the overwhelming majority of cases, consumers visit comparison-shopping sites, especially for mortgage loans, with the reasonable expectation that they will receive communications from multiple potential providers with the best offers meeting their needs.  This expectation exists even if the consumer does not know the names of the specific providers making (or who will make) offers at the time the consumer begins (or even completes) the comparison-search request.  A single consent to multiple providers is extraordinarily convenient to, knowingly given by, and beneficial to the consumer seeking financing or loan options.  Just as a consumer searching a mortgage loan-comparison site expects to receive communications from multiple mortgage lenders or brokers, a consumer searching an insurance-comparison site expects to be contacted by multiple insurance carriers or brokers to

---

[2]    *Id.*, ¶ 61.
[3]    *Id.*, ¶ 58.

satisfy their needs.

However, the Commission should modify at least one element of its proposal. Although LendingTree supports ensuring that consumers know to whom they are giving their consent to receive calls or texts, the Commission's current proposal could harm comparison-shopping websites and the millions of consumers that use and benefit from them. Comparison-shopping websites, including those LendingTree operates, match consumer requests across hundreds, and sometimes thousands, of potential providers in order to identify the best matches and offers for a specific consumer's needs. In LendingTree's case, it works with several hundred (or more) providers to generate comparisons, but matches the consumer with fewer than ten providers that offer the product meeting the customer's targeted request. Customers provide consent before the matching process, at a time when the specific providers that match with the customer's request are unknown. Accordingly, a requirement to identify the specific providers that will contact a consumer at the time consent is collected is impractical. The Commission should modify its proposal to clarify that comparison-shopping providers may disclose the specific companies to whom the consumer's consent extends <u>after</u> the comparison-shopping service has matched the consumer to potential providers . Alternatively, the Commission should allow a website to provide a weblink identifying the specific type of entities to whom the consent would reach, with a limit on the number of entities to whom the consumer's information would be shared. Importantly, the disclosure of specific entities should occur after the consumer provides consent, so long as the comparison-shopping provider discloses the names of the entities to the consumer when the consumer's information is transmitted to the entity.

## I.     BACKGROUND & INTRODUCTION

### A.  An Overview of LendingTree

LendingTree operates an online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. LendingTree has operated for more than 26 years, facilitated the approval of approximately 3 million loans, and helped roughly 111 million people.[4] By matching consumers with potential providers that compete to do business with the consumer, LendingTree puts consumers in a position to make effective and informed financial decisions as they seek financial products. LendingTree's websites and services are completely free for consumers to use.

Through multiple branded marketplaces, LendingTree empowers consumers to shop for financial services the same way they would shop for airline tickets or hotels, comparing multiple offers from a nationwide network of more than 800 partners in one simple search, and choose the option that best fits their individual financial needs in the moment. This is known as "comparison-shopping." In a matter of minutes, LendingTree's services allow consumers to quickly comparison-shop for mortgage purchase and refinance loans, home equity loans and lines of credit, personal loans, business loans, credit cards, deposit accounts, home and automobile insurance, and other financial products. In addition, LendingTree offers tools and resources, including free credit scores, credit monitoring, and educational content, that empower consumers to make informed decisions regarding financial products and services.

LendingTree supports consumers within its online marketplace by matching them with multiple lenders and providers that compete for their business. To initiate the matching process, which only takes a few minutes to complete, interested consumers complete inquiry forms for a

---

[4]      https://www.lendingtree.com/press/ (last visited Apr. 28, 2023).

certain financial product and provide information about themselves and the loans or other products they are seeking.  Once a consumer is matched to a potential provider that offers that financial product, multiple lenders or providers can offer that consumer competing rates or quotes for the specific product.  LendingTree has a wide number of partners across its lines of business, many of whom a consumer may not recognize or even know about before the comparison search, even when these lesser-known partners may offer a superior product, rate, or customer experience.

LendingTree's comparison-shopping model provides significant benefits and savings to consumers in numerous respects.  For example, a 2022 LendingTree study found that "shopping around for a mortgage could save borrowers across the nation's largest metros an average of $63,151 over the lifetime of their loans."[5]  Another 2022 LendingTree study found that borrowers can save thousands of dollars by comparison shopping for other types of loans, including auto and personal loans.[6]

### B. Comparison-Shopping Marketplaces in General

In addition to consumer benefit, comparison-shopping marketplaces provide benefits to small providers and new entrants into a specific market.  Many of LendingTree's partners do not have the same name recognition or marketing budget to compete with well-established providers in the market.  Comparison-shopping sites often are the only cost-effective way for smaller providers to reach and present offers to potential consumers.

Comparison-shopping marketplaces are well-known outlets for consumers. One source concluded that "Because shoppers can easily compare prices of similar firms and/or brands in a

---

[5]    https://www.lendingtree.com/home/mortgage/mortgage-shopping-study/  (last  updated June 14, 2022).

[6]    https://www.lendingtree.com/personal/study-raising-credit-score-saves-money/  (last updated Sept. 26, 2022).

**A107**

matter of seconds, the active use of price comparison websites not only reduces search costs but also empowers shoppers to buy from firms offering the best deal."[7] A 2021 *Forbes* article stated that: "It's a win-win situation for both companies and consumers when you establish partnerships with comparison shopping sites, as businesses get on more major acquisition channels and customers receive more choice and convenience."[8] And, in 2006, the Federal Trade Commission recognized that consumers benefit from leads generated by comparison-shopping sites because consumers can "quickly and easily obtain multiple credit offers based on her unique financial position."[9] The FTC observed that it therefore necessarily follows that a "consumer expects to receive some calls as a result of her visit to the website" operated by a lead generator using a comparison-shopping model.[10]

And consumer benefits extend from loans to insurance, where LendingTree also operates. Indeed, some have estimated that, in the case of automobile insurance, 92% of policyholders who shop for new insurance save money, and 26% of them save $200 or more per year after shopping for new insurance and switching to a different provider.[11]   Comparing different automobile

---

[7]     Michael Adu Kwarteng, et al., *The Influence of Price Comparison Websites on Online Switching Behavior: A Consumer Empowerment Perspective*, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7134266/pdf/978-3-030-44999-5_Chapter_18.pdf.

[8]     Forbes, *How Consumers Compare Prices to Make Purchase Decisions,* https://www.forbes.com/sites/forbesbusinesscouncil/2021/06/18/how-consumers-compare-prices-to-make-purchase-decisions/?sh=71c574086486 (last updated Apr. 18, 2022).

[9]     Request for Informal Advisory Opinion Concerning the Application of the Telemarking Sales Rule's "Established Business Relationship" Exemption to an Internet-based Lead Generation Mechanism, https://www.ftc.gov/sites/default/files/documents/advisory_opinions/opinion-06-2/hudsoncookadvisoryop_0.pdf (last visited Apr. 28, 2023).

[10]    *Id.*

[11]    https://www.valuepenguin.com/auto-insurance-shopping-survey (last updated Apr. 18, 2022).

insurers through comparison-shopping can thus save money for consumers.[12]  Many comparison-shopping websites, such as those LendingTree operates, provide tangible consumer benefits and are completely free of charge to the consumer.

## II.    THE "LOGICALLY AND TOPICALLY ASSOCIATED" REQUIREMENT

LendingTree agrees with the Commission that "[c]onsumers may find comparison shopping websites helpful."[13]  Comparison-shopping websites are beneficial to consumers because they allow consumers to make informed choices by presenting them with multiple offers for specific products or services they are seeking.  Critically, some of these websites do this at the specific moment the consumer is seeking alternatives.  For comparison-shopping sites, at least those LendingTree operates, the resulting provider matches or suggestions are, by design, "logically and topically associated"[14] with the consumer's request.

If the Commission were to formally adopt this standard, it should provide as much clarity as possible to the industry and to consumers.  The Commission should specifically identify comparison-shopping websites as prime examples where the resulting provider matches are "logically and topically associated" with a consumer's inquiry.  Whenever a consumer visits a comparison-shopping website for mortgages, for example, they are seeking to receive offers from participating providers that can offer them a mortgage.  There are a wide variety of such sites, offering comparisons for loans, insurance, home improvement contractors, automobiles, and others.  In each case, consumers visiting the website are seeking providers or information related to the topic of the site.  In this litigious environment, providers of comparison-shopping websites

---

[12]    https://www.valuepenguin.com/state-of-auto-insurance-2023#section-6 (last visited May 7, 2023).

[13]    *FNPRM*, ¶ 61.

[14]    *Id.*

should not have to worry that their results are not "logically and topically associated" with the website.

Providers that are matched to consumers using comparison-shopping services should offer the types of products or services that the consumer is actively seeking and ultimately requests. The goal of LendingTree's matching process is to identify those providers with offers that most closely match the product or service that the consumer is seeking in that moment. Thus, LendingTree's comparison-shopping model operates consistent with the "logically and topically associated" standard the Commission is considering.

LendingTree only works with partners that provide the types of products and services that the consumer seeks, and its partners are "logically and topically" related to the subject matter of the specific LendingTree website or comparison-search form. Importantly, although LendingTree has relationships with hundreds of potential partners, it shares the consumer's information with fewer than ten providers identified as best matching the consumer's request. LendingTree does not share consumer contact information with providers that offer products or services unrelated to the product or service the consumer requested via its comparison-shopping website.[15]

---

[15] *See, e.g.*, National Consumer Law Center's Comments on Assurance IQ Petition, Docket No. 02-278, at 2-3 (filed June 22, 2020) (alleging that unrelated companies are included in TCPA consent for insurance quotes); Comments of James Shelton, Docket No. 02-278, at 12-16 (filed June 22, 2020) (alleging that hundreds of unknown and unrelated companies were included in Assurance IQ's TCPA consent solicitation). It should be noted that for some inquiries, such as for personal loans, consumers may receive more favorable rates or terms through other lending vehicles, such as a home equity loan or line of credit, which may be a better option for certain consumers or financial situations. Matches with such providers may also be provided when the consumer could benefit from the alternative.

**A110**

## III.    DISPLAYS ON THE SAME WEBPAGE

### A.  Issues with a Same Webpage Requirement

In addition to the "logically and topically associated" requirement, the Commission is proposing that the "names" of potential providers or sellers be "clearly disclosed on the same web page" as the consent.[16]  This proposal is unworkable in the comparison-shopping context.

On LendingTree's comparison-shopping websites, a consumer first provides personal information, including an e-mail and telephone number, to begin the matching process.  At that point, the comparison-shopping website has not yet matched the consumer with any offers or providers for the consumer's particular request.  It is at this point where the consumer provides their contact information and where, logically, the consumer will be asked to give consent to be contacted by the resulting service providers.

However, at this point, the universe of potential providers has not been narrowed.  Notably, it benefits the consumer to have more providers willing to make offers when the consumer is seeking a specific financial product.  Comparison-shopping providers, therefore, will attempt to partner with as many qualified, willing sellers as possible in order to provide robust competition in providing services to the consumer.  A list of hundreds of competing sellers is not unusual, and it increases the chances that a consumer will receive a favorable offer that best suits their needs.  But the Commission's "same page" proposal would require identification of these hundreds of potential providers, by name, in the consent.  This is hardly practical, particularly when a consumer is using a mobile device or mobile app.  Even if it were possible to list every potential seller in a consent form, the list of names would clutter the consent and likely overwhelm the remainder of the disclosures provided to the consumer.

---

[16]     *Id.*

9

**A111**

Moreover, it would confuse consumers to provide a list of hundreds of potential matches at the initial stage of a consumer's inquiry because the vast majority of those potential providers or sellers would not match with the consumer and thus would not receive information about the consumer and similarly would not contact the consumer. Under the Commission's "same page" proposal, the consumer might believe (falsely, at least in LendingTree's case) that hundreds of providers will receive their information and contact them when, in reality, LendingTree matches the consumer with only a handful of providers – most often five to eight on LendingTree's most used comparison sites. Further, this confusion caused by the "same page" proposal would lead some consumers to abandon their comparison-shopping search altogether when they are confronted with hundreds of potential matches. Such abandonment, in turn, could then cause consumers to lose out on hundreds or thousands of dollars in savings, and only because they did not engage meaningful comparison shopping. The Commission's proposal thus would require the consumer to receive superfluous and likely confusing information if the names of all potential providers must be disclosed in the consent itself, risking a consumer exodus and loss of benefit from comparison shopping.

**B. Alternative Solutions**

Instead of a requirement that all providers be identified in the consent itself, LendingTree proposes two ways to ensure that consumers know to whom they provide consent. First, the Commission can modify its proposal to allow operators of comparison-shopping services to collect TCPA consent when the customer submits an inquiry but allow the operator to disclose the specific parties to whom the consent applies <u>after</u> a match has been made.

More specifically, the FCC should modify its rules to clarify that the names of the entities to which consent is given need not be provided within the TCPA consent disclosure, so long as the

10

**A112**

consumer is given information regarding to whom the lead is provided (such as a lender or broker) <u>after</u> a match is completed and before or at the same time providers contact the consumer. Such notice could be provided by any of multiple means, such as in search results, in an email or by mail. For example, some website operators may choose to provide the names on the match results or similar page. In other cases, if no matching results are provided, website operators could give notice regarding any providers that are given contact information for further inquiry regarding the consumer's requested product or service. So long as the consumer can readily identify to whom its information is shared, the consumers consent would be valid.

This approach will allow comparison-shopping websites to work with a large number of potential sellers for the benefit of consumers, thereby maximizing the overall value of the comparison-shopping process and providing consumers with numerous choices. At the same time, however, the consumer's consent would only extend to the few identified providers that matched with the consumer. Again, in LendingTree's case, the consent would extend to fewer than ten potential providers of the financial product or service in which the consumer is interested. Under this model, the consumer is given sufficient notice and control over the grant of TCPA consent.

Alternatively, the Commission could modify the proposal to allow the TCPA consent disclosure to name the specific type(s) of entities that may receive the consumer's information and contact the consumer (e.g., "qualified mortgage lenders or brokers") along with a weblink listing the potential parties. This alternative could be accompanied by a maximum number of entities to whom the information should be shared (e.g., ten).

Without such modifications, the current proposal would inhibit the provision of comparison-shopping services, limit consumer choice, and discourage and handicap new and smaller businesses from entering or expanding in markets against well-known, name-brand

11

**A113**

competitors.  The proposed rule would harm consumers and competition rather than help them.

## IV.    THE FCC SHOULD REJECT MORE EXTREME LIMITATIONS ON TCPA CONSENT, INCLUDING THE "SINGLE-ENTITY" STANDARD

Public Knowledge has requested that the Commission require that a consumer provide prior, express consent to one entity at a time in order to receive calls or texts from that entity. Public Knowledge's proposal will harm consumers, consumer welfare, and the competition that comparison-shopping websites promote among multiple providers and sellers.

Millions of consumers look to comparison-shopping experiences for mortgage loans, personal loans, insurance, and other financial products and services.  Those experiences allow consumers to quickly shop, compare offers, and save large sums of money.  Public Knowledge's proposed limitation on prior, express consent would drastically limit a consumer's interaction to one seller or provider at a time.  Such a limitation undermines the very reason that a consumer seeks out and visits a comparison-shopping website, which is to obtain simultaneous offers from multiple, competing sellers and providers, rather than having to shop from seller to seller on their own.

Under a "single-entity" standard, a consumer will waste time by sifting through one offer at a time and being contacted by (and negotiating with) one provider one at a time.  This result starkly contrasts with the current consumer-friendly result of a consumer receiving all potential offers and providers at once.  It is also contrary to a consumer's current ability to actively compare and see different terms of offers simultaneously, which permits the consumer to exercise options and make immediate tradeoffs.  For example, LendingTree knows that some consumers may prefer a longer or shorter term for the same loan amount or they may simply prefer the option with the lowest rate. Imposing a "single entity" standard would take away the consumer's ability to view all available options and make informed tradeoffs. In the case of a consumer seeking a loan, the

12

**A114**

"single-entity" standard would harm the consumer and cost them money. If the consumer is only exposed to one provider at a time, consumers are unlikely to complete a comparison search multiple times in order to receive information regarding multiple options. Indeed, this would undermine the very purpose of a comparison-shopping site. Even if the consumer were to complete this process, the consumer may settle upon one entity out of convenience, confusion, or a lack of time, even if another entity may ultimately prove to offer a lower rate or better terms. For example, LendingTree knows that some small businesses seeking business loans prioritize loans with quick funding to use for immediate needs like payroll. A small business may not have time to complete multiple requests and provide consent individually to multiple entities. That small business, or any consumer, may then potentially lose hundreds or thousands of dollars, depending upon the loan amount and term, because they were unable to effectively comparison shop for multiple offers and providers at one time. Neither of those outcomes are in the interests of consumers.

Furthermore, a "single-entity" standard stifles competition and deprives consumers of choice. LendingTree was founded to alleviate consumers' burden of physically visiting multiple lenders to obtain a mortgage and create one central clearinghouse for consumers to visit and have lenders to compete for their business.[17] If a "single-entity" standard were adopted, a consumer would likely seek out each potential provider sequentially, costing significant time and money. Those consumers may also be inclined to begin with, or only select, those name-brand providers that are well known simply because they have larger advertising budgets but may not offer the best rates or experiences. Likewise, the consumer may be reluctant to provide consent to a company that they may have never heard of, but which may provide a better rate, thereby depriving the consumer of the opportunity to consider an offer that may prove more beneficial. Thus, a "single-

---

[17]    https://www.lendingtree.com/press/executives/doug-lebda/ (last visited May 7, 2023).

entity" standard would give an unfair advantage to more-established providers with an outsized brand name or ability to spend large sums on advertising (which is often driven by higher rates passed to the consumer). This, in turn, leads to consumers being exposed to only a small number of providers and sellers which severely limits marketplace competition for consumers. For these and other reasons provided above, the Commission should reject Public Knowledge's "single-entity" consent proposal.

## V.    CONCLUSION

For the foregoing reasons, LendingTree agrees with the Commission's proposed requirement that entities receiving consent be "logically and topically associated" with the website that a consumer is visiting. Typically, at least in LendingTree's case, the providers or sellers participating on comparison-shopping websites should already be "logically and topically associated" with the consumer's inquiry regarding a specific financial product. Thus, the comparison-shopping sites LendingTree operates relieve the consumer from communications that are unrelated to the consumer's specific request and reason for visiting a consumer-shopping website.

LendingTree recommends that the Commission modify its proposal and allow comparison-shopping operators to collect TCPA consent when the customer is submitting personal and contact information to obtain a quote or offer and permit the operator of a comparison-shopping site to disclose the specific providers to whom the consent applies after matches are finalized. To that end, the Commission should reject requests that it adopt a "single-entity" standard because such a standard would harm consumers by wasting their time and money as they look for the best offer for their specific needs. Indeed, a "single-entity" standard would inevitably harm competition by permitting larger, more well-known providers to gain an unfair advantage, and by requiring

14

**A116**

additional time and cost for the consumer to painstakingly contact each provider individually themselves.  If the Commission permits a comparison-shopping website to identify the providers receiving the consumer's information after the consumer is matched, by contrast, the consent process is streamlined, and the identification of potential providers that may contact the consumer remains transparent.

Respectfully Submitted,

**LENDING TREE, INC**

_____
Steven A. Augustino
Josh Myers
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
101 Constitution Avenue, NW
Suite 900
Washington, DC 20001
(202) 689-2947
May 8, 2023                steven.augustino@nelsonmullins.com
josh.myers@nelsonmullins.com

*Counsel to LendingTree, LLC*

15

**A117**

# TAB E

Comments of QuinStreet, Inc., FCC CG Dkt. Nos. 21-402, 02-278 (May 8, 2023)

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| | ) | |
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |

**COMMENTS OF QUINSTREET, INC.**

Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Marty Collins
Chief Legal and Privacy Officer
QuinStreet, Inc.
950 Tower Lane, 6th Floor
Foster City, CA 94404
mcollins@quinstreet.com

May 8, 2023

**Table of Contents**

EXECUTIVE SUMMARY ................................................................. i

I.    INTRODUCTION AND BACKGROUND .................................... 1

II.   PERMITTING CONSENT TO APPLY TO MULTIPLE ENTITIES  IF THEY ARE "LOGICALLY AND TOPICALLY ASSOCIATED" WITH THE WEBSITE THAT SOLICITS THE CONSENT WOULD BENEFIT CONSUMERS. ......................................................... 7

III.   REQUIRING SELLERS TO BE DISPLAYED "CLEARLY AND CONSPICUOUSLY" ON THE WEBSITE CONSENT FORM WITHOUT THE USE OF A HYPERLINK WOULD LIMIT CONSUMER CHOICE AND HARM LEGITIMATE BUSINESSES. ...................... 8

IV.   THE COMMISSION SHOULD CONTINUE TO REJECT PUBLIC KNOWLEDGE'S PROPOSAL THAT PRIOR EXPRESS WRITTEN CONSENT TO RECEIVE CALLS OR TEXTS MUST BE MADE DIRECTLY TO ONE SELLER AT A TIME. ............................ 11

V.   ALTERNATIVE METHODS TO PREVENT UNWANTED CALLS AND TEXTS ....................................................................... 13

VI.   CONCLUSION ....................................................... 16

ANNEX A ......................................................................... A-1

ANNEX B ......................................................................... B-1

**A119**

## EXECUTIVE SUMMARY

The Commission's proposal to amend the definition of "prior express written consent" under the Telephone Consumer Protection Act ("TCPA") to sellers that are "logically and topically associated" with the website that solicits the consent strikes an appropriate balance between the preferences of consumers, advertisers that are trying to reach those consumers, and marketers that connect the two groups. This aspect of the Commission's proposal should be adopted, with only slight clarifying modifications; *see* **Annex A**.

The proposal to prohibit the use of hyperlinks should not be adopted. Prohibiting the use of hyperlinks would limit consumer choice and hurt legitimate businesses, especially smaller and local businesses that may be a consumer's best option. Once the Commission limits the list to sellers "logically and topically associated," the length of the list becomes irrelevant to reducing unwanted calls and texts. Even today, the length of the list has almost no impact on the number of sellers that will receive consumer data, let alone the number of times any consumer is contacted, or whether that contact is unwanted.

Publishers and marketers currently list all *potential* sellers in the hyperlinked list *because they do not (and in some cases cannot) know at that instant of consumer engagement which limited subset of the sellers may meet that specific consumer's needs*. Consumer contact information is ultimately transmitted only to a small subset of the listed sellers (*i.e.*, 3-5). Requiring that all prospective seller names be shoehorned into the consent text is not only at odds with other regulatory approaches to online contracts, but also will impose substantial costs on consumers, publishers and advertisers, particularly smaller and local businesses.

Those adverse consequences include that: (x) thousands of businesses will need to incur additional costs and hire companies to manage their consent and advertising processes, (y)

i

**A120**

limited consent slots will be sold to the highest bidder (an auction that will further disadvantage the thousands of small businesses (*e.g.*, insurance agents and home improvement contractors who would struggle to compete for consumer attention in real time)), and (z) consumer searches will not only be harder, but also will result in fewer and less optimal alternatives, particularly local alternatives.  Against all of these costs, the resulting decrease in unwanted calls and texts will be likely *de minimis*.

The better fix with respect to the hyperlink would be to require that consent forms using hyperlinks for potential matches clearly and conspicuously disclose that, by consenting, the consumer agrees to be matched with a specific number of companies that are identified in the hyperlink, and that each matched company may call or text them.

Instead of attempting to reduce unwanted calls and texts indirectly by focusing on the hyperlink, the Commission could do so with respect to multi-party consents in the performance marking context by limiting (or requiring disclosure with respect to) (i) the number of parties that receive a consumer's contact information, (ii) the number of times a consumer can be contacted for marketing purposes, and (iii) the duration of consent for marketing efforts.  The foregoing could be achieved by federally mandated limits or disclosure (where such authority exists), as well as by encouraging the development of auditable industry standards.

These simple steps would be easy for legitimate businesses to adopt; QuinStreet and other industry participants have already adopted elements of each.

ii

**A121**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| | ) | |
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |

**COMMENTS OF QUINSTREET, INC.**

QuinStreet, Inc. ("QuinStreet") submits these comments in response to the Commission's proposal in its *Further Notice of Proposed Rulemaking* ("*FNPRM*") to amend the definition of "prior express written consent" in its rules.[1]

## I.    INTRODUCTION AND BACKGROUND

QuinStreet is a publicly traded performance marketing company (Nasdaq: QNST).  Its mission is to connect high-intent, in-market consumers with advertisers whose products and services meet the consumers' specific needs.[2]  QuinStreet does this via its own websites (*e.g.*, insurance.com, modernize.com), by managing websites owned by other publishers, and by

---

[1] *In the Matter of Targeting and Eliminating Unlawful Text Messages; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 at ¶ 61, CG Docket Nos. 21-402, 02-278, (rel. Mar. 17, 2023) (hereinafter, "*FNPRM*") ("We seek comment on amending our TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page").

[2] The TCPA refers to advertisers, and those contacting consumers on their behalf, as "sellers" or "callers."

1

A122

contracting with publishers and advertisers to create a marketing network.  QuinStreet's award-winning compliance team continually monitors its network to ensure that all parties comply with applicable laws, contractual commitments, and industry standards.[3]

*The Online Consumer Journey.*  Imagine a consumer in a small town in upstate New York searching online for auto insurance.  They end up on a web site with auto insurance content.  That site might be owned by a large auto insurance carrier.  Or it could be an insurance comparison site owned by a large or small company.  Or it could be one of the thousands of websites created by small business owners or individuals whose content, by dint of commerce (*e.g.,* paid search, brand advertising) or quality (*i.e.,* ranking high in organic results) brought the consumer to them.  Businesses like these, who create content consumers engage with, are generally referred to as "publishers."[4]

Most online publishers do not, and cannot, charge for website access.  Only a small subset of publishers (*e.g., The New York Times*) can establish and enforce paywalls or rely on subscriptions as a primary source of revenue.[5]  Content creation, site maintenance costs and search engine optimization and marketing efforts need to be paid for.  As has been the case for

---

[3] *See* CTIA Short Code Monitoring Program, *Short Code Monitoring Handbook*, Version 1.8 (Jan. 1, 2021), available at https://www.wmcglobal.com/hubfs/CTIA%20Short%20Code%20Monitoring%20Handbook%20-%20v1.8.pdf; s*ee also* **Annex B**.

[4] When publishers contract with marketers (or, less likely, advertisers) they often are called "affiliates" or are characterized as being part of an "affiliate network."  Their status as an "affiliate" of one or more marketers or advertisers is not a negative quality; it simply is a reflection that content creation is not free.

[5] *See* Yudhijit Bhattacharjee, *Who's Making All Those Scam Calls?*, NY Times (Apr. 21, 2021), available at https://www.nytimes.com/2021/01/27/magazine/scam-call-centers.html.

2

**A123**

decades, advertising is the primary source of publisher revenue, whether off- or on-line. Sellers have paid publishers for advertising since at least the 18th century.

In the 21st century, substantially all online publisher revenue ultimately comes from advertisers.[6] Banner advertising is one approach, although inquiry-based advertising (*e.g.*, clicks, leads and calls) predominates in cases where the products and services the consumer is seeking will almost inevitably require real-time communication to complete their research and buying journey.[7] Accordingly, advertising involving calls and texts simply is a subset of the ways legitimate publishers are paid by legitimate advertisers.

*Performance Marketing.* Performance marketing is a form of online marketing in which advertisers pay for specific actions or outcomes, such as clicks, leads, or sales, rather than simply paying for ad space. Performance marketers then pay a portion of those proceeds to the publishers whose content those consumers engaged with. By connecting publishers and advertisers, performance marketing enables publishers to optimize revenue and advertisers to optimize advertising spend.[8]

---

[6] In a sense, all websites are in some sense "comparison websites" in that product comparisons may either be in the foreground (*e.g.*, editorial content) or in the background (*e.g.*, in the competition to be the advertiser that is displayed on or linked from that website).

[7] For example, while contemporary consumers have become comfortable buying airline tickets online, most consumers still prefer some human contact as they evaluate considered purchases for items such as mortgages, life insurance, home insurance or home improvement products. Scheduling, including scheduling a mutually convenient time for a call, is increasingly conducted by text exchanges between consumers and businesses.

[8] Performance marketing is also known as pay-for-performance marketing or affiliate marketing. It is typically achieved using various metrics and performance tracking tools that allow advertisers to monitor the success of their campaigns in real-time. Performance marketing can be done through a variety of channels, including search engine advertising, social media advertising, email marketing, and affiliate (multi-publisher) marketing programs. This type of

Most online publishers *have no direct contractual or technological connection with sellers or advertisers*.[9]  Instead, performance marketers create, maintain and police multi-publisher and -advertiser networks.  The Commission has already recognized that federally mandating a single-advertiser environment would be inconsistent with consumer preferences.[10]  It is important to note that a single advertiser environment would also *destroy the primary monetization pathway for thousands of legitimate publishers who are connected to thousands of legitimate advertisers*.[11]  Even technologically sophisticated publishers would struggle with monetization if advertising were only limited to a single advertiser.[12]  Moreover, thousands of small advertisers (*e.g.,* local insurance agents, home improvement contractors), would effectively become invisible in a single-advertiser regime, even if they could be the best match for a consumer, and are locally owned and operated.[13]

---

marketing is particularly popular in e-commerce and other online businesses where direct response and measurable results are important to consumer satisfaction and commercial success.

