No. 24-10277

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

INSURANCE MARKETING COALITION LIMITED,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Matthew J. Dunne
  *Counsel*

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF INTERESTED PERSONS

As far as we are aware, the Certificate Of Interested Persons in Petitioner's Brief is complete.

/s/ *Matthew J. Dunne*
Matthew J. Dunne
*Counsel for Respondent*
*Federal Communications Commission*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is appropriate in this case given the complexity of the record and the legal issues presented, as well as its importance to consumers.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .............................................. i

STATEMENT REGARDING ORAL ARGUMENT ...................................... ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 3

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF THE CASE .................................................................... 5

    A.    Telephone Consumer Protection Act ....................................... 5

    B.    The FCC's *2012 Order* ............................................................. 6

    C.    The Lead Generator Loophole and Notice of Proposed
            Rulemaking .............................................................................. 7

           1.    The lead generation industry ........................................ 7

           2.    Notice of Proposed Rulemaking .................................... 9

    D.    The *Order* .............................................................................. 10

STANDARD OF REVIEW ....................................................................... 15

SUMMARY OF THE ARGUMENT ........................................................... 16

ARGUMENT ........................................................................................... 19

I.    THE REVISED ROBOCALL CONSENT RULE COMPORTS WITH THE
    STATUTE ........................................................................................ 21

    A.    The FCC lawfully established different requirements
            for demonstrating consent to receive commercial and
            non-commercial robocalls ...................................................... 21

    B.    The Commission's revised rule comports with the
            ordinary meaning of consent. ................................................ 26

II.    THE CONSENT RULE DOES NOT VIOLATE THE FIRST
    AMENDMENT. ................................................................................ 30

    A.    The consent rule easily survives intermediate scrutiny. ..... 30

# TABLE OF CONTENTS
## (continued)

**Page**

1. The rule promotes a substantial interest. ................. 31

2. The rule is proportionate to the government's interest. ................................................. 34

B. The rule is not subject to strict scrutiny. ............................ 37

III. THE CONSENT RULE IS REASONABLE AND SUPPORTED BY THE RECORD. ........................................................ 39

A. The FCC reasonably found lead generation websites are a problem, and the new rule is a solution. ..................... 40

B. The FCC considered and reasonably rejected IMC's comments and alternative proposal. .................................... 45

C. The FCC adequately considered the impact of the rule on small businesses. ............................................... 47

CONCLUSION ........................................................ 52

CERTIFICATE OF COMPLIANCE ........................................... 53

## TABLE OF AUTHORITIES*

**Cases**

*Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016)........27

*Baltimore Gas and Elec. Co. v. United States*, 817 F.2d 108 (D.C. Cir.1987) ..................................................................................45

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020)..1, 32, 37, 39

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ..........34, 36

*Blow v. Bijora, Inc.*, 855 F.3d 793 (7th Cir. 2017)...................................27

* *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ...................................................................................31

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) ...................................................................................38

*City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257 (11th Cir. 2022) ...................................................................................48

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ..................5

*Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235 (11th Cir. 2015) ...................................................................................31, 38

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ........................50

*FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290 (11th Cir. 2017) ..................................................................31, 34, 35, 38

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995)...................................33

*Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789 (9th Cir. 2018) ...................................................................................17, 19, 29

---

* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Georgia Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311 (11th Cir. 2018) ............................................................................ 42

*Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094 (11th Cir. 2019) ................................................................... 17, 29

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) ........................................................................ 16

*Hussion v. Madigan*, 950 F.2d 1546 (11th Cir. 1992) ...................... 45, 47

*Loper Bright Enters. v. Raimondo*, 603 U.S. __, 144 S. Ct. 2244 (2024) ........................................................................ 15

*Mantha v. QuoteWizard.com, LLC*, No. 19-12235-LTS, 2022 WL 325722 (D. Mass. Feb. 3, 2022) ........................................ 12

*Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257 (11th Cir. 2009) ............................................................ 16

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012) ............................. 5

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211 (1991) ....................................................... 44

*Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 843 (11th Cir. 2016) ......................................................................... 50

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014) ...... 26

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022) ................................. 38

*Reed v. Town of Gilbert, Az.*, 576 U.S. 155 (2015) ........................... 37, 38

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ............... 48

* *Schweitzer v. Comenity Bank*, 866 F.3d 1273 (11th Cir. 2017) ... 17, 22, 26

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) ..................................................................... 16, 39

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) .............. 32

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) .................................... 36

**Statutes**

28 U.S.C. § 2342(1) ................................................................................. 3

\* 47 U.S.C. § 227(b)(1)(A) ........................................................ 1, 4, 5, 16, 19

\* 47 U.S.C. § 227(b)(1)(B) ........................................................ 1, 4, 5, 16, 19

\* 47 U.S.C. § 227(b)(2) ............................................................ 1, 5, 16, 19, 22

47 U.S.C. § 402(a) ................................................................................. 3

\* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (codified at 47 U.S.C. § 227) ....... 1, 5, 17, 22, 23, 36, 47

**Regulations**

47 C.F.R. § 64.1200(a)(1) ....................................................................... 22

47 C.F.R. § 64.1200(a)(2) ........................................................... 2, 3, 22, 31

47 C.F.R. § 64.1200(a)(3) ........................................................... 2, 3, 22, 31

47 C.F.R. § 64.1200(f)(1) ........................................................................ 31

47 C.F.R. § 64.1200(f)(9) ........................................................... 2, 12, 21, 22

47 C.F.R. § 64.1200(f)(13) .................................................................. 6, 31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Administrative Materials**

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd 1830 (2012) ................. 6, 7, 24, 25

**Legislative Materials**

H.R. Rep. No. 102–317 (1991) ................................................................. 23

**Treatise**

Dobbs, The Law of Torts ........................................................................ 27

## INTRODUCTION

"Americans passionately disagree about many things. But they are largely united in their disdain for robocalls"—that is, text messages and telephone calls that are artificially voiced, prerecorded, or placed using automatic dialing technology. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020). In the order on review, the Federal Communications Commission ("FCC" or "Commission") adopted important measures to combat the proliferation of robocalls. *See Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC 23-107 (Dec. 18, 2023) (A1) ("*Order*").

The Telephone Consumer Protection Act of 1991 ("TCPA" or "Act"), Pub. L. No. 102-243, 105 Stat. 2394 (codified at 47 U.S.C. § 227), prohibits robocalls placed to most lines without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii), (B). To effectuate that prohibition, the statute empowers the FCC to adopt implementing rules. *See id.* § 227(b)(2).

Since 2012, the Commission has required that "express consent" for most categories of telemarketing robocalls be made in writing. *See* 47

- 1 -

C.F.R. § 64.1200(a)(2) & (3). But in recent years, that rule has failed to protect consumers from a flood of "unwanted texts and calls when [they] visit comparison shopping websites" run by entities known as "lead generators." *Order* ¶ 2 (A3). A consumer visiting such a website might click a single box and, without realizing it, be deemed to have "consented" to receiving robocalls from hundreds or thousands of the lead generator's "marketing partners." *Id.* ¶ 32 (A14). In many cases, those callers are businesses with no logical or topical connection to the website on which the consumer supposedly furnished consent. *Id.*

Petitioner Insurance Marketing Coalition ("IMC") represents lead generators and their clients in the insurance industry. IMC Br. 7–8. IMC's members find it cost effective to use a single checkbox to collect consumers' "consent" to be contacted by any one of "many potential businesses" that might purchase a lead obtained through a "comparison shopping" website. *Id.* 7. In defense of that business model, IMC insists that consumers "*want*, and have expressly *asked*, to receive" robocalls initiated this way. *Id.* 1.

The record shows otherwise, and the FCC reasonably disagreed. The Commission accordingly updated Section 64.1200(f)(9) of the agency's rules, 47 C.F.R. § 64.1200(f)(9), to close what it called the "lead

generator loophole" to the existing requirement of "express written consent" for telemarketing robocalls, 47 C.F.R. § 64.1200(a)(2) & (3); *see Order* ¶ 30 (A12). Once the revised rule takes effect in January 2025, robocalls that require express written consent will no longer be allowed unless a called party gives advertiser-specific "one-to-one consent," *id.* ¶ 31 (A13), and the telemarketing in question is "logically and topically related" to the website where consent is obtained, *id.* ¶ 36 (A17).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). Notice of the *Order* was published in the Federal Register on January 26, 2024. *Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5098 (Jan. 26, 2024). IMC timely filed its petition for review the same day.

## STATEMENT OF THE ISSUES

In implementing the TCPA's requirement for "express consent" for robocalls, 47 U.S.C. § 227(b)(1)(A) & (B), the FCC required that consent for telemarketing robocalls be given separately for each caller, and that those calls be logically and topically associated with the website where the consumer gave consent.

1. Does the *Order* comport with the TCPA?

2. Does the *Order* advance an important government purpose, with a reasonably tailored fit, as required by the First Amendment for regulations of commercial speech?

3. Is the *Order* reasonable and supported by the record, as required by the Administrative Procedure Act ("APA")?

## STATEMENT OF THE CASE

### A.   Telephone Consumer Protection Act

Congress enacted the TCPA in 1991 in response to public "outrage[]" over the proliferation of intrusive, nuisance [telemarketing] calls," which consumers "rightly regarded…as 'an invasion of privacy.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting the TCPA § 2, 105 Stat. at 2394 (second alteration in original)); *see Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264–65 (11th Cir. 2019). Among other restrictions, the TCPA generally forbids calls made "using any automatic telephone dialing system or an artificial or prerecorded voice" to a cell phone without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). The same consent requirement applies for calls to residential lines made "using an artificial or prerecorded voice." *Id.* § 227(b)(1)(B). The FCC generally refers to these communications as "robocalls" (or as "robotexts," when referring to messages delivered by text). *See Order* ¶ 8 & n.14 (A4).