[9] The online marketing ecosystem consists of many thousands of publishers and many thousands of advertisers.  There is no simple, universal way to connect all of these parties directly, either technologically or contractually.  This is even more true when an advertiser is subject to regulation (*e.g.,* financial services products such as loans and credit cards).  Performance marketers fill these technological and contractual gaps, including with respect to compliance with applicable laws, regulations and brand guidelines.

[10] *See, e.g., FNPRM* at ¶ 61 (acknowledging and seeking comments on, but not proposing to adopt, the Public Knowledge request that consent be secured by one entity at a time).

[11] *See* SolarReviews.com Comments, CG Docket No. 02-278 (April 20, 2023), at 4 (explaining how lead generators help small businesses compete against larger companies).

[12] Imagine what online search engine results pages would look like, and what the impact would be, if only a single advertiser could be displayed.

[13] As the saying goes, "If you're not online, you don't exist."  Imagine a small insurance brokerage in upstate New York, which has sponsored youth sports teams, parades, and local charities for decades.  Before online advertising existed, those efforts (and ads published in the local paper) constituted sufficient advertising efforts.  As consumers increasingly search online, however, that agency needs an online presence to meet its prospective customers where they are.

4

**A125**

*Economics.*  Advertisers have little interest in engaging with consumers who do not want their products and services.  They are even less interested in having those consumers be called or texted.  Neither calling nor texting is free, and irritating consumers is not in any advertiser's interest.[14]

Advertisers use performance marketing to identify high-intent, in-market consumers who *are* interested in their products and services.  Performance marketers like QuinStreet specialize in the online identification, matching, and compliance capabilities required to sort consumer preferences and advertiser offers.  These capabilities are typically neither core nor scalable skillsets for most advertisers.  The Commission's proposal to limit consent in multi-party circumstances to sellers "logically and topically associated" will reinforce what legitimate advertisers already want and performance marketers seek to deliver: real, in-market, high-intent consumers.  Converting what is already a commercial standard for many industry participants into a legal requirement will contribute to a reduction in calls and texts that advertisers do not want to make, and consumers do not want to receive.

---

And if that agency wants a chance at writing local business, they need to appear online, including in the list of sellers that might end up contacting a consumer.

[14] This is especially true when litigation, warranted or otherwise, is a possible outcome of such contact.  The misuse of the TCPA's private right of action by portions of the plaintiff's bar is beyond the scope of this submission.  *See, e.g., The Juggernaut of TCPA Litigation*, U.S. Chamber Institute for Legal Reform (October 2013) at 2, 10, available at https://instituteforlegalreform.com/wp-content/uploads/2020/10/TheJuggernautofTCPALit_WEB.pdf.  It remains a real problem.  It effectively requires that all potential sellers be listed in hyperlinks to online consent forms.  Any seller not on the list it is a potential litigation target.  Even where class certification is unlikely, the steady drip of four- and five-figure settlements to avoid the costs of defending against what may be frivolous claims causes most advertisers to require that their brands, subsidiaries, and even individual insurance agents and contractors be listed in hyperlinks from the consent form.

*Unwantedness*.  Calls and texts can be unwanted in two respects.  First, they can be unwanted at the product level; a consumer searching for Product A may well not want or expect to be contacted about Product B.[15]  The Commission's proposal to limit consent to sellers "logically and topically associated" with the consumer's search for Product A will do great work in eliminating this kind of unwantedness, sometimes referred to as "co-registration."

Calls and texts can also be unwanted due to their frequency and duration.  This can result from (i) too many parties obtaining contact information based upon a single consumer consent, as well as (ii) parties contacting the consumer too often or for too long.  If it were practicable to estimate the volume of this kind of unwantedness cause by legitimate U.S. businesses vs. bad actors, foreign and domestic, we would.[16]  Unfortunately, it is not.  Our sense is the vast majority of U.S. businesses only want to engage with consumers who want to engage with them; engagement is not free.  In any event, it is critical that the Commission consider the distinction between bad actors (who have no intention of complying with applicable law), and responsible companies, especially when the adverse consequences of even well-intended federal regulation will fall almost exclusively on U.S. consumers and businesses.

---

[15] A consumer interested in Product A *may* be interested in Product B.  For example, a consumer interested in auto insurance may also be interested in home insurance.  That conversation about home insurance can occur if the consumer so chooses (*e.g.*, in connection with a call or text discussing Product A).  In most cases, if a consumer is also  interested in Product B, the consumer will initiate a separate search for Product B online, which may then lead to separate consent to be contacted about Product B.

[16] *See*, *e.g.*, Yudhijit Bhattacharjee, *Who's Making All Those Scam Calls?*, NY Times (Apr. 21, 2021), available at https://www.nytimes.com/2021/01/27/magazine/scam-call-centers.html.

6

**A127**

## II.  PERMITTING CONSENT TO APPLY TO MULTIPLE ENTITIES IF THEY ARE "LOGICALLY AND TOPICALLY ASSOCIATED" WITH THE WEBSITE THAT SOLICITS THE CONSENT WOULD BENEFIT CONSUMERS.

The Commission's proposal that consent be "logically and topically associated" with the website that solicits the consent represents a significant step forward in facilitating compliance efforts by legitimate publishers and sellers.  It addresses an issue sometimes referred to as "co-registration": contacting a consumer who expressed an interest in Product A about Product B.  Requiring consent to be "logically and topically associated" will substantially eliminate co-registration, which we believe can at times be a source of unwanted contact.[17]

While QuinStreet supports this aspect of the Commission's proposal, it respectfully submits that the amendments the Commission has proposed to the specific language in the definition of "prior express written consent" should be modified slightly to hew more closely to the Commission's intent.  The first such modification would involve making it clearer that in the multi-seller context sellers should be "logically and topically associated *with the website that solicits the consent"* (emphasis added).  The addition of these italicized words to the definition would better reflect what the Commission proposed in the text of the *FNPRM* and provide clarity which will enhance industry compliance efforts.[18]  The second such modification would involve changing the word "entity" to "seller" in the Commission's proposed amendment to conform

---

[17] A consumer interested in Product A may in fact be interested in Product B.  For example, a consumer interested in auto insurance may also be interested in home insurance.  That conversation about home insurance can occur if the consumer so chooses.  But when a consumer provides initial consent to be contacted about auto insurance it is appropriate to limit that consent to contacts from sellers that are "logically and topically associated" with the website discussing auto insurance.  In most cases, if a consumer also is interested in Product B (*e.g.*, home insurance), the consumer will either be amenable to an upsell via call or text.

[18] *Compare FNPRM* at ¶ 61 *with id.* at **Annex A**.

7

**A128**

more closely to the terminology in the rest of the definition.  These proposed changes are illustrated in **Annex A** hereto.

### III. REQUIRING SELLERS TO BE DISPLAYED "CLEARLY AND CONSPICUOUSLY" ON THE WEBSITE CONSENT FORM WITHOUT THE USE OF A HYPERLINK WOULD LIMIT CONSUMER CHOICE AND HARM LEGITIMATE BUSINESSES.

*The Problem is not the Hyperlink.*  Advertising and performance marketing existed prior to the TCPA.  The TCPA, however, through the Commission's rules, imposed a requirement that a seller secure a consumer's "prior express written consent" before transmitting a telemarketing call or text message to that consumer in certain circumstances.[19]  Accordingly, use of a hyperlinked page became the minimal, *legally-required* way to identify all *potential* sellers in a multi-seller context.[20]

*Reasonable but Invalid Assumptions.*  Some parties appear to assume that each (or even many) of the sellers identified via the hyperlink receive each consumer's contact information.  That assumption is incorrect.  Legitimate publishers and marketers transfer consumer contact information only to *a limited subset of sellers who have been appropriately matched to a consumer's request* (*e.g.*, 3-5 sellers).  This limit is called the "match rate."

Most online publishers, advertisers and marketers establish match rates as part of their standard commercial and internal practices.  Match rates are applied via contract and business processes across private marketing networks to all of the participants.  Some publishers and

---

[19] 47 C.F.R. § 64.1200(a)(2).

[20] *See id.* at § 64.1200(f)(9) (requiring clear and conspicuous disclosure that the consumer authorizes the seller(s) to deliver a telemarking call, which may be completed by electronic or digital signature).

marketers publish match rates in the text of the consent (*e.g.*, "you agree to be contacted by up to five [lenders]/[insurance agents]/[contractors]").  Match rates are driven by a combination of consumer attributes and advertiser filters, as well as by product cost and complexity. [21]

For example*,* our upstate New York consumer looking for auto insurance would receive no benefit from being matched to a national advertiser not offering coverage in New York or for a consumer with that driving record.  Auto insurance alone requires sorting over 20 consumer attributes in 50 states against the in-market capabilities of hundreds of national, regional carriers and local carriers and agents.  Whether National Advertiser A is "on" in NY may vary by the minute; whether Local Agent B is interested in new business may vary by the day or week.[22]

It is not currently commercially or technologically practicable for *each* consumer at *every* publisher site to be matched with the optimal *available* advertiser *in real-time*.  The hyperlink overcomes this hurdle by listing all *potentially matched advertisers*.  Matching to a limited subset of sellers is then completed as the network sorts what product or service the consumer wants and is likely to qualify for, as well as which seller is interested in and able to deliver that product or service.

Eliminating the hyperlink terminates sorting too early in the process.  Mandating that all publishers, marketers and advertisers display only valid real-time in-market matched sellers in the text of the consent would probably benefit QuinStreet and certain other large performance marketing companies, but would harm smaller publishers and industry players.  This is because

---

[21] Consumers typically prefer to see two or more choices; contact and closure rates are often higher when consumers are shown more than one choice.  Sellers typically prefer to only contact a consumer if the record shows there are two or fewer other sellers who are aware of that consumer's interest in a particular product and service at a particular time.

[22] Performance marketers give individual agents and contractors the capability to toggle their interest in engaging with potential customers in near real-time.

**A130**

publishers, marketers and advertisers would be forced to participate in one or more private networks to obtain the required real-time matching and compliance capabilities. Forcing publishers to purchase additional services from private companies may not be the optimal or appropriate policy outcome in the absence of a meaningful countervailing benefit, which a prohibition on hyperlinks would not provide.

Alternatively, publishers and marketers may just elect to show a small subset of large, national brands in the text of the consent form. This could trigger a bidding war (as is already the case with search keywords) that could benefit QuinStreet and large performance marketing companies. But it would also disenfranchise smaller and local advertisers who would lose the opportunity to engage with prospective customers, including local customers for whom they may be the best fit.

*The Better Fix*. The FCC could require that consent forms using hyperlinks for potential matches clearly and conspicuously disclose that by consenting, the consumer agrees to be matched with a specific number of companies that are identified in the hyperlink, and that each matched company may call or text them.

*Helping by Hassling?* Some commentators appear to believe that requiring all potential sellers be listed in the text of the consent form would be off-putting to the consumer, thus decreasing the volume of consumer consent and, indirectly, thereby reducing the volume of unwanted calls and texts. Maybe. But requesting a federally mandated consumer scrolling requirement is a convoluted (and we believe ultimately ineffective) attempt to achieve that goal. It is not clear that mandated inconvenience works; companies that have elected to have

10

**A131**

consumers scroll through even lengthier and more consequential Privacy Notices and Terms of Service often do not see material reductions in consent.[23]

The assumption that attempting to shorten the list of prospective callers will lead to a reduction in unwanted calls and texts is not only invalid but also creates significant harm to consumers and businesses, especially small businesses. For these reasons it should not be adopted.[24]

## IV. THE COMMISSION SHOULD CONTINUE TO REJECT PUBLIC KNOWLEDGE'S PROPOSAL THAT PRIOR EXPRESS WRITTEN CONSENT TO RECEIVE CALLS OR TEXTS MUST BE MADE DIRECTLY TO ONE SELLER AT A TIME.

As outlined above, Public Knowledge's proposal is an extreme version of the ostensibly reasonable but actually invalid assumption that a shorter list of potential sellers leads to a better consumer experience. Instead, Public Knowledge's proposal would do the most damage of the proposals that proceed from that assumption, harming not only consumers, but also hurting small businesses, and expanding the power of the larger industry participants.

Public Knowledge's proposal would harm consumers because it would require them to take constant, affirmative steps to get – at best – the same information they currently can access

---

[23] *See* Jonathan A. Obar & Anne Oeldorf-Hirsch, *The biggest lie on the Internet: ignoring the privacy policies and terms of service policies of social networking services*, Taylor & Francis Online (Nov. 2017), available at https://www.tandfonline.com/doi/abs/10.1080/1369118X.2018.1486870 ("Qualitative findings suggest that participants view policies as nuisance, ignoring them to pursue the ends of digital production, without being inhibited by the means.").

[24] As discussed in Section V below, the simpler, easier and more effective way to achieve the goal of ensuring only a small subset of listed sellers is the benefit of consumer consent is to limit the match rate, or at least require it to be stated in the text of the consent (*e.g.*, "no more than five").

11

**A132**

and – at worst – cause them to receive less information than otherwise may be available to make educated, informed purchasing decisions.

Today, consumers can access resources that help them quickly and easily compare prices, quotes, services, or products. Under Public Knowledge's proposal, a consumer would have to access every seller website separately, or consent to hear from each individual seller they might be interested in hearing from, especially when shopping for products and services where communication by phone or text is almost inevitable.[25] This would only serve to increase consumer fatigue when attempting to seek out the best deal, product or service. Moreover, studies have shown that increased fatigue on consumers makes it more likely that a consumer will buy from larger and familiar brands,[26] another consequence that would make it more difficult for smaller businesses to compete.

While online shopping has made it easier for consumers to visit multiple sites online, the reality is that consumers are more likely to visit bigger, established sites that can offer more variety in less time. Performance marketers help solve this problem for smaller sellers by giving them deserved advertising shelf space at thousands of publishers they would otherwise struggle to connect and contract with. Public Knowledge's approach would not only eliminate this marketing channel for small advertisers, but also lead to less competition and ultimately less

---

[25] *E.g.*, financial products and services such as mortgages and other loans; home services that require appointment setting, etc.

[26] Raluca M. Ursu et al., *Search gaps and Consumer Fatigue*, UCLA (Dec. 2021), available at https://www.anderson.ucla.edu/sites/default/files/document/2022-01/SearchGaps_UrsuZhangHonka_Dec2021.pdf ("We find that not being able to reset fatigue during a break leads to a significant reduction in the number of products consumers search and purchase: searches decrease by approximately 20% and purchases by more than 6%. Most importantly, larger and more popular websites are hurt less in such a situation. In other words, consumers become more likely to buy from larger and more familiar websites.").

consumer choice.  There is no reason to impose these additional limitations and costs once the Commission adopts the "logical and topically associated" standard.

## V.    ALTERNATIVE METHODS TO PREVENT UNWANTED CALLS AND TEXTS

The goal of reducing unwanted calls and texts could be advanced through more direct methods.  Specifically, in the multi-seller performance marketing context, the Commission could encourage the adoption of limits on, or disclosure with respect to, match rate, contact cadence and consent duration.

*Match Rate.*  It may make sense to require disclosure with respect to, or expressly limit, or urge the industry to limit, the number of matches that can be made between a consumer and potential sellers based on a single multi-seller consent form.

The FTC[27] and others have acknowledged and documented that consumers typically compare multiple offers for specific products and services.[28]  The number of comparisons is based on numerous factors and varies by consumer, product, and industry.  Any approach the Commission takes should consider being flexible to meet various consumer preferences, product requirements and industry capabilities.  Match rates are developed through consumer surveys, industry research, and data analytics; publishers, marketers, and sellers could be required to document and publish the basis for their match rates.  They could be required to disclose, in the

---

[27] *See* Staff Perspective, *"Follow the Lead Workshop"*, FTC (Sep. 2016), available at https://www.ftc.gov/system/files/documents/reports/staff-perspective-follow-lead/staff_perspective_follow_the_lead_workshop.pdf.

[28] *See, e.g.*, Raluca M. Ursu et al., *Search gaps and Consumer Fatigue*, UCLA (Dec. 2021), available at https://www.anderson.ucla.edu/sites/default/files/document/2022-01/SearchGaps_UrsuZhangHonka_Dec2021.pdf (study reviewing consumer shopping and comparison habits and how breaks in searching for products affect consumer behavior).

text of the consent, the number of parties who will receive the consumer's contact information.[29]

Documentation and disclosure are already part of the solution to other issues in online

advertising.[30]  A federal requirement to document and disclose match rates would act to drive

industry behavior at the margins toward the type of limited match rates that legitimate publishers

and marketers already impose, and advertisers and consumers reasonably expect.

    *Contact Cadence*.  An additional alternative would be limiting, or requiring disclosure

with respect to, contact cadence.  Many marketers and sellers already set limits on calling they

conduct or have conducted on their behalf.  For these industry participants, recently enacted state

laws[31] limiting contact cadence had no material adverse effect, as the new standards were at or

below existing internal limits that had already been demonstrated to make commercial and

---

[29] QuinStreet has done this for years.

[30] *See CFPB Issues Guidance to Protect Mortgage Borrowers from Pay-to-Play Digital Comparison-Shopping Platforms*, CFPB (Feb. 07, 2023), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-mortgage-borrowers-from-pay-to-play-digital-comparison-shopping-platforms/ (the Consumer Financial Protection Bureau has issued guidance saying that websites that advertise for mortgage lenders based on referral payments violate the Real Estate Settlement Procedures Act); *see Operators of Comparison Shopping Website Agree to Settle FTC Charges Alleging Deceptive Rankings of Financial Products and Fake Reviews*, FTC (Feb. 3, 2020), available at https://www.ftc.gov/news-events/news/press-releases/2020/02/operators-comparison-shopping-website-agree-settle-ftc-charges-alleging-deceptive-rankings-financial; *see also Victory Media Settles FTC Charges Concerning Its Promotion of Post-Secondary Schools to Military Consumers*, FTC (Oct. 19, 2017), available at https://www.ftc.gov/news-events/news/press-releases/2017/10/victory-media-settles-ftc-charges-concerning-its-promotion-post-secondary-schools-military-consumers.

[31] *See* Fla. Stat. § 501.616(6)(b) (2022) (preventing commercial telephone sellers from making more than three phone solicitation calls over a 24-hour period, regardless of the phone number used to make the call.); *see also* Okla. Stat. tit. 15, § 775C.4(A)(2) (2022) (imposing the same limits).

reputational sense.[32]  Federal regulators have also proposed limits on contact cadence that would be similarly below the thresholds for most legitimate U.S. businesses.[33]  Again, in the absence of a mandated regulatory limit or disclosure with respect to contact cadence, commercial incentives exist at the margin for callers to make additional calls in the hope that those calls will result in a sale.[34]

*Consent Duration*.  The third additional alternative would be to limit the duration of *marketing* consents.  For example, contact after 90 days could be prohibited if consent is not extended or no business relationship is established.[35]  In setting any such limit regulators would need to be careful to distinguish between marketing contact (*i.e.*, no business relationship exists) and *customer* contact (*i.e.*, businesses communicating with their existing customers, including

---

[32] QuinStreet did not need to make any changes to its internal calling practices to comply with any of the new state laws.  As a publicly-traded national performance marketer, we often apply the most stringent state or advertiser standards across our entire network.  We call this approach using the "highest common denominator."  It reflects not only an approach to business, but also the fact that, again, in many cases it is not clear early in the consumer's journey which seller is best ready, willing and able to serve them.

[33] *See* Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising, 88 Fed. Reg. 3668 (Jan. 01, 2023) (to be codified at 47 C.F.R. § 64.1200(a)(3)) (announcing a July 20, 2023 effective date for the amended Commission rules that, among other things, impose numerical call limits on certain calls to a residence).

[34] For commercial reasons it is difficult to impose this obligation on the party who obtains the consent, who is often the publisher or marketer; not the caller.  This is simply the application of the golden rule; callers, sellers and advertisers are sources of revenue for marketers and publishers.  It is rarely the case in commerce that vendors can dictate to their clients the terms on which *those clients* will contact *their prospective customers*.  Legitimate sellers likely already have established internal contact cadence limits; regulatory mandates would just make these uniform.

[35] QuinStreet generally limits its contact duration to 60 days or less.  Due to the impact of QuinStreet's internal contact cadence limits, however, contact is typically effectively limited to 30 days.  Moreover, for all practical purposes contact that is not met with an affirmative response typically results in contact ending within a week, and sometimes the same day.

15

**A136**

about new products). Put differently, such limits should apply only when a consumer has not purchased a product, good, or service from the business.[36]

In the case of each of the above alternatives, the Commission would need to consider whether it possesses adequate authority to impose such limits and disclosures, and whether even then there may be policy reasons to not do so. In those cases, it may be best to encourage the adoption of industry standards and best practices, and support industry efforts to audit compliance with those standards and best practices.[37]

## VI.    CONCLUSION

Risks can rarely be eliminated. Instead, they are managed by identification and mitigation, with an eye toward avoiding unintended consequences.[38]

We agree unwanted calls and texts are a problem. After a problem is identified, the next step is understanding the source. In online advertising, this is difficult; assessing the degree to which the problem is driven by U.S.-based companies abusing the consent portion of the contact process is a hard problem. We believe many of the most virulent sources of unwanted call and text activity are offshore, and effectively beyond the reach of federal or state regulatory action.

---

[36] The risk of unwanted contact is much lower when businesses are contacting their existing customers. Competitive, reputational and other factors create strong incentives for businesses to avoid alienating their existing customers. Most businesses give their existing customers granular control over how, whether and when they wish to be contacted for exactly these reasons.

[37] *See Consumer Consent Council Announces New Industry Best Practices*, AP News (Dec. 13, 2022), available at https://apnews.com/article/1f5f553b290b978c42a1af517cc5b9ba; *see also Lead Generation Standards*, C3, available at https://consumerconsent.org/standards/ (last visited May 8, 2023).

[38] Especially when some of the suggested mitigations might create greater problems than the risks they are designed to address. *See*, *e.g.*, Public Knowledge Reply, CG Dockets Nos. 21-402 and 02-278 (Nov. 28, 2022), at 5-6.

Most domestic U.S., businesses endeavor to comply with clear regulatory requirements.[39] They are selling not consumer contact information to non-compliant offshore call centers. Those call centers do not need them to; they can obtain consumer contact information without the support of any legitimate U.S. business, or, indeed, any consumer consent.[40] The Commission's proposals and actions with respect to mandatory blocking are more likely to reduce unwanted calls and texts from these sources.

There is wide and overlapping set of existing requirements with respect to online consumer engagement/consumer consent and contact,[41] and architecting additional requirements should be done thoughtfully. It should also not be done based upon false premises. Federally-mandated solutions in particular need to be developed thoughtfully and targeted appropriately. It may be difficult to achieve that solely via publicly-filed advocacy over a three-to-six month period. Accordingly, QuinStreet remains ready to be a resource and partner to the regulators, consumer advocates and industry participants in addressing the problems, identifying alternative solutions, and calculating the costs and benefits of each.

QuinStreet does not want to make, or assist anyone in making, unwanted calls and texts. QuinStreet does not want its employees, their families, or, indeed, anyone to receive unwanted calls and texts. Those preferences are inherently aspirational; no network or system has 100% availability. But QuinStreet endeavors daily to apply technology and business processes to

---

[39] *See*, *e.g.*, the extensive guidance already issued by federal regulators on the topics of online advertising and consent listed on **Annex B**.

[40] This is why the call and text blocking components of the *FNPRM* are likely the most powerful mechanism of reducing unwanted calls and texts. Regulating consent gathering by U.S. companies, including where certain text will appear in the consent, is likely to have a deeply secondary impact on reducing unwanted calls and texts.

[41] *See* **Annex B**.

continuously improve the consumer's experience, meet advertiser expectations and manage

compliance with law, commercial contracts, and industry standards.

Thank you for initiating the *FNPRM* in support of that effort.

Respectfully submitted,

QUINSTREET, INC.

Marty Collins
Marty Collins
Chief Legal and Privacy Officer
QuinStreet, Inc.
950 Tower Lane, 6th Floor
Foster City, CA 94404
mcollins@quinstreet.com

Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

May 8, 2023

**A139**

## ANNEX A

**FCC PROPOSAL**

Amend § 64.1200 by revising section (f)(9) to read as follows (FCC proposed amendments in blue):

**(9)** The term *prior express written consent* means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Prior express written consent for a call or text may be to a single entity seller, or to multiple entities sellers logically and topically associated with the website that solicits the consent. If the prior express written consent is applies to multiple entities sellers, the entire list of entities sellers to which the consumer is giving consent applies must be clearly and conspicuously displayed to the consumer at the time consent is requested provided. To be clearly and conspicuously displayed, the list must, at a minimum, may be displayed on the same web page where the consumer gives provides consent, or through an easily accessible hyperlink on that web page.

> **(i)** The written agreement shall include a clear and conspicuous disclosure informing the person signing that:
>
> **(A)** By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and
>
> **(B)** The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

\*\*\*

<u>ANNEX B</u>

| Authority | Cite | Year | Title | Notes |
|---|---|---|---|---|
| *Statutes, Rules, and Regulatory Guidance* | | | | |
| Federal Law | 15 U.S.C. § 45 | | Federal Trade Commission Act (FTC Act) | Prohibits ''unfair or deceptive acts or practices in or affecting commerce.'' |
| Federal Regulation | 16 C.F.R. § 310 | | Telemarketing Sales Rule (TSR) | Prohibits calling a consumer on the do-not-call registry without an established business relationship or PEWC.  Prohibits misrepresentations; sets limits on the times telemarketers may call consumers; and prohibits calls to a consumer who has asked not to be called again. |
| FTC Notice of Penalty Offenses | | 2021 | Notice of Penalty Offenses Concerning Deceptive or Unfair Conduct in the Education Marketplace | Compilation of acts/practices that are deceptive or unfair and therefore unlawful under Section 5 of FTC Act. |
| FTC Letter | | 2006 | Lending Tree Letter | FTC staff guidance indicating that the FTC staff would not be likely to recommend enforcement action against a lead generator that clearly informs a consumer of the number and identity of merchants that may contact the consumer, as long as the number of merchants is consistent with the consumer's expectations in visiting the lead generator's website. |
| *FTC Enforcement Actions* | | | | |
| FTC Enforcement | Case No. 2:22-cv-00073-DSF-E | 2022 | FTC v. ITMedia Solutions LLC | FTC alleged that lead generation company collected sensitive personal information from consumers under the guise of connecting them with lenders.<br><br>Order requires defendants to: 1) not make misleading statements to consumers about how their personal information will be used, 2) not sell personal information outside of a limited set of circumstances, 3) screen the recipients of that information. |
| FTC Enforcement | Case No. 1:19-cv-05739 | 2019 | FTC v. Career Education Corporation | FTC alleged CEC used sales leads from lead generators that falsely told consumers they were affiliated with the U.S. military, induced consumers to submit their information under the guise of providing job or benefits assistance, told consumers |

B-1

**A141**

| Authority | Cite | Year | Title | Notes |
|---|---|---|---|---|
| | | | | information would not be shared, and illegally called consumers on DNC Registry.<br><br>Order requires CEC to: 1) launch a system to review all materials that lead generators use to market its schools, 2) investigate complaints about lead generators, 3) not use or purchase leads obtained deceptively or in violation of the TSR, 4) not make misrepresentations about any other benefits of any post-secondary school or any other of the defendants' products or services. |
| FTC Enforcement | Case. No. 1:19-cv-01984 | 2019 | FTC v. EduTrek, LLC [Complaint, filed April 2019] | FTC charged a telemarketing operation and its owners with making illegal, unsolicited calls about educational programs to consumers who submitted their contact information to websites promising help with job searches, public benefits, and other unrelated programs. |
| FTC Enforcement | Case No. 3:18-cv-01444-HNJ | 2018 | FTC v. Sunkey Publishing and Fanmail.com | FTC alleged defendants operated websites posing as military recruiters to generate leads for post-secondary schools.<br><br>Proposed orders required defendants to: 1) not make misrepresentations about military affiliation or extent of sharing consumers' information, 2) disclose websites are not affiliated with military and solicit consumers' acknowledgement of that, 3) receive permission to disclose consumer information collected in connection with lead generation. |
| FTC Enforcement | Case No. 2:17-cv-02117-ESW | 2017 | FTC v. Blue Global and Christopher Kay | FTC alleged defendants operated websites that enticed consumers to complete loan applications that were then sold as leads to a variety of entities, most of which were not lenders. The FTC alleged that the company claimed it would search a network of 100 or more lenders, and connect each loan applicant to the lender that would offer them the best terms, but in |

B-2

A142

| Authority | Cite | Year | Title | Notes |
|---|---|---|---|---|
| | | | | fact the defendants sold very few of the loan applications to lenders. |
| | | | | Settlement/order requires defendants to: 1) not make misrepresentations relating to financial products or services, 2) protect and secure consumers' personal information, 3) investigate and verify identity of businesses to which they disclose consumers' information, 4) obtain consumers' express, informed consent for disclosures. |
| FTC Enforcement | Case No. 6:16-cv-00714-CEM-TBS | 2016 | FTC v. Expand, Inc. (Gigats) | Action against education lead generator. FTC alleged that company claimed it was "pre-screening" job applicants for hiring employers when actually generating leads for education programs. |
| | | | | Order prohibits defendants from: 1) promoting job openings without a reasonable basis to expect that employers are currently hiring for those jobs, 2) transferring consumers' personal information to third parties without clearly disclosing that it will be transferred, and their relationship with the third party, 3) using the information covered under the order unless consumers affirmatively opt in to their services. |
| FTC Enforcement | Case No. 4:14-cv-1262 | 2014 | FTC v. GoLoansOnline.com, Inc. | FTC alleged that defendant advertised low interest-rate loans as fixed-rate mortgages, when in fact they were adjustable-rate mortgages that could become more expensive for borrowers over time. |
| | | | | Settlement forbids lead generator from: 1) misrepresenting the terms and conditions of any financial product or service, and any term or condition of a mortgage credit product, 2) assisting others to misrepresent any material fact about a mortgage credit product, 3) disclosing, selling, or transferring consumer data, 4) violating the FTC Act; the MAP Rule and Regulation |

| Authority | Cite | Year | Title | Notes |
|---|---|---|---|---|
| | | | | N; and the Truth in Lending Act and Regulation Z. |

# TAB F

Comments of USTelecom – The Broadband
Association, FCC CG Dkt. Nos. 21-402, 02-278
(May 8, 2023)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| | ) | |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | ) | CG Docket No. 02-278 |
| | ) | |
| | ) | |

**COMMENTS OF**
**USTELECOM – THE BROADBAND ASSOCIATION**

USTelecom – The Broadband Association ("USTelecom")[1] submits these comments in response to paragraphs 58 to 62 of the Federal Communications Commission's ("Commission" or "FCC") Further Notice of Proposed Rulemaking ("*Further Notice*") regarding closing the lead generator loophole.[2] USTelecom strongly supports Commission action to close any perceived loopholes in its rules relied on by lead generators to deliver unwanted robocalls to consumers.