The TCPA does not define the "express consent" required for these calls. Instead, as to this and other aspects of the statute, Congress directed the Commission to prescribe implementing regulations. 47 U.S.C. § 227(b)(2).

### B.    The FCC's *2012 Order*

In an order implementing the TCPA in 2012, the FCC interpreted "express consent" under the statute to require express *written* consent for telemarketing robocalls. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd 1830, 1838 ¶ 20 (2012) (*2012 Order*).[1] The FCC adopted this requirement to "reduce the opportunities for telemarketers to place unwanted or unexpected calls to consumers," and to "reduce the chance of consumer confusion in responding orally to a telemarketer's consent request." *Id.* at 1839 ¶ 24.

By contrast, the Commission determined that it would not require written consent for informational, non-telemarketing robocalls—*e.g.*, messages from non-profit and political organizations, or calls providing information about credit card fraud or school closings. *See id.* at 1838 ¶ 21. In the agency's judgment, requiring written consent for such calls would "unnecessarily impede," *id.*, access to "information that consumers find highly desirable," *id.* at 1841 ¶ 29. With less reason to doubt the sufficiency of oral consent to receive such calls, the Commission "[left] it

---

[1] FCC regulations define "telemarketing" to "mean the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(13).

to the caller to determine, when making an autodialed or prerecorded *non-telemarketing* call to a wireless number, whether to rely on oral or written consent in complying with the statutory consent requirement." *Id.* at 1842 ¶ 29.

### C.    The Lead Generator Loophole and Notice of Proposed Rulemaking

In recent years, the Commission began to explore the proper application of the TCPA and the agency's implementing rules to the "lead generation" industry.

### 1.    The lead generation industry

"Lead generation is the process of identifying and cultivating individual consumers who are potentially interested in purchasing a product or service," primarily based on the consumer's voluntary submission of information online. Federal Trade Commission, *"Follow The Lead" Workshop*: *Staff Perspective* at 2 (Sept. 2016) ("*FTC Workshop*") (SA186); *see Order* n.69 (A12) (citing *FTC Workshop*).

Typically, "consumers' first interaction with online lead generators starts with a website" that encourages "consumers to submit additional information about themselves to learn more and connect with merchants or advertisers (like retailers or lenders)." *FTC Workshop* at 2 (SA186).

The website operator will then attempt to sell this "lead," either to end-buyer merchants or, frequently, to intermediaries known as "lead aggregators." *Id.* at 3 (SA187). Aggregators then may sell a batch of leads to an end-buyer merchant or, alternatively, to yet another aggregator, which will further process them and sell them to another buyer. *Id.*

Industry representatives contend there are benefits to this arrangement, which they say connects buyers and sellers quickly and efficiently, lowers prices, and promotes competition. *Id.* at 4–5 (SA188–89). The Federal Trade Commission, however, has described several potential drawbacks from this "often very complex and opaque" system. *Id.* at 5 (SA189). For example, consumers who fill out web forms may not realize that (1) "they are operated by lead generators" (consumers may "instead assume that they are submitting information directly to a merchant or other advertiser"); (2) consumers' "information can be sold and re-sold multiple times" ("and further that, as a result, [consumers] may be contacted by numerous marketers…unfamiliar to them"); or (3) consumers' information may go "to the companies willing to pay for it (or pay the most for it), as opposed to those best suited to offering [consumers] the products or services they seek." *Id.*

### 2.    Notice of Proposed Rulemaking

In recent years, despite the FCC's previous efforts, intrusive, unwanted, and often illegal robocalls continued to proliferate. *See Order* ¶¶ 5–7, 30 & n.68, 31 & n.72 (A3–A4, A12, & A13). Between 2015 and 2020, for example, "the number of spam text messages that wireless providers blocked grew ten times," to an estimated 14 billion per year. *Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 23-21 ¶ 6 (Mar. 17, 2023) (SA6) (*NPRM*).

Accordingly, in March 2023, the FCC sought comment on several proposals to cut down on illegal and intrusive robocalls. *Id.* ¶¶ 48–65 (SA22–27). Among these proposals, the Commission sought comment on closing the "lead generator loophole." *See id.* ¶¶ 58–62 (SA25–26).

As an example of the problem it sought to address, the FCC cited its recent experience regarding a lead generation company called Assurance IQ, whose website "purport[ed] to enable consumers to comparison shop for insurance," but which—on a separate, hyperlinked webpage—sought consent for calls and texts from "partner companies" that included entities that seemingly did not offer insurance at all. *Id.* ¶ 59 (SA25). The Commission also cited another insurance-related

website that listed 8,423 entities on a hyperlinked page. *See id.* ¶ 60 (SA26). Such examples gave rise to the concern, the Commission explained, that a telemarketer purchasing a lead might "believe that it has the consumer's prior express consent" where there was in fact no consent "to the particular caller or callers." *Id.*

In light of these concerns, the Commission sought comment on a proposal to require "that prior express consent to receive calls or texts…be made directly to one entity at a time." *Id.* ¶ 61 (SA26). It also proposed to require "that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page." *Id.*

### D.    The *Order*

In the *Order* on review, the Commission implemented both proposals. *See Order* ¶ 30 (A12).

As the *Order* makes clear, a wide range of commenters—including consumer groups, members of Congress, state attorneys general, telecom industry groups, and individual consumers—favored closing the lead generator loophole. *Id.*; *see id.* n.72 (A13) (citing Joint Consumers Comments (SA50), USTelecom Comments (SA90); AG Reply Comments

(SA121); and Letter from U.S. Senators Ben Ray Luján et al. (Aug. 7, 2023) (Aug. 7 Congressional) (SA179)). Examining the record, the Commission agreed that the "resale of consumer data by lead generators and lead aggregators" has "significantly" contributed to the problem of unwanted robocalls. *Id.* ¶ 31 (A13).

The FCC also took note of other cases where lead generation websites had contributed to unwanted calls. As one example, it pointed to "abuses" uncovered in a recent enforcement action against the company Urth Access, *id.* ¶ 32 (A14), in which the Commission rejected the adequacy of disclosures through which consumers were supposed to have "consented" to receiving "millions of student-loan-related robocalls" on websites that had no "connection with student loan assistance." *Urth Access LLC*, 37 FCC Rcd 14133, 14136, 14139 ¶¶ 8, 15 (Enf. Bur. 2022) (SA 198) (*Urth Access Order*). The consent disclosures in question included a hyperlink to a separate webpage listing 5,329 entities as "marketing partners." *Order* ¶ 32 (A14) (citing *Urth Access Order*, 37 FCC Rcd at 14139 ¶ 16 (SA205). In another example, a telemarketer had relied on consent that had been resold several times, and which the plaintiff denied ever having given. *Id.* n.70 (A13) (referencing *Mantha v. QuoteWizard.com, LLC*, No. 19-12235-LTS, 2022 WL 325722 (D. Mass.

Feb. 3, 2022)). With the benefit of this record, the Commission concluded that lead-generated communications "often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts." *Id.* ¶ 30 (A12); *see id.* n.70 (A12–A13) (collecting examples of abuses).

In the agency's judgment, "new protections [were] necessary to stop abuse of [its] established consent requirements." *Id.* ¶ 30 (A12). The Commission therefore amended the definition of "prior express written consent" set forth in Section 64.1200(f)(9) of its rules to mean a written agreement "that clearly and conspicuously authorizes no more than one identified seller" authorized to send (or cause to be sent) a telemarketing robocall. *Id.* at App. B (A51) (amending 47 C.F.R. § 64.1200(f)(9)). The Commission further specified, in its revised rule, that "[c]alls and texts must be logically and topically associated with the interaction that prompted the consent." *Id.*

By "[u]nequivocally requiring one-to-one consent" for telemarketing robocalls, *id.* ¶ 31 (A13–A14), the Commission sought to "stop[] the practice of buried, barely visible disclosures that…appear in fine print on a website or [are] only accessible through a hyperlink," and thereby to ensure that, going forward, "consumers consent only to sellers they wish to hear from," *id.* ¶ 32 (A14) (citing "the abuses we saw…in *Urth Access*").

As the Commission explained, the one-to-one consent requirement also makes "clear that sharing lead information with a daisy-chain of 'partners' is not permitted." *Id.*

In requiring that the content of robocalls "be logically and topically associated with the website where [a] consumer [gives] consent," *id.* ¶ 30 (A13), the Commission explained that "consumers deserve protection against calls that go beyond the scope of consent, a scope that can be reasonably inferred from the purpose of the website at which they gave that consent," *id.* ¶ 36 (A17). In adopting this requirement, the Commission specifically considered and rejected IMC's contention that a consumer's consent on a car loan comparison website should be understood to extend beyond car loans, to robocalls about loan consolidation. *Id.*

The Commission further considered, but rejected, other industry proposals, including IMC's proposal that the agency require only that lead generation websites more explicitly disclose their practices, and proposals from other industry members that websites be permitted to obtain a single consent for a short list of callers (such as 10). *Id.* ¶¶ 33, 34 & n.85 (A15–A16). In the Commission's judgment, these proposals were not sufficiently protective of consumers' interest in controlling

"which parties they consent to receive robocalls or robotexts from." *Id.* ¶ 34 (A16).

The Commission additionally considered arguments that its revised definition of consent would hurt consumers and small businesses. *Id.* ¶¶ 37–45 (A17–A20). Without disputing that comparison shopping websites and lead generators may sometimes benefit consumers or businesses, the Commission recognized a need to "balance[]" such benefits against the public interest in protecting "consumers, including small businesses, from a deluge of unwanted robocalls and robotexts." *Id.* ¶ 37 (A17). The Commission stated that no party had provided specific evidence that the revised rule would prevent consumers from comparison shopping. *See id.* ¶¶ 38–41 (A17–A18). The agency also explained that many avenues will remain available to lead generators and marketers, even under the revised rule: websites may ask for consent after a "match" is made between customer and seller, *id.* ¶ 33 (A15); websites may offer a list of possible sellers and allow consumers to choose each seller they wish to hear from, *id.* ¶ 41 (A18); or sellers may purchase leads obtained without one-to-one consent and then communicate with consumers by means other than robocalls, *id.* ¶ 39 (A18).