As USTelecom has previously noted, the tide is turning against illegal robocallers and their enabling voice service providers.[3] Once prolific robocalls impersonating the Social

---

[1] USTelecom is the premier trade association representing service providers and suppliers for the communications industry. USTelecom members provide a full array of services, including broadband, voice, data, and video over wireline and wireless networks. Its diverse membership ranges from international publicly traded corporations to local and regional companies and cooperatives, serving consumers and businesses in every corner of the country. USTelecom leads the Industry Traceback Group ("ITG"), a collaborative effort of companies across the wireline, wireless, VoIP and cable industries actively working to trace, identify the source of, and ultimately stop illegal robocalls. The ITG was first designated by the FCC as the official U.S. robocall traceback consortium in July 2020.

[2] *Targeting and Eliminating Unlawful Text Messages; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Further Notice of Proposed Rulemaking, CG Docket No. 21-402, CG Docket No. 02-278, FCC 23-21 ¶¶ 58-62 (Mar. 17, 2023) ("*Further Notice*").

[3] *See* Comments of USTelecom, CG Docket No. 17-59, WC Docket No. 17-97, at 2-7 (filed Aug. 17, 2022).

1

**A145**

Security Administration, for instance, are increasingly rare.[4]  Other fraud robocalls, which most often originate abroad, likewise are receding.  But despite this progress, consumers still receive too many unwanted robocalls.  Today, the robocalls consumers are most likely to receive are lead generation robocalls they do not want, rather than fraud robocalls.[5]  These lead generation robocall campaigns often rely on flimsy claims of consent where a consumer interested in job listings, a potential reward, or a mortgage quote, unknowingly and unwillingly "consents" to telemarketing calls from dozens – or hundreds or thousands – of unaffiliated entities about anything and everything.  More often than not, relevant disclosures for such "consent" are buried in fine print, only accessible through a hyperlink.  Lead generation calls make up a disproportionate portion of unwanted robocalls, and create more hurdles for enforcers and the traceback process as callers obfuscate the legality of their unwanted robocalls by claiming they have valid consent.[6]

---

[4] *See id.* at 5; Industry Traceback Group, *The State of Industry Traceback – March 2023*, https://tracebacks.org/state-of-industry-traceback-march-2023/.

[5] *See, e.g.,* News Release, FCC, *FCC Authorizes Phone Companies to Cut Off Likely Auto Warranty Scam Robocall Campaign*, July 7, 2022, https://docs.fcc.gov/public/attachments/DOC-385038A1.pdf (announcing actions "to cut off a flood of possibly illegal robocalls marketing auto warranties targeting billions of consumers" and that the "FCC and its partners believe upwards of eight billion" were generated); Emma Whitford, Forbes, *Student Loan Scams Stole An Estimated $5 Billion From Americans This Year*, Nov. 3, 2022, https://www.forbes.com/sites/emmawhitford/2022/11/03/student-loan-scams-stole-an-estimated-5-billion-from-americans-this-year/ ("RoboKiller has counted about 700 million student loan-related robocalls per month"); News Release, YouMail, *US Consumers Received 4.3 Robocalls in February, According to YouMail Robocall Index*, Mar. 3, 2023, https://www.prnewswire.com/news-releases/us-consumers-received-4-3-billion-robocalls-in-february-according-to-youmail-robocall-index-301761783.html ("The most unwanted robocall campaign for this month is a telemarketing call that appears to be selling low-cost health insurance" and "appears to be exceeding 50 million calls/month and violating various telemarketing regulations, as well as calling people who did not give prior consent.").

[6] Notably, consumers routinely dispute that they have consented to such calls.  *See, e.g., Sumco Panama SA, et al.*, Notice of Apparent Liability, File No. EB-TCD-21-00031913, FCC 22-99 ¶¶ 45-46 (Dec. 21, 2022) ("*Sumco NAL*") (noting complaints and other evidence undermining consent claims).

To this end, the *Further Notice* asks whether the Commission should amend its Telephone Consumer Protection Act ("TCPA") "consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page."[7] Responsible callers, including responsible telemarketers, have already interpreted the Commission's TCPA consent requirements in this way. The Commission therefore should make clear that all callers do the same by expressly banning the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent.[8] Clear, definitive guidance will deprive aggressive telemarketers of the plausible deniability they've relied on to undermine originating providers' know-your-customer processes and bombard Americans with scores of these robocalls.[9]

The Commission, however, should not adopt the new language it proposes for section 64.1200(f)(9). Under the Commission's rules today, for telemarketing robocalls, callers must "prior express written consent," which is defined in relevant part as "an agreement … that **clearly authorizes _the seller_** to deliver or cause to be delivered to the person called

---

[7] *Further Notice* ¶ 61.

[8] *Id.* ¶ 58. The Commission, however, should make clear that affiliates within the same family of companies are permitted to rely on a single consent to market the same or closely related products and services, including through contractors and agents. This approach aligns with longstanding Commission requirements under the customer proprietary network information ("CPNI") rules. *See* 47 CFR § 64.2007(b) (permitting a carrier to rely on opt-in or opt-out approval to disclose CPNI to agents and affiliates that provide communications-related services for the purpose of marketing such services).

[9] Some originating providers may knowingly accept such calls under the same theories of plausible deniability that the callers rely on. In this case, a clear FCC declaration also will put such providers on notice about knowingly accepting such unlawful traffic, in turn enhancing industry traceback and enforcement efforts.

advertisements or telemarketing messages using … an artificial or prerecorded voice[.]"[10]  The term "seller" in turn is defined as "***the person or entity*** on whose behalf a telephone call or message is initiated[.]"[11]  Because the Commission's rules already require that consent be obtained on behalf of one, singular seller, consent claimed on behalf of an untold number of sellers already is invalid under the Commission's existing consent requirement.[12]

Moreover, the Commission's rules also require that the written consent agreement "include a clear and conspicuous disclosure" providing certain information to the person signing.[13]  The term "clear and conspicuous" is defined in the rules to mean a "notice that would be *apparent to the reasonable consumer*, separate and distinguishable from the advertising copy or other disclosures."[14]  Buried clickthrough links of "marketing partners" to consent to receive robocalls from dozens, hundreds, or even thousands of entities fail to meet this standard.  Indeed, as the Enforcement Bureau observed in its recent action against Urth Access:

> [T]he Commission requires the caller to provide a "clear and conspicuous disclosure" when obtaining prior express written consent.  The websites included TCPA consent disclosures whereby the consumer agreed to receive robocalls from "marketing partners."  These "marketing partners" would only be visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of each of 5,329 entities.  We find that listing more than 5,000 "marketing partners" on a secondary website is not

---

[10] 47 CFR § 64.1200(f)(9) (emphases added).

[11] *Id.* § 64.1200(f)(10) (emphases added).

[12] *Cf. Sumco NAL* ¶ 42 n. 132 (Dec. 21, 2022) ("Our rules require the <u>seller</u> to obtain written consent. The vehicle service contact sellers allegedly obtained written consent agreements for all calls in the form of websites requesting consumer information.  However, the disclosure language was not sufficiently clear in notifying the consumer that he or she was providing consent for telemarketing calls from the seller.  Thus the written consent agreements were non-compliant our rules.") (emphasis in original).

[13] 47 CFR § 64.1200(f)(9).

[14] *Id.* § 64.1200(f)(3) (emphasis added).

> sufficient to demonstrate that the called parties consented to the calls from any one of these "marketing partners."[15]

Thus, the new language proposed in the *Further Notice* is unnecessary. Worse, it runs the risk of introducing new ambiguity and permitting practices that may not be allowed under the existing rule. Rather than rewrite the rule, the Commission instead should explicitly declare that its existing rule requires that consent be considered granted only to the caller (or its agent) logically and topically associated with the website that solicits consent and whose name is clearly disclosed on the same web page.

Relatedly, the Commission should explicitly confirm in this proceeding that lead generators cannot evade do-not-call restrictions by relying on the same anti-consumer mechanisms of sold leads and buried disclosures they use to claim broad consent. To this end, Commission rules exempt from do-not-call restrictions calls to a person with that person's "prior express invitation or permission[.]"[16] The rules specifically require that "[s]uch permission must be evidence by a signed, written agreement between ***the consumer and*** ***<u>seller</u>*** which states that the consumer agrees to be contacted by ***<u>this seller</u>***[.]"[17] Such "prior express invitation or permission" thus must be made to a particular seller, and cannot be made to a lead generator that in turn sells that invitation or permission to another entity as part of generating a new lead. Likewise, signing up for information for a particular product or service cannot be construed as

---

[15] *Urth Access, LLC*, Order, File No. EB-TCD-22-00034232, DA 22-1271 ¶ 16 (EB Dec. 8, 2022) (footnotes omitted); *see also id.* ¶ 15 (finding robocall operation did not receive adequate consent of parties for its robocalls because, among other reasons, that website address included in "consent logs" did not appear to have any connection with the subject of the robocalls).

[16] 47 CFR § 64.1200(f)(15) (defining "telephone solicitation" to exclude a call or message "[t]o any person with that person's prior express invitation or permission"); *id.* § 64.1200(c)(2) (applying do-not-call restrictions to "telephone solicitations").

[17] *Id.* § 64.1200(c)(2)(ii) (emphases added). The Commission, however, should make clear that affiliates can constitute the same seller. *See* note 8 *supra*.

prior express invitation or permission to be contacted about myriad other products or services offered by entirely separate entities, simply because of hidden fine print in a hyperlinked second screen.[18]

USTelecom supports clear and decisive Commission action to eliminate any perceived loopholes in its rules that allow lead generators and other telemarketers to deliver scores of unwanted robocalls to consumers. The Commission, however, should do so through declaration rather than a rule change, as the Commission's existing rules already are best read to prohibit current lead generator abuses. The Commission should specifically confirm that its existing rules do not permit the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent and to otherwise ignore do-not-call restrictions. Taking these actions will provide clear guidance to callers as well as the provider community, in turn enhancing industry traceback and enforcement efforts to prevent these illegal, unwanted calls.

By:  */s Joshua M. Bercu/*
Joshua M. Bercu
Vice President, Policy & Advocacy

USTelecom – The Broadband Association
601 New Jersey Avenue, N.W.
Suite 600
Washington, D.C. 20001
(202) 551-0761

May 8, 2023

---

[18] *Cf. Sumco NAL* ¶ 47 (noting consumers reporting receiving calls despite being on the National Do Not Call Registry as indication that caller ignored consent requirements). Many lead generation and other telemarketing robocalls fail to identify the entity responsible for the robocall, as required by Commission rules. *See, e.g., id.* ¶ 48. Therefore, the Commission should take the opportunity in this proceeding to remind telemarketers as well as originating voice service providers regarding the identification requirements set forth in sections 64.1200(a)(7)(i)(A), 64.1200(b)(1), and 64.1200(d)(4) of the agency's rules.

# TAB G

Reply Comments of Insurance Marketing Coalition Ltd., FCC CG Dkt. Nos. 21-402, 02-278 (June 6, 2023)

**imc**

Insurance Marketing Coalition

June 6, 2023

Federal Communications Commission
45 L Street NE
Washington, DC 20554

Submitted via http://apps.fcc.gov/ecfs

Re:     CG Docket No. 21-402 (Targeting and Eliminating Unlawful Text Messages) and CG Docket No.
        02-278 (Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991)

Dear FCC Commissioners,

The Insurance Marketing Coalition ("IMC") submits this reply to certain comments submitted in relation to the Commission's Further Notice of Proposed Rulemaking in CG Docket Nos. 02–278 and 21–402; FCC 23–21, adopted on March 16, 2023 and released on March 17, 2023 ("FNPRM").

Upon review and consideration of the comments submitted in this FNPRM, IMC's position remains unchanged.[1] IMC continues to support enhancing the requirements of "prior express written consent" ("PEWC") under § 64.1200(f)(9) (the "PEWC standard") to ensure that consumers have transparency about the calls they may agree to receive. Specifically, IMC continues to support amending § 64.1200(f)(9)(i) to clarify that the following items be added to the clear and conspicuous disclosure that is already required in a PEWC agreement: (1) the potential number of callers, (2) the maximum time period during which calls may be received, and (3) the types or categories of goods or services that may be offered on such calls.[2]

IMC also remains concerned with the proposal to add an overbroad and undefined "logically and topically associated" standard, which concern appears widely shared by nearly all commentators. Although IMC opposes adoption of the "logically and topically associated" standard, if adopted IMC advocates for a technology-neutral definition that focuses on ensuring transparency with consumers.[3]

IMC now turns to replying to specific comments submitted in this FNPRM.

---

[1] IMC's original comments were filed as ID 1050833302323, available at https://www.fcc.gov/ecfs/search/search-filings/filing/1050833302323 ("IMC Comments").
[2] As explained on page 3 of IMC Comments, "… by requiring disclosure of the types or categories of goods or services that a person agrees to be called about, the problem of a consumer being duped into receiving calls about Y product when they thought they were going to get calls about X product is solved. By requiring disclosure of the maximum number of potential callers, the problem of a consumer being surprised about how many of the listed "marketing partners" may call is solved. And by requiring the maximum time period that such callers may call, the problem of consumers being surprised by calls at a later date than expected is solved."
[3] IMC Comments pp. 7-8.

imc

Insurance Marketing Coalition

<u>REPLY</u>

I.    <u>No restrictions or unreasonable burdens should be placed on consumers that would limit their ability to receive calls that they want, or that would limit their choices to only large companies at the expense of small businesses or new market entrants.</u>

In the quest to eradicate unwanted calls, care must be taken to avoid rules that would frustrate consumers' ability to receive desired calls. As noted by a federal appellate court: "The TCPA aims to curb a particular kind of call: a call that a person does not expect to receive. So the statute's applicability turns entirely on what conduct the called party authorized."[4] Some of the proposals set forth by certain commentators in the FNPRM, despite being well intentioned, would hinder consumer choice and prevent them from receiving desired calls, with the collateral impact of harming competition and reinforcing market position of dominant players. Such proposals should be rejected.

(A)    The proposal to limit a PEWC agreement to a single seller would hurt consumer choice and competition.

One commentator proposes that a PEWC agreement be limited to authorizing a single seller to call a person whose number is on the DNC list or send that person a prerecorded call.[5] This proposal disregards consumer choice and would arbitrarily prevent consumers from taking advantage of online and telephonic comparison tools for products and services. As noted by IMC and other commentators, numerous consumers each year choose to receive multiple quotes or offers through a single PEWC agreement.[6] Based on IMC members' interactions with consumers,[7] the vast majority of these consumers are satisfied with their experiences and find them convenient and valuable. No justification exists for stripping consumers of their ability to choose for themselves through a single PEWC agreement to be contacted by more than one seller.

The argument that PEWC, including consent to receive calls to lines registered on the DNC Registry, cannot be facilitated by intermediaries[8] is also harmful to consumers as it would prevent them from receiving calls that they want. Take for example an online advertisement, placed by a marketing organization that does not sell insurance, that offers a consumer the ability to receive a phone call from a licensed insurance agent to get a quote on an auto insurance policy. The advertisement includes a webform for the consumer to provide their telephone number and other information, and includes a clear and conspicuous disclosure confirming that the consumer agrees to be called by one of the listed insurance agents to receive a quote. Desiring to receive a call to obtain a quote, the consumer fills out the form and submits it. In this scenario, the consumer has provided consent directly to the seller by signing a document that includes the name of the seller and that specifically states that the consumer agrees to be called by that seller. The consumer is indifferent as to whether the online advertisement and webform were deployed by the seller itself, or a marketer, as the end result is exactly the same: the consumer will receive a call to get a quote from one of the sellers that is listed.[9] There is thus no logical basis for imposing a rule to prevent intermediaries from facilitating PEWC consent between sellers and consumers.

---

[4] *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 794 (9th Cir. 2018) (rejecting argument that consent cannot be provided through an intermediary).

[5] *See* ID No. 1050859496645 pp. 17-18, available at https://www.fcc.gov/ecfs/search/search-filings/filing/1050859496645 ("NCLC Comments").

[6] *See* IMC Comments pp. 3-5.

[7] IMC's members include insurance brokers and agents who provide plan information and options by phone to millions of consumers each year, many of whom are comparison shoppers that have agreed to receive calls from more than one broker or agent through a single PEWC agreement.

[8] *See* NCLC Comments pp. 19-20.

[9] As noted in IMC's Comments, a lengthy list of potential sellers is typically included in PEWC agreements in an attempt to maintain compliance with TCPA requirements; not because permission to call is being provided to each such seller. To improve transparency, IMC supports requiring a clear and conspicuous disclosure of the maximum number of sellers that may call.

Insurance Marketing Coalition

The key here, of course, is making sure that consumers understand the scope of calls that they may receive. This is why IMC proposes a clear and conspicuous disclosure of the potential number of callers, the maximum time period during which calls may be received, and the types or categories of goods or services that may be offered on such calls. Disclosure, not arbitrary and overreaching prohibitions, is the best approach to avoiding unwanted calls and text messages.

There is no inconsistency between, on the one hand, allowing consumers to agree to receive calls from multiple callers in response to a single PEWC agreement and, on the other hand, the DNC rules requiring a caller to honor DNC requests. In such a scenario, consumers knowingly agree to a maximum number of callers, so there is no surprise or harm if, for example, three sellers call the consumer as specified in a PEWC agreement. Just as if the consumer had filled out three separate PEWC agreements to compare quotes from three sellers, the consumer may make a DNC request to any, or all three, of the sellers. The only difference in the two scenarios above is that the burden placed on the consumer is *greater* in the scenario where the consumer is required to fill out three separate PEWC agreements in order to receive three calls to compare quotes, instead of through the convenience and choice of a single PEWC agreement.[10]

Limiting a single seller per PEWC agreement would also hurt competition. Digital advertising is expensive and complex. Many smaller companies do not have the technical ability or financial resources necessary to promote their businesses through exclusive single-route advertising proposed by these commentators. Comparison shopping, including matching by marketers of interested consumers to available agents or brokers,[11] is a critical mechanism for small businesses to compete for customers on the same footing as industry giants with multi-million dollar marketing budgets.[12] Including multiple potential sellers in a single PEWC agreement, and allowing consumers to agree to be called by more than one of those sellers, drives down the advertising cost for small businesses and allows them to compete for the same customers as larger businesses. Prohibiting this common and consumer-friendly practice would slam the door on market competition for smaller businesses in favor of larger companies reinforcing their market dominance through exercise of large budgets that can overcome the added costs of single-route PEWC as proposed by these commenters.

Suggestions by some commentators that companies could simply "adjust how they connect prospects to their partners"[13] such as by "allowing a separate checkmark to a box [for each seller]"[14] are uninformed and demonstrate ignorance of the technical complexities of real-time matching of interested consumers with available agents or brokers. As previously explained by IMC, it is impossible to determine at the time a consumer submits a

---

[10] In any case, to the extent that it were desirable to address the ability of consumers to make DNC requests in the context of multiple sellers calling in response to a single PEWC agreement, there are better solutions than an arbitrary ban. For example, the Commission through future rulemaking could require pass-through of DNC requests so that a consumer's DNC request to a single seller would be passed along to, and honored by, any other seller that received permission to call based on that same PEWC agreement. Mechanics, liability, and other details related to such proposal could be developed through the notice and comment process to allow input from all stakeholders.

[11] This matching process is described in IMC's Comments pp. 2 and 4-7.

[12] Large companies also recognize that restrictions on the number of sellers in a PEWC agreement would hurt consumer choice and competition. *See* UHC Comments, ID 10508141209857 p. 4, available at https://www.fcc.gov/ecfs/search/search-filings/filing/10508141209857 ("Additionally, if limits are applied to the number of companies or their authorized licensed agents that may contact a consumer in response to their request for information through a lead, consumers may miss out on valuable information and opportunities for education and comparison shopping if they are only contacted by a limited number of businesses or licensed agents. For example, if an unreasonable limit is placed on the number of contacts that a consumer can consent to, it may restrict the consumer's ability to access information from the range of businesses that could provide them with goods or services (e.g., limiting consent to contact from five authorized agents in a market with ten health insurance issuers).")

[13] ID No. 10515064376161 p. 10, available at https://www.fcc.gov/ecfs/search/search-filings/filing/10515064376161 ("ZDX Comments").

[14] NCLC Comments p. 20.

Insurance Marketing Coalition

PEWC agreement which particular agent or broker is a match for the consumer as that determination depends on multiple unknown factors such as agent or broker availability. Other commentators outside of the insurance industry have similarly explained that ". . . a requirement to identify the specific providers that will contact a consumer at the time consent is collected is impractical."[15]

In short, there is no "technical solution" that would continue to allow consumers to benefit from comparison shopping and small businesses to benefit from participation in digital ad markets. If the proposal to limit a PEWC agreement to a single seller were imposed, it will have a devastating impact on consumer choice and competition, particularly on smaller businesses.

**(B)  Other arbitrary limits on consumer choice should be rejected.**

The Commission should disregard other arbitrary limits on consumer choice suggested by some commentators, such as prohibiting consumers from providing PEWC for more than a ninety-day period or prohibiting consumers from entering into a PEWC agreement orally on a recorded call even if it is otherwise in compliance with state contractual law or the E-Sign Act.

Take the proposal to prohibit consumers from entering into a PEWC agreement that allows calls more than ninety-days in the future.[16] In the insurance context, consumers often purchase annual policies that can be changed once a year, such as during an open enrollment period. Insurance plans (including features like premiums, networks, etc.) also change from year-to-year. A consumer who learns about a plan option from licensed agent A in year 1 may decide to purchase a different plan in year 1 offered by licensed agent B, but that consumer may welcome the opportunity for licensed agent A to call the consumer back in year 2 so that the consumer can again compare options and elect a plan that best fits the consumer's needs. Current rules allow the consumer to provide PEWC to licensed agent A to call back in year 2, but this consumer-friendly practice would be prohibited under a proposal to limit the validity of a PEWC agreement to ninety days.

As another example of an arbitrary limit, some commentators have proposed prohibiting consumers from providing PEWC orally on a recorded call. This proposal would burden consumers by making it difficult for them to agree to be called back by insurance agents who they call. For example, a consumer may call an insurance agent in response to an advertisement or directory listing that includes the insurance agent's telephone number. During that call, the consumer may want to grant permission to the insurance agent to call the consumer back at some point in the future, such as the example above where a consumer seeks a call back a year in the future.[17] Assuming that the recorded oral agreement complies with state law or the E-Sign Act requirements for a written agreement, there is no rational basis for banning PEWC. Indeed, a recorded call may have even greater indicia of validity than other agreements as the consumer's voice is captured on the recording, thereby eliminating any question that the consumer agreed to be called.

More examples could be given,[18] but the point is that arbitrary limits on PEWC should be carefully scrutinized and rejected where they could prevent consumers from receiving calls that they request and desire.

---

[15] ID No. 10508927220560 p. 3, available at https://www.fcc.gov/ecfs/search/search-filings/filing/10508927220560.

[16] ID No. 10509043191182 p. 5, available at https://www.fcc.gov/ecfs/search/search-filings/filing/10509043191182.

[17] The existing-business-relationship exception ("EBR") to the DNC rules only permits call-backs based on inquiries for three months, thus PEWC is necessary to call beyond that period. Even within three months, an insurance agent would need PEWC for use of a prerecorded marketing message.

[18] For example, one well-intentioned commentator proposes adoption by the Commission of an entire set of prescriptive rules ". . . FAR more restrictive than any current legal requirements. . . " that includes  some nonsensical and arbitrary limits that would hurt consumer choice and competition.  *See* ID Nos. 10509951114134 and 10509797928081 at 18, available, respectively, at https://www.fcc.gov/ecfs/search/search-filings/filing/10509951114134 and https://www.fcc.gov/ecfs/search/search-filings/filing/10509797928081. IMC opposes adoption by the Commission of any proposed rule or regulation that would exceed

**Insurance Marketing Coalition**

Instead of imposing arbitrary limits, sensible regulation should focus on ensuring that it is clearly and conspicuously disclosed to consumers what calls they will receive. For this reason, IMC advocates for strengthening disclosure requirements.

### (C) The Commission has already adequately addressed signature requirements for PEWC agreements.

IMC opposes one commentator's view that the FCC should "spell out" the requirements of the federal E-Sign Act and explain how it applies to FCC regulations[19] for three reasons.

*First*, Congress has not implicitly or explicitly delegated interpretive authority of the E-Sign Act to the Commission, and thus the Commission lacks authority to interpret the requirements of the E-Sign Act.[20] Instead, authority for interpretation of the requirements of the E-Sign Act lies with the judicial branch of government.

*Second,* the Commission has already explained how the E-Sign Act applies to the Commission's PEWC standard. Specifically, the Commission has already determined, following a notice and comment period, that:

> . . . consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording . . .
>
> Allowing documentation of consent under the E-SIGN Act will minimize the costs and burdens of acquiring prior express written consent for autodialed or prerecorded telemarketing calls while protecting the privacy interests of consumers. Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act. We conclude that the E-SIGN Act significantly facilitates our written consent requirement, while minimizing any additional costs associated with implementing the requirement.[21]

There is no need for the Commission to revisit or add to this determination of how the E-Sign Act applies to the PEWC standard, and any interpretation of the specific requirements of the E-Sign Act must be left to the courts.

*Finally*, the commentator's interpretation of the E-Sign Act's requirements for electronic signatures is wrong as it improperly conflates the requirements necessary for delivery of electronic records with the requirements necessary for signature.[22]

## II. <u>Any Changes to Regulation Governing PEWC Should be Technology-Neutral</u>

Much of the commentary in the FNPRM focuses on online advertising and electronic PEWC agreements, but the Commission should not lose sight of the fact that offline advertising and PEWC agreements would also be impacted by changes to the PEWC standard. Regulations that would require the use of an electronic medium in lieu of all other methods (for example, the proposed requirement that a list of callers be displayed on a "webpage")

---

the statutory bounds of the laws (including the TCPA) within the Commission's mandate, or that would hurt consumer choice or competition.

[19] *See* NCLC Comment pp. 23- 32.

[20] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").

[21] In the Matter of Rules and Regulations Implementing the TCPA of 1991, 27 FCC Rcd. 1830, 1844 ¶¶ 33-34 (F.C.C. Feb. 15, 2012).

[22] *See, e.g., Reinert v. Power Home Remodeling Grp. LLC*, No. 19-13186 (E.D. Mich. Nov. 17, 2020) 2020 U.S. Dist. LEXIS 214666 (holding that the "litany of disclosures" required under 15 U.S.C. § 7001(c) are inapplicable to the signature requirements under the TCPA); *Morris v. Modernize, Inc.*, No. AU-17-CA-00963, 2018 U.S. Dist. LEXIS 232701 (W.D. Tex. Sept. 27, 2018) (holding that the E-Sign Act disclosures do not apply to the TCPA).

would inadvertently eliminate offline interactions desired by consumers. Moreover, esoteric debates such as whether disclosures should be provided on websites versus webpages ignore the fundamental question of consumer experience.