No party, the Commission observed, had offered "specific evidence on the potential economic impact" of the revised rule for lead generators or their clients. *Id.* ¶ 47 (A21); *see id.* ¶ 42 (A19). By contrast, the agency's "analysis suggest[ed] that the harm of unwanted and illegal calls is at least $13.5 billion annually"—a problem to which, the Commission found, lead generators and aggregators have contributed "significant[ly]." *Id.* ¶ 47 (A21).

## STANDARD OF REVIEW

IMC argues that the FCC's implementation of the TCPA through the revised rule conflicts with the statute. While reviewing "courts must exercise independent judgment in determining the meaning of statutory provisions," the interpretations of "those responsible for implementing particular statutes…'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. __, 144 S. Ct. 2244 (2024), slip op. at 16 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Review of IMC's claim that the *Order* violates the First Amendment is de novo. *See, e.g.*, *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169,

1181 (11th Cir. 2017) (en banc) (de novo review for questions of constitutional law).

By contrast, review of IMC's claim that the *Order* is arbitrary and capricious is "exceedingly deferential." *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1290–91 (11th Cir. 2021) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009)). A decision is arbitrary and capricious only if the agency relied on factors that Congress would not have intended, "entirely failed to consider an important aspect of the problem," "offered an explanation counter to the evidence before the agency," or took "action…so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotation marks and citations omitted).

## SUMMARY OF THE ARGUMENT

Congress authorized the Commission to prescribe regulations to implement the TCPA, 47 U.S.C. § 227(b)(2), including the requirement of "prior express consent" for robocalls, *id.* § 227(b)(1)(A), (B). Here, the FCC reasonably exercised that authority, consistent with the statute.

**I.A.** The FCC's decision to impose differing standards to demonstrate consent for telemarketing as opposed to non-telemarketing

robocalls was reasonable and consistent with the TCPA. Congress showed a particular concern with telemarketing and gave the FCC the "flexibility to design different rules" for robocalls that are, and are not, a nuisance. TCPA § 2(13), 105 stat 2395. The FCC has had different consent requirements for telemarketing and non-telemarketing calls since 2012, and the record in this proceeding continued to show a problem with the former, but not the latter.

**I.B.** The Commission's revised rule is also consistent with the ordinary meaning of consent: a "willingness for certain conduct to occur." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017). The record showed that consumers should not be presumed willingly to invite robocalls from hundreds or thousands of entities identified on a comparison shopping website's hyperlinked list, often with no logical or topical connection to the website. *See Order* ¶ 32 (A14). Lead generation arrangements of this kind are not reasonably analogous to cases IMC highlights—*Gorss Motels, Inc. v. Safemark Systems, LP*, 931 F.3d 1094 (11th Cir. 2019), and *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789 (9th Cir. 2018)—in which parties knowingly authorized communications from affiliates of the party with which they had a direct relationship.

**II.A.** As a regulation of commercial speech, the Commission's rule is subject to—and easily survives—intermediate First Amendment scrutiny. The government has a substantial interest in protecting consumers from intrusive and unwanted calls, and the record shows that the new consent rule would further that interest. In addition, the rule is appropriately—indeed, narrowly—tailored: consumers can still use comparison websites, and lead generators and sellers still have many avenues through which to pursue their telemarketing activities.

**II.B.** IMC argues that because the rule targets only commercial speech, the rule is "content-based" and so is subject to strict scrutiny. That argument runs counter to decades of established law on commercial speech regulation. The cases on which IMC relies do not support that result, and the Supreme Court and this Court have recently reaffirmed the continuing viability of the commercial speech doctrine.

**III.** The consent rule is reasonable and supported by the record. Abundant evidence from a wide variety of commenters showed that lead-generated robocalls are a significant problem. The record likewise supported the agency's conclusion the new consent rule would help solve that problem. The agency fully considered and reasonably rejected more limited proposals from IMC and other lead generators. It likewise

reasonably found that any impact of the rule on small businesses was outweighed by the significant interest in protecting consumers from unwanted telemarketing robocalls, as Congress had intended.

The petition for review should be denied.

## ARGUMENT

Congress empowered the Commission to prescribe regulations to implement the TCPA, 47 U.S.C. § 227(b)(2), including the statute's requirement of "prior express consent" for robocalls to most phone lines, *id.* § 227(b)(1)(A), (B). In the *Order*, the FCC exercised that authority to address a substantial threat to consumer privacy from the lead generation industry. An extensive record showed that "[l]ead-generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts." *Order* ¶ 30 (A12); *see above* pp. 10–13; *below* Part III.A. Taking account of this "transactional context," *Fober*, 886 F.3d at 793, the Commission reasonably concluded that requiring one-to-one consent would "stop[] the practice of buried, barely visible disclosures" and instead "ensure[] that consumers consent only to sellers they wish to hear from," *Order* ¶ 32 (A14). Although the Commission considered other, more limited proposals that IMC and other

industry commenters might have preferred, *see above* pp. 13–14, *below* Part III.B, it concluded that a requirement of one-to-one consent would better ensure that consumers only receive robocalls they give informed consent to receive, *see Order* ¶ 34 (A15). That determination was an eminently reasonable exercise of the Commission's congressionally conferred discretion.

It was likewise well within the Commission's discretion to mandate a "logical[] and topical[]" connection between the commercial interaction giving rise to consent and any resulting telemarketing robocalls. *Id.* ¶ 36 (A17). The Commission's recent experience in the *Urth Access* enforcement proceeding, for example, supported this decision. There, a telemarketing group had made "millions" of unwanted calls regarding student loans and claimed to have obtained consent for those calls through a lead generator's websites that had no apparent connection to student loan assistance. *Urth Access Order* ¶¶ 8 & 15 (SA202, SA205). Similarly, USTelecom—as leader of the "Industry Traceback Group" that traces robocalls—complained to the Commission about "claims of consent where a consumer interested in job listings, a potential reward, or a mortgage quote, unknowingly and unwillingly 'consents' to telemarketing calls from dozens—or hundreds or thousands—of

unaffiliated entities about anything and everything." USTelecom Comments at 1 & n.1, 2 (SA91, SA92). On this record, the Commission reasonably took steps to protect consumers from unwittingly inviting sales communications they might not reasonably expect. *Order* ¶ 36 (A17).

In the face of this reasonable and well-supported action, IMC's various objections to the *Order* are unpersuasive.

## I. THE REVISED ROBOCALL CONSENT RULE COMPORTS WITH THE STATUTE.

IMC contends that the FCC's revisions to Section 64.1200(f)(9) of the agency's rules, 47 C.F.R. § 64.1200(f)(9), exceed the Commission's authority under the TCPA. *See* IMC Br. 22–30. Neither of IMC's two statutory theories is persuasive.

### A. The FCC lawfully established different requirements for demonstrating consent to receive commercial and non-commercial robocalls.

IMC argues, first, that the Commission unlawfully "assign[ed] different meanings to the same statutory term"—"prior express consent"—for telemarketing and non-telemarketing robocalls. IMC Br. 22; *see id.* 22–26. But there is no inconsistency. For telemarketing and

non-telemarketing messages alike, express consent means an expression of "willingness for certain conduct to occur." *Schweitzer*, 866 F.3d at 1276.

Because different circumstances surround telemarketing and non-telemarketing calls, however, the FCC has long required different evidence of willingness in each context. Consent for telemarketing robocalls must be demonstrated through "express written consent" as defined in Section 64.1200(f)(9)—which, when the *Order* takes effect, will include the one-to-one-consent and logical-and-topical-relation requirements. *See* 47 C.F.R. § 64.1200(a)(2) & (3), (f)(9). By contrast, consent for other calls may be proved in writing or orally. *See id.* § 64.1200(a)(1).

The Commission's separate requirements for telemarketing and non-telemarketing robocalls are consistent with the text and design of the TCPA. In directing the FCC to implement the requirements of the TCPA, 47 U.S.C. § 227(b)(2), Congress recognized that the FCC "should have the flexibility to design different rules for those types of automated or prerecorded calls that…are not considered a nuisance or invasion of privacy, or for noncommercial calls." TCPA §§ 2(13), 105 Stat 2394, 2395; *see also* 47 U.S.C. § 227(b)(2)(B) (directing the FCC to consider exempting certain non-commercial calls and commercial calls that do not include

advertisements). As explained by the Committee on Energy and Commerce in the House report recommending adoption of the TCPA, "the record suggest[ed] that most unwanted telephone solicitations are commercial in nature," and that "non-commercial calls…are less intrusive to consumers because they are more expected." H.R. Rep. No. 102–317, at 16 (1991). IMC would elide this statutory difference by taking out of context a congressional finding that, "regardless of the content or the initiator of the message," robocalls can be "a nuisance and an invasion of privacy." IMC Br. 38, quoting TCPA § 2(10), 105 Stat 2394, 2395. But that finding follows nine others that describe the growing burden of telemarketing calls specifically, TCPA §§2(1)-(9), and is followed by the finding quoted above that the FCC should have "flexibility" to adapt its rules for calls that are noncommercial or not a nuisance. TCPA §§ 2(13).[2] Congress plainly saw a distinction between

---

[2] TCPA § 2(13) ("While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.").

telemarketing and non-telemarketing robocalls and authorized the FCC to implement the statute accordingly.[3]

The distinction between telemarketing and non-telemarketing robocalls, moreover, long predates the current *Order*. It arises from the *2012 Order*, in which the Commission provided that telemarketers must demonstrate "express consent," as required by Section 227(b)(1)(A) and (B), through *written* evidence, whereas either oral or written consent suffices to demonstrate compliance with the statute for other types of robocalls. As the agency then explained, obtaining prior written consent for telemarketing would require "conspicuous action by the consumer" and so "reduce the chance of consumer confusion in responding orally to a telemarketer's consent request." *2012 Order*, 27 FCC Rcd at 1839 ¶ 24; *see id.* at 1840 ¶ 25 (consumers who orally consent to service calls "do not necessarily expect" to get telemarketing calls). By contrast, equivalent evidence of consent is not needed for non-telemarketing, informational calls because consumers regard access to such information as "highly

---

[3] IMC complains that the Commission did not properly exercise its exemption power here (Br. 23-24), but the agency did not grant anyone an exemption from the statutory consent requirement. As explained, it simply defined an evidentiary requirement to show consent for certain types of calls.

desirable"; requiring written proof of consent in every instance would thus "serve as a disincentive to the provision of services on which consumers…rely." *Id.* at 1841 ¶ 29. Thus, the different rules governing consent that the Commission adopted in 2012 were calibrated to match consumers' expectations.