Indeed, whether certain information is presented on a website versus a webpage does not answer the question of whether any particular information was presented clearly and conspicuously. Further, technology is complex and rapidly changing. Disclosure rules tied to certain technological specifications are circumventable through technical ingenuity and will not stand the test of time. Any revisions to the PEWC standard thus should be technology-neutral, such as IMC's proposal to require, regardless of medium, clear and conspicuous disclosure of the potential number of callers, the maximum time period during which calls may be received, and the types or categories of goods or services that may be offered on such call.

Similarly, while IMC opposes adoption of the "logically and topically associated" standard on the grounds that it is vague and ambiguous, if adopted, the Commission should set forth a technologically-neutral definition focused on ensuring transparency, such as the definition proposed by IMC:

> The term **logically and topically associated** means of sufficient similarity to the information or advertising presented in conjunction with the prior express written consent so that a consumer acting reasonably under the circumstances is unlikely to be misled as to the calls that the consumer may receive.

### III.    Additional Reply Comments

**(A)  Industry participants, such as IMC members, take compliance seriously and are highly incentivized to avoid harassing consumers with unwanted calls.**

Some commentators have portrayed the marketing industry, and purchasers of their advertising services, as out-of-control actors with little or no incentives to put limits on the calls that consumers receive. IMC cannot speak as to other industries, but with respect to the insurance industry such portrayals are patently untrue. To the contrary, IMC members and others within the insurance industry are highly regulated at the state and federal level, take compliance seriously, care deeply about ensuring a positive consumer experience, and are highly incentivized to prevent consumers from receiving unwanted calls.

Insurance agents and brokers who retain the services of performance marketers do not want and find no value in referrals of consumers who are upset or surprised about being called. In fact, each and every contact with a consumer who does not want to be called and has no interest in the service being offered cuts directly into an insurance agency/broker's bottom revenue line. And the value of a referral to an insurance agent or broker decreases if more sellers are permitted to provide their offers to that same referral. For this reason, as noted in IMC Comments, contracts between sellers and performance marketers typically expressly prohibit or limit other calls to a consumer based on a single PEWC agreement.[23] Many sellers audit referrals provided by performance marketers, and are quick to take action if the terms of their agreement are violated. Building trust with consumers is critical to agents and broker success, and it is wrong to portray them as incentivized to harass consumers with calls they don't want.

Similarly, it is wrong to portray marketers as lacking incentives to restrict how many callers may contact an individual based on a single PEWC agreement. To the contrary, marketers regularly limit or prohibit the number of callers who may contact an individual. As noted, this is a typical contractual requirement in the insurance industry, and marketers that violate these terms face loss of business, reputational damage and, in some cases, legal action. Marketers that reliably deliver genuinely interested consumers on exclusive, or specifically limited, bases are rewarded by the marketplace.

---

[23] IMC Comments p. 7.

**imc**

Insurance Marketing Coalition

This is not to say that there are not bad actors. There are. Which is why IMC proposes tightening the disclosure requirements for PEWC agreements and supports enhanced regulatory action against those who break the law. But the harm caused by bad actors cannot be fairly or reasonably attributed to the industry as a whole. Indeed, as noted in IMC's Comments, a single bad actor can alone generate billions of unwanted calls.[24] There is no basis to assume from the volume of unwanted calls that the cause is widespread among all in the marketing space, and certainly not within the insurance industry.

**(B)   Sustained Enforcement Against Bad Actors is Necessary**

IMC recognizes, as other commentators have pointed out, that there are unscrupulous companies that trick consumers into receiving unwanted calls and others that peddle in outdated or falsified consent records. And as recognized by various commentators, many unwanted calls today are placed without any purported consent and involve fraudulent offers. This type of conduct, which is offered as justification for new regulation, is already prohibited under current laws such as Section 5 of the FTC Act and state UDAAP laws, which prohibit unfair or deceptive acts or practices. In addition, in the case of a falsified PEWC agreement, or no PEWC agreement at all, a caller faces potential direct liability and statutory damages under the TCPA and analogous state laws.

In an attempt to stop practices that are already prohibited under current laws, care should be taken to avoid overbroad regulations that would hurt consumer choice and competition. Only enforcement by regulators (aided by initiatives such as stir/shaken to identify the source of such calls) against illegal callers is likely to have any appreciable impact on unwanted calls.

<u>**CONCLUSION**</u>

The IMC appreciates the opportunity to comment. We support the Commission's effort to provide consumers with transparency and protect them from unwanted telephone calls. IMC supports setting clear, objective standards for PEWC, as set forth above, while preserving consumer choice and protecting competition.

Thank you for your time and consideration of our coalition's response.

---

[24] IMC Comments p. 9.

# TAB H

Letter from Yaron Dori, Counsel to QuinStreet, to Marlene H. Dortch, FCC, FCC CG Dkt. Nos. 21-402, 02-278 (Aug. 30, 2023)

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

August 30, 2023

*Via ECFS*

Ms. Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

> **Re:   Notice of Ex Parte Presentation; Targeting and Eliminating Unlawful Text Messages, CG Docket No. 21-402; Implementing the Telephone Consumer Protection Act, CG Docket No. 02-278**

Dear Ms. Dortch:

On August 28, 2023, representatives of QuinStreet, Inc. ("QuinStreet"), met with Commission staff to discuss the issue of multi-party consents set forth in the *Report and Order and Further Notice of Proposed Rulemaking*[1] released in the above-referenced dockets. The following individuals attended the meeting on behalf of the Commission: Jerusha Burnett, Zachary Champ, Aaron Garza, Alejandro Roark, Mika Savir, and Kristi Thornton. Attending on behalf of QuinStreet were Marty Collins, Chief Legal & Privacy Officer, and the undersigned. This letter reports on the points that were made by QuinStreet in the meeting.

*The Spectrum of Behaviors.* QuinStreet began the meeting by noting that those who make unwanted contact with consumers span a spectrum, from those engaged in outright fraud to those that simply seek to deliver valuable products and services to consumers with legally valid and appropriate consent. Those on one end of that spectrum do not read the rules; those on the other end of the spectrum (such as QuinStreet) spend substantial time and money endeavoring to comply.

One consequence of this is that contact from fraudsters can only effectively be mitigated by technical means. These entities can and will be affected only by measures they cannot avoid or ignore (*e.g.,* technical mechanisms such as mandatory blocking). QuinStreet stated its belief that the vast majority of unwanted contact comes from such sources, and that absent technical measures they will continue and the sources of that contact will remain beyond the reach of either regulatory enforcement authorities or the plaintiffs' bar. As a result, QuinStreet noted that the consent-based components of the FNPRM effectively would fall only upon those who are aware of the rules, and who are subject to legal, financial, and reputational risks for failing to follow them.

---

[1] *Targeting and Eliminating Unlawful Text Messages*, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (March 17, 2023) ("*FNPRM*").

**COVINGTON**

Ms. Marlene H. Dortch, Secretary
August 30, 2023
Page 2

*The Spectrum of Products.* QuinStreet explained that the online marketing services provided by QuinStreet and others only involve calls and texts *in the subset of product and services where the consumer requested that contact.* These typically involve considered consumer comparisons, where the dollar-value of the decision (typically four- to five-figure sums, annualized) or the nature of the service (including the need to schedule an appointment), result in most consumers requesting contact as part of their comparison and decision-making processes.[2] Taken together, this means the portions of the *FNPRM* related to consent should enable the consumer's preference for contact, as well as the interest and ability of industry participants to provide comparisons across a wide range potential service providers.

*The Spectrum of Search.* Given the above, QuinStreet discussed the adverse and perverse consequences of the single-advertiser regime requested by some *FNPRM* commenters. QuinStreet observed that, in some quarters, standard internet search is already criticized as being pay-to-play, with the appearance of content the result of opaque commercial and algorithmic decisions. Creating (even inadvertently) a federal rule that would require certain consumer searches to yield only a single result ("Constrained Search") would not be in the public interest. Saddling consumers looking to make considered comparisons with the obligation to do so one-product-at-a-time would not, on its face, be pro-consumer. It would make life harder still for low-income consumers already saddled with substantial time and economic burdens.

QuinStreet observed that the likely result of a Constrained Search regime would be that one or two large advertisers would come to dominate the online search results for products and services. QuinStreet and a limited number of other marketing intermediaries would continue to exist; performance marketing would not go away.

But what would go away is consumer choice. Hundreds of advertisers (and in the case of products like insurance, thousands of independent service providers and brokers) would lack the technical ability to navigate such an environment as well as the commercial wherewithal to adjust to these additional constraints. Standard search engine marketing is still too hard for most small companies. And in standard search the advertiser does not need to "win;" it just needs to be the first page of the search results. By contrast, Constrained Search would truly be winner-take-all. It would not only be anti-consumer, but also anti-business, especially small business.

*The Goldilocks Approach.* QuinStreet commended the staff for the approach taken by the Commission in the *FNPRM*. The single-advertiser, Constrained Search approach was considered, with comment sought, but it ultimately was not included in the *FNPRM's* proposed rule. Instead, the *FNPRM* proposed to restrict sellers on a multi-party consent form to those "logically and topically associated" with the website on which the form appears and thus the

---

[2] QuinStreet observed that while it provides an online capability for consumers to compare insurance from multiple providers and bind online without the need for a call or text (which reduces costs for both QuinStreet and its insurance clients), the vast majority of consumers elect instead to request a call or text as part of that process. The same is true for considered consumer comparisons of mortgages, personal loans and most home services products.

**COVINGTON**

Ms. Marlene H. Dortch, Secretary
August 30, 2023
Page 3

subject matter of the consumer's inquiry. QuinStreet echoed the view of other commenters that additional specificity on this item would be important to minimizing unnecessary and unwarranted private litigation about the scope of this requirement.

Building off the above discussion of considered comparisons, QuinStreet urged the Commission to withdraw the *FNPRM's* proposal to eliminate the hyperlink and require that all prospective sellers be named in the text of the consent. QuinStreet discussed that the list of prospective sellers was inherently lengthy; it represented all sellers who *might* potentially be a match for *any particular consumer*. Moreover, because sellers may or may not be in-market for a particular consumer on a weekly, hourly or even minute-to-minute basis, the list is a static list of all potential sellers, and is not amendable to dynamic adjustment daily, let alone in real-time.[3]

*Matched Consent Notice.* As had been suggested by other parties in this proceeding, there are ways to (1) meet the consumer's preference to make considered comparisons and be contacted by call or text, (2) retain the ability to make comparisons across a wide range of potential solution-providers (without eliminating small businesses from the mix), while (3) limiting the number of parties who will contact the consumer. In QuinStreet's comments, QuinStreet (along with other commenters) suggested limiting match rate, contact cadence and contact duration as direct and effective approaches to achieve the above objectives.

In the meeting, QuinStreet supported an alternative approach suggested by other commenters: making consent effective for only a limited number of sellers to whom the consumer is matched. The Commission could accomplish this by amending the definition of "prior express written consent" to specify that, if a hyperlink is used to identify potentially matched sellers, then such consent will apply *only to those entities identified in a match notice that subsequently is transmitted to the consumer* (a "Matched Consent Notice").

QuinStreet noted that the Commission could specify the timeframe and format in which Matched Consent Notice would need to be transmitted.[4] In addition, if the Commission would prefer to limit the number of entities identified in the Matched Consent Notice it could specify so in its rules.

---

[3] QuinStreet explained that advertiser budgets are often subject to daily or intra-day caps; a consumer who is a potential customer at 11 a.m. for Insurer X may not be a potential customer at noon if Insurer X's advertising spend cap is exhausted by noon. Moreover, advertisers may have additional caps based upon consumer location, type of project, and so forth, all of which can be met or changed intra-day. As a result, the list of potential sellers is generally static, changing only as new advertisers are signed by a marketer, and their consumer filters (*e.g.,* geography) are ingested into the performance marketers' systems. The issue of consumer "duplicates" (*e.g.*, the same consumer conducting multiple searches for the same product across time) was also discussed. This creates additional complexities with real-time processing.

[4] For the reasons identified in footnote 3, real-time delivery of the Matched Consent Notice is likely impracticable, but prompt notice (*e.g.,* 1-2 business days) is likely workable.

**A160**

**COVINGTON**

Ms. Marlene H. Dortch, Secretary
August 30, 2023
Page 4

QuinStreet also explained that because the entities to whom the consent would apply would be identified in the Matched Consent Notice, the consumer would have the ability to revoke consent at its discretion, whether when contacted by a matched entity or preemptively. In this regard, QuinStreet pointed out that in 2015 the Commission stated that a consumer can revoke consent "through any reasonable means" and that the Commission currently is considering in a parallel TCPA proceeding whether and how to codify this standard.[5]

QuinStreet explained that the effect of the Matched Consent Notice would mean that *no other sellers on the static hyperlinked list may contact the consumer.* This would address the concern expressed by some commenters and regulators that the limited number of sellers in the Matched Consent Notice could transfer the consumer's data to anyone on the hyperlinked list, who could then contact the consumer. This would not be the case. Only the sellers on the Matched Consent Notice would be in compliance with the law if they contacted the consumer. As a practical matter, given that they would be competing with others for the consumer's business for a specific product or service, it would not be in their interest to share that information with their competitors, anyway.

QuinStreet noted in the meeting that the Commission could effectuate the above-described approach by amending the definition of "prior express written consent" in 47 C.F.R. § 64.1200(f)(9) along the lines set forth in Appendix A to this letter.

Throughout the course of the meeting, QuinStreet reiterated its interest in being part of a solution that would strike an appropriate balance between the needs of consumers to control the entities to whom they provide their consent and the needs of businesses to reach and serve those consumers. QuinStreet emphasized that a single-advertiser, Constrained Search approach was not only anti-consumer and anti-business, but also legally flawed. The legal justifications for that approach contain inaccuracies and misconstrue the Commission's rules. QuinStreet committed to elaborate as to why in this written submission. Appendix B to this submission provides that elaboration.

QuinStreet appreciated the opportunity to meet with Commission staff and engage in a productive discussion about these issues. Any questions concerning this submission should be addressed to the undersigned.

Respectfully submitted,

*Yaron Dori*

Yaron Dori
Jorge Ortiz
*Counsel to QuinStreet*

---

[5] *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, *Notice of Proposed Rulemaking*, FCC 23-49 (rel. June 9, 2023) at ¶¶ 9-12.

**COVINGTON**

Ms. Marlene H. Dortch, Secretary
August 30, 2023
Page 5

    Attachment

cc:    Jerusha Burnett
        Zachary Champ
        Aaron Garza
        Alejandro Roark
        Mika Savir
        Kristi Thornton

COVINGTON

## Appendix A

## __Further Proposed Revisions to the Definition of "Prior Express Written Consent"__

Further proposed revisions to the definition of "prior express written consent" in 47 C.F.R. § 64.1200(f)(9) to incorporate the match notice concept.

The current definition of the term appears in black.  The Commission's proposed amendment to the current definition as reflected in Appendix A to the *FNPRM* appears in blue; QuinStreet's proposed edits to the Commission's amendment, as presented in its comments, appear in red; the addition of the match notice concept appears in green.

> The term ***prior express written consent*** means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Prior express written consent for a call or text may be to a single entity seller, or to multiple entities sellers logically and topically associated with the website that solicits the consent. If the prior express written consent is applies to multiple entities sellers, the entire list of entities sellers to which the consumer is giving consent applies must be clearly and conspicuously displayed to the consumer at the time consent is requested provided. To be clearly and conspicuously displayed, the list must, at a minimum, may be displayed on the same web page where the consumer gives provides consent, or through an easily accessible hyperlink on that web page.  If a hyperlink is used to display the list, then the "prior express written consent" shall apply to no more than [x] sellers on that list that must be identified in a one-time notice to the consenting person before advertisements or telemarketing messages are transmitted to that person based on that consent.

> **(i)** The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

>> **(A)** By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

>> **(B)** The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

**COVINGTON**

## Appendix B

### Response to NCLC Argument Regarding Single Seller Consent

The Federal Communications Commission ("FCC") currently is considering a *Further Notice of Proposed Rulemaking* ("*FNPRM*") that, among other things, seeks comment on the circumstances under which a consumer can submit a single consent to receive marketing calls and text messages from multiple different entities.[6]  This scenario commonly arises when a consumer seeks to comparison shop online – whether for a mortgage, auto insurance, home maintenance assistance, or other types of products or services – and, after inputting certain information, agrees to be contacted by a handful of companies that are appropriately "matched" to the consumer's specified needs and qualifications.

Based on the rule proposed in its *FNPRM*, the FCC preliminarily has concluded that this sort of multi-party consent for marketing calls would appropriately protect consumer interests if the companies that contact the consumer are logically and topically associated with the website that solicits the consent and if the names of those companies are disclosed on the web page that solicits the consent.[7]  Many commenters in the proceeding have supported the core concept of the FCC's proposed outcome:  namely, that consumers should have an easy and practical way to comparison shop and efficiently consent to hear from multiple suitable companies.  Indeed, such an outcome would be consistent with the observations of the staff of the Federal Trade Commission ("FTC"), which noted after a series of workshops that that this approach can "benefit consumers by connecting them quickly with multiple merchants, and their associated offers, that consumers might not find as easily on their own."[8]

Rather than accept this practical outcome, the National Consumer Law Center ("NCLC") has taken the position that the FCC's current rules *prohibit* multi-party consent and *require* consumers to consent individually to each and every company in order to receive marketing calls or text messages from that "seller."[9]  In other words, the NCLC claims that the FCC cannot and should not establish parameters for securing multi-party consent because the FCC's current rules prohibit it.

The NCLC's position is inaccurate, misconstrues the FCC's rules, and if adopted would be disastrous for consumers and competition.  As explained more fully below, the NCLC makes three basic arguments in support of its claim and none stands up to scrutiny.

**NCLC Argument #1:  The FCC's definition of "prior express written consent" uses the word "seller" in the singular.**  The NCLC's first argument is that the FCC's

---

[6] *In re Targeting and Eliminating Unlawful Text Messages, et al.,* CG Docket Nos. 21-402, 02-278, *Further Notice of Proposed Rulemaking,* FCC 23-21, ¶¶ 58-62 (rel. March 17, 2023).

[7] *Id.* at ¶ 61; Appendix A.

[8] FTC Staff Report, *Follow the Lead Workshop:  A Staff Perspective*, September 2016, at 4, *available at* https://www.ftc.gov/system/files/documents/reports/staff-perspective-follow-lead/staff_perspective_follow_the_lead_workshop.pdf.

[9] *See Comments of NCLC, et al.*, CG Docket Nos. 02-278, 21-402 (May 8, 2023) at 15.

**COVINGTON**

current definition of "prior express written consent" in Section 64.1200(f)(9) of the FCC's rules prohibits multi-party consent because the word "seller" is used in that definition in the singular rather than in the plural. This argument ignores decades of clear precedent from Congress and the FCC, both of which have made it abundantly clear on many occasions that in such contexts the singular version of a word can and does include the plural.

The docket in the *FNPRM* proceeding already is replete with examples of this cited by others.[10]   For instance, the very first section of the very first volume of the U.S. Code states that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise-- . . . words importing the singular include and apply to several persons, parties, or things."[11] Courts have applied this same approach when construing statutes and have made similar findings. For example, in *AnMed Health v. Becerra*, the court noted "that reading a singular reference to include the plural in a particular context is far from nonsensical . . . in the analogous realm of statutory interpretation, courts are *required to read a singular reference to include the plural*, 'unless the context indicates otherwise' . . . and there is no reason why that common sense practice should not apply to regulatory interpretation as well."[12]   Other courts have made similar findings.[13]

Congress and the courts have not been alone in this approach. Indeed, the application of the plural to the singular occurs frequently in the FCC's own rules, too, including in the rules implementing the Telephone Consumer Protection Act ("TCPA"), the very statute at issue in the *FNPRM*. For instance, in the FCC's rules a "sender" (singular) can be the entity that places a call (or transmits a fax), but under certain circumstances that sender also can be the platform provider through which the call or fax is transmitted.[14]   Similarly, a "called party" (singular) can be the subscriber to the voice or text service, but in certain circumstances it also can be the customary user of the telephone number for that service.[15]

---

[10] *See, e.g., Reply Comments of Lending Tree, Inc.*, CG Docket Nos. 02-278, 21-402 (June 6, 2023) at 9-11; *see also*, *Reply Comments of R.E.A.C.H.*, CG Docket Nos. 02-278, 21-402 (June 5, 2023) at 4-5.

[11] 1 U.S.C. § 1.

[12] Civil Action 20-3826 (RDM), at *27 (D.D.C. Sep. 15, 2022) (internal citations omitted) (emphasis added).

[13] *See, e.g., Braver v. Northstar Alarm Servs., LLC*, No. CIV-17-0383-F, at *10 n.27 (W.D. Okla. July 16, 2019) ("The meaning of § 227(b)(1)(B) would be clear even without 1 U.S.C. § 1 based on the common understanding of the English language. For example, if someone asks, 'Was there a thunderstorm yesterday?' the answer will be 'yes' whether there was one thunderstorm or two. Similarly, if someone asks, 'Did that telephone call deliver a prerecorded message?' the answer will be 'yes' whether the call delivered one prerecorded message or several."); *see also Schott v. C.I.R.*, 319 F.3d 1203, 1206 (9th Cir. 2003) ("singulars normally include plurals, just as 'he' normally includes 'she.'").

[14] *See, e.g.*, 47 C.F.R. § 64.1200(a)(4).

[15] *Id.*

**COVINGTON**

In addition to failing on the merits, the NCLC's argument is inaccurate because the very definition at issue – "prior express written consent" – is not a statutory term; it is a defined term in the FCC's rules that was *created by* the FCC. As a result, the FCC is not bound to interpret the term in any particular manner; rather, it can interpret the term in whatever rational manner it deems fit. Indeed, the FCC did precisely this when it considered the NCLC's argument in the *FNPRM* and rejected it.[16] Nothing has changed since the FCC last considered the issue a mere five months ago when it released the *FNPRM* and NCLC has presented no new facts or evidence to suggest that the FCC should change its mind.

**NCLC Argument #2: Permitting multi-party consent would impair a consumer's ability to revoke consent.** The NCLC's second argument is that permitting multi-party consent would impair a consumer's ability to revoke consent. This is untrue. Contrary to NCLC's statement, it is not – and in the future would not be – "impossible" for a recipient to revoke consent provided to multiple sellers.[17]

Recipients today can and do revoke consent in myriad ways, including by asking to be placed on the seller's entity-specific do not call list (when contacted through a voice call), by pressing a designated digit on the telephone keypad to opt-out of future calls (when contacted through a prerecorded call), and by replying "STOP" or a similar term (when contacted via text message). Indeed, the NCLC's own comments expressly acknowledge this.[18] Indeed, just two months ago the FCC proposed to codify a ruling that has been in place since 2015, stating that "consumers who have provided prior express consent to receive autodialed or prerecorded voice calls may revoke such consent through any reasonable means."[19] Furthermore, when it comes to text messages transmitted through short codes or ten-digit long codes (which represent the overwhelming majority of mass-delivered recurring text message marketing programs), CTIA's industry rules require senders to instruct consumers at the outset (*i.e.,* in the initial consent protocol) how to opt-out of future text messages (*e.g.,* "reply STOP to stop"), to remind consumer of that in the opt-in confirmation text message they receive, and do remind them again of their ability to opt-out at regular intervals.[20] The NCLC's suggestion that consenting consumers somehow would be left helpless if they submit their consent through a multi-party consent form simply is inaccurate.

**NCLC Argument #3: Permitting multi-party consent would create a conflict between the definitions of "prior express written consent" and "prior express**

---

[16] Although the *FNPRM* sought comment on the NCLC's argument, the rule proposed in the *FNPRM* does not adopt it. *See FNPRM* at Appendix C (proposing to amend the definition of "prior express written consent" to permit multi-party consents).

[17] *Comments of NCLC, et al.*, CG Docket Nos. 02-278, 21-402 (May 8, 2023) at 18.

[18] *Id.*

[19] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, *Notice of Proposed Rulemaking,* FCC 23-49 (rel. June 9, 2023) at ¶ 9.

[20] *See* CTIA Short Code Monitoring Handbook, Version 1.8, January 1, 2021, at A.3.4 (Opt Out), A.10 (Recurring Message Programs); *see also id.* at Exhibit 2 (requiring opt out information to be provided in the initial call to action, the program terms and conditions, the message flow, and in program messages).

COVINGTON

**invitation or permission."**  The NCLC's third argument is that permitting multi-party consent would render the definition of "prior express written consent" in Section 64.1200(f)(9) of the FCC's rules inconsistent with the requirement in Section 64.1200(c)(2)(ii) that sellers must secure "prior express invitation or permission" before transmitting telephone solicitations to telephone numbers on the National Do Not Call Registry.  Like NCLC's other arguments, this claim selectively construes, and thus misconstrues, the FCC's rules.

The FCC's National Do Not Call rules – and the "prior express invitation or permission" requirement that NCLC cites[21] – apply only to a "telephone solicitation," and the FCC's rules define that term to exclude calls made on the basis of "prior express invitation or permission" *or* an "established business relationship" ("EBR").[22]  In other words, "prior express invitation or permission" is not the only way a seller can overcome a recipient's National Do Not Call registration; a recipient's inquiry or application regarding a seller's products and services can be enough, as it forms the basis for an EBR.  Thus, multi-party consents and the FCC's National Do Not Call Registry rules can (and indeed already do) exist in harmony.  When a consumer provides "prior express written consent" through a multi-party consent form to receive more information about a product or service, that amounts to an inquiry to the seller, too, which forms the basis for an EBR between the consumer and the seller.  This means that the consumer's "prior express invitation of permission" is not needed for the seller to contact the consumer under the National Do Not Call rules.  The consumer's "prior express written consent" and the EBR together suffice.

Although it is clear that the NCLC's arguments fail on legal grounds, it is important to take a step back to contemplate precisely what NCLC is proposing:  that when a consumer provides clear and unambiguous consent – "prior express written consent" – to receive marketing communications at a specified mobile telephone number provided by the consumer, that consent somehow is not enough to satisfy another consent requirement – "prior express invitation of permission" – if that mobile telephone number happens to be on the National Do Not Call Registry.  In other words, following the NCLC's logic, consent cannot be consent.  That cannot possibly be a correct interpretation of the FCC's rules.

**Other NCLC Arguments.**  The NCLC makes a handful of other arguments that are equally flawed and do not prevent the FCC from proceeding with its proposal to permit multi-party consents under certain conditions.

For instance, the NCLC claims that the FCC should adopt a single seller approach to consent because the FTC has done so.  Whatever statements the FTC staff may have made of late in this regard, it is important to recognize that they pertain to the Telemarketing Sales Rule, which does not apply and has never been applied to text messages.  The FCC is the sole agency that holds the authority to interpret and effectuate the requirements of the TCPA.

The NCLC's arguments regarding the requirements of the Federal E-Sign Act also are misplaced.  The Federal E-Sign Act was enacted in 2000, well before the world of e-commerce (and state contract law) came to understand how consent forms and contracts could be effected with the click of a mouse.  In 2012, the FCC held that the signed writing portion of the prior express written consent *could* be satisfied through compliance with the Federal E-Sign Act, but

---

[21] *Id.* at 20.

[22] 47 C.F.R. § 64.1200(f)(15)

**COVINGTON**

that was not (and is not) the only way to comply.  Reverting to standards that were created *nearly 25 years ago* before the birth of e-commerce would not be good policy.

<div align="center">*          *          *</div>

The NCLC's arguments also fail to consider the practical consequences that would result from the "single seller" consent rule it supports.  For example, such a rule effectively would destroy the online comparison shopping process, requiring consumers to seek out prices and terms from sellers through a laborious and unnecessary one-at-a-time consent protocol, making the process time-consuming and unwieldy.  Consumers would end up spending more time clicking on forms than getting the information they need from a discrete number of merchants to make smart and effective purchasing decisions.  This approach would also limit the ability of smaller, lesser known and local sellers to compete against established brands.[23]  Without comparison shopping, smaller companies would stand less of a chance of being seen by consumers.  Removing competition ultimately would lead to increases rather than decreases in prices, further hurting consumers.

In short, the NCLC's position is not simply wrong as a matter of law, it seeks a policy outcome that would impede consumer choice, raise consumer costs, and thus is contrary to the public interest.

---

[23] If the NCLC's position were adopted, it would be akin to requiring internet search engines to produce only a single, auctioned-off-to-the-highest-bidder, result for each consumer search query.  In its desire to reduce unwanted calls and texts, the NCLC is proposing a rule that would eliminate substantially many *wanted* calls and texts, too.  That is not a pro-consumer approach.

<div align="center">B-5

**A168**</div>

# TAB I

Letter from Luke Bell, Zillow Group, to Marlene H. Dortch, FCC, FCC CG Dkt. Nos. 21-402, 02-278 (Oct. 27, 2023)

**Zillow®**

October 27, 2023

Ms. Marlene Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

CC:   Mika Savir
      Zack Champ
      Jerusha Burnett
      Kristi Thornton
      Mark Stone
      Aaron Garza
      Alejandro Roark

*Submitted Electronically on October 27, 2023 via FCC Electronic Comment Filing System*

RE: Ex Parte Submission, FCC Further Notice of Proposed Rulemaking (FNPR), Targeting and Eliminating Unlawful Text Messages - CG Docket No. 21-402; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991- CG Docket No. 02-278

Dear Ms. Dortch,

Pursuant to Section 1.1206 of the Federal Communications Commission's ("Commission") rules, Zillow Group ("Zillow") is providing notice that on October 25, 2023, it met via Microsoft Teams with representatives of the Commission's Consumer & Governmental Affairs Bureau.