The Commission's maintenance of that distinction was likewise supported by the record here. The *Order*'s updates to Section 64.1200(f)(9) responded to lead generation techniques that gave rise to unwanted telemarketing robocalls. *See NPRM* ¶¶ 58–60 (SA25–26). But there was no evidence that non-telemarketing, informational calls—for example, informational robocalls about school closings or credit card fraud, *see 2012 Order*, 27 FCC Rcd at 1841 ¶ 29 n.79—were unwanted, or being made based on mistaken or unreliable claims of consent. There was thus no reason for the Commission to depart from its determination in the *2012 Order* that compliance with the TCPA for non-telemarketing robocalls could be established with evidence of oral consent, as opposed to written consent.[4]

---

[4] IMC suggests that the *Order* did not explain that context requires different standards of consent for telemarketing and non-telemarketing calls and so cannot do so now. IMC Br. 25 (citing *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)). But because the distinction between telemarketing

**B.    The Commission's revised rule comports with the ordinary meaning of consent.**

IMC also challenges the FCC's statutory authority on a theory that the Commission's one-to-one-consent and logical-and-topical-relation requirements conflict with the "ordinary meaning" of the term "consent." IMC Br. 26; *see id.* at 26–30. But the *Order*'s definition of consent, which the Commission adopted to align with consumers' expectations, is fully consistent with the common understanding of that term.[5]

Both parties agree on the appropriate starting point for construing "consent": "the basic premise of consent is that it is given voluntarily." *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1253 (11th Cir. 2014), *cited at* IMC Br. 26; *see Schweitzer*, 866 F.3d at 1276 (consent is a "willingness for certain conduct to occur").

But "the scope of consent, like its existence, depends heavily upon implications and the interpretation of circumstances." *Id.* at 1279.

---

and non-telemarketing calls stems from the *2012 Order*, there was no reason for the Commission to re-explain this longstanding approach in the *Order. See Order* n.67 (A12) (observing, in response to IMC's argument, that the challenged written consent requirement arises from the *2012 Order*).

[5] The validity of the Commission's challenged rule in no way depends on the application of *Chevron* deference, now overruled by *Loper Bright*, 603 U.S. __.

(quoting Dobbs, The Law of Torts § 108, at 328–29).[6] Here, the record showed that consumers should not be presumed "voluntarily" or "willingly" to invite robocalls from hundreds or thousands of entities identified on a lead generator's hyperlinked list, particularly when the listed entities have no logical or topical connection to the website. The Commission cited, for example, an FTC report "observing that consumers who fill out web forms may not realize they are operated by lead generators, *i.e.*, not merchants, or may not know that this information can be sold and re-sold multiple times." *Order* n.69 (A12). The agency likewise highlighted the view of USTelecom—informed by USTelecom's experience as the leader of the Industry Traceback Group—that "buried, barely visible disclosures" that appear on websites "in fine print," or that are "only accessible through a hyperlink," present an obstacle to consumers' provision of "fully informed" consent. *Id.* ¶ 32 (A14).

This was the same problem, moreover, that led to the "abuses" addressed in the *Urth Access* enforcement action. *Id.* IMC contends (IMC

---

[6] *See also Blow v. Bijora, Inc.*, 855 F.3d 793, 805 (7th Cir. 2017) (scope of consent under the TCPA is "dependent on the context in which it is given" (cleaned up)); *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 343 (6th Cir. 2016) ("context of the consent…is critical").

Br. 27) that check-box acceptance of telemarketing from multiple companies, including those unrelated to the subject of a consumer's initial inquiry, amounts to "[c]onsent that is clearly and unmistakably stated." But, with ample support from the record, the Commission reasonably disagreed—as well might anyone who has interacted with lengthy pop-up agreements on the web.

To be sure, there may be particular instances, as IMC contends (IMC Br. 28), in which it would be reasonable to conclude that a consumer provides willing, informed agreement to receive robocall marketing from "multiple named intermediaries" (or even, conceivably, from unnamed affiliates). But as IMC elsewhere recognizes (IMC Br. 26 n.7), the Commission was not, in the *Order*, tasked with evaluating the validity or scope of a particular consumer's specific consent on an individual occasion. The Commission instead crafted a legislative rule designed to ensure compliance with the TCPA's "prior express consent" requirement for telemarketing robocalls generally. And on the available record, the Commission reasonably concluded that, without the one-to-one-consent and logical-and-topical-relation requirements, visitors to lead generation websites would continue to provide "consent" unwittingly, and to receive unwanted robocalls as a result.

For the same reason, IMC's reliance on *Gorss Motels* and *Fober* to establish the meaning of consent (IMC Br. 28) is misplaced. In each of those cases, the specific facts of the consumer transactions at issue were central. *See, e.g.*, *Fober*, 886 F.3d at 793 ("the scope of consent must be determined upon the facts of [the] situation").

In *Gorss Motels*, this Court found that a hotel ownership group knowingly gave "permission" for fax solicitations from affiliates of their franchisor when, in the franchise agreement, it provided its fax numbers and "expressly agreed to receive information about purchasing items from [the franchisor's] affiliates." 931 F.3d at 1101; *see id.* at 1097, 1100. The consent of a commercial enterprise to be contacted by affiliates of a contracting partner is very different from a shopper's checked box on a webform.

In *Fober*, the Ninth Circuit held that a patient had given informed consent to receive a robocall assessing the quality of her medical care when, upon enrolling in her healthcare plan, she expressly authorized the plan to disclose information in her enrollment form—which included her phone number—"for purposes…of quality improvement." 886 F.3d at 793. In that context, the court held, it was irrelevant that the caller had obtained the consumer's phone number through an intermediary of the

health plan; the call was for the purpose the consumer had knowingly authorized. *Id.* In other words, there was little doubt that the customer had consented to be called for a limited, non-commercial purpose, and the court found it irrelevant that a different party had actually made the quality-control call.

These facts lie far afield from the practices of the lead generation industry. As the Commission explained based on the record, and as common sense confirms, "most reasonable consumers would not expect to receive" telemarketing robocalls from potentially "hundreds…of sellers" when seeking further information by clicking on a single website link. *Order* ¶ 31 (A14). In this context, the FCC's interpretation of "prior express consent" falls comfortably within the ordinary meaning of consent, as well as within the Commission's statutory authority.

## II.    THE CONSENT RULE DOES NOT VIOLATE THE FIRST AMENDMENT.

### A.    The consent rule easily survives intermediate scrutiny.

The revised consent requirement adopted by the *Order* regulates only commercial speech, *i.e.*, "speech proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447

U.S. 557, 562 (1980).[7] "The law is clear that commercial speech is afforded lesser protections than those traditionally given to noncommercial speech." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). As this Court has explained, regulations of commercial speech "are given more leeway because of the robustness of the speech and the greater need for regulatory flexibility in those areas." *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1246 (11th Cir. 2015). Such rules are therefore subject to intermediate scrutiny: they are permissible so long as they advance "a substantial [government] interest" and the restrictions they impose are "in proportion to that interest." *Central Hudson*, 447 U.S. at 564; *see Dana's R.R. Supply*, 807 F.3d at 1246.

### 1. The rule promotes a substantial interest.

The revised rule adopted by the *Order* readily satisfies this standard. IMC does not (and could not reasonably) dispute that protecting consumers from unwanted robocalls is a substantial

---

[7] The definition amended by the *Order* is required only for a robocall "that includes or introduces an advertisement or constitutes telemarketing," defined as a message "advertising the commercial availability or quality of any property, goods, or services" or "encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(a)(2) & (3), (f)(1) & (13).

government interest. *See* IMC Br. 34; *Barr*, 140 S. Ct. at 2348 (upholding the TCPA's general restriction on robocalls based on the government's interest in "protecting consumer privacy"); *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227 (9th Cir. 2019).

The *Order* directly advances that interest. As we elsewhere explain (*see above* pp. 10–13; *below* Part III.A), the FCC found, based on extensive comment, that consumers have been besieged by robocalls resulting from lead generation websites, and that the new one-to-one-consent and logical-and-topical-relation requirements will "stop[] the practice of buried, barely visible disclosures" and instead "ensure[] that consumers consent only to sellers they wish to hear from." *Order* ¶ 32 (A14).