In attendance at the meeting on behalf of Zillow were Mike Burg, Senior Counsel, Data and Analytics, Legal; Emily Casal, Senior Program Manager, B2C Product Management; Bryan Drake, Senior Director, Product Management, Product Development: Evaluate, Connect, and Shared Platform; Alana Outlaw, Legislative Policy Manager, Government Relations; David Pope, Senior Manager, Government Relations; and Phoebe Schultz, Vice President, Contact Center Operations.

**A169**

**Zillow**

Zillow made the presentation to Mika Savir, Jerusha Burnett, Kristi Thornton, Mark Stone, Zac Champ, and Alejandro Roark, all within the Consumer & Governmental Affairs Bureau.

Zillow was founded to empower consumers with the knowledge and information they need to navigate a traditionally opaque real estate market. With the Zestimate, we were the first to offer free home valuation estimates to consumers. Today, millions of home buyers and sellers search across Zillow Group's network of sites each day, using our platforms to rent, buy, sell, and finance a home. One way we serve our customers is through our Premier Agent (PA) program by connecting buyers who wish with a local real estate agent (PA Partner) to help them navigate the homebuying process.

During the meeting with Commission staff, Zillow explained how PA connects PA Partners with interested buyers, creating live connections for PA Partners with motivated buyers who have requested to be connected with a local real estate agent:

- Our system uses a variety of factors to determine to whom a customer should be routed and prioritizes connecting customers to a PA Partner quickly.
- Once a buyer submits their information in a request to be contacted, Zillow contacts the buyer to confirm availability and interest.
- Zillow calls through a list of agents (one team at a time) and connects the first agent to answer with the customer.
- Buyer information (name, contact information, and links to any properties they inquired about) is shared only with the agent that accepts the call and agent information is simultaneously shared with the buyer.
- Zillow's PA system sends customer information to only one agent at a time instead of multiple agents who might each attempt to contact a customer.

Zillow reiterated that its PA system sends customer information to only one agent at a time instead of multiple agents who might each attempt to contact a customer. In this way, the PA routing system operates much like today's ride sharing applications, as opposed to the sort of lead generation system that the rule seems to contemplate. The Zillow team further explained that this process meets home buyers' on-demand expectations and functions successfully across the country. Therefore, based on our experience with consumers, some flexibility as to the precise agent to whom a customer will be connected is necessary to meet consumers' desires for a speedy response.

**A170**

**Zillow**®

Zillow emphasized to Commission staff that it is important to protect consumers from nuisance calls and text messages from sellers and potentially fraudulent actors with whom a consumer did not intend to authorize contact. However, as drafted, the proposed rule could negatively impact consumers who request to connect with a PA Partner to get the local insights and expertise only a local agent can provide. By increasing the time, process, and steps for connecting an interested home buyer to a PA Partner, the rule would further complicate an already complex homebuying process, instead of making it more transparent and easier.

Zillow articulated that the proposed rule is not sufficiently tailored to allow for certain contacts that a consumer wishes to receive, even when that contact is not specifically identified by name or consent is not provided directly to one entity at a time. Zillow noted that the proposed rule's unintended consequences would likely decrease the speed and increase the time it takes for a buyer during the home seeking process, create high "no answer" rates from real estate agents, and decrease competition in various markets.

Zillow expressed support for the Commission's aim to address the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers beyond the scope of the original consent. Zillow asked that the Commission to consider refining any final rule promulgated to protect consumers from nuisance and fraudulent practices while empowering them to choose to provide consent to be contacted by callers "logically and topically associated with the website that solicits consent" without displaying the names of potential callers on the same web page. This would close the consent-transfer loophole that currently enables the practice of "consent farming," whereby one entity gathers consent, often with no intention of providing any service, and sells the contact information collected and consent for later inquiries to hundreds, and sometimes thousands, of additional entities.

Zillow asked the Commission to craft a rule that protects consumers while preserving an adequate degree of consumer choice and the flexibility to serve consumers in the speedy manner they expect in the digital age.

Zillow recommended that, alternatively, the Commission consider limiting the proposed rule's language to limit consent to callers "logically and topically associated with the website that solicits consent" while providing a numerical limit on the number of callers who may contact a customer. Zillow also asked the Commissions to omit "express consent to receive calls or texts must be made directly to one entity at a time."

Zillow appreciated the opportunity to meet with Commission staff to discuss how tailoring the proposal can protect consumers while preserving an adequate degree of choice, speed, and

flexibility that best serves buyers. We would welcome the opportunity to answer questions or to provide additional information.

Respectfully submitted,

Luke Bell
Director, Government Relations
Zillow Group

Enclosure: Zillow Connections Experience document

**A172**

# TAB J

Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, FCC, FCC CG Dkt. Nos. 21-402, 02-278 (Nov. 16, 2023)

Eric J. Troutman ("*The Czar*")
*Partner*
Puja J. Amin ("Queenie")
*Partner*

Troutman Amin, LLP
530 Technology Drive Suite 200
Irvine, CA 92618
troutman@troutmanamin.com
amin@troutmanamin.com

# TROUTMAN AMIN, LLP
## —— DESERVE TO WIN ——

**November 16, 2023**

Ms. Marlene Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

     **Re**: <u>**Notice of Ex-Parte Presentation**</u>
        Targeting and Eliminating Unlawful Text Messages, CG Docket No. 21-402;
        Strengthening Consumer Protections Against Unwanted Robocalls and Rules and
        Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Dckt
        No. 02-278.

Dear Ms. Marlene Dortch,

     On November 15, 2023, EXP Realty Independent Agents met with Attorney Advisor
Jerusha Burnett and Mika Savir of the Commission's Bureau of Consumer and Governmental
Affairs. The agents in attendance were Bic DeCaro of Bic DeCaro & Associates, Tina Caul of
Caul Group Residential, and Elizabeth Riley of Luxe Property Group. Also in attendance was
Anthony Witkowski, Global Data Privacy Counsel for EXP Realty, Jenniffer Cabrera, Associate
at Troutman Amin, LLP and myself.

     Attendees discussed the crushing impact of the Commission's present Notice of Proposed
Rulemaking Proceeding on the lead generation industry.[1] Specifically, the agents shared their

---

[1] *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; Report and Order and Further Notice of Proposed Rulemaking (March 16, 2023); *Strengthening Consumer Protections Against Unwanted Robocalls*, CG

**A173**

**November 16, 2023**

**VIA EMAIL**

individual experiences in building their small business under the EXP Realty umbrella with the use of lead generation.

Bic DeCaro, an independent agent based out of northern Virginia, has owned her business for over 20 years and manages her small business with fifteen employees, including support staff. In today's digital world, Bic relies on over 50% of her business from online sources to reach potential customers who want to receive assistance in the purchase of real estate. Without lead generation, Bic believes she will have to lay off 75% of her workforce.

Then, Tina Caul who has been in business for over 24 years and currently services Raleigh, North Carolina, shared her unique experience. For Tina, relying on traditional methods of reaching consumers made agents reactive to consumer requests and this made it increasingly difficult to support a family. In contrast, buying leads on an online marketplace, like Zillow, allows Tina's small business to compete against bigger organizations, use her experience and knowledge to assist and protect the consumer. Additionally, Tina was able to transfer her business to a new market when her family moved by buying leads when she was no longer able to rely upon a referral-only business as a brand-new member of her community. Presently, Tina has 50 partner agents and 18 supporting staff members. More than 60% of her business is generated through online leads. Without lead generation, her business would inevitably close and put a lot of people out of jobs.

Another independent agent, Elizabeth Riley started her business 19 years ago in Georgia and then, moved to Austin, Texas. As a mother with four young children, Elizabeth was able to build her business in her new state through online leads. Elizabeth estimates that 40% of her business is generated from online platforms, like Zillow, which allow Elizabeth and her team to showcase their expertise, assist consumers and find solutions for the consumer's real estate needs.

The agents understand that limiting the number of potential agents who may contact consumers is necessary but if lead generation is abolished, their hard-earned businesses will fail. Instead, these agents shared their reality and want the opportunity to maintain their compliant businesses while allowing the consumer to make an informed decision about selecting the agent that best suits their needs.

Thank you for the opportunity to discuss the real effects on real people that the present NPRM will have on the lead generation industry. If you have any question about this filing, please feel free to contact me. Thank you.

Respectfully submitted,

*/s/ Eric J. Troutman*
Eric J. Troutman
Partner, Troutman Amin, LLP
On behalf of EXP Realty

---

Docket No. 02-278, FCC-CIRC2306-02 (May. 18, 2023); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Dckt No. 02-278, FCC 23-49 (Jun. 9, 2023).

# TAB K

Letter from Major L. Clark III, U.S. Small Business Administration, to Marlene H. Dortch, FCC, FCC CG Dkt. Nos. 02-278, 21-402, and 17-59 (Dec. 1, 2023)

U.S. SMALL BUSINESS ADMINISTRATION

**OFFICE OF ADVOCACY**

REGULATION • RESEARCH • OUTREACH

December 1, 2023

**VIA ELECTRONIC FILING**
Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: In the Matter of Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls, CG Docket Nos. 02-278 AND 21-402, 17-59**

Dear Ms. Dortch:

The Office of Advocacy respectfully submits this *ex parte* letter for consideration by the Federal Communications Commission (FCC or Commission) in the above-referenced proceeding.

**About the Office of Advocacy**

Congress established the Office of Advocacy (Advocacy) under Pub. L. 94-305 to represent the views of small businesses before federal agencies and Congress. Advocacy is an independent office within the Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. Part of our role under the Regulatory Flexibility Act (RFA) is to assist agencies in understanding how regulations may impact small businesses, and to ensure that the voice of small businesses is not lost within the regulatory process.[1] Congress crafted the RFA to ensure that regulations do not unduly inhibit the ability of small entities to compete, innovate, or to comply with federal laws.[2] In addition, the RFA's purpose is to address the adverse effect that "differences in the scale and resources of regulated entities" has had on competition in the marketplace.[3]

**Background**

On November 1, 2023, Advocacy held a small business roundtable focused on pending regulatory matters before the FCC. Participants included small businesses and trade association representatives, as well as staff from the FCC who observed the discussion. Among other topics, small businesses raised concerns about the FCC's proposal to require that callers covered by the FCC's robocalling and robotexting regulations must obtain consent to make such calls or texts from one customer at a time (1-1 consent). Roundtable participants shared that small businesses who purchase sales leads, and small businesses who act as lead generators, would be significantly disadvantaged by such a change. On November 21, 2023, the FCC announced its December meeting agenda and

---

[1] Pub. L. No. 96-354, 94 Stat. 1164 (1980) (codified at 5 U.S.C. §§ 601-612).
[2] *Id.* § 2(a)(4)-(5) (codified at 5 U.S.C. § 601 note).
[3] *Id.* § (4).

409 3rd Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



published a draft Second Report and Order and Further Notice of Proposed Rulemaking (Draft Order)[4] which would finalize the 1-1 consent requirement proposed by the FCC, while continuing to seek comment on other proposed rules to target and eliminate unwanted calls and text messages. Small businesses and their representatives have again reached out to Advocacy and expressed confusion and concern about the impact of the 1-1 consent requirement.

**Small Business Concerns**

Small businesses have shared with Advocacy that the FCC's proposal to require sellers to obtain consent to call or text from one consumer at a time could increase costs significantly for small businesses that both buy and sell sales leads. Many small businesses, such as the small credit unions and small insurance companies that Advocacy has spoken with, rely on purchasing sales leads from lead generators as their primary marketing method. These businesses lack the advantages of larger firms that can afford targeted advertising but offer important competitive alternatives that benefit consumers. They have shared some unease regarding their future ability to purchase affordable sales leads, compared to larger entities. Small businesses that aggregate consumer information and sell leads have also contacted Advocacy to share concerns about the feasibility and cost of obtaining consent for each individual seller that might meet a consumer's needs.

Advocacy respectfully requests that the FCC continue to seek comment from small entities on the 1-1 consent proposal and conduct a more extensive analysis of the economic impact the proposal could have on small entities before making a final decision about whether to implement the requirement. Given the concerns that small businesses have shared with our office, Advocacy believes that the Initial Regulatory Flexibility Analysis (IRFA) published with the proposed rule[5] and Final Regulatory Flexibility Analysis (FRFA) in the Draft Order may underestimate the impact that the final rule would have on small entities.[6] Seeking additional comment and conducting further analysis of the costs of the proposal will provide a better record to support any final action on this matter.

Thank you for considering the concerns of small businesses in this proceeding. Should you have any questions please contact me or my staff at (202) 516-6290.

Respectfully submitted,

*/s/* Major L. Clark III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/ Jamie Belcore Saloom
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration

---

[4] *See* Fed. Commc'n Comm'n, *Targeting and Eliminating Unlawful Text Messages* (Nov. 21, 2023), https://www.fcc.gov/document/targeting-and-eliminating-unlawful-text-messages.

[5] *See Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 21-402, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (Mar. 17, 2023).

[6] Fed. Commc'n Comm'n, *supra* note 4, at 49.

2

**A176**

# TAB L

Letter from Insurance Marketing Coalition Ltd., to FCC, FCC CG Dkt. Nos. 21-402, 02-278 (Dec. 6, 2023)



**Insurance Marketing Coalition**
420 Throckmorton Street
Fort Worth, TX 76102

December 6, 2023

Federal Communications Commission
45 L Street NE
Washington, DC 20554

Submitted vis http://apps.fcc.gov/ecfs

    Re:    CG Docket No. 21-402 (Targeting and Eliminating Unlawful Text Messages) and CG Docket No. 02-278 (Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991)

Dear FCC Commissioners:

    The Insurance Marketing Coalition ("IMC")[1] is alarmed with the direction this proceeding has taken - as reflected in the draft *Second Report & Order and Second Notice of Proposed Rulemaking* that the Commission plans to consider at its next open meeting on December 13, 2023[2] - and urges the Commission to vote "no" to the proposed changes to the definition of "prior express written consent" (PEWC) for the following reasons:

    1.    The Commission lacks statutory authority to prohibit consumers from receiving calls that consumers consent to receive. Under the plain language of the Telephone Consumer Protection Act ("TCPA"), consumers are permitted to receive calls that they want upon providing their "prior express consent." Indeed, as recognized by the U.S. Court of Appeals for the Ninth Circuit, "[t]he TCPA aims to curb a particular kind of call: a call that a person does not expect to receive. So the statute's applicability turns entirely on what

---

[1] IMC – which is comprised of licensed insurance agencies and brokers and marketing, advertising, and technology companies that support them – participated actively in this proceeding by filing two sets of comments, available at https://www.fcc.gov/ecfs/search/search-filings/filing/1050833302323), ("IMC Comment Letter") and reply comments, https://www.fcc.gov/ecfs/search/search-filings/filing/10606772724875, ("IMC Reply") on May 8, 2023, and on June 6, 2023, respectively.

[2] *See In re* Targeting and Eliminating Unlawful Text Messages, CG Docket No. 21-402*, et al.,* Draft Second Report & Order and Second Further Notice of Proposed Rulemaking, FCC-CIRC2312-02, Nov. 22, 2023 ("draft *Second R&O*").

conduct the called party authorized."[3] The draft *Second R&O* exceeds the bounds of the TCPA by prohibiting consumers from receiving calls that they authorize.[4]

2.  The premise of the changes to the PEWC definition in the draft *Second R&O* – that "prior express consent" cannot exist where more than one potential seller is listed – is false and unsupported by the record. To the contrary, IMC and others have explained in their comments how each year millions of satisfied consumers provide prior express consent in this manner.[5] There has been no rebuttal to this evidence about the positive experience of millions of consumers (who are happy with the calls they receive and thus don't file complaints with regulators); the draft *Second R&O* ignores that evidence.

3.  With respect to the "logically and topically" standard that the draft *Second R&O* would introduce in 47 C.F.R. § 64.1200(f)(9), IMC is pleased that the standard is technology-neutral and focuses on consumer experience, as IMC advocated.[6]  But, the accompanying commentary in the draft *Second R&O* is inconsistent with the new standard under § 64.1200(f)(9) because the commentary continues to mandate an arbitrary nexus between a website's general content and other content (including, for example, an advertising webform) that is presented on that website. The commentary in the draft *Second R&O* goes as far as asserting that a consumer could *never* be permitted to provide consent to receive calls about loan consolidation simply due to the fact that the website generally promotes loan comparison.[7] This is illogical. Websites (like TV, radio, newspapers, and other mediums) frequently, and without deceiving consumers, promote a variety of content that is unrelated to the content on the website. CNN's website, for example, presents a variety of advertisements that do not promote news publications. There is no rational reason why a consumer cannot consent to receive a call about an insurance product through a non-deceptive webform advertisement presented on a news website. Similarly, there is no rational reason why on a loan comparison website (where, contextually, it can be assumed that the website visitor may have, or soon have, a loan) a consumer cannot solicit a call about loan consolidation. It may be true that some website operators may attempt to dupe consumers into receiving unwanted calls through bait-

_____

[3] *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 794 (9th Cir. 2018).

[4] IMC believes that *reasonable* regulation could and should be enacted to enhance the "prior express consent" requirement under the TCPA. For example, IMC advocated in its IMC Comment Letter and IMC Reply for the following items to be added to the clear and conspicuous disclosure that is already required in a PEWC agreement: (1) the potential number of callers, (2) the maximum time period during which calls may be received, and (3) the types or categories of goods or services that may be offered on such calls. Such a regulation would help ensure that consumers only receive calls for which they have provided "prior express consent" without any overbroad prohibition on consented-to calls as exists under the PEWC definition in the draft *Second R&O*.

[5] E.g., IMC Comment Letter at 2, 4-5 (including fn. 4), 8; and IMC Reply at 5-6.

[6] IMC Comment Letter at 7-8; IMC Reply at 6.

[7] Draft *Second R&O* at ¶35.

and-switch tactics, but the commentary in the draft *Second R&O* goes far beyond this behavior by imposing a prohibition even when there is zero misunderstanding and the consumer knows, understands, and *consents* to receive a specific type of call. Concerns about bait-and-switch tactics are addressable under a variety of existing laws (e.g., Section 5 of the FTC Act, state UDAAP laws, common law fraud, and under the current TCPA framework if there was no consent due to deception). IMC thus encourages revision of the commentary in the draft *Second R&O* to align it with the standard set forth in § 64.1200(f)(9). Specifically, IMC respectfully suggests that the Commission strike the existing commentary[8] and replace it with commentary as previously submitted by IMC: "The term logically and topically associated means of sufficient similarity to the information or advertising presented in conjunction with the prior express written consent so that a consumer acting reasonably under the circumstances is unlikely to be misled as to the calls that the consumer may receive."[9] Other wording could be used, but the point is that the commentary, like the § 64.1200(f)(9), should be technology-neutral and focused on consumer experience and perception and should not include illogical and contradictory commentary.

4. The draft *Second R&O* relies on multiple false assumptions and disregards, without justification, the severe economic impact that the changes to the PEWC definition will have on industry, including small businesses. More specifically:

    a. The draft *Second R&O* fails to consider the devastating impact on consumer choice and competition, particularly on smaller businesses, the changes to the PEWC definition will have. IMC and others provided extensive commentary on the negative economic and financial impact of the PEWC changes, including the harm to small businesses that will be unable to affordably access digital ad markets and compete with dominant players.[10] The draft *Second R&O* turns a blind eye to this problem.

    b. The Commission's assertion that companies can "use can use a variety of means for collecting one-to-one consent for multiple sellers to comply with [the] rule," such as providing checkboxes for consumers to select,[11] is nonsense. The draft *Second R&O* does not meaningfully address IMC's detailed explanation[12] of why this assertion is unfounded (specifically, because there are *unknown* factors at the time consent is provided, such as what specific insurance agent will be available to reach out to the consumer at the time that the consumer makes their request).

---

[8] Including, without limitation, ¶¶ 2, 13, 29 and 35.

[9] IMC Comment Letter at 8; IMC Reply at 6.

[10] Discussed throughout the IMC Comment Letter and IMC Reply.

[11] Draft *Second R&O* at ¶37.

[12] IMC Comment Letter at 4-9; IMC Reply at 3-4.

Even if consumer may only be called by, or transferred to, a single seller, the list of potential sellers could exceed one hundred, thus a "check-the-box" solution is impossible.

c.  The Commission's assumption that a lengthy list of potential sellers in a PEWC agreement means that the consumer is unwittingly being tricked into potentially receiving calls from all of the potential sellers listed is false. As IMC has repeatedly explained, "it is common practice in the Insurance industry for contracts between sellers and performance marketers to expressly prohibit or limit other calls to a consumer based on a single PEWC agreement. The number of potential 'marketing partners' on a list thus cannot be used to assume the number of potential callers that may contact the consumer based on the PEWC agreement."[13] The reason for the lengthy list of potential sellers (again, explained in great detail in IMC's comments) is due to compliance concerns. Specifically, under current law (and again, as explained in detail in IMC's comments) there are perverse incentives for professional litigators to sue companies if a solicited and desired call is made by or transferred to a person or entity that is not on the list.[14] (Moreover, because the specific insurance agent is often not ascertainable at the time a consumer requests to be called by an insurance agent to get a quote, all potential insurance agents that might contact the consumer must be listed in the PEWC agreement.)

d.  There is zero evidence in the record that any appreciable number of unwanted calls are attributable to consent records that list more than one seller or that are provided through webform advertisements that do not have the same content as what is on the website itself. To be sure, the draft *Second R&O* parrots the unsubstantiated claim that "[l]ead-generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts."[15] But even if that assertion is true, it provides no basis for assuming that the purported "flimsy claims of consent" are attributable to the consent records listing more than one seller or being obtained through webform advertisements that do not have the same content as what is on the website itself. Indeed, in nearly all of the examples of unwanted calls provided by commentators, and in enforcement actions brought by the FCC, consumers deny having *ever* filled out webforms to consent to calls.[16] The evidence thus suggests that the issue of unwanted calls is attributable to lack of consent or falsified consent records; not legitimate consent records that list more than one potential seller or that are provided through webform

---

[13] IMC Comment Letter at 7; IMC Reply at 2-3.

[14] IMC Comment Letter at 5-6; IMC Reply at 2-3.

[15] Draft *Second R&O* at ¶29.

[16] Discussed in IMC Comment Letter at 9; IMC Reply at 7.

4

**A180**

advertisements that differ somewhat from the website where such advertisement appears.

e.  Above all, the changes to the PEWC definition in the in the draft *Second R&O* will not make a dent in overall volume of unwanted calls and texts, which are primarily made without consent.[17] Scammers that bombard consumers with unsolicited calls and texts will continue their bombardment. Fraudsters that sell false consent records will continue to peddle their wares. The only companies that will change their practices due to the changes to the PEWC definition in the in the draft *Second R&O* are law-abiding companies that care about consumer experience and strive to avoid unwanted calling practices. And this will come at great economic and financial cost to them, and loss of consumer choice, as IMC and other commentors have explained.

As others in this proceeding have amply noted, the Commission's deviation from its proposal in the *FNPRM* to require consent to be provided on a "one-to-one" basis would be catastrophic for precisely the sort of businesses that are members of IMC.[18] These businesses rely on comparison shopping websites to market their products and services and connect with interested consumers. The decline of "Main Street" and the indisputable ascendance of the e-commerce economy leaves businesses with no choice but to seek to generate opportunities and forge connections through the online environment. Limiting the ability of these businesses, including small businesses in particular, to secure and rely on multi-party consent forms in the manner the draft *Second R&O* has done represents a departure from the sort of reasoned decision making the Commission is required to undertake.

In addition to those shortcomings, the Commission should also reject the draft *Second R&O* because the consent requirement it embraces exceeds the Commission's statutory authority and violates the First Amendment.

***Statutory Authority.*** With regard to the Commission's statutory authority, Section 227 of the Communications Act ("TCPA") makes it "unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the *prior express consent* of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice-- . . . to any telephone number assigned to a cellular telephone service."[19] The statute does not define the term "prior express consent," and in the draft *Second R&O* the Commission ascribes a

---

[17] Discussed in IMC Comment Letter at 9; IMC Reply at 7.

[18] *See, e.g., In re* Targeting and Eliminating Unlawful Text Messages, CG Docket No. 21-402*, et al.,* QuinStreet, Inc., Notice of Ex Parte Presentation, filed Nov. 30, 2023, at 3; *In re* Targeting and Eliminating Unlawful Text Messages, CG Docket No. 21-402*, et al.,* U.S. Small Business Administration, Ex Parte Letter, filed Dec. 1, 2023, at 2.

[19] 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). The Commission has held in the past that a "call" includes a text message.

meaning to that term that differs to the meaning it has ascribed to it in other contexts. Specifically, the draft *Second R&O* takes the position that the "prior express consent" requirement in Section 227 means "prior express *written* consent," and it defines that term in relevant part as

> an agreement, in writing, that bears the signature of the person called that clearly and conspicuously authorizes no more than one identified seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages to be transmitted using an automatic telephone dialing system or an artificial or prerecorded voice.[20]

The definition goes on to require that calls be logically and topically associated with the interaction that prompted the consent and that the agreement contain certain specified disclosures.[21] In other words, if a *marketing* call will be transmitted, then, under the Commission's approach, the term "prior express consent" in Section 227 means *written* consent containing certain Commission-specified disclosures.

That framework differs from the Commission's interpretation of the term "prior express written" consent in Section 227 in other contexts. For instance, the Commission has previously held that if a non-marketing *informational* call will be transmitted, then "prior express consent" in Section 227 does *not* require the consent to be in writing or contain Commission-specified disclosures. Rather, the consent can be oral.[22]

The Commission's approach – interpretating a single statutory term, "prior express consent," to mean one thing with respect to marketing calls but another thing with respect to informational calls – is inconsistent with reasoned decision making and exceeds the Commission's authority. Although the Commission may possess the authority to interpret an undefined term in the Communications Act, it cannot decide that it means one thing in one context and something else in another.[23] IMC is not aware of any indication or directive by Congress for the Commission to interpret the term "prior express consent" in Section 227 in such an unusual manner. While the Commission's selective approach may be convenient, it is unsound

---

[20] *Second R&O* at Appendix B.

[21] *Id.*

[22] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1841-42 (2012); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Notice of Proposed Rulemaking, No. CG02-278, 2023 WL 3946686, at *12 n.48 (June 9, 2023) ("the Commission has confirmed that callers can obtain prior express consent to make informational calls either orally or in writing") (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Order on Reconsideration and Declaratory Ruling, FCC 22-100, 2022 WL 18023141, at 4, para. 12 (2022)).

[23] *See, e.g.*, *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) (courts must "avoid interpretations that would attribute different meanings to the same phrase" (citation and quotation marks omitted)).

and at odds with "the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[24]

The draft *Second R&O* also exceeds the Commission's authority by grafting the word "written" onto the statutory term "prior express consent" in Section 227. The Commission's role in implementing the TCPA is to "interpret the words of Congress, not add to them."[25] As noted above, the Commission has acknowledged that consent can be obtained in multiple ways, including through means other than writing. That flexible understanding comports with the ordinary meaning of the word "consent,"[26] whereas the *Second R&O*'s definition does not. Although the Commission adopted the PEWC requirement in a prior proceeding, its action in the draft *Second R&O* reopens that issue by reaffirming and expanding on the PEWC definition in the Commission's regulations.

**_First Amendment._** The draft *Second R&O*'s consent requirement also violates the First Amendment's free speech protections. The one-to-one consent requirement is a content-based restriction on speech subject to strict scrutiny, which the rule does not satisfy.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[27] As the Supreme Court has explained, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[28]

The one-to-one consent requirement applies to marketing communications but not to other communications, including political speech, issue advocacy, and charitable fundraising.[29]

---

[24] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

[25] *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 466 (7th Cir. 2020) (citation and quotation marks omitted); *see also Borden v. United States*, 141 S. Ct. 1817, 1829 (2021) (declining to "insert [a] word" in statute when construing its meaning).

[26] *See, e.g.*, *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (considering "the parties' verbal and non-verbal actions" in analyzing consent for Fourth Amendment purposes); *Hays v. Bolton*, 488 F. App'x 971, 976–77 (6th Cir. 2012) (considering "the totality of the circumstances, including a party's non-verbal conduct" in conducting similar analysis); *Bismark v. Fisher*, 213 F. App'x 892, 896 (11th Cir. 2007) (holding that "express consent" to disposition of a civil action by a magistrate judge "should be commemorated via a filed, fully executed written consent form *or the parties' oral expressions of consent* during a hearing on the record" (emphasis added)).

[27] *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

[28] *Id.*

[29] *See* 47 C.F.R. § 64.1200(a)(1) (requiring "prior express consent" for informational calls); *id.* § 64.1200(a)(2) (requiring "prior express written consent" for "telemarketing" calls); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1838 (2012).