IMC's suggestion that the Commission "simply posit[ed] the existence of" "conjectural" harms, IMC Br. 41 (internal quotation marks omitted), is belied by the record, which included submissions by law enforcement, legislators, the leader of the Industry Traceback Group, consumer groups, individual commenters, and even another lead generation trade group that disagreed with IMC. *See Order* n.70 (A13); *id.* n.72 (A13); *id.* n.86 (A16); *see also id.* ¶ 32 (A14) (discussing the *Urth Access* enforcement action). It is thus not true that the FCC relied on "a single citation to a [single] comment letter," IMC Br. 34, to demonstrate

the problem arising from lead generation practices. And the concerns of 28 state attorneys general and of the leader of the Industry Traceback Group are not "mere conjecture" (IMC Br. 34–35), but rather are rooted in the experience acquired by those groups in combatting and investigating the causes of unwanted robocalls. *See* US Telecom comments at 2 (SA92) (lead generation calls "create more hurdles for enforcers and the traceback process as callers obfuscate the legality of their unwanted robocalls by claiming they have valid consent"). The Commission reasonably took account of that experience, and the knowledge the agency obtained in the *Urth Access* enforcement action, alongside other evidence in the record.

Finally, contrary to IMC's suggestion that a reduction in unwanted calls "by some unknown amount" is insufficient to sustain the Commission's rule (IMC Br. 36), "empirical data" are not required under the First Amendment; "history, consensus, and simple common sense" can be sufficient support. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (cleaned up). Here, the benefits of the rule changes, the Commission found, will "accrue to millions of individuals and businesses, including small businesses." *Order* ¶ 59 (A25).

### 2. The rule is proportionate to the government's interest.

Commercial speech regulation need "not necessarily [employ] the least restrictive means" of promoting a substantial government interest to survive First Amendment scrutiny. *FF Cosmetics*, 886 F.3d at 1299 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)). Instead, the First Amendment is satisfied if the "fit" between the regulation and the interest it promotes "is not necessarily perfect, but reasonable." *Id.*

The Commission's rule as revised in the *Order* readily satisfies that standard. It directly addresses the "lead generator loophole" by aligning the showing of consent required for telemarketing robocalls with consumer expectations, while still allowing consumers to specifically consent to receive those telemarketing robocalls they actually want to receive. *Order* ¶ 38 (A17). The Commission likewise has not banned or unduly restricted comparison shopping websites; the revised rule simply prevents them from requiring consumers to "agree to receive robocalls or robotexts from multiple, potentially hundreds, of other callers" as a precondition "to access[ing] [comparison shopping] services." *Id.* ¶ 32 (A14). The *Order* does not even prevent sellers from contacting

consumers who have given a generalized consent to a long list of "marketing partners"; the sellers simply cannot employ robocalling (or robotexting) to do so. *Order* ¶¶ 38–39 (A17–18).

IMC nonetheless asserts (without proof) that the rule is overinclusive because "many calls affected" by the rule "are in fact wanted by the consumer that authorizes them." IMC Br. 36. But consumers can still consent to robocalls from sellers they wish to hear from, either individually from a list, or after a "match" is made with a prospective seller. Indeed, a declaration that IMC furnished in support of its stay motion confirms that lead generation websites can be updated to pair a consumer and buyer before consent is given (instead of harvesting consent for a long list of "partners"), albeit with a modest delay that IMC's members would prefer to avoid. Dobak Decl. ¶ 12 (Doc. 20-3) (acknowledging that the "delay may seem inconsequential"); *see Order* ¶ 33 (A15) (describing pre-consent match possibility). The preference of IMC's members to retain their business models entirely unchanged is not evidence that the Commission's rule is impermissibly overinclusive. *See FF Cosmetics*, 866 F.3d at 1300 (commercial speech regulation is invalidated not where it goes "only marginally beyond what would adequately have served the governmental interest," but rather

where it is "substantially excessive, disregarding far less restrictive and more precise means" (quoting *Fox*, 492 U.S. at 479)).

IMC also characterizes the rule as "underinclusive" because the rule mandates one-to-one consent and a logical or topical relationship only for telemarketing robocalls, and not informational robocalls. IMC Br. 37. But "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (citation omitted). Instead, underinclusiveness is relevant only if it is so irrational as to "raise doubts about whether the government is in fact pursuing the interest it invokes." *Id.* at 448 (cleaned up).

That is not the case here. As we have observed, the record showed a problem with telemarketing robocalls, but no such problem with non-telemarketing calls. *See above* p. 25. And Congress contemplated, in enacting the TCPA, that telemarketing and non-telemarketing robocalls might require different types of rules; it provided that the FCC "should have the flexibility" to  implement the statute accordingly. TCPA § 2(13), 105 Stat 2394, 2395. In these circumstances, requiring one-to-one consent and a logical-and-topical relation only for telemarketing robocalls does not suggest that the FCC's purpose was pretextual.

IMC's contention that the FCC failed to address less restrictive proposals in the record—such as IMC's proposal that lead generator websites more explicitly disclose (but not substantively change) their practices—is likewise incorrect. IMC Br. 39. As we elsewhere explain, *see above* p. 13; *below* Part III.B, the agency cited these proposals, including IMC's, and explained why, in the agency's judgment, they "would not close the lead generator loophole." *Order* ¶ 34 (A16); *see id.* n.85 (A15–A16). Among other things, the Commission concluded that the proposed approaches would still require consumers to consent to a long list of entities and would not "provide consumers with sufficient control" or "prevent the daisy-chaining of consents." *Id.* ¶ 34 (A16).

## B.  The rule is not subject to strict scrutiny.

Perhaps because the Commission's rule easily survives intermediate scrutiny, IMC mainly argues that the rule is instead subject to strict scrutiny. *See* IMC Br. 31–40. Because the requirements of the rule are mandatory only for telemarketing calls, IMC argues, the rule is necessarily "content-based." IMC Br. 31–32 (citing *Reed v. Town of Gilbert, Az.*, 576 U.S. 155, 165 (2015), and *Barr*, 140 S. Ct. at 2343).

To accept IMC's argument would require an impermissible departure from established commercial speech doctrine. *See, e.g.*, *Recht*

*v. Morrisey*, 32 F.4th 398, 409 (4th Cir. 2022) ("*Reed* simply concerned a totally different context; it cannot be distorted to so unsettle the *Central Hudson* regime."); *FF Cosmetics*, 866 F.3d at 1298 ("The law is clear that commercial speech is afforded lesser protections than those traditionally given to noncommercial speech."); *Dana's R.R. Supply,* 807 F.3d at 1246.

The Supreme Court itself disclaimed IMC's suggestion in *City of Austin, Texas v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 72 (2022), issued after *Reed* and *Barr*. As the Court explained, although one must "read or hear" a message to know if it entails a commercial solicitation, "restrictions on solicitation are not content based and do not inherently present 'the potential for becoming a means of suppressing a particular point of view,' so long as they do not discriminate based on topic, subject matter, or viewpoint." *Id*.

The scope of *Reed* and *Barr* are far narrower than IMC contends. *Reed* involved a law that regulated and distinguished among ideological, political, and nonprofit signs—speech at the heart of the First Amendment and subject to the highest scrutiny—and the Court had no reason to discuss commercial speech. 576 U.S. at 159–61. As for *Barr*, IMC gets the case backwards: the Court there invalidated a statutory provision that preferred one subset of commercial speech—messages

concerning collection of government debts—above all other forms of commercial and noncommercial speech, including political speech. *See* 140 S. Ct. at 2346. The regulation at issue here, by contrast, regulates all commercial speech, and only commercial speech, without regard to the content of that speech. The *Barr* majority nowhere suggested that it was overruling *Central Hudson*; indeed, it disavowed any intention "to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Id.* at 2347. Accordingly, IMC's First Amendment challenge fails.[8]

## III.  THE CONSENT RULE IS REASONABLE AND SUPPORTED BY THE RECORD.

IMC argues that the *Order* is arbitrary and capricious. IMC Br. 44–54. In reality, IMC simply disagrees with the agency's considered judgments. That falls well short of meeting a petitioner's burden under the Administrative Procedure Act's "exceedingly deferential" standard. *State of Fla.*, 19 F.4th at 1290.

---

[8] Even if heightened scrutiny applied (and it does not), the consent rule would be constitutional because it furthers a compelling interest and is narrowly tailored, as we have explained. *See above* pp. 31–33.

### A. The FCC reasonably found lead generation websites are a problem, and the new rule is a solution.

Contrary to IMC's arguments (IMC Br. 44), the record in this proceeding amply supports the Commission's finding that "[l]ead-generated communications are a large percentage of unwanted calls and texts." *Order* ¶ 30 (A12). For example, Attorneys General from 28 states (including Alabama) filed comments in support of the one-to-one-consent rule, based on their "offices' efforts in combatting illegal robocalls and text messages." AG Reply Comments at 1 (SA122). They stated that an "unwitting consumer" could "open[] the floodgates" to "thousands upon thousands" of unwanted robocalls by "simply requesting an insurance quote" from one website. *Id.* at 4 (SA125). These practices were the source of many unwanted calls because telemarketers "typically rely on the purported consent provided through data brokers, bots, or weblinks on websites." *Id.* at 5 (SA126).

Other comments likewise supported this conclusion. A group of 11 consumer advocate organizations, for example, advised the Commission that "resale of consumer data by lead generators and lead aggregators significantly contributes to the problem of illegal calls." *Order* ¶ 31 (A13) (quoting Joint Consumer Comments (SA175)); *see also* Joint Consumer

Reply (SA163). A group of 11 senators similarly asserted that the "sale and trading" of consents has "led to the proliferation of unwanted telemarketing robocalls," Aug. 7 Congressional at 1 (SA180) (describing 1.25 billion unwanted calls every month). In addition, the telecommunications trade group USTelecom—leader of the Industry Traceback Group for illegal robocalls—stated that lead generation robocalls are now a bigger problem for consumers than fraud robocalls. USTelecom Comments at 2 (SA92).