Its application requires analyzing the content of the speech. Thus, it is a "content-based" regulation that "on its face draws distinctions based on the message a speaker conveys" and is subject to strict scrutiny.[30]

The draft *Second R&O*'s consent requirement fails strict scrutiny because the Commission has not demonstrated how it is narrowly tailored to serve a compelling government interest. Even assuming the Commission has a compelling government interest, when "First Amendment rights" are at issue, that interest "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive."[31] The consent requirement imposes a substantial burden on marketers' ability to communicate with individuals and obtain their consent using comparison shopping websites. But the consent requirement is underinclusive—the Commission has not explained how marketing calls are any more intrusive than political calls or other calls which are not subject to the one-to-one consent requirement.[32] Moreover, the Commission has not established that its interest cannot be satisfied by a more targeted restriction on speech sufficient to meet intermediate scrutiny, let alone strict scrutiny. IMC has proposed a carefully balanced approach that would serve the Commission's objectives in a way that would avoid these serious constitutional questions.[33]

The draft *Second R&O*'s consent requirement also fails the intermediate scrutiny applied to commercial speech.[34] That standard requires the government to show that its asserted interest is "substantial," and that "the regulation directly advances the government interest asserted" and "is not more extensive than is necessary to serve that interest."[35] Even assuming that the one-to-one requirement serves a substantial government interest, the Commission has failed to show that the requirement is not more extensive than is necessary to serve that interest. To make that showing, the Commission must present evidence to show that "less restrictive means would fail"; in doing so, the agency "cannot rest on 'speculation or conjecture.'"[36]

The draft *Second R&O* does not show that a narrower restriction on speech would fail to serve the governmental interest in eliminating unlawful calls and texts to consumers. Indeed, the

---

[30] *Reed*, 576 U.S. at 163; *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality opinion).

[31] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011).

[32] *See Reed*, 576 U.S. at 171-72 (city ordinance banning directional signs but not political signs was underinclusive); *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (similar).

[33] *See* IMC Comment letter, *supra* at 3.

[34] *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 477 U.S. 557, 564-66 (1980).

[35] *Id.* at 566; *see also United States v. Philip Morris USA Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *rev'd on other grounds Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014).

[36] *Philip Morris USA*, 855 F.3d at 327; *Nat'l Ass'n of Manufacturers*, 800 F.3d 518, 526 (D.C. Cir. 2015) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

Commission has previously *rejected* application of a one-to-one consent approach.[37] As IMC and others have explained, the Commission can accomplish its goal by less restrictive means—for example by requiring disclosures of the types or categories of property, goods, or services the person agrees to be called about, the total number of callers that may contact the person, and the maximum time period(s) that such callers may contact the person.[38] Nor has the Commission "sufficiently justified the differentiation between [marketing] speech and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, commercial advertising, and the like."[39]

\*                   \*                   \*

IMC appreciates the opportunity to make this submission and hopes it will assist the Commission in developing clear, objective, and supportable requirements for "prior express consent."

---

[37] *See In the Matter of Targeting and Eliminating Unlawful Text Messages; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 at ¶¶ 58-62, CG Docket Nos. 21-402, 02-278, (rel. Mar. 17, 2023) (acknowledging the one-to-one consent proposal but failing to adopt that approach).

[38] *See, e.g.*, IMC Comment Letter, *supra*, at 3; IMC Reply, *supra*, at 2-4.

[39] *Barr*, 140 S. Ct. at 2357 (Sotomayor, J., concurring).

9

**A185**

# TAB M

Letter from Steven A. Augustino, Counsel to LendingTree, LLC, to Marlene H. Dortch, FCC, FCC CG Dkt. Nos. 21-402, 02-278 (Dec. 6, 2023)



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

101 Constitution Ave, NW, Suite 900
Washington, DC 20001
T: 202.689.2800  F: 202.689.2860
nelsonmullins.com

Steven A. Augustino
T: 202.689.2947
steven.augustino@nelsonmullins.com

December 6, 2023

**<u>Via Electronic Filing in ECFS</u>**

Ms. Marlene Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

RE:     *Ex Parte* Submission, CG Docket Nos. 21-402 and 02-278

Dear Ms. Dortch:

LendingTree, LLC ("LendingTree"), by its attorneys, submits this letter in response to a letter submitted by Burke Law Offices, LLC to Chairwoman Rosenworcel regarding the lead generation proposals in this docket.[1]  The Burke letter contains two significant errors in arguing for a restrictive "one-to-one" consent requirement for comparison shopping sites.

First, the Burke letter asserts that the one-to-one consent rule is necessary to conform the FCC's rules to the FTC rules.[2]  However, the FTC rule referenced actually only applies to calls delivering prerecorded messages or using an artificial voice.  16 C.F.R. § 310.4(b)(1)(v).  Calls or texts delivered using an autodialer are not subject to the same requirement.  Instead, the FTC rules allow consent to be obtained for multiple sellers and by an intermediary.  *See* 16 C.F.R. § 310.4(b)(1)(iii)(B).  The proposed FCC rule would be **more restrictive** and not aligned with the FTC's rules regarding texts and autodialed calls.

Second, the Burke letter manifestly misstates how LendingTree's comparison shopping sites work and, in LendingTree's experience, does not describe typical comparison shopping sites.  Burke asserts:

My experience is that consumers who go to lead generation websites and click the link to receive insurance quotes, for example, uniformly do not understand that the lead generators use this as *carte blanche* to (a) sell their personal information on to anyone tangentially related to any "marketing partner" and (b) sell the rights to robocall the consumer until the consumer requests that calls cease.[3]

---

[1]     Letter from Alexander H. Burke, Burke Law Offices, to FCC Chairwoman Jessica Rosenworcel, dated December 5, 2023.
[2]     Burke letter at unnumbered page 2.
[3]     *Id.*

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | ILLINOIS | MARYLAND | MASSACHUSETTS | MINNESOTA
NEW YORK | NORTH CAROLINA | OHIO | PENNSYLVANIA | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

December 6, 2023
Page 2

This statement does not describe LendingTree's sites.  *See* LendingTree Comments, at 7-12 (filed May 8, 2023).  Comparison shopping, by its nature, presents consumers with specific offers that are responsive to the parameters the consumer submits as part of the request.  LendingTree's comparison shopping gives consumers a limited number (up to 5) of named entities that offer relevant products to consumers.  Those entities use the information to make offers to the consumer about the loan type they seek.

Nothing else in the record claims that comparison shopping sites bestow *carte blanche* on marketing partners to sell the consumer's personal information or to "sell robocall rights" until the consumer requests that calls cease.  These statements are typical of the abusive consent farms described in the *FNPRM* or USTelecom's comments, but not of comparison shopping sites.[4]

The Burke letter's complaints seem to be leveled against the exact abusive lead generation practices that the original "logically and topically related" proposal would address.  Burke does not demonstrate that harms are created by comparison shopping or that a one-to-one consent rule is needed to address abusive lead generation tactics.  Nothing in the Burke letter describes consumer benefits that are not already achieved by the "logically and topically related" standard initially proposed by the Commission.

LendingTree urges the FCC to modify the Public Draft's proposals as described in LendingTree's ex parte filings in this docket, including without limitation, the letters dated November 30, 2023, and December 5, 2023.

Respectfully submitted,

Steven A. Augustino
Josh Myers
*Counsel to LendingTree, LLC*

---

[4]　　USTelecom Comments at 2, CG Dkt Nos. 21-402, 02-278 (filed May 8, 2023) (describing "*flimsy claims of consent* where a consumer interested in job listings, a potential reward, or a mortgage quote, *unknowingly and unwillingly 'consents'* to telemarketing calls from dozens – or hundreds or thousands – of *unaffiliated entities about anything and everything.*") (emphasis added); *FNPRM*, ¶ 58 ("We propose to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent.").

# TAB N

Letter from Senator Thom Tillis and Senator Marsha Blackburn, to Chairwoman Jessica Rosenworcel, FCC (Dec. 6, 2023)

1102

# United States Senate
## WASHINGTON, DC 20510

**VIA ELECTRONIC TRANSMISSION**

December 6, 2023

The Honorable Jessica Rosenworcel
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

Dear Chairwoman Rosenworcel:

We write to you regarding the Federal Communications Commission (FCC) Further Notice of Proposed Rulemaking (FCC Docket 21-402). We are acutely aware that phone calls and text messages are the primary forms of communication that people use to connect themselves with family, friends, businesses, and even governmental entities. It is therefore laudable that the FCC is aiming to protect citizens from unwanted calls and text messages under the Telephone Consumer Protection Act of 1991 (TCPA). We believe that the FCC proposal should have a balance between protecting consumers and preventing unintended negative consequences regarding the ability for comparison shopping websites to function.

As the FCC has already recognized, comparison shopping websites are "helpful" to consumers.[1] They foster consumer choice by allowing consumers to compare different services and products in real time to determine which business is providing them with the best deal. This benefit is quantifiable—for example, according to a recent study from LendingTree, "[b]orrowers in the nation's 50 largest metros could save an average of $84,301 over the lifetime of their loans by shopping around for a mortgage."[2] Among borrowers nationwide, "borrowers who only receive two offers could save an average of $35,377 over the lifetime of their loans, while borrowers who get more than five offers could save an average of $105,912 – or an additional $70,535."[3] These are significant cost savings for American consumers and are attributable to the accessibility of comparison shopping platforms.

---

[1] *FNPRM*, ¶ 63.
[2] Jacob Channel, *Shopping Around for a Mortgage Could Help Borrowers Save More Than $84,000 Over Their Loans' Lifetime*, LendingTree, available at https://www.lendingtree.com/home/mortgage/mortgage-shopping-study/.
[3] *Id.*

**A188**

Additionally, comparison shopping websites promote competition among companies of varying sizes. When consumers comparison shop on their own, they are likely to view offers only from larger companies that have robust advertising campaigns. However, consumers who comparison shop online are also able to view offers from smaller and midsize businesses. These are businesses that American consumers may not know about and, resultingly, have not previously considered their offerings. Comparison shopping thus allows smaller businesses to compete on a level field against larger entities. The American consumer wins from this competitive enterprise. They can determine who has earned their business and which business can fairly meet their immediate needs.

Concerns to the FCC's Further Notice of Proposed Rulemaking have been raised by public entities, specifically highlighting the undue harm to comparison shopping websites. The most striking example is the "single seller" consent proposal. According to these advocates, the FCC's Rules limit consent to only one seller at a time, and American consumers may not provide their consent to multiple entities at once. To them, the singular use of "seller" in the FCC rule means that consent can only be conveyed to one entity at a time. Their position would prevent American consumers from providing consent through comparison shopping platforms. The FCC should not sacrifice the numerous benefits that are derived from comparison shopping by adopting this debilitating proposal. The "single seller" interpretation is plainly at odds with the canons of statutory construction that have been endorsed by Congress.[4]

Under the Dictionary Act, Congress has long explained that "words importing the singular include and apply to several persons, parties, or things."[5] Moreover, such a position is inconsistent with decades of FCC orders that interpret consent as extending to multiple parties and with FCC interpretations of singular nouns within its TCPA Rules.[6] We respectfully urge the FCC to conform with Congress's instructions and its own prior interpretations of the scope of consent is the TCPA context. The "single seller" proposal contradicts these approaches. The FCC can both rein in the abuses of "consent farms" from rogue lead generators and preserve the benefits of comparison shopping platforms. We urge the FCC to consider targeted solutions that avoid making it impossible for comparison shopping platforms to obtain consent for multiple entities that are matched to the consumer's needs.

The FCC's current record contains other proposals that do not overly regulate legitimate comparison shopping websites. To avoid an onslaught of litigation and confusion, the FCC can clarify and modify the "logically and topically associated" standard that it put forth in the rulemaking notice. Additionally, the FCC can place a limit on the number of potential entities that may receive consent through comparison shopping platforms. These are reasonable proposals that preserve the benefits of comparison shopping platforms for American consumers and also combat the harmful effects from "consent farms" and other rogue lead generators.

---

[4] 1 U.S.C. § 1.

[5] *Id.*

[6] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559, at 10 (applying consent to "creditors and debt collectors"); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd 7961, at 141 (2015) (Omnibus TCPA Declaratory Ruling); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, DA 23-62, CG Docket No. 02-278, at 11 (CG Bur. Jan. 23, 2023).

**A189**

We appreciate the FCC's diligent efforts in attempting to protect consumers from the abuses of some lead generators. As the FCC continues to hear from a wide range of stakeholders, we respectfully ask that you consider and not create unintended strains for comparison shopping sites that provide targeted offers to Americans consumers that lead to monetary savings. Thank you for your prompt attention to this matter.

Sincerely,

Thom Tillis
United States Senator

Marsha Blackburn
United States Senator

# TAB O

Petition of Insurance Marketing Coalition, Ltd. for Partial Stay Pending Judicial Review, FCC CG Dkt. Nos. 21-402, 02-278, 17-59 (Mar. 20, 2024)

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**Via ECFS**                                                       March 20, 2024

Marlene H. Dortch
Office of the Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

> **Re:  CG Docket Nos. 21-402 (Targeting and Eliminating Unlawful Text Messages), 02-278 (Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991), and 17-59 (Advanced Methods to Target and Eliminate Unlawful Robocalls)**

Dear Ms. Dortch:

Insurance Marketing Coalition, Ltd. ("IMC") hereby submits redacted copies of its Petition for a Partial Stay Pending Judicial Review and the corresponding declarations, as well as a Request for Confidential Treatment, in the above referenced dockets in ECFS.  IMC is also simultaneously filing confidential, unredacted copies of its Petition, the declarations, and the Request for Confidential Treatment with the Commission via hand delivery.

Any questions concerning this submission should be addressed to the undersigned.

Respectfully submitted,

*/s/ Kevin F. King*
Kevin F. King
Yaron Dori
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
kking@cov.com

*Counsel for Insurance
Marketing Coalition*

Enclosures

cc: Alejandro Roark, Chief, Consumer and Governmental Affairs Bureau

**A191**

**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**Via Hand Delivery**                                    March 20, 2024

Marlene H. Dortch
Office of the Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

                Re:  **Request for Confidential Treatment**

                **CG Docket Nos. 21-402 (Targeting and Eliminating
                Unlawful Text Messages), 02-278 (Rules and Regulations
                Implementing the Telephone Consumer Protection Act of
                1991), and 17-59 (Advanced Methods to Target and
                Eliminate Unlawful Robocalls)**

Dear Ms. Dortch:

        Pursuant to Sections 4(i) and 4(j) of the Communications Act of 1934, as amended, 47
U.S.C. §§ 154(i), 154(j); Section 4 of the Freedom of Information Act, 5 U.S.C. § 552(b)(4); and
Sections 0.457(d)(2) and 0.459(b) of the Commission's Rules, 47 C.F.R. §§ 0.457(d)(2), 0.459(b),
Insurance Marketing Coalition ("IMC") respectfully requests that the identified portions
("Confidential Information") of the enclosed request for a partial stay pending judicial review and
the corresponding declarations (the "Submissions") be withheld from public inspection and
afforded confidential treatment.  Accordingly, the enclosed submission is labeled "Confidential –
Not for Public Inspection."  IMC is simultaneously electronically filing a redacted version of its
request for a partial stay pending judicial review, marked "Redacted – For Public Inspection," in
accordance with Section 0.459(a)(2) of the Commission's Rules, 47 C.F.R. § 0.459(a)(2).

        Under Exemption 4 of the Freedom of Information Act, an agency may withhold from
public disclosure any information that qualifies as "trade secrets and commercial or financial
information obtained from a person [outside government] and privileged or confidential."  5
U.S.C. § 552(b)(4).  The Submissions include highly sensitive commercial information about
IMC's members' businesses that falls under Exemption 4 because it is "of a kind that would not
customarily . . . be released to the public."  *Critical Mass Energy Project v. NRC*, 975 F.2d 871,
879 (D.C. Cir. 1992).  IMC therefore submits this Request for Confidential Treatment in
accordance with Sections 0.457(d)(2) and 0.459(b) of the Commission's rules, and IMC supports
its request with the following showing:

                                    **A192**

**COVINGTON**

Marlene H. Dortch
March 20, 2024
Page 2

<u>The information for which confidential treatment is sought</u>

IMC seeks confidential treatment for the bracketed Confidential Information in the Submissions because it is highly sensitive and proprietary commercial and financial information that is entitled to protection from public disclosure and availability under 5 U.S.C. § 552(b)(4) and 47 C.F.R. § 0.457(d).

<u>Commission proceeding in which the information was submitted</u>

The Confidential Information is being submitted with IMC's Submissions in CG Docket No. 21-402, *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 02-278, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, and CG Docket No. 17-59, *Advanced Methods to Target and Eliminate Unlawful Robocalls.*

IMC requests that the Commission stay its Second Report and Order, FCC 23-107 (rel. Dec. 18, 2023) ("Order"), pending judicial review of the *Order* in *Insurance Marketing Coalition Ltd. v. FCC*, No. 24-10277 (11th Cir.).

<u>Degree to which the information is commercial or financial, or contains a trade secret or is privileged</u>

The Confidential Information consists entirely of sensitive, non-public commercial and financial information.  It includes details about two particular IMC members—Ideal Concepts, Inc. and Blue Ink Digital—such as, among other things, their client counts; annual expenses and revenue; contractual relationships; projected losses of past capital and labor investments, including but not limited to those made in reliance on and in compliance with the Commission's 2012 TCPA Order; projected costs of compliance with the *Order*; the *Order*'s consequences for the viability of their businesses; their existing clients' responses to the *Order*, including shifts in demand for services; and the new capital investments these members must make in response to the *Order*; as well as other information regarding financial and business harm.

This Confidential Information is not routinely and has not been made available for public inspection by IMC or its member corporations and thus is protected from public availability and inspection under 5 U.S.C. § 552(b)(4), 47 C.F.R. § 0.457(d), and Supreme Court precedent. *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) ("commercial" is given its ordinary meaning and, "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4 [of the Freedom of Information Act, 5 U.S.C. § 552(b)(4)]").

<u>Degree to which the information concerns a service that is subject to competition and how disclosure of the information could result in substantial competitive harm</u>

Disclosure of the Confidential Information would pose significant harm to Ideal Concepts and Blue Ink Digital.  These IMC members participate in highly competitive markets for providing performance marketing and other services.  If these members' sensitive business information, such as their client counts, revenue, expenses, and business methods were disclosed, their

**A193**

**COVINGTON**

Marlene H. Dortch
March 20, 2024
Page 3

competitors would obtain a substantial advantage.  Indeed, while IMC's members have provided their Confidential Information to the undersigned counsel for submission to the Commission, the members and the undersigned have taken several tangible steps to ensure that the Confidential Information is not shared with IMC or any other IMC members.

<u>Measures taken by the submitting party to prevent unauthorized disclosure</u>

Ideal Concepts and Blue Ink Digital have treated and continue to treat the Confidential Information disclosed in IMC's Submissions as highly confidential and have protected the information from public disclosure.  Before submitting their declarations in support of IMC's request for a stay, Ideal Concepts and Blue Ink Digital have not shared the Confidential Information with any outside entities.  Ideal Concepts and Blue Ink Digital have only agreed to share this information with IMC's outside counsel and the Commission because the *Order* poses a significant threat to Ideal Concepts's and Blue Ink Digital's businesses and because they face irreparable harm if the *Order* is not stayed pending judicial review.  In the ordinary course of business, the Confidential Information is only made available to employees, attorneys, or other agents of Ideal Concepts and Blue Ink Digital who need access to such information for the performance of their duties.

<u>Availability of the information to the public and the extent of any previous disclosure of the information to third parties</u>

Ideal Concepts and Blue Ink Digital have not made the Confidential Information available to the public or any third parties.  As described above, Ideal Concepts and Blue Ink Digital have only agreed to make the Confidential Information available to IMC's outside counsel and the Commission because the *Order* threatens core aspects of Ideal Concepts's and Blue Ink Digital's businesses.  Ideal Concepts and Blue Ink Digital have not made and will not make the Confidential Information available to IMC or any of IMC's other members.

<u>Justification of the period during which the submitting party asserts that material should not be available for public disclosure</u>

At this time, IMC cannot determine any date on which the Confidential Information included in the Submissions should not be considered confidential or become stale for purposes of the current matter.  Ideal Concepts and Blue Ink Digital would not, in the normal course of business, provide this information or data to the public or to any third parties, including to IMC or IMC's other members.  IMC thus respectfully requests that the Commission indefinitely withhold the Confidential Information in the Submission from public inspection.

\*      \*      \*

If the Commission denies IMC's request for confidential treatment, IMC respectfully requests pursuant to Section 0.459(e) of the Commission's Rules that the Commission return the materials to IMC.  This request for confidential treatment should not be construed as a waiver of any other protection from disclosure or confidential treatment accorded by law.  Please contact the undersigned at (202) 662-6000 should you have any questions concerning this submission.

**A194**

**COVINGTON**

Marlene H. Dortch
March 20, 2024
Page 4

Respectfully submitted,

*/s/ Kevin F. King*
Kevin F. King
Yaron Dori
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
kking@cov.com

*Counsel for Insurance
Marketing Coalition*

Enclosures

cc:    Alejandro Roark, Chief, Consumer and Governmental Affairs Bureau

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | ) ) | CG Docket No. 02-278 |
| | ) | |
| Advanced Methods to Target and Eliminate Unlawful Robocalls | ) ) | CG Docket No. 17-59 |
| | ) | |

**PETITION OF INSURANCE MARKETING COALITION, LTD.**
**FOR PARTIAL STAY PENDING JUDICIAL REVIEW**

Yaron Dori
Kevin King
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
ydori@cov.com
kking@cov.com

*Counsel for Insurance Marketing Coalition, Ltd.*

March 20, 2024

REDACTED - FOR PUBLIC INSPECTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 3

    A.    Statutory and Regulatory Background .................................................. 3

    B.    IMC and the Performance Marketing Industry ................................... 3

    C.    The 2023 *Order* ................................................................................... 5

ARGUMENT ...................................................................................................... 8

I.    IMC Is Likely to Prevail on the Merits. ...................................................... 8

    A.    The *Order*'s "Prior Express Consent" Requirements for Marketing Calls Exceed the Commission's Statutory Authority ......... 8

        1.    The *Order* Impermissibly Redefines "Prior Express Consent" to Mean Two Different Things. ................................. 9

        2.    The *Order* Redefines "Prior Express Consent" in a Way that Conflicts with that Term's Ordinary Meaning. ............... 11

    B.    The *Order's* Discrimination Against Marketing Calls Violates the First Amendment. ......................................................................... 15

II.    The *Order* Will Cause IMC Members Irreparable Harm. ........................... 20

III.    The Balance of Equities and Public Interest Require a Stay. ....................... 26

IV.    CONCLUSION .............................................................................................. 27

## PETITION FOR STAY PENDING APPEAL

Pursuant to 47 C.F.R. § 1.43, Insurance Marketing Coalition, Ltd. (IMC) petitions for a partial stay of the Commission's December 13, 2023 order implementing provisions of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.[1]  In particular, IMC respectfully requests that the Commission stay the effect of Part III.D of the *Order*, as well as the *Order*'s corresponding revisions to 47 C.F.R. § 64.1200, pending disposition of IMC's petition for judicial review of the *Order*.[2]  A partial stay is warranted because, as explained below, the *Order* exceeds the Commission's authority and will irreparably harm IMC's members.

## INTRODUCTION

The TCPA provides that a caller generally must obtain "prior express consent" to place an automated call to a consumer.  For decades, courts and the Commission have interpreted that requirement in a way that allows performance marketing companies to quickly and efficiently connect comparison shoppers with the businesses that are best positioned to meet their needs.  That framework has been particularly beneficial for small businesses, such as local insurance offices and handyman services, because it has provided an inexpensive way for them to reach

---

[1] *See* Second Report and Order, *In re Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Dkt. Nos. 21-402, 02-178, 17-59 (released Dec. 18, 2023) (*Order*), https://docs.fcc.gov/public/attachments/FCC-23-107A1.pdf.

[2] *See Insurance Marketing Coalition, Ltd. v. FCC*, No. 24-10277 (11th Cir.).

1

new customers and compete with larger, more sophisticated rivals. Comparison shoppers have benefitted as well, due to the broader range of choices and better matches the consent rules have made possible.

The *Order* discards that longstanding framework and replaces it with a rigid new scheme that will reduce consumer choice, drive small businesses out of the market, and devastate performance marketing companies that partner with and operate comparison shopping services. The *Order*'s unprecedented scheme is unlawful. Its additional consent requirements exceed the Commission's authority by (1) impermissibly defining the same statutory term to mean different things depending on the caller at issue and (2) contravening the ordinary meaning of "prior express consent." Compounding these errors, the *Order* also violates the First Amendment by applying content-based discrimination against commercial marketing calls. The Supreme Court invalidated another part of the TCPA on those grounds in *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), and the same reasoning applies here.

On January 26, 2024, IMC petitioned for judicial review of the *Order* in the U.S. Court of Appeals for the Eleventh Circuit. Because IMC's members would be irreparably harmed if the *Order*'s redefinition of "prior express consent" is permitted to take effect, and because the remaining factors support a stay, the Commission should grant a partial stay of the *Order* pending judicial review.

2

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

In 1991, Congress enacted the TCPA to protect Americans from unwanted calls made using automated telephone equipment.  Under the TCPA, a caller generally must obtain "prior express consent," a term the statute does not define, before making an automated call to a consumer.  47 U.S.C. § 227(b)(1).[3]

In 2012, the Commission issued regulations defining "prior express consent" to mean "prior express *written* consent" and requiring commercial marketers to obtain such consent before making automated calls.  *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830 (Feb. 15, 2012) (emphasis added).  Under these regulations, other types of automated calls may continue to rely on non-written consent, such as verbal consent or consent derived from a business relationship.  *See* 47 C.F.R. § 64.1200(a)(2) (requiring "prior express written consent" only for automated calls that "includ[e] or introduc[e] an advertisement or constitut[e] telemarketing").

### B.    IMC and the Performance Marketing Industry

Performance marketing (sometimes referred to as "lead generation") often takes place on comparison shopping websites, which provide a one-stop means of comparing options for health insurance, auto loans, home repairs, and other

---

[3] IMC uses the term "automated" herein to mean a call made using an automatic telephone dialing system or an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1).

services—thus sparing consumers the inconvenience of having to consult multiple vendors for information and offers.  Comparison shopping sites typically give visitors the option of requesting additional information—such as a quote for particular services—from the listed businesses, and website operators often employ algorithms, questionnaires, or other means to connect consumers with the businesses that best match their needs.  If a consumer consents to receive a follow-up call or text message, the website will then transmit that "lead" to one or more of those businesses.  Because marketers and website operators typically cannot know in advance which businesses will be the best fit for a particular consumer, many potential businesses are listed when seeking a consumer's prior express consent for TCPA purposes, even when only a handful of business (or only a single business) will ultimately contact the consumer.

IMC represents entities in the insurance marketing industry, including performance marketing companies that offer insurance comparison services, lead brokers who have networks of performance marketing companies and use them to furnish leads generated on those websites to insurance providers, and small insurers who depend on such leads to reach new customers and compete for their business. IMC filed detailed comments in the proceedings leading up to issuance of the *Order*, pointing out among other things that the proposed redefinition of "prior express

consent" would violate the TCPA, the First Amendment, and the Administrative Procedure Act.[4]

### C.    The 2023 *Order*

On December 13, 2023, the Commission adopted the *Order*, with Commissioner Simington dissenting in part.  As relevant here, the *Order* interprets the TCPA's requirement to obtain "prior express consent" as including two additional conditions—on top of the written-consent requirement imposed by the 2012 rule—when a commercial marketer makes an automated call:

- *First*, the *Order* requires that prior express consent for marketing calls be provided on a "one-to-one" basis.  *Order* ¶ 31.  As a result, a consumer cannot consent to receive automated calls from a list of "marketing partners," even if that list is clearly and conspicuously displayed to the consumer in advance of consent.  *Id.* ¶ 32.  Instead, a consumer must separately consent to each *individual* potential marketer that may or may not later choose to call the consumer (for example by checking a box for each marketer).  *Id.*

- *Second*, the *Order* requires that "consent obtained on comparison shopping websites must be logically and topically related to th[e] website" from which it is obtained.  *Id.* ¶ 36.  For example, according to language in the *Order*'s preamble (but not the Code of Federal Regulations), a visitor to "a car loan comparison shopping website" may not "consent to" automated calls or text messages "about loan consolidation."  *Id.*  That is true even if website visitors in fact have loans they wish to consolidate and expressly state their desire to receive calls about options for doing so.  *Id.*

---

[4] *See, e.g.*, Letter from Insurance Marketing Coalition to Federal Communications Commission, CG Docket Nos. 02-278, 21-402 (Dec. 6, 2023), https://www.fcc.gov/ecfs/document/1206656001108/1.

REDACTED - FOR PUBLIC INSPECTION

Neither of these limitations applies when a consumer consents to receive any type of call other than a marketing call.[5]

The *Order* acknowledges that "many comparison shopping websites . . . benefit consumers by enabling them to quickly compare goods and services and discover new sellers." *Order* ¶ 30; *see also id.* ¶ 30 n.69 (describing lead generation as "a well-established industry that offers benefits to both consumers and advertisers"). These websites are also a particularly useful tool for small businesses that "face larger competitors for consumer attention" because the websites provide an efficient way of connecting with "potential customers." Statement of Commissioner Anna Gomez at *1.