Even a lead generation trade group unaffiliated with IMC, known as "REACH," conceded that "the robocall epidemic has been fueled to some degree by unscrupulous conduct in the lead generation industry." REACH Comments at 1 (SA98). REACH acknowledged that, before the *Order*, its industry "lack[ed] any meaningful standards in terms of the content or layout of disclosures, the number of times consent information [could] be transferred, [or] the duration of time for which consent remains valid." *Id.* REACH further stated that, although some "scam" calls are made with no consent at all, other unwanted robocalls result from "legitimate companies who operate in the gray area of the law, protected by ambiguities in the TCPA" regarding consent. *Id.* at 3 (SA100). REACH warned that, once a consumer has filled out a webform (which may itself

be deceptive), lead generators "seek[] to profit by reselling the 'lead'…perhaps hundreds…of times over a limitless period," and take the position that, because "express written consent does not expire," a "website is free to sell the [consumer's] consent forever." *Id.*

The *Order* cited all of this evidence to support its conclusion that the lead generation industry contributes significantly to unwanted robocalls. *See Order* n.70 (A13) (citing USTelecom Comments, Joint Consumers Comments & Reply, AG Reply Comments); *id.* n.72 (A13) (same, and Aug. 7 Congressional); *id.* n.73 (A13) (citing Joint Consumers Comments, USTelecom Comments, and individual consumer comments); *id.* n.86 (A16) (citing REACH Comments). Thus, contrary to IMC's contention (IMC Br. 44), the FCC based its conclusion that the lead generation loophole was a problem in need of a regulatory solution not on any single commenter's input, but on a wide variety of comments from law enforcement, consumer advocates, individual commenters, Congress, the Industry Traceback Group, and even a lead generation trade group. This record more than satisfies substantial evidence review under the APA. *See Georgia Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (substantial evidence review is "limited," requiring

only "such relevant evidence as a reasonable person would accept as adequate to support a conclusion").[9]

The agency likewise acted rationally in concluding that the one-to-one-consent and logical-and-topical-relation requirements would "stop large numbers of robocalls and robotexts from many different entities based on a single grant of consumer consent." *Order* ¶ 32 (A14). As the agency explained, these requirements are calculated to stop the practice of "buried, barely visible" disclosures that "burden[] the consumer with yet another step to be fully informed," and will prevent the "daisy-chaining" of consent through repeated resale that leads to robocalls from telemarketers that consumers do not wish to hear from. *Id.*

IMC argues the rule will be ineffective because, it alleges, robocalls "originate from overseas bad actors" who will not comply with the TCPA. IMC Br. 46. But, as we have noted, *see above* p. 41, the lead generation

---

[9] IMC also asserts (IMC Br. 44) that the *Order* did not identify "a single instance" in which a comparison shopping website abused consumers' consent. In fact the FCC cited its experience in the *Urth Access* enforcement action, *Order* ¶ 32 (A14), in which a student loan telemarketer made millions of unwanted robocalls and claimed it had obtained consent through websites related to health insurance products and services, *see Urth Access Order*, 37 FCC Rcd at 14136, 14139 ¶¶ 8 & 15 (SA202, SA205).

trade group REACH disagreed, advising the Commission that some unwanted calls result from "legitimate companies who operate in the gray area of the law," REACH Comments at 3 (SA100). Similarly, USTelecom, which has extensive experience tracing unwanted robocalls, commented that "the robocalls consumers are most likely to receive are lead generation robocalls they do not want, rather than fraud robocalls." USTelecom Comments at 2 (SA92).

In any case, a rule, or portion of a rule, is not arbitrary simply because it ameliorates only one aspect of a problem. *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991) (an "agency need not solve every problem before it in the same proceeding"). That is especially so here because the rest of the *Order* and other FCC actions are aimed at reducing illegal robocalls made without even putative consent. *See Order* ¶ 12 (A6) (previous rule regarding blocking); *id.* ¶¶ 16–29 (A7–A11) (further rules regarding blocking and the Do Not Call List). The consent requirement at issue in this case is more narrowly aimed to close the lead generator loophole, and the record supports that it will do so.

### B.     The FCC considered and reasonably rejected IMC's comments and alternative proposal.

"Under the 'arbitrary and capricious' standard of review, an agency is...required to respond to significant comments that cast doubt on the reasonableness of the rule the agency adopts." *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992) (quoting *Baltimore Gas and Elec. Co. v. United States*, 817 F.2d 108, 116 (D.C. Cir.1987)).

IMC argues that the FCC "failed to adequately consider" less restrictive measures. IMC Br. 49. Not so. IMC had proposed that the Commission require websites to disclose more explicitly—but not change—practices, such as the categories of goods and services about which customers can expect robocalls, the total number of callers, and the time period in which these would occur. *Order* n.85 (A16) (citing and explicitly rejecting IMC's proposals); IMC ex parte at n.4 (A178). Other industry commenters had proposed a rule that would limit the total number of calls, but not otherwise change lead generation practices. *Order* n.85 (A15) (describing proposals). The FCC cited these proposals and rejected them explicitly. *Id.* ¶ 34 (A15). The agency explained that the proposals would not "provide consumers with sufficient control over which parties they consent to receive robocalls or robotexts from, and

would still deprive consumers of the ability to grant consent only to those sellers from which they wish to receive robocalls or robotexts." *Id.* Instead, under these industry proposals, consumers would "be forced to consent to all callers on [a] list without the ability to limit that list for purposes of their comparison shopping." *Id.* Moreover, these industry proposals "would not prevent the daisy-chaining of consents whereby a seller on the initial list would then resell or otherwise share their consent to another lead buyer and so on potentially hundreds of times." *Id.*

IMC argues that the FCC's explanation applied only to other commenters, who favored limiting the number of calls, and not to IMC's proposal for further disclosures. IMC Br. 50. Because the *Order* cites and rejects IMC's proposal in the same footnote as the other proposals, *Order* n.85 (A15), the agency's explanations are more naturally read as applying to all of the cited proposals. Moreover, the Commission's logic—that merely limiting the total number of calls does not provide consumers with sufficient control over who calls—applies with even more force to IMC's proposal to change nothing but disclosure requirements. Because IMC's objections are "accounted for in the Agency's action and furthermore fall far short of indicating any clear error of judgment by the Agency, the

arbitrary and capricious standard provides no basis to set aside" the rule. *Hussion*, 950 F.2d at 1554.

The FCC also did not act unreasonably in rejecting IMC's suggestion that a car loan shopping website should be allowed to solicit consent about loan consolidation. *See* IMC Br. 49. The agency agreed instead with commenters who argued that consumers deserve protection against calls that go beyond the scope of consent, "a scope that can be reasonably inferred from the purpose of the website at which they gave that consent." *Order* ¶ 36 & n.93 (A17). This reasonable conclusion, too, easily satisfies the agency's duty to respond to significant comments.

## C. The FCC adequately considered the impact of the rule on small businesses.

Finally, IMC argues (IMC Br. 50–54) that the *Order* inadequately accounts for the impact of the Commission's revised rule on small businesses. Here again, IMC simply disagrees with the FCC's considered policy judgment. In the TCPA, Congress found that "[i]ndividuals' privacy rights" and "commercial freedoms of speech and trade" "must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." TCPA § 2(9), 105 stat. 2394. In the *Order*, the FCC acknowledged that lead generators and comparison

shopping websites offer value to some consumers and businesses, but it recognized a need to "balance[]" that benefit against the public interest in protecting "consumers, including small businesses, from a deluge of unwanted robocalls and robotexts." *Id.* ¶ 37 (A17). The agency explained carefully how and why it struck that balance, emphasizing the importance of protecting consumers and explaining the many avenues still open to businesses, including lead generators. *Id.* ¶¶ 37–45 (A17–20). The Commission "enjoys broad discretion" when balancing competing policy objectives like these, and the agency reached a reasonable balance here. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (discussing balancing under another section of the Communications Act); *see generally City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1267–68 (11th Cir. 2022) ("it is within the sound discretion of the agency to determine which of Congress's goals this particular project should accomplish").

IMC specifically takes issue with the FCC's response to comments from the Small Business Association regarding alleged increased costs for "small businesses that both buy and sell sales leads." IMC Br. 51–53; SBA Comments at 2 (A176). But the FCC made clear it "underst[ood] the concerns" of those commenters, *Order* ¶ 38 (A17), and it responded fully,

pointing out the myriad avenues that remain open to telemarketers and lead generators, *see above* p. 14.

Among these options, websites can offer a list of partners and allow consumers to choose each seller they wish to hear from. *Order* ¶ 41 (A18). IMC argues that this option is inadequate because buyers will "inevitably" choose large companies over small ones. IMC Br. 52. But the FCC found "no basis in the record 'on which to assume that consumers will never consent [to receive] telemarketing calls from small businesses, if they are pitched at the same time as large businesses.'" *Order* ¶ 45 (A20) (quoting Joint Consumer Comments); *see id.* (crediting argument that some consumers will prefer large businesses, some will prefer small businesses, and some may want to compare offers from both). Even if consumers were to favor large businesses, moreover, the FCC explained that customers have the "right to make that determination." *Id.* While the FCC has a duty to consider the impact on small businesses, it is not required to favor small businesses without regard to customer preferences.