Nevertheless, the *Order* concludes that additional consent requirements are necessary because lead generation is responsible for "a large percentage of unwanted [automated] calls and texts," and because such calls "often rely on flimsy claims of consent." *Order* ¶ 30. The only evidence the *Order* provides to support those assertions is a comment letter from USTelecom. *See id.* ¶ 30 n.68. That letter contains no statistics whatsoever about the prevalence of unwanted automated calls

---

[5] The Commission's rules generally divide calls into two classes: marketing calls and "informational" calls, which are subject to fewer restrictions and include calls and text messages from political campaigns, advocacy organizations, charities, and other non-commercial entities (or that serve non-commercial purposes). *See* 47 C.F.R. § 64.1200(a)(3); *see also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Further Notice of Proposed Rulemaking, FCC 24-24, CG Docket No. 02-278, ¶¶ 29–30 (Feb. 15, 2024).

REDACTED - FOR PUBLIC INSPECTION

resulting from lead generation. Instead, it merely asserts that "the robocalls consumers are most likely to receive are lead generation robocalls they do not want" and cites three news articles, none of which even mentions lead generation. USTelecom Comments at 2 (May 8, 2023), https://www.fcc.gov/ecfs/document/ 10508915228617/1. The USTelecom letter is equally threadbare with respect to its assertion regarding the validity of consent for lead-generated marketing calls: The letter cites only a single enforcement action on that issue, involving a fraudulent overseas enterprise that, in stark contrast to the comparison shopping websites IMC members operate and partner with, made no effort to obtain prior express consent from the consumers who received calls. *See id.* at 2 (citing *In re Sumco Panama SA*, File No. EB-TCD-21-00031913, No. FCC 22-99, ¶¶ 45–46 (F.C.C. Dec. 21, 2022)). Indeed, the Commission has informed Congress that "[f]oreign-originated calls are a significant portion, if not the majority, or illegal robocalls." FCC, Report to Congress on Robocalls and Transmission of Misleading or Inaccurate Called Identification Information, at 7 (Dec. 23, 2022), https://docs.fcc.gov/public/ attachments/ DOC-390423A1.pdf.

In his dissenting statement, Commissioner Simington explained that the *Order*'s one-to-one consent rule is based on "a factually thin record," and its reasoning is "so impoverished . . . that it gives every appearance of an arbitrary and capricious action." Statement of Commissioner Simington at *1.

REDACTED – FOR PUBLIC INSPECTION

A summary of the *Order* was published in the *Federal Register* on January 26, 2024, and the *Order*'s one-to-one and logically-and-topically-related consent requirements are scheduled to take effect on January 26, 2025.

## ARGUMENT

The Commission should grant a partial stay of the *Order* because (1) IMC is likely to succeed on the merits of its challenges to the *Order*; (2) IMC members will suffer irreparable harm if the *Order* is not stayed; (3) the Commission will not be injured if a stay is granted; and (4) a stay is in the public interest. *See Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018); *In re Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 16,737, 16,738–39 (2021).

## I.    IMC IS LIKELY TO PREVAIL ON THE MERITS.

### A.    The *Order*'s "Prior Express Consent" Requirements for Marketing Calls Exceed the Commission's Statutory Authority.

The *Order* redefines the term "prior express consent" for marketing calls (and *only* for marketing calls) in a way that exceeds the Commission's statutory authority. *First*, the *Order* assigns different meanings to the same statutory term without any textual basis for doing so. *Second*, the *Order* defines "prior express consent" for marketing calls to include additional conditions—that the consent be (1) obtained on a one-to-one basis and (2) logically-and-topically related to the website where consent was obtained—that are not encompassed within that term's ordinary

8

REDACTED - FOR PUBLIC INSPECTION

meaning.  Each of these reasons is independently sufficient to warrant vacatur of the *Order* in relevant part.

### 1.      The **Order** *Impermissibly Redefines "Prior Express Consent" to Mean Two Different Things.*

Generally, "an agency may not simultaneously interpret the same statute in two different ways."  *Ford Motor Co. v. United States*, 715 F.3d 906, 915-16 (Fed. Cir. 2013); *see also, e.g.*, *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) (courts must "avoid interpretations that would attribute different meanings to the same phrase"); *United States v. Bryant*, 996 F.3d 1243, 1258 (11th Cir. 2021) ("[W]e presume that the same words will be interpreted the same way in the same statute.").  This presumption against multiple interpretations hardens into an outright prohibition where the agency seeks to define the same term in two different ways within a single provision.  *See, e.g.*, *United States v. Jackson*, 55 F.4th 846, 858-59 (11th Cir. 2022) (courts "must construe the definition of" the same term in the same provision to mean the same thing); *Ryan v. United States*, 725 F.3d 623, 627 (7th Cir. 2013) ("It is rare enough to interpret the same language differently in distinct statutory sections, but is an entirely different matter for a court to give a term a different meaning in the same statutory provision.").

That is precisely what the *Order* does.  According to the *Order*, before a marketer may make an automated call to a customer, it must obtain (1) written and (2) one-to-one consent that is (3) logically-and-topically related to the website where

9

such consent was obtained. *Order* ¶¶ 30-36. None of these conditions applies to consent for any other type of automated call—even though the TCPA requires "prior express consent" to be obtained for those calls as well.

Nothing in the TCPA grants the Commission authority to define "prior express consent" in wholly different ways depending on the type of call at issue. True, the TCPA permits the Commission to "prescribe regulations," including promulgating certain "exemptions" to the requirement that prior express consent be obtained. 47 U.S.C. § 227(b)(2). But that authority cannot save the *Order*. The *Order* nowhere invokes the Commission's authority to craft exemptions, as the Commission has consistently done when exercising that authority in the past.[6] Nor does it purport to redefine the statutory term "prior express consent" as a general matter and then promulgate an exemption negating the requirement to obtain such consent for everyone but marketers. Instead, the *Order* simply provides that "prior

---

[6] *See, e.g.*, *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8023 (2015) ("We exempt from the TCPA's consumer consent requirements, with conditions, certain pro-consumer messages about time-sensitive financial and healthcare issues."); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1837 (2012) ("[W]e adopt an exemption . . . [for] health care-related calls to residential lines."); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8755 (1992) ("We exempt . . . calls: not made for commercial purposes; made for commercial purposes which do not transmit an unsolicited advertisement; made to a party with whom the caller has an established business relationship; and non-commercial calls by tax-exempt nonprofit organizations.").

10

express consent" means one thing for marketers—and another very different thing for everyone else, such as the political campaigns, advocacy groups, and nonprofits that are not "telemarketers" and thus are not subject to the *Order*'s new interpretation of the TCPA. That approach is unlawful under the precedent cited above.[7]

### 2. The Order *Redefines "Prior Express Consent" in a Way that Conflicts with that Term's Ordinary Meaning.*

The TCPA does not define "prior express consent." *Medley v. Dish Network, LLC*, 958 F.3d 1063, 1069–70 (11th Cir. 2020) ("[T]he TCPA is silent regarding the means of providing or revoking consent" (quotation marks omitted)). That term should thus be given its ordinary meaning, as informed by the surrounding statutory context and the common-law understanding of what consent normally entails. *See Lucoff v. Navient Sols., LLC*, 981 F.3d 1299, 1304 (11th Cir. 2020) ("We use common law principles to interpret whether a party gave . . . their 'prior express consent' to receive calls under the TCPA."); *Osorio v. State Farm Bank*, 746 F.3d 1242, 1255 (11th Cir. 2014) ("[O]ne can infer that Congress intended for the TCPA to incorporate the common-law meaning of consent[.]"); *United States v. Lopez*, 590

---

[7] Even if the Commission *had* invoked its authority to craft exemptions, that authority only permits exemptions that are, for example, "necessary in the interest of the privacy rights this section is intended to protect." 47 U.S.C. § 227(b)(2)(C). For reasons discussed below, the *Order* does not include findings that would support such an exemption for all non-marketing calls here.

11

REDACTED - FOR PUBLIC INSPECTION

F.3d 1238, 1248 (11th Cir. 2009) ("When a statutory term is undefined, courts give it its ordinary meaning or common usage." (quotation marks omitted)).

"Under the common law understanding of consent, the basic premise of consent is that it is given voluntarily." *Osorio*, 746 F.3d at 1253 (quotation marks omitted).   That understanding accords with the ordinary meaning of "express consent" as simply "[c]onsent that is clearly and unmistakably stated." *Express Consent*, Black's Law Dictionary (11th ed. 2019); *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (looking to Black's Law Dictionary to construe the related TCPA term "prior express . . . permission" to mean "permission that is clearly and unmistakably granted by actions or words, oral or written.").[8]

This ordinary understanding of "express consent" does not encompass the additional conditions the *Order* imposes on automated marketing calls—*i.e.*, that consent be one-to-one and logically-and-topically related to the website where it was obtained.   In other words, express consent can be "clearly and unmistakably stated" to multiple individuals at once and on a website with no logical or topical relationship to the call being consented to. *See Lawrence v. Bayview Loan Servicing,*

---

[8] The TCPA defines an "unsolicited advertisement" to a fax machine as one "transmitted" without the recipient's "prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

12

A209

REDACTED - FOR PUBLIC INSPECTION

*LLC*, 666 F. App'x 875, 879 (11th Cir. 2016) ("No specific method is required under the TCPA for a caller to obtain prior consent to place automated calls[.]").[9]

The Ninth Circuit's decision in *Fober v. Management & Technology Consultants, LLC*, 886 F.3d 789 (2018), illustrates the point. *Fober* involved a TCPA claim against a company that made an automated call to conduct a survey on healthcare issues. The Ninth Circuit affirmed the award of summary judgment against the plaintiff because she had *agreed* that her health care provider could disclose her phone number to intermediaries for purposes of "quality improvement." *Id.* at 793. As the court noted, the TCPA "does not require any one method for obtaining 'prior express consent.'" *Id.* Looking to the longstanding rule that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary," the court concluded that the plaintiff had given her prior express consent for the automated survey call. *Id.* at 792 (quoting *In re Rules &*

---

[9] For the same reason, the Commission's decision in the 2012 rule to require that "prior express consent" for marketing calls be made in writing is likewise inconsistent with the ordinary meaning of that term. As with express permission—which courts have noted can be "oral or written,'" *Gorss Motels*, 931 F.3d at 1100—express consent ordinarily need not be provided in writing, *see, e.g.*, *Bismark v. Fisher*, 213 F. App'x 892, 896 (11th Cir. 2007) (holding that "express consent" to disposition of a civil action by a magistrate judge "should be commemorated via a filed, fully executed written consent form or the parties' *oral expressions of consent* during a hearing on the record") (emphases added)); *United States v. Vines*, 9 F.4th 500, 509 (7th Cir. 2021) ("[C]onsent can be express or implied from circumstances, and can be verbal or non-verbal.").

13

REDACTED - FOR PUBLIC INSPECTION

*Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992)).

If prior express consent can be given to multiple *unnamed* intermediaries at once, as in *Fober*, it follows that it can also be given to multiple *named* intermediaries at once, contrary to the *Order*'s one-to-one consent requirement. Indeed, the Eleventh Circuit has already held as much with respect to the related term "prior express . . . permission." *See Gorss Motels*, 931 F.3d at 1100–01 (plaintiffs provided "prior express . . . permission" to receiving solicitations via fax, because they had "expressly agreed to receive information about purchasing items from Wyndham affiliates, so they cannot complain that an affiliate sent them that kind of information").

The *Order*'s logically-and-topically related requirement strays even further from the ordinary meaning of "prior express consent." On its face, that requirement serves only to *prevent* consumers from consenting to calls that they would like to receive. Under the *Order*, for example, a consumer on a car loan comparison website can *never* consent to receive marketing calls about loan consolidation—even if that consumer has multiple loans and clearly and unmistakably states a desire to learn more about how to consolidate them. *See Order* ¶ 36 n.93. No ordinary understanding of "prior express consent" would bar a consumer from being able to consent to receive such a call.

The *Order* does not justify its redefinition of the term "prior express consent" for marketing calls as an ordinary interpretation of those words. Instead, it seeks to defend this redefinition purely on policy grounds. *See Order* ¶¶ 30–36. But precedent makes clear that the Commission "cannot impose a limitation [into the TCPA] that Congress did not include." *Gorss Motels*, 931 F.3d at 1102; *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (agencies may not "rewrite clear statutory terms to suit its own sense of how the statute should operate"); *Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1196 (11th Cir. 2014) (same).

## B.   The *Order's* Discrimination Against Marketing Calls Violates the First Amendment.

The *Order* is unconstitutional because it applies more rigorous consent requirements to marketing calls than to other types of calls. This content-based discrimination violates the First Amendment.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* "It is rare" that a content-

REDACTED - FOR PUBLIC INSPECTION

based regulation on speech "will ever be permissible." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000).

The *Order* flunks these standards. In *Barr*, the Supreme Court held that the TCPA's government-debt exception (which excepted calls to recover debts owed to the federal government from the prior express consent requirement) was a content-based regulation of speech. 140 S. Ct. at 2347. Because that exception favored government-debt collection calls over "other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, *commercial advertising*, and the like," it had to satisfy strict scrutiny (which the Government conceded it could not). *Id*. (emphasis added).

It follows from *Barr* that the *Order*'s discriminatory treatment of marketing calls is likewise subject to strict scrutiny, a standard the Commission cannot meet. Even assuming that the Commission has a compelling interest in restricting unwanted automated calls generally, discriminating against marketing calls is not a narrowly tailored way of advancing that interest.

*First*, the *Order* is both over and underinclusive. *See Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 805 (2011) (laws subject to strict scrutiny "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive."). The *Order* is overinclusive because many calls affected by its redefinition of "prior express consent" are in fact *wanted* by the consumer that

REDACTED – FOR PUBLIC INSPECTION

authorizes them. *See Schweitzer*, 866 F.3d at 1276 ("The TCPA . . . is designed to protect consumers from receiving *unwanted* and intrusive telephone calls.") (emphasis added); *Fober*, 886 F.3d at 792 ("[T]he statute aims to curb a particular type of uninvited call. As a result, the statute omits from its ambit those calls that a person agrees to receive."). The *Order* prohibits marketing calls to which customers have given their prior express consent under any ordinary meaning of that term. *See supra* at 11–14. The Commission does not have any interest (much less a compelling one) in preventing consumers from receiving calls that they have expressly consented to receiving.

The *Order* is also underinclusive because it only targets marketing calls, even though the legislative findings in support of the TCPA show that Americans "consider [unwanted] automated or prerecorded telephone calls, *regardless of the content or the initiator of the message*, to be a nuisance and an invasion of privacy." 137 Cong. Rec. H11307-01, 1991 WL 250340 (emphasis added). Indeed, the *Order* offers no explanation for why its heightened consent requirements apply only to marketing calls and not to "informational" calls and texts from political committees, advocacy groups, or similar entities. *See Reed*, 576 U.S. at 172 (striking down a law differentiating between different types of street signs because "the Code's distinctions fail as hopelessly underinclusive," as "the Town has offered no reason

REDACTED - FOR PUBLIC INSPECTION

to believe that directional signs pose a greater threat to safety than do ideological or political signs").

*Second*, the *Order* contains no record evidence that unwanted marketing calls resulting from comparison shopping websites are especially common, or that the new consent rules in the *Order* would meaningfully reduce the number of such calls. *See FEC v. Cruz*, 596 U.S. 289, 307 (2022) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden.") (cleaned up). In fact, the only support in the *Order* for the idea that "[l]ead-generated communications are a large percentage of unwanted calls and texts," *Order* ¶ 30, is a single citation to a comment letter that itself includes no evidence whatsoever about the prevalence of such calls, *see supra* at 6–7. The *Order* likewise fails to explain how its proposed consent requirements would meaningfully reduce the number of unwanted automated calls. *See* Statement of Commissioner Simington at *1 ("[T]he factual record on the question" of how mandating "1-to-1 consent" will ward off unwanted automated calls "is so thin, and the [*Order*] so impoverished in its reasoning supporting a rule upending the consumer financial products industry, that it gives every appearance of an arbitrary and capricious action by the Commission."). And even if the *Order* were to conceivably reduce the number of unwanted calls received by consumers by some unknown amount, that would still not be enough to justify a content-based discrimination against marketing calls. *See Brown*, 564 U.S. at 803

18

**REDACTED - FOR PUBLIC INSPECTION**

n.9 ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced.").

*Third*, there were numerous less-restrictive measures (some of which are content neutral) that the Commission could have instead adopted to address any legitimate concerns it might have had about unwanted automated calls. For instance, IMC proposed requiring prior express consent agreements to clearly and conspicuously disclose: (1) the number of callers who may rely on a single provision of consent; (2) the maximum time period after consent is given during which calls may be made; and (3) the types or categories of goods or services that may be offered on such calls. *See* Letter from Insurance Marketing Coalition to Federal Communications Commission, CG Docket Nos. 02-278, 21-402, at 2 n.4 (Dec. 6, 2023), https://www.fcc.gov/ecfs/document/1206656001108/1. The Commission's failure to adopt these less-restrictive alternatives—or explain why they would not serve its interests—dooms any argument that the *Order* is narrowly tailored. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) ("Absent a showing that the proposed less restrictive alternative would not be as-effective, . . . the more restrictive option . . . could not survive strict scrutiny."); *Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use [it].");  *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017)

(striking down municipal law that "disregarded numerous and obvious less-burdensome alternatives").

Even if the *Order* were assessed under the commercial speech doctrine, it would still be unconstitutional. When that doctrine applies, the government must show that its asserted interest is "substantial" and that its regulation on commercial speech "directly advances" and "is not more extensive than is necessary to serve that interest." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Even if the *Order* served a substantial government interest (which, as discussed above, it does not), the Commission has failed to show that its additional consent requirements are not more extensive than necessary to serve that interest. To make that showing, the Commission must present evidence to show that "less restrictive means would fail"; in doing so, it "cannot rest on 'speculation or conjecture.'" *United States v. Philip Morris USA Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017). As explained above, the Commission has not shown that the many less restrictive means available would fail to serve any legitimate interests it might have.

## II.    THE *ORDER* WILL CAUSE IMC MEMBERS IRREPARABLE HARM.

Absent a stay, IMC and its members will suffer irreparable harm from the *Order*, including damage to their business operations, significant compliance costs, and chilling of their speech.

REDACTED - FOR PUBLIC INSPECTION

While the relevant parts of the *Order* do not take effect until January 2025, the *Order* is *already* imposing significant costs on IMC members.  As explained in sworn declarations attached to this petition, to comply with the *Order*, IMC's members must engage in costly, time-consuming, and labor-intensive processes that include revamping their technology, remaking websites to integrate with new systems, renegotiating contracts with other business, educating and training their employees on compliance with the *Order*, and reassessing their company strategy and viability.   Ex. A, Declaration of Alexander Liebergall ¶¶ 23–24; Ex. B, Declaration of Gregory Dobak ¶¶ 22–23.  Those efforts are so substantial that IMC members must begin working on them now to have any hope of coming into compliance by January.  Liebergall Decl. ¶ 23; Dobak Decl. ¶ 22.

IMC members are already feeling the *Order*'s tangible effects in other ways as well—for example, {{█████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████}}.  Dobak Decl. ¶ 24.  And before the *Order* takes effect, that member will also spend {{███████████████

███}} developing a new technology system that will allow service providers to continue generating leads under the *Order*.  *Id.* ¶¶ 11, 22.  Similarly, another member estimates it will spend {{█████████████}} on its compliance efforts before the *Order*'s effective date because the member must, among other things, adjust its

{{ ████████████████████████████████████████ }}.  Liebergall

Decl. ¶ 24.  Absent a stay pending appeal, these companies will be forced to reduce

{{ ██████████████████ }}, shut down {{ ████████████████ }}, spend

{{ ████████████████████ }} on their efforts to comply with the *Order*, and

lose {{ ██████████████ }} of their revenue.  Liebergall Decl. ¶ 24; Dobak Decl.

¶ 23.

     The *Order*'s new consent requirements also threaten the core business

operations of IMC's members.  For example, the *Order* will prohibit IMC members

from using the shared leads they have gathered in reliance on the Commission's prior

interpretation of the TCPA.  *See* Liebergall Decl. ¶ 10; Dobak Decl. ¶¶ 7–9.  These

shared leads—which some IMC members have invested nearly {{ ████████

████████ }} to generate—will instantly become worthless, even though leads

are typically useful for a period of time after a consumer's initial consent.  Liebergall

Decl. ¶¶ 10–12, 18.  Shared leads currently account for {{ ██████████ }} as many sales

as exclusive leads and self-generated leads combined.[10]  *Id.* ¶ 13.  But under the

*Order*, IMC members will be forced to use only exclusive leads—which are

{{ ████ }} more expensive than shared leads—and self-generated leads—which are

---

[10] Shared leads are leads that can be sold to multiple lead buyers.  Exclusive leads
are leads that can only be sold to one lead buyer.  Self-generated leads are leads that
service providers generate themselves, *i.e.* without assistance from a third party
website or marketing partner.  *See* Liebergall Decl. ¶¶ 13–17; Dobak Decl. ¶ 8.

REDACTED - FOR PUBLIC INSPECTION

{{■■■■■}} more expensive than shared leads.  *Id.* ¶¶ 13, 17.  The upshot is that, as a direct result of the *Order*, the leads developed (or obtained) by IMC members will cost more money and generate less revenue than under the prior framework, resulting in a significant overall loss of business.

The *Order* also prevents IMC's members from using their technology to help consumers find the service providers that can best meet their needs.  Visitors to comparison shopping sites will be forced to individually select potential service providers from a list of businesses—many of which they may be unfamiliar with.  Liebergall Decl. ¶ 4; Dobak Decl. ¶¶ 18–19.  This will be especially true for small, non-branded businesses, who already struggle to compete with larger branded companies, particularly online.  *See* Dobak Decl. ¶¶ 6, 17–19.  While performance marketers can currently solve this information problem by matching a consumer with the optimal service providers, the *Order* limits this technology because performance marketers will be forced to try to make that match while the consumer waits on a loading screen.  Dobak Decl. ¶¶ 11–14; Liebergall Decl. ¶ 15.  If it is even possible to make matches in real time, it will cost {{■■■■■■■■■■■■■}} and will take {{■■■■■■■■}} to develop the requisite technology, and it will require consumers to wait on a loading screen for {{■■■■■■■■■}}.  Although that delay may seem inconsequential, studies and the declarants' industry experience show that the additional delay caused by the *Order* will have "significant

23

A220

adverse effects" on performance marketers' businesses, for example by substantially reducing the number of consumers who complete the consent process.  Dobak Decl. ¶¶ 11–12; *see also* Liebergall Decl. ¶ 20 (noting performance marketers have quoted post-*Order* costs per lead that are {{ ███ }} higher than current costs per lead).  And even if a consumer consents to receive calls and texts, the *Order* forbids IMC members from helping the consumer find additional services he or she may be interested in because those services may not be "logically and topically related" to the consumer's request, as the Commission envisions that term.  Liebergall Decl. ¶ 16.

These injuries constitute irreparable harm.  Even if the Eleventh Circuit grants IMC's petition for review, IMC's members will be unable "to recover monetary damages because of sovereign immunity," which "renders the harm suffered irreparable."  *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (finding irreparable harm because petitioner "would not be able to bring a lawsuit to recover their undue economic losses if the FCC's rules are eventually overturned").  Understanding the bind that regulated entities face, courts have explained that "unrecoverable costs of compliance constitute irreparable harm," *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022), as do "the

loss of customers and goodwill," *BellSouth Telecomms., Inc. v. MCI Metro Access Trans. Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).

IMC's members satisfy these standards. The *Order* imposes significant financial hardship, none of which IMC's members will be able to recover if the Eleventh Circuit vacates the challenged parts of the *Order*. Members have been forced to begin developing technology that would allow them to generate leads that comply with the *Order*, even though this technology will be unnecessary if IMC's petition for review is granted. Dobak Decl. ¶¶ 11–14; 16–21; Liebergall Decl. ¶¶ 19–23. IMC's members have also begun preparing for scenarios in which they would {{████████████}}, shut down locations, and invest resources in renegotiating many of their existing contracts. Liebergall Decl. ¶¶ 23–24. And at least one member {{████████████████████████}} as more customers learn about the *Order*'s effects. Dobak Decl. ¶ 24.

The *Order* also inflicts irreparable harm by chilling IMC members' speech. The *Order* violates the First Amendment by discriminating against marketing calls. *See supra* at 15–20. Courts have recognized that "it is well established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (cleaned up). As a result, if IMC is likely to succeed on the merits of its First Amendment claim, it follows that IMC and its members

25

A222

would be irreparably harmed if the *Order* were permitted to take effect while the litigation proceeds. *See KH Outdoor*, 458 F.3d at 1271–72; *cf. LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 954–55 (11th Cir. 2022) ("Ordinances that violate the First Amendment are per se irreparable injuries." (cleaned up)).

To be sure, the challenged parts of the *Order* do not take effect until January 2025. But if the *Order* is not stayed, IMC and its members would be forced to continue their efforts to comply with a government mandate that discriminates against their speech and expression. Requiring IMC to continue those efforts cannot be squared with the "stringent protection of First Amendment rights," which stems from "the intangible nature of the benefits flowing from the exercise of those rights," or with the rule that a plaintiff need not "prove actual, current chill" to "prove irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). Without a stay, the *Order* could take effect while the courts consider the merits of IMC's petition for review, forcing IMC to lose its First Amendment freedoms in the meantime. *See Honeyfund.com, Inc. v. Governor, State of Fla.*, __ F.4th __, 2024 WL 909379, at *8 (11th Cir. Mar. 4, 2024) ("[A] [First Amendment] violation, even for a minimal period of time, constitutes irreparable injury.").

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST REQUIRE A STAY.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435–36 (2009). Those factors

26

also counsel in favor of a stay. The public does not have a significant interest in the Commission's reinterpretation of the TCPA taking effect before a court determines whether the Commission exceeded its legal authority. IMC's members invest significant resources to ensure that they comply with the Commission's prior (and longstanding) interpretation of the TCPA, and they already do not make automated calls or texts without a consumer's express consent. *See* Liebergall Decl. ¶¶ 10, 18, 20 (explaining compliance with Commission's 2012 Order). Although the Commission has an interest in limiting unwanted calls, *see Barr*, 140 S. Ct. at 2348, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021). Further, because the *Order* violates the First Amendment, a stay is appropriate "because neither the government nor the public has any legitimate interest in enforcing an unconstitutional ord[er]." *LaCroix*, 38 F.4th at 955.

## IV.  CONCLUSION

For the foregoing reasons, the Commission should stay the effect of Part III.D of the *Order* and the corresponding revisions to 47 C.F.R. § 64.1200 pending disposition of IMC's petition for judicial review of the *Order*. This stay should remain in effect until a final, nonappealable court order has issued with respect to the petition for review and any subsequent petition for rehearing or writ of certiorari.

Respectfully Submitted,

*/s/ Kevin King*
Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488
kking@cov.com

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

March 20, 2024

# EXHIBIT A

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Advanced Methods to Target and Eliminate | ) | CG Docket No. 17-59 |
| Unlawful Robocalls | ) | |
| | ) | |

## DECLARATION OF ALEXANDER LIEBERGALL

I, ALEXANDER ABRAHAM LIEBERGALL, hereby declare under penalty of perjury as follows:

1.      I am currently the Compliance Officer at Ideal Concepts, Inc.  I have held that position for six (6) years and have six (6) years of experience in the insurance and marketing industry.  Before that, I worked at McBee as a Compliance Analyst and Pentec Health, Inc. as a Compliance Analyst.  I am a graduate of Elizabethtown College with a Bachelor of Science (B.S.) in Business Administration and Management with a concentration in Marketing; the Drexel University Dornsife School of Public Health with a Master of Public Health (M.P.H.); and the Drexel University Thomas R. Kline School of Law with a Juris Doctor (J.D.).

2.      I am competent to testify to the matters set forth herein, which are based on my personal knowledge, information I have acquired in my current position at Ideal Concepts Inc., which has a wholly-owned subsidiary, InsureMe, Inc., (collectively Ideal Concepts Inc. and InsureMe Inc. will be referred to as "Company") and information provided to me by others in the ordinary course of business.

1

3.      I understand that this declaration is being filed in support of the Insurance Marketing Coalition's motion for a stay pending judicial review of the Federal Communications Commission's December 18, 2023, *Second Report and Order* ("*Order*") in the above-captioned proceeding.

4.      I understand that, under the *Order*, everyday consumers who comparison shop for goods and services, including insurance coverage, will no longer be permitted to provide a single consent to receive automated phone calls and text messages from multiple providers. Instead, consumers will be required to separately consent to receive calls and texts from each individual seller, even though consumers will not be well-positioned to understand which sellers best meet their needs, and that the *Order* would put the consumer at a disadvantage due to the inability to comparison shop, which may result in consumers settling for plans that may not best meet their needs (e.g., higher premiums, fewer benefits).  I also understand that the *Order* requires consent obtained on comparison shopping websites to be "logically and topically related" to that website.