IMC also disparages the *Order* for not "marshal[ling] evidence" to show that small businesses can adapt to the new rule, for example by using manually dialed calls rather than robocalls. IMC Br. 53. But "[t]he

APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Rather, an agency may make "a reasonable predictive judgment based on the evidence" before it. *Id.*

Here the FCC found that although commenters alleged, as IMC does now, that the rule would harm small businesses, no commenter had "provided specific evidence to demonstrate that such a rule would harm their businesses in a way that would outweigh the need to protect consumers." *Order* ¶ 42 (A19). Specifically, no commenter provided evidence of "what fraction of their business involves robocalls and robotexts and thus how much of their total business would be affected by the new rule"; nor did commenters offer evidence of "how much it would cost to modify their websites and processes" to get one-to-one consent, or evidence of "the cost to small businesses of disclosing their names before consumers consent." *Id.*[10] Finally, commenters alleging harm ignored

---

[10] While IMC sought to support its stay request in this Court through declarations quantifying alleged costs and harms, it presented no similar evidence to the agency during the rulemaking. On APA review of agency action, "the court may not go outside the administrative record." *Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 843, 875 (11th Cir. 2016) (citation omitted).

offsetting benefits to small businesses, including reducing unwanted robocalls to them. The Commission deemed that a potentially significant benefit, given that small business owners may be "unable to ignore calls from strange numbers" because "each call may be from a potential customer." *Id.* ¶ 44 (A20).

To be sure, "some businesses," including IMC's members, "may have to alter their business practices to provide more transparency upfront to consumers" under the Commission's revised rule. *Id.* ¶ 42 (A19). But that is the inevitable result of requirements that protect consumers from the unwanted effects of these business practices. On this record, the agency struck a reasonable balance between the commercial interests of lead-generating telemarketers against the public interest in protecting consumer privacy.

## CONCLUSION

The petition for review should be denied.

Dated:  July 15, 2024

Respectfully submitted,

/s/  *Matthew J. Dunne*

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Matthew J. Dunne
   *Counsel*

Jonathan S. Kanter
   *Assistant  Attorney General*

Robert B. Nicholson
Robert J. Wiggers
   *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
   *United States of America*

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
   *Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>10,087</u> words, *or*

    ☐   this document uses a monospaced typeface and contains <u>    </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using <u>       </u> with <u>       </u>.

*/s/  Matthew J. Dunne*
Matthew J. Dunne
*Counsel for Respondents*

Statutory Addendum

# Table of Contents

TCPA, 105 Stat. 2394 ..................................................... 1

47 U.S.C. § 227 ............................................................. 3

47 C.F.R. § 64.1200 ..................................................... 11

PL 102–243

105 Stat. 2394

December 20, 1991

TELEPHONE CONSUMER PROTECTION ACT OF 1991

An Act to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Telephone Consumer Protection Act of 1991".

SEC. 2. FINDINGS.

The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

1

(9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

(11) Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.

(12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

(13) While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14) Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.

(15) The Federal Communications Commission should consider adopting reasonable restrictions on automated or prerecorded calls to businesses as well as to the home, consistent with the constitutional protections of free speech.

*    *    *

2

47 U.S.C. § 227

## § 227. Restrictions on use of telephone equipment

**(a) Definitions**

As used in this section—

**(1)** The term "automatic telephone dialing system" means equipment which has the capacity--

>**(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and

>**(B)** to dial such numbers.

**(2)** The term "established business relationship", for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in <u>section 64.1200 of title 47, Code of Federal Regulations</u>, as in effect on January 1, 2003, except that--

>**(A)** such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

>**(B)** an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)).<u>1</u>

**(3)** The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

**(4)** The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

**(5)** The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

3

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

**(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--

**(i)** to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

**(ii)** to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

**(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

**(C)** to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless--

**(i)** the unsolicited advertisement is from a sender with an established business relationship with the recipient;

**(ii)** the sender obtained the number of the telephone facsimile machine through--

4

**(I)** the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

**(II)** a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

**(iii)** the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

**(D)** to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

**(2) Regulations; exemptions and other provisions**

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission--

**(A)** shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

5

**(B)** may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe--

    **(i)** calls that are not made for a commercial purpose; and

    **(ii)** such classes or categories of calls made for commercial purposes as the Commission determines--

        **(I)** will not adversely affect the privacy rights that this section is intended to protect; and

        **(II)** do not include the transmission of any unsolicited advertisement;

**(C)** may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

**(D)** shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if--

    **(i)** the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

    **(ii)** the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

    **(iii)** the notice sets forth the requirements for a request under subparagraph (E);

    **(iv)** the notice includes--

        **(I)** a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

        **(II)** a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism

and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

**(v)** the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

**(vi)** the notice complies with the requirements of subsection (d);

**(E)** shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if--

**(i)** the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

**(ii)** the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

**(iii)** the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

**(F)** may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not contain the notice required by paragraph (1)(C)(iii), except that the Commission may take action under this subparagraph only--

**(i)** by regulation issued after public notice and opportunity for public comment; and

**(ii)** if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability

7

of the members of such associations to stop such associations from sending any future unsolicited advertisements;

**(G)**

**(i)** may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall--

**(I)** determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

**(II)** determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

**(III)** evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

**(IV)** determine whether with respect to small businesses, the costs would not be unduly burdensome; and

**(ii)** may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005;

**(H)** may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States; and

**(I)** shall ensure that any exemption under subparagraph (B) or (C) contains requirements for calls made in reliance on the exemption with respect to--

**(i)** the classes of parties that may make such calls;

**(ii)** the classes of parties that may be called; and

**(iii)** the number of such calls that a calling party may make to a particular called party.

**(3) Private right of action**

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State--

**(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**(4) Civil forfeiture**

**(A) In general**

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title.

**(B) Violation with intent**

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection with the intent to cause such violation shall be liable to the United States for a forfeiture penalty

pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be equal to an amount determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title plus an additional penalty not to exceed $10,000.

**(C) Recovery**

Any forfeiture penalty determined under subparagraph (A) or (B) shall be recoverable under section 504(a) of this title.

**(D) Procedure**

No forfeiture liability shall be determined under subparagraph (A) or (B) against any person unless such person receives the notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

**(E) Statute of limitations**

Notwithstanding paragraph (6) of section 503(b) of this title, no forfeiture penalty shall be determined or imposed against any person--

> **(i)** under subparagraph (A) if the violation charged occurred more than 1 year prior to the date of issuance of the required notice or notice of apparent liability; or
>
> **(ii)** under subparagraph (B) if the violation charged occurred more than 4 years prior to the date of issuance of the required notice or notice of apparent liability.

> **(F) Rule of construction**
>
> Notwithstanding any law to the contrary, the Commission may not determine or impose a forfeiture penalty on a person under both subparagraphs (A) and (B) based on the same conduct.

\*    \*    \*

10

47 C.F.R. § 64.1200

## § 64.1200 Delivery restrictions.

(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

    (i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

    (ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

    (iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

    (iv) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service, provided the number is not already on the national do-not-call registry or caller's company-specific do-not-call list. A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when making calls exempted by paragraph (a)(9) of this section.

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a

11

tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message that includes or introduces an advertisement or constitutes telemarketing without the prior express written consent of the called party, or that exceeds the applicable numerical limitation on calls identified in paragraphs (a)(3)(ii) through (v) of this section without the prior express consent of the called party.

A telephone call to any residential line using an artificial or prerecorded voice to deliver a message requires no consent if the call:

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103, and the caller makes no more than one call per day to each patient's residential line, up to a maximum of three calls combined per week to each patient's residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section.

12

(4) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine, unless—

    (i) The unsolicited advertisement is from a sender with an established business relationship, as defined in paragraph (f)(6) of this section, with the recipient; and

    (ii) The sender obtained the number of the telephone facsimile machine through—

        (A) The voluntary communication of such number by the recipient directly to the sender, within the context of such established business relationship; or

        (B) A directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution. If a sender obtains the facsimile number from the recipient's own directory, advertisement, or Internet site, it will be presumed that the number was voluntarily made available for public distribution, unless such materials explicitly note that unsolicited advertisements are not accepted at the specified facsimile number. If a sender obtains the facsimile number from other sources, the sender must take reasonable steps to verify that the recipient agreed to make the number available for public distribution.

        (C) This clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005 if the sender also possessed the facsimile machine number of the recipient before July 9, 2005. There shall be a rebuttable presumption that if a valid established business relationship was formed prior to July 9, 2005, the sender possessed the facsimile number prior to such date as well; and

    (iii) The advertisement contains a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements. A notice contained in an advertisement complies with the requirements under this paragraph only if—

        (A) The notice is clear and conspicuous and on the first page of the advertisement;

13

(B) The notice states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The notice sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

(D) The notice includes—

(1) A domestic contact telephone number and facsimile machine number for the recipient to transmit such a request to the sender; and

(2) If neither the required telephone number nor facsimile machine number is a toll-free number, a separate cost-free mechanism including a Web site address or email address, for a recipient to transmit a request pursuant to such notice to the sender of the advertisement. A local telephone number also shall constitute a cost-free mechanism so long as recipients are local and will not incur any long distance or other separate charges for calls made to such number; and

(E) The telephone and facsimile numbers and cost-free mechanism identified in the notice must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week.

(iv) A request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(A) The request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(B) The request is made to the telephone number, facsimile number, Web site address or email address identified in the sender's facsimile advertisement; and

(C) The person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such

14

advertisements to such person at such telephone facsimile machine.

(v) A sender that receives a request not to send future unsolicited advertisements that complies with paragraph (a)(4)(v) of this section must honor that request within the shortest reasonable time from the date of such request, not to exceed 30 days, and is prohibited from sending unsolicited advertisements to the recipient unless the recipient subsequently provides prior express invitation or permission to the sender. The recipient's opt-out request terminates the established business relationship exemption for purposes of sending future unsolicited advertisements. If such requests are recorded or maintained by a party other than the sender on whose behalf the unsolicited advertisement is sent, the sender will be liable for any failures to honor the opt-out request.