5.      Both Ideal Concepts, Inc. and InsureMe, Inc. are corporations based in Pennsylvania. Ideal Concepts, Inc., is an insurance marketing and technology company founded in 2007 to help connect insurance agents to clients across the country by providing independent insurance agents administration, marketing, training, technology, and other support services. InsureMe, Inc. is an insurance agency that is licensed in all fifty (50) states and contracts with over one hundred health insurance carriers nationwide. In addition to individual health insurance, InsureMe, Inc.'s licensed agents offer consumers Medicare Advantage plans, supplemental accident and health plans, life insurance plans, and property insurance, including, but not limited

to, home and auto insurance.  Both Ideal Concepts, Inc. and InsureMe, Inc. are members of the Insurance Marketing Coalition.

6.      Company is a customer of performance-marketing services.  Performance-marketing services help make everyday consumers aware of the broad array of product choices and sellers available to them.  Performance marketers allow consumers to explore their purchasing options easily and quickly from several sellers at once.  This service is especially valuable in the context of personalized products, such as insurance, where consumers often seek consultations with licensed professionals to help them comparison shop and understand options, terms, benefits, pricing, etc., prior to purchase.

7.      Company purchases leads from performance marketers.  Company uses those leads to intelligently match Company's licensed insurance agents with consumers interested in insurance and insurance-related products and services.

8.      Company has annual sales of ████████████████████████████ ████████████ and, since 2020, ██████████████████████████████ of Company's sales stem directly from these leads and from other activity regulated by the *Order*.

9.      The leads Company receives from performance marketers are essential to its business. Company has used these types of leads to provide products and services to a ████ ████████ customers since 2020, which is ██████████████████████████████ its customers. These leads allow Company to reach more customers, a large percentage of whom are in need of insurance. Using these leads, Company has been able to grow its market share and total enrollments year-over-year. Much of this increase is attributable to the new customers Company has obtained as a result of the leads it received from performance marketers.

10.     Marketing is one of Company's biggest expenses.  As part of Company's good-faith effort to abide by the Telephone Consumer Protection Act ("TCPA"), since 2015, Company has spent ████████████ on marketing in compliance with the FCC's interpretation of the TCPA in the FCC's 2012 Order. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830 (Feb. 15, 2012); *see also* 77 Fed. Reg. 34,233 (June 11, 2012). This expense accounts for ████████████ ████ of Company's total budget.

11.     Under the *Order*, Company may no longer be able to use its database of leads because those leads were obtained in conformity with the 2012 Order, which permitted consumers to consent to receive information from multiple providers at once. Company purchased those leads in good-faith reliance on the FCC's existing interpretation of the TCPA's consent requirement. Typically, Company would expect to leverage this consent to extract the value of these leads over a multi-year period because, based on Company's experience, consumers continue to be in the market for insurance services well after they initially provide their consent to receive calls and texts for a variety of reasons such as a new insurable interest (e.g., new/additional property or covered life) and the need to reconsider options before policy renewal/expiration, annually during Open Enrollment, and/or after a qualifying life event. If the FCC's new definition applies to Company's existing leads, those leads become worthless once the *Order* goes into effect.

12.     Losing access to these leads, would significantly impact the Company's business, costing Company ████████████████████ ████████████████████ since 2020 alone, and would effectively require Company to start ████████████████ the day the regulation goes into effect, discarding all prospective consumer information previously generated prior to that day. Moreover, losing these

4

**A230**

leads would mean Company would have to contend with massive corporations (e.g., Allstate, Geico, AIG, and UnitedHealthcare) that have brand recognition and large marketing budgets in the space, unequally favoring these big-name players. Competition of this type does not currently exist in the market, because without a one-to-one consent requirement businesses of all sizes that are included in the consent language have a chance to contact the same consumers.

13.    Without the option of shared leads, the price of each lead will materially increase, as there will be a significantly smaller supply, while the same demand, if not higher, will persist. This will restrain the ability of Company to ███████████████████████████ ██████████████ because, since 2020, █████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ To compensate for the reduction in volume of leads available from performance marketers that Company currently relies on ████████████████████████████████ since 2020, Company will likely have to ██████████████████████████████████████████████ Based on an analysis of Company's investments since 2020, ████████████████████████ ██████████████████████████████████ However, what is much more concerning is that Company found █████████████████████████████████ ███████████████████████████ and ██████████████████████████ ████████████████████████████████████ The costs for ████████████ ████████████████████████████████████████████████████████████████ ████████████████ will restrain Company's ability to ██████████████████ ████████████████ and needed to ███████████████████████████

14.     The *Order* would make many of these negative effects a reality.  Under the *Order*, Company could no longer easily work with performance-marketing companies to ensure that Company was pitched to consumers who are well-suited to receive its services and who have consented to receiving information from businesses like Company.  Instead, when providing consent, consumers would be required to individually select Company specifically, even though the consumer may not be as familiar with Company and its offerings.  Within the insurance industry, this means that consumers will instead be forced to stare at a list of insurance providers, many of which they may be unfamiliar with, and discern the differences between them.

15.     Under the *Order*, performance marketers cannot use their know-how and expertise to obtain consumers' consent to reduce those transaction costs by intelligently matching consumers with businesses, including Company, that would provide the options a reasonably prudent person would need to comparison shop and make a knowledgeable enrollment decision. Currently, performance marketers use consumers' explicit consent to multiple marketers to help streamline this process and allow consumers to discover Company, which can offer consumers an abundance of product options.  But the *Order* significantly limits performance marketers' ability to match consumers with the right businesses. If Company would no longer be able to use shared leads, ███████████████████████████████████████████████ since 2020, Company would be substantially limited in its capability to ████████████ which it is reliant on to ██████████████████ At the same time, Company would lose the ability to provide many consumers with the ability to get a clearer picture and understanding of their options, which naturally allows consumers to make a knowledgeable enrollment decision by selecting a plan that better meets their needs.

6

16.     The *Order* will also prevent Company from connecting consumers with insurance and insurance-related products and services that they are likely to need in the future. Even when there is a clear connection between the website a consumer uses and the services Company provides, consumers will not be permitted to consent to receiving information about Company unless the website is "logically and topically related" to Company's services.  For example, if Company receives a consumer's consent regarding homeowners insurance, even though that consumer will highly likely have a need for auto insurance and may even receive multi-line discounts for purchasing homeowners and auto insurance through the same carrier (in our experience, consumers are often interested in knowing about such discounts), Company may not be able to offer that consumer auto insurance despite a clear need and benefit to the consumer (e.g., in 2022, 91.7% of U.S. households had at least one vehicle[1]) because, based on the example the Commission provided in the *Order*, auto insurance would not be "logically and topically related" to the consumer's original inquiry for homeowners insurance.  This would reduce Company's ████████████████████████ because, since 2020, ████████████████████████ Company's clients purchase ████████████████    Moreover, the "logically and topically related" restriction would create significant additional compliance overhead because Company would need to ensure that, for every consumer Company speaks to, every agent is explicitly aware of the exact product the consumer consented to, which can differ and be highly specific for every lead. For example, the majority of consumer inquiries typically relate to a few primary products, such as auto insurance or health insurance.  As such, agents are generally accustomed to presenting or discussing those commonly requested products.   Even though Company's proprietary

---

[1] *See* Forbes, Car Ownership Statistics 2024, https://www.forbes.com/advisor/car-insurance/car-ownership-statistics/#american-community-survey (Feb. 12, 2024).

technology already provides its agents with the specific product the consumer inquired about, if a consumer's inquiry concerns an uncommon product, such as motorcycle insurance or accident insurance, from time to time agents may reference the general product types (e.g., auto insurance and health insurance) when reaching out to consumers. As such, maintaining one hundred percent (100%) compliance may be very difficult and resource intensive due to the human element in the natural course of interactions between agents and consumers. Even if Company were able to achieve ninety-nine percent (99%) compliance through technological mechanisms and rigorous training and auditing of agents, the remaining one percent (1%) of non-compliance would expose Company and its performance marketing partners to significant liability due to the threat of class action suits under the TCPA. Currently, the *Order* does not explicitly define this term, and only offers a vague description of what could classify as "logically and topically related." This leaves Company in a gray area, waiting on the judicial system to define the term through case law.



17.    If the *Order* goes into effect, Company will be restricted in its ability to obtain ▮▮▮▮▮▮▮▮▮▮▮▮▮ it does today, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ since 2020, due to the fact that most lead sources will be dominated by the companies with brand recognition and deep pockets. Company uses these leads to connect with consumers who have a demonstrated need for the insurance and insurance-related products and services it provides. Since ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ since 2020, it will be difficult and cost prohibitive, placing a financial burden on Company, for Company to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮. Likewise, it will be extraordinarily onerous for Company to find or develop an alternative method or tool that will not only provide the same value that the Company derives from

███████████████████████████████████████████████████ since 2020, but that will also produce the same ██████████ needed to ██████████████████████.

18.    If the Commission interprets the *Order* to apply retrospectively to pre-existing leads, Company will no longer be able to market to ██████████████████ it has already cultivated.  Company has spent ████████████████ to acquire ██████████ and ██████████ ██████████████████████. All these leads were obtained in good-faith compliance with the TPCA, as last defined by the FCC in its 2012 Order.  Under the *Order*, the lists of prospects Company has cultivated over this time have an ██████████████████ ██████████████, thereby ████████████████████████████, because of a change in definition by the FCC if applied retrospectively.

19.    Under the *Order*, instead of using its current practices and existing leads, Company may be forced to make significant changes.   At a minimum, Company will have to start from scratch, modifying and creating new agreements for vendors to ensure that their lead generation complies with Company's strict compliance standards.  Company prides itself on its culture and organizational commitment to Compliance. Company has a long-standing policy that one hundred percent (100%) of marketing materials (e.g., advertisements, landing pages, mailers, scripts) are reviewed and approved for compliance. Company currently rejects ██████████████ ████████████████ from performance marketers that do not meet Company's criteria for TCPA compliance, insurance marketing compliance, Medicare compliance, and/or other applicable laws and regulations.

20.    On average, Company spends ██████████████████████ annually on ████████████████████████ ██████████████. The *Order* will require Company to invest more resources, time, and

9

A235

REDACTED - FOR PUBLIC INSPECTION

expenses, in excess of ███████████████████████████████████ it already invests annually, into ████████████████████████████████████████████████ ████████████████. Furthermore, irrespective of Company making the aforementioned changes, Company will still have to wait for the performance marketers themselves to modify the collection vehicles they use to generate compliant leads, which Company will then purchase. As mentioned earlier, it is expected that the ██████████████████████ will be much higher, and so Company will have to pay this increased cost to ██████████████. After initial reach out █

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████. Company may not even be able to call prospective consumers whose leads were generated the day before the *Order* goes into effect unless those leads were generated in compliance with the new requirements of the *Order*, defeating the purpose of adjustment period provided by the *Order*.

21.     The changes mandated by the *Order* will reduce revenues, increase costs of leads, decrease total amount of leads, impose additional compliance costs, impede ability to effectively compete with the largest competitors, impact ability to grow market share and sustain Company's current growth rate.

22.     The *Order* also imposes a chilling effect on Company's speech. Part of Company's business includes generating leads for its own use, but Company will be subject to regulations on its lead generation that business in other industries will not have to face because of the content of Company's speech. The *Order* restricts Company's ability to make marketing calls,

10

A236

but it does not restrict other types of calls, nor does it restrict marketing calls from entities in other industries, such as political and nonprofit fundraising calls. In other words, Company understands that entities in other industries will still be permitted to obtain a consumer's single consent to receive calls from multiple parties and then to place calls to those consumers. However, Company will no longer be permitted to obtain consent or to place calls in these circumstances, because, due to their content, Company's messages are regulated by the *Order*.

23.    Compliance with the *Order* will be a costly, time-consuming, and labor-intensive process. It will include technological changes, renegotiations of all contracts with all performance marketers, updating compliance standards and framework, policy and procedure updates, ongoing education of employees on compliance with the *Order*, retraining employees, and reassessment of company strategy. For example, Company will have to renegotiate all of its contracts with its performance marketers to establish new compliance requirements/expectations, pricing models, and more. Therefore, although some parts of the *Order* do not carry legal force for twelve (12) months, Company will have to begin its compliance efforts immediately, otherwise Company could risk losing any investments made between now and the effective date for compliance. However, as mentioned above, Company efforts are limited by the timelines of performance marketers ensuring that their lead generation forms are in compliance with the *Order*. In essence, many parts of Company's business are reliant on performance marketers to adjust to the *Order*.

24.    If the *Order* is not stayed during the pendency of the litigation, Company will suffer the following kinds of irreparable harm: (1) ███████████████████████ ; (2) shut down ██████████████████████ operations/locations; (3) lose ██████ ████████████████████████████ revenue; (4) increase costs related to

11

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ (5) increase reliance on ████████████

which ███████████████████████████████ since 2020 but are

███████████████████████████████████████████████

███████████████████████████████████████ since 2020, and

███████████████████████████████████████████████

████████ .

25.      Even if IMC's petition for review is ultimately granted, Company will never be able to recover those financial and opportunity costs, for example because damages are not available in litigation against the Commission.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed at Hatboro, Pennsylvania on March 13, 2024.

*A. Liebergall*

Alexander Abraham Liebergall

12

**A238**

REDACTED - FOR PUBLIC INSPECTION

# EXHIBIT B

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Advanced Methods to Target and Eliminate | ) | CG Docket No. 17-59 |
| Unlawful Robocalls | ) | |
| | ) | |

**DECLARATION OF GREGORY DOBAK**

I, Gregory Dobak, hereby declare under penalty of perjury as follows:

1.    I am the CEO and Founder of Blue Ink Digital. I have held those positions going on six years and have nine years of experience in the marketing industry. Before I founded Blue Ink Digital, I worked with a variety of other early-stage and established companies including TripAdvisor, Boston Materials and InfoBoard International. I am a graduate of Columbia University in the City of New York with a masters degree in Journalism, Northeastern University with a juris doctorate, and University of Idaho with a bachelor's degree in Political Science, International Relations, and Psychology.

2.    I am competent to testify to the matters set forth herein, which are based on my personal knowledge, information I have acquired in my current position at Blue Ink Digital, and information provided to me by others in the ordinary course of business.

3.    I understand that this declaration is being filed in support of the Insurance Marketing Coalition's motion for a stay pending judicial review of the Federal Communications

**A240**

Commission's December 18, 2023 *Second Report and Order* ("*Order*") in the above-captioned proceeding.

4.      I understand that, under the *Order*, everyday consumers who comparison shop for goods and services, including insurance coverage, will no longer be permitted to consent to receiving information via an automated phone call from multiple service providers. Instead, consumers will be required to separately consent to receive information from each individual service provider or "seller," even though it may be extremely difficult, if not impossible, as a technical matter to display which individual seller will be best suited to fulfill that particular consumer's request before the request is made.

5.      Blue Ink Digital is a performance-marketing company founded in Boston, Massachusetts, that offers consumers the ability to be connected in real-time to insurance providers as well as home service providers who can provide a customized quote for the service the consumer is seeking. Blue Ink Digital employs seven fulltime workers in the United States and provides performance marketing services to hundreds of clients enabling thousands of consumers to quickly, easily and at no cost to them find local businesses offering the services they are seeking. Blue Ink Digital is a member of the Insurance Marketing Coalition.

6.      Performance marketers and marketing organizations sometimes known as lead generators help service providers (sellers) advertise to a broad set of consumers in a cost-effective way when they might otherwise be too small, regional, unsophisticated, or lack the resources to run effective digital marketing efforts. These performance marketing organizations also help consumers by allowing them to explore, compare, and get quotes from local service providers (sellers) quickly and easily. Further, by the nature of the products we work in (insurance and home services) there exist hundreds of thousands of small local service providers that the

consumer likely has not encountered before due to the service providers' size and local focus (*e.g.*, local insurance agents, regional window installers, neighborhood handymen etc.).

7.      Today, Blue Ink Digital facilitates leads for service providers in the following way: Blue Ink hosts (*i.e.*, owns and operates) consumer-facing websites such as HomeOtter.com that allow consumers nationwide the ability to receive quotes from local home service providers relating to the home service the consumers are seeking. Blue Ink Digital does this by allowing a consumer to make a request to obtain a quote for a particular service (*e.g.*, window repair). Once the consumer has submitted the request—which includes the consumer's geographic location—and provided his consent to receive calls from our service-provider clients, we use a software platform to check which service providers in the country might be able to provide a quote based on the location of the consumer along with any additional information provided by the consumer. Our software matches this to the best situated service provider and passes the consumer's request to that service provider (and only that service provider) within seconds. The service provider is then able to see the consumer's request in real time, reach out and provide the desired quote with no further action required by the consumer. That outreach from the service provider to the consumer commonly occurs using an automated mechanism to dial and transmit the call. The service we provide is free for the consumer; the service provider (seller) pays us a referral fee.

8.      Blue Ink Digital also operates a similar matching service for instances in which consumers submit their service requests on a third-party website. Once a consumer submits his request for a quote and provides his consent to receive calls, the third-party website transmits basic information about the request (e.g., the location and type of service) to Blue Ink Digital. We then use our software to match the consumer with the optimal service provider and Blue Ink Digital

REDACTED - FOR PUBLIC INSPECTION

submits a bid for the lead on the service provider's behalf. If our client submits the winning bid, we then receive access to the consumer's personal identifying information. We then perform a separate validation process to confirm the information in the bid (e.g., that the listed name and address are true, that the lead does not already exist in our system, that the consumer is not on the FCC's Do Not Call Registry, etc.). The chosen service provider also performs its own separate validation process. Once the lead is validated, the chosen service provider pays for the lead. If, however, the chosen service provider declines to pay for lead, Blue Ink Digital can attempt to sell the lead to a different service provider capable of fulfilling the consumer's request. Because all Blue Ink Digital's leads are exclusive leads, today, we sell each lead to only one service provider.

9.      Our business operates in such a way that any single request is only passed to a single service provider.  However, until the consumer submits the request we cannot know which service provider will be best suited to handle the consumer's request. By requiring the consumer to consent to a specific service provider (seller), the *Order* requires us to implement substantial modifications to our system that effectively require us to return to the consumer *after* we have matched the consumer's request to a service provider to seek to consumer's consent for that specific, identified service provider to call that consumer.  The *Order* also will require the service providers that Blue Ink Digital serves to make modifications to their systems.  The costs and other implications of these modifications to Blue Ink Digital and these service providers are described below.

10.      Currently, Blue Ink Digital can match a consumer to a service provider after the consumer provides his consent to receive automated calls from several service providers. However, if the *Order* takes effect, Blue Ink Digital will be forced to change its technology to try to create a system through which a consumer can provide his consent to receive calls from only

4

the optimal service provider before the validation process. But that consent necessarily can only occur after Blue Ink Digital uses its software to identify the optimal service provider. The only way to implement the *Order*'s mandate is for Blue Ink Digital's software to attempt to match the consumer to a service provider while the consumer is entering his information and/or to make the consumer wait at a loading screen after he submits his information so that the matching system can find the best service provider. After this wait, the consumer could then consent to receive calls from only the optimal match.

11.    Developing this technology will be challenging and extremely costly. Based on the information known today, Blue Ink Digital believes it will initially cost ███████████ █████ and take ████████████ of development to attempt to create a first iteration of a system that would satisfy the *Order*'s new interpretation of the TCPA, plus further ongoing costs discussed below. In addition to creating a new system, every lead generation website would need to make substantial changes to their website and how they operate to be able to work with Blue Ink's new system. These changes would require substantial expenditure, reworking, and testing on thousands of websites operated by hundreds of independent companies. Most customer websites will also now need to work with multiple systems as there is no industry standard and multiple companies have already come forward and are creating different potential systems in an attempt to comply with the *Order*. Even if it is technologically possible to develop the type of system that complies with the *Order*, our current research shows that any new system will not work nearly as well as the current system.

12.    Even if a new system is implemented, it will not be as effective as the current system in producing effective and useful leads. We estimate that, if a consumer is forced to wait for the matching system to show the best service provider, the consumer will be waiting

REDACTED - FOR PUBLIC INSPECTION

█████████████ for a match. Although that delay may seem inconsequential, it is not. Indeed, based on my knowledge and experience understanding how consumers use the Internet, this length of delay would have significant adverse effects on Blue Ink Digital's business. We estimate that █████████████ consumers would not wait for the match to appear and therefore would not provide consent. *See* Kristen Baker, *11 Website Page Load Time Statistics [+How to Increase Conversion Rate]*, HubSpot (Nov. 10, 2023) (explaining based on an analysis of more than four billion website visits that the average desktop webpage load time is 2.5 seconds, that websites that load in 1 second have a conversion rate three times higher than websites that load in five seconds and five times higher than websites that load in 10 seconds, and that "as each second passes, the potential to lose out on prospective customers increases"), https://blog.hubspot.com/marketing/page-load-time-conversion-rates.[1] The end result is that a new system, if technologically feasible, would generate far fewer leads than the current framework, in turn significantly reducing Blue Ink Digital's revenues and increasing Blue Ink Digital's cost of doing business.

13.    Additionally, even for the portion of consumers that do wait for the final screen and provide their consent, there will be additional challenges preventing that consent from generating a usable lead. After receiving consent, Blue Ink Digital would then still need to perform our validation process to confirm that the lead is usable before Blue Ink Digital shares the lead with the service provider, and the provider will need to conduct its own validation (such as checking if the lead will be a duplicate or if the consumer has already requested a quote in the past). If there is any problem with the lead that prevents its validation, Blue Ink Digital cannot

---

[1] "Conversion rate" means the percentage of visitors to a website that complete a desired goal, such as consenting to be contacted about a good or service.

later sell the lead to a different service provider because the consumer did not provide his consent for other service providers. This means in many cases the consumer may never receive a call from a service provider that could meet his needs, even though the consumer has affirmatively sought a quote and expressed that he wishes to hear from service providers. It also means that such leads will cease having any value to Blue Ink Digital. Currently ███████ our leads, which are all exclusive leads, end up being sold to a service provider other than the one first matched with the consumer. The *Order* will prevent this practice and cause significant harm to Blue Ink Digital by eliminating that portion of our business, which amounts to ██████ Blue Ink Digital's revenue.

14.    Blue Ink Digital ███████████████████████████████████████████████ ████████████████████████████████████. In other words, ████████ ███████████████████████████████████████████████ ████████████████████████████████████.

15.    ███████████ Blue Ink Digital's annual sales are potentially regulated by the *Order*. Essentially all of Blue Ink Digital's clients (most of which use some form of automated technology to dial the consumer when the request comes in) would be subject to the *Order*. This includes our local insurance agent clients, solar installation operations and regional home service clients.

16.    If the *Order* takes effect, Blue Ink Digital's business structure will be forced to change. Blue Ink Digital will no longer be permitted to use its software to run a search of the more eligible service providers after the consumer makes their request.

17.    Blue Ink will still be able to display large nationwide businesses to the consumer because nationwide service providers have the financial and geographic flexibility to accept a wide range of potential leads. For example, a nationwide insurer could agree to pay a

7

**A246**

fixed rate for leads without a sophisticated matching process that accounts for the consumer's location or the particular type of service sought. Websites that generate quotes from consumers will therefore be more likely to work with nationwide service providers, because the nationwide providers will be able to offer more revenue certainty.

18.  While large service providers may be able to mitigate the *Order*'s damage, the *Order* poses a significant challenge in displaying the optimal local or regional service provider to the consumer prior to the consumer submitting a request as required by the *Order*. A large portion of our business goes to smaller service providers and hundreds of thousands of small and local businesses rely on lead generation services to connect to their customers. Specifically, small individual insurance agents, local home service providers, and regional organizations will be the most affected as they often have little to no online presence or technical capacity. Blue Ink Digital will have to work with these businesses to position them to generate leads that will satisfy the *Order*'s consent requirement, but that technology will be costly for us to develop and will be costly for small service providers to rely on—all to generate leads that will not be as effective as current leads. These increased costs with lead generation under the *Order* are likely to cause small service providers to leave the market altogether. Put differently, the *Order* will imminently result in a significant erosion of Blue Ink's customer base and sales.

19.  If the *Order* takes effect, Blue Ink Digital will not be able to provide its clients, many of which are small businesses, with the types of marketing leads they have come to expect. Blue Ink Digital's clients rely on these leads to connect with customers who have a demonstrated need for particular types of insurance coverage or other services we offer. Losing these leads will harm our clients' ability to compete with larger companies. Losing our ability to provide these leads will damage the relationships that Blue Ink Digital has built with its clients

8

**REDACTED - FOR PUBLIC INSPECTION**

and threatens both Blue Ink Digital's business as well as the business model of our clients and the hundreds of thousands of other small businesses that also rely on these services.

20.    Under the *Order*, instead of using its current, proven practices, Blue Ink Digital will be forced to make significant changes if it seeks to continue to operate. For example, Blue Ink Digital will need to limit business only to clients that are able to service consumer requests nationwide or must implement costly and unproven technology to attempt to determine which service provider (seller) the consumer should be matched with before consumers make and submit their requests. Because smaller service providers only seek to purchase leads that fit their business, Blue Ink Digital will have to build software that matches these service providers to consumers while the consumer waits on a loading screen so that the consumer can provide individual consent to receive calls from the service provider. As explained above, this technology will be incredibly expensive to develop, and it is unclear whether it will even be feasible.

21.    These changes will surely reduce revenues, increase the cost of marketing to our clients, decrease the total number of consumer requests we can process, impose compliance costs, slow business operations, eliminate jobs, damage client relationships, and generally make things more difficult for the company and the industries that we serve. While it is difficult to precisely estimate the overall impact since the change is so large and creates so much uncertainty, it is likely the total cost of marketing for leads will ███████████ for clients. This will also accompany a decrease in how effective the leads are as Blue Ink Digital will be severely limited in placing leads with the optimal service provider. This dramatic change in the cost of marketing will put many smaller businesses out of business or they will no longer be able to afford to use Blue Ink Digital's services. Any loss of clients will require Blue Ink Digital to scale down operations and lay off employees.

22.    Compliance with the *Order* will be a costly, time-consuming, and labor-intensive process that is both extremely large in scope, high in technical difficulty and unproven. It will require multiple industries to make significant changes and exposes hundreds of thousands of businesses to additional and significant costs. More specifically thousands of companies that currently buy leads will ultimately need to create, implement, or license technology that will allow them to comply with this *Order*. This process will likely impose yearly costs on those businesses in the range of $5,000.00 to $20,000.00 per business per year to license the required technology and substantially more to create their own. Additionally, tens of thousands of websites will need to be remade and integrate with new and untested systems. This will likely impose costs of several thousand dollars to tens of thousands of dollars per website to make these changes. Additionally Blue Ink Digital and similar companies will need to spend ███████████████ creating and implementing just the first version of a new system and likely equal amounts in coordinating with other companies to agree on common standards, implementation and testing.  This change is akin to requiring a hospital receptionist to tell a prospective patient walking in off the street which exact doctor they will speak with before the patient even specifies what they are looking for. To put it simply, complying with the *Order* is no small change, it requires a complete retooling of operations and ultimately of the systems that consumers have come to rely on in order to obtain free quotes for any given service they are looking for.

23.    If the *Order* is not stayed during the pendency of the litigation, Blue Ink Digital will suffer irreparable harm, including: 1) the expenditure ████████████ ████████████ to create and implement brand new technological systems to attempt to comply with the *Order*. These systems must  have the ability to identify the optimal service provider (seller) and display that information to the consumer before the consumer makes his or

10

**A249**

her service request, or it must factor in long delays for the consumer while the matching process is carried out and the resulting drop off in terms of the number of consumers who remain on the website while that process is completed; 2) continued loss of clients, including based on the legal uncertainty of being able to continue to legally buy leads and the increased costs of leads; and 3) significant costs ███████████████ to train or onboard clients on a new system and to integrate client's existing platforms with the new systems that must be built to attempt to comply with this *Order*.

24.    Indeed, Blue Ink Digital ████████████████████████████████



███████████████████████. The *Order* also increases the risk that businesses will face allegations of TCPA non-compliance, even when businesses make best efforts to comply in good faith with the *Order* and the TCPA. ████████████████████████████████ ███████████████.

25.    The *Order* will also restrict Blue Ink Digital's speech. Blue Ink Digital currently communicates with consumers by noting the benefits associated with consenting to calls, and once the consumers provide their consent, Blue Ink Digital contacts them directly to provide service offerings and communicates with other service providers to determine which company is best positioned to serve the consumer. However, if the *Order* takes effect, Blue Ink Digital's ability to engage in this expression will be significantly limited, as it will no longer be able to rely on a consumer's single consent to communicate with multiple service providers and select the most appropriate service provider on the consumer's behalf. Blue Ink Digital's speech will be restricted in this manner, even though performance marketers in other industries will be able to continue

REDACTED - FOR PUBLIC INSPECTION

providing services the same way Blue Ink Digital does now. However, due to the content of Blue Ink Digital's speech, the *Order* imposes restrictions.

26.     Even if IMC's petition for review is ultimately granted, Blue Ink Digital will never be able to recover the above stated costs because damages are not available in litigation against the Commission.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at New York City, March *13*, 2024.

Gregory Dobak