(vi) A facsimile broadcaster will be liable for violations of paragraph (a)(4) of this section, including the inclusion of opt-out notices on unsolicited advertisements, if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(5) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(6) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(7) Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30–day period for a single calling campaign. If a single calling campaign exceeds a 30–day period, the abandonment rate shall be calculated separately for each successive 30–day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

(i) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after

15

the called person's completed greeting, the telemarketer or the seller must provide:

> (A) A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and

> (B) An automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call.

(ii) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line or to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section after the subscriber to such line has granted prior express written consent for the call to be made shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(iii) The seller or telemarketer must maintain records establishing compliance with paragraph (a)(7) of this section.

(iv) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by this paragraph (a)(7).

(8) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

(9) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section for making any call exempted in this paragraph

16

(a)(9), provided that the call is not charged to the called person or counted against the called person's plan limits on minutes or texts. As used in this paragraph (a)(9), the term "call" includes a text message, including a short message service (SMS) call.

(i) Calls made by a package delivery company to notify a consumer about a package delivery, provided that all of the following conditions are met:

(A) The notification must be sent only to the telephone number for the package recipient;

(B) The notification must identify the name of the package delivery company and include contact information for the package delivery company;

(C) The notification must not include any telemarketing, solicitation, or advertising content;

(D) The voice call or text message notification must be concise, generally one minute or less in length for voice calls or 160 characters or less in length for text messages;

(E) The package delivery company shall send only one notification (whether by voice call or text message) per package, except that one additional notification may be sent for each attempt to deliver the package, up to two attempts, if the recipient's signature is required for the package and the recipient was not available to sign for the package on the previous delivery attempt;

<Text of subsection (a)(9)(i)(F) effective until (date pending).>

(F) The package delivery company must offer package recipients the ability to opt out of receiving future delivery notification calls and messages and must honor an opt-out request within a reasonable time from the date such request is made, not to exceed 30 days; and,

<Text of subsection (a)(9)(i)(F) delayed until announcement of effective date in the Federal Register. See 89 FR 15757.>

(F) The package delivery company must offer package recipients the ability to opt out of receiving future delivery notification calls and messages and must honor an opt-out request within a reasonable time from the date such request is made, not to exceed six business days; and,

(G) Each notification must include information on how to opt out of future delivery notifications; voice call notifications that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make an opt-out request prior to terminating the call; voice call notifications that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future package delivery notifications; text notifications must include the ability for the recipient to opt out by replying "STOP."

(ii) Calls made by an inmate collect call service provider following an unsuccessful collect call to establish a billing arrangement with the called party to enable future collect calls, provided that all of the following conditions are met:

(A) Notifications must identify the name of the inmate collect call service provider and include contact information;

(B) Notifications must not include any telemarketing, solicitation, debt collection, or advertising content;

(C) Notifications must be clear and concise, generally one minute or less;

(D) Inmate collect call service providers shall send no more than three notifications following each inmate collect call that is unsuccessful due to the lack of an established billing arrangement, and shall not retain the called party's number after call completion or, in the alternative, after the third notification attempt; and

(E) Each notification call must include information on how to opt out of future calls; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future notification calls; and,

18

(F) The inmate collect call service provider must honor opt-out requests immediately.

(iii) Calls made by any financial institution as defined in section 4(k) of the Bank Holding Company Act of 1956, 15 U.S.C. 6809(3)(A), provided that all of the following conditions are met:

(A) Voice calls and text messages must be sent only to the wireless telephone number provided by the customer of the financial institution;

(B) Voice calls and text messages must state the name and contact information of the financial institution (for voice calls, these disclosures must be made at the beginning of the call);

(C) Voice calls and text messages are strictly limited to those for the following purposes: transactions and events that suggest a risk of fraud or identity theft; possible breaches of the security of customers' personal information; steps consumers can take to prevent or remedy harm caused by data security breaches; and actions needed to arrange for receipt of pending money transfers;

(D) Voice calls and text messages must not include any telemarketing, cross-marketing, solicitation, debt collection, or advertising content;

(E) Voice calls and text messages must be concise, generally one minute or less in length for voice calls (unless more time is needed to obtain customer responses or answer customer questions) or 160 characters or less in length for text messages;

(F) A financial institution may initiate no more than three messages (whether by voice call or text message) per event over a three-day period for an affected account;

(G) A financial institution must offer recipients within each message an easy means to opt out of future such messages; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the

19

consumer can call to opt out of future calls; text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

(H) A financial institution must honor opt-out requests immediately.

(iv) Calls made by, or on behalf of, healthcare providers, which include hospitals, emergency care centers, medical physician or service offices, poison control centers, and other healthcare professionals, provided that all of the following conditions are met:

(A) Voice calls and text messages must be sent only to the wireless telephone number provided by the patient;

(B) Voice calls and text messages must state the name and contact information of the healthcare provider (for voice calls, these disclosures would need to be made at the beginning of the call);

(C) Voice calls and text messages are strictly limited to those for the following purposes: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions;

(D) Voice calls and text messages must not include any telemarketing, solicitation, or advertising; may not include accounting, billing, debt-collection, or other financial content; and must comply with HIPAA privacy rules, 45 CFR 160.103;

(E) Voice calls and text messages must be concise, generally one minute or less in length for voice calls or 160 characters or less in length for text messages;

(F) A healthcare provider may initiate only one message (whether by voice call or text message) per day to each patient, up to a maximum of three voice calls or text messages combined per week to each patient;

(G) A healthcare provider must offer recipients within each message an easy means to opt out of future such messages; voice calls that could be answered by a live person must

20

include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future healthcare calls; text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

(H) A healthcare provider must honor opt-out requests immediately.

(10) A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) and (c)(2) of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender. Any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a call; using the words "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe" sent in reply to an incoming text message; or pursuant to a website or telephone number designated by the caller to process opt-out requests constitutes a reasonable means per se to revoke consent. If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and robotexts. If a reply to an incoming text message uses words other than "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe," the caller must treat that reply text as a valid revocation request if a reasonable person would understand those words to have conveyed a request to revoke consent. Should the text initiator choose to use a texting protocol that does not allow reply texts, it must provide a clear and conspicuous disclosure on each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol, and clearly and conspicuously provide on each text reasonable alternative ways to revoke consent. All requests to revoke prior express consent or prior express written consent made in any reasonable manner must be honored within a reasonable time not to exceed ten business days from receipt of such request. Callers or senders of text messages covered by

21

paragraphs (a)(1) through (3) and (c)(2) of this section may not designate an exclusive means to request revocation of consent.

(11) The use of any other means to revoke consent not listed in paragraph (a)(10) of this section, such as a voicemail or email to any telephone number or email address intended to reach the caller, creates a rebuttable presumption that the consumer has revoked consent when the called party satisfies their obligation to produce evidence that such a request has been made, absent evidence to the contrary. In those circumstances, a totality of circumstances analysis will determine whether the caller can demonstrate that a request to revoke consent has not been conveyed in a reasonable manner.

(12) A one-time text message confirming a request to revoke consent from receiving any further calls or text messages does not violate paragraphs (a)(1) and (2) of this section as long as the confirmation text merely confirms the text recipient's revocation request and does not include any marketing or promotional information, and is the only additional message sent to the called party after receipt of the revocation request. If the confirmation text is sent within five minutes of receipt, it will be presumed to fall within the consumer's prior express consent. If it takes longer, however, the sender will have to make a showing that such delay was reasonable. To the extent that the text recipient has consented to several categories of text messages from the text sender, the confirmation message may request clarification as to whether the revocation request was meant to encompass all such messages; the sender must cease all further texts for which consent is required absent further clarification that the recipient wishes to continue to receive certain text messages.

\*   \*   \*

(f) As used in this section:

(1) The term advertisement means any material advertising the commercial availability or quality of any property, goods, or services.

(2) The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(3) The term clear and conspicuous means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures. With respect to facsimiles and for purposes of paragraph (a)(4)(iii)(A) of this section, the notice must be placed at either the top or bottom of the facsimile.

(4) The term emergency purposes means calls made necessary in any situation affecting the health and safety of consumers.

(5) The term established business relationship for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

    (i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

    (ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(6) The term established business relationship for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a

voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(7) The term facsimile broadcaster means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

(8) The term one-ring scam means a scam in which a caller makes a call and allows the call to ring the called party for a short duration, in order to prompt the called party to return the call, thereby subjecting the called party to charges.

(9) The term prior express written consent means an agreement, in writing, that bears the signature of the person called or texted that clearly and conspicuously authorizes no more than one identified seller to deliver or cause to be delivered to the person called or texted advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice. Calls and texts must be logically and topically associated with the interaction that prompted the consent and the agreement must identify the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

  (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing
  that:

        (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls or texts using an automatic telephone dialing system or an artificial or
        prerecorded voice; and
        (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services. The term "signature" shall

24

include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(10) The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(11) The term sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.

(12) The term telemarketer means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(13) The term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(14) The term telephone facsimile machine means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(15) The term telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

(i) To any person with that person's prior express invitation or permission;

25

(ii) To any person with whom the caller has an established business relationship; or

(iii) By or on behalf of a tax-exempt nonprofit organization.

(16) The term unsolicited advertisement means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(17) The term personal relationship means any family member, friend, or acquaintance of the telemarketer making the call.

(18) The term effectively mitigate means identifying the source of the traffic and preventing that source from continuing to originate traffic of the same or similar nature.

(19) The term gateway provider means a U.S.-based intermediate provider that receives a call directly from a foreign originating provider or foreign intermediate provider at its U.S.-based facilities before transmitting the call downstream to another U.S.-based provider. For purposes of this paragraph (f)(19):

(i) U.S.-based means that the provider has facilities located in the United States, including a point of presence capable of processing the call; and

(ii) Receives a call directly from a provider means the foreign provider directly upstream of the gateway provider in the call path sent the call to the gateway provider, with no providers in-between.

\*   \*   \*

26