No. 24-10277

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

INSURANCE MARKETING COALITION LIMITED,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

---

**Brief of Amici Curiae National Consumer Law Center, Electronic Privacy Information Center, Consumer Federation of America, U.S. PIRG, and Public Knowledge in support of the Federal Communications Commission and United States of America.**

---

*Counsel for Amici Curiae*
Megan Iorio
**Electronic Privacy Information Center**
1519 New Hampshire Ave NW
Washington DC 20008
202-483-1140
iorio@epic.org

Dated: July 22, 2024

*On Brief*
Margot F. Saunders
Carolyn Carter
**National Consumer Law Center**
1001 Connecticut Ave, NW
Washington, D.C. 20036
202-452-6252
msaunders@nclc.org

*Additional Amici Curiae*

Nicholas Garcia
**Public Knowledge**
1818 N St. NW, Suite 410
Washington, DC 20036
nick@publicknowledge.org
Counsel for *Amicus Curiae*
*Public Knowledge*

Erin Witte
**Consumer Federation of America**
1620 I Street, NW, Suite 200
Washington, DC 20006
ewitte@consumerfed.org
Counsel for *Amicus Curiae*
*Consumer Federation of America*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Local Rules 26.1-1 and 29.2, *Amici Curiae* provide the following Certificate of Interested Persons and Corporate Disclosure Statement. In addition to the persons and entities identified in the Certificate of Interested Persons and Corporate Disclosure Statement in the Brief of Petitioner, the following are known to have an interest in the outcome of the case:

1. Carter, Carolyn, Counsel for *Amicus Curiae* National Consumer Law Center

2. Electronic Privacy Information Center (*Amicus Curiae*)

3. Garcia, Nicholas, Counsel for *Amicus Curiae* Public Knowledge

4. Iorio, Megan, Electronic Privacy Information Center, Counsel for *Amici Curiae*

5. Murray, Teresa, U.S. PIRG (*Amicus Curiae*)

6. National Consumer Law Center (*Amicus Curiae*)

7. Public Knowledge (*Amicus Curiae*)

8. Saunders, Margot, Counsel for *Amicus Curiae* National Consumer Law Center

9. U.S. PIRG (*Amicus Curiae*)

10. Witte, Erin, Counsel for *Amicus Curiae* Consumer Federation of America

Respectfully submitted,

July 22, 2024

/s/ Megan Iorio_____

Megan Iorio
Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

The National Consumer Law Center (NCLC) is a Massachusetts non-profit corporation established in 1969 and incorporated in 1971. It is a national research and advocacy organization focusing specifically on the legal needs of low-income, financially distressed, and elderly consumers.

The Electronic Privacy Information Center (EPIC) is a non-profit research and advocacy center in Washington, D.C., established in 1994 to protect privacy, freedom of expression, and democratic values in the information age.

Consumer Federation of America (CFA) is an association of non-profit consumer organizations that was established in 1968 to advance the consumer interest through research, advocacy, and education.

Public Knowledge is a non-profit that works at the intersection of copyright, telecommunications, and internet law, at a time when these fields are converging.

U.S. PIRG is a federation of independent, state-based, citizen-funded Public Interest Research Groups; PIRG advocates for the public interest, speaking out for the public and standing up to special interests on problems that affect the public's health, safety, and wellbeing.

Each of the amici operates as a tax-exempt organization under the provisions of section 501(c)(3) of the Internal Revenue Code. None of amici have a parent

corporation, nor does any publicly held company own 10 percent or more of any amici organization's stock.

Respectfully submitted,

July 22, 2024                    /s/ Megan Iorio_____

                                Megan Iorio
                                Counsel for *Amici Curiae*

**STATEMENT UNDER FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(4)(E)**

*Amici* state: (1) no party or parties' counsel authored this brief in whole or in part; (2) no party or parties' counsel has contributed any money that was intended to fund preparing or submitting the brief; and (3) no person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

July 22, 2024        /s/___Megan Iorio_____

                               Megan Iorio
                               Counsel for *Amici Curiae*

## STATEMENT OF ISSUES

Amici adopt the Appellee's statement of issues.

## STATEMENT OF THE CASE

Amici adopt the Appellee's statement of the case.

# TABLE OF CONTENTS

TABLE OF CITATIONS.................................................................. iv

STATEMENT OF INTEREST OF THE AMICI CURIAE ...................................1

ARGUMENT ...............................................................................................2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...........................2

**I. The record includes ample evidence supporting the amendments to the FCC rule. ........................................................................3**

A. Tightening consent requirements for telemarketing calls is essential to limit the onslaught of unwanted telemarketing calls to U.S. telephones.....3

B. Invasive telemarketing calls harm small businesses. .............................9

C. One-to-one consent will enhance consumers' privacy and end the use of abusive consent farms, while still allowing lead generators to match consumers with products and services they seek......................................12

**II. The FCC's amendments merely reinforce requirements with which lead generators and callers are already required to comply......................15**

A. The FTC already requires one-to-one consent for prerecorded telemarketing calls. .....................................................................16

B. Telemarketing calls for Medicare Supplemental Insurance also must comply with one-to-one consent requirements..........................................20

**III. The requirement that calls must be "logically and topically related to the interaction that prompted the consent" is not substantially different from the FCC rule for consent for non-telemarketing calls.......................22**

**IV. The TCPA is a remedial statute that must be liberally construed. .......26**

CONCLUSION ..........................................................................................27

CERTIFICATE OF COMPLIANCE..............................................................29

**CERTIFICATE OF SERVICE**................................................................**30**

# TABLE OF CITATIONS

**Cases**

Americans for Beneficiary Choice v. United States Dep't of Health & Human Servs., 2024 WL 3297527 (N.D. Tex. July 3, 2024)............................................26

Barr v. Am. Ass'n of Political Consultants, Inc., 591 U.S. 610, 140 S. Ct. 2335 (2020) ......................................................................................................................35

Breda v. Cellco P'ship, 934 F.3d 1 (1st Cir. 2019) ...................................................35

Daubert v. NRA Group, L.L.C., 861 F.3d 382 (3d Cir. 2017) ................................36

Nigro v. Mercantile Adjustment Bureau, L.L.C., 769 F.3d 804 (2d Cir. 2014).......33

Parchman v. SLM Corp., 896 F.3d 728 (6th Cir. 2018)...........................................36

Van Patten v. Vertical Fitness Group, 847 F.3d 1037 (9th Cir. 2017).....................36

**Statutes**

47 U.S.C. § 227 ...........................................................................................................3

**Regulations**

*16 C.F.R. § 310.4(b)(1)(v)(A) ...............................................................................17

47 C.F.R. § 64.1200(a)(2)(3) ...................................................................................23

*47 C.F.R. § 64.1200(f)(9) .........................................................................................3

**Administrative Materials and Filings**

68 Fed. Reg. 4,580 (Jan. 29, 2003)..........................................................................19

75 Fed. Reg. 48,458 (Aug. 10, 2010) ................................................................15, 17

89 Fed. Reg. 30,448 (Apr. 23, 2024) .......................................................................22

*Centers for Medicare & Medicaid Services, Contract Year 2025 Medicare Advantage and Part D Final Rule (CMS-4205-F) (Apr. 4, 2024) ("Medicare Final Rule")..........................................................................16, 20, 21

Comment of Drips, CG Docket Nos. 21-402, 02-278 (May 8, 2023)......................8

Comment of Professional Associations for Customer Engagement, CG Docket Nos. 21-402, 02-278 (May 8, 2023)......................................8

Comment of Responsible Enterprises Against Consumer Harassment, CG Docket Nos. 21-402, 02-278 (May 9, 2023)......................................7

Comments of National Consumer Law Center *et al.*, CG Docket Nos. 20-402 & 02-278 (May 8, 2023) ...........................................4

*Fed. Trade Comm'n, Business Guidance, Complying with the Telemarketing Sales Rule...................................................18, 19

Fed. Trade Comm'n, Follow the Lead Workshop—Staff Perspective (Sept. 2016) .6

*In re* Advanced Methods to Target and Eliminate Unlawful Robocalls and Call Authentication Trust Anchor, Seventh Report and Order in CG Docket 17-59 and WC Docket 17-97, Eighth Further Notice of Proposed Rulemaking in CG Docket 17-59, and Third Notice of Inquiry in CG Docket 17-59, CG Docket No. 17-59 and WC Docket No. 17-97, 38 F.C.C. Rcd. 5404 (Rel. May 19, 2023) ......4

*In re* Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Blackboard, Inc. Petition for Expedited Declaratory Ruling *et al.*, Declaratory Ruling, CG Docket No. 02-278, 31 F.C.C. Rcd. 9054 (Rel. Aug. 4, 2016)...24, 25

*In re* Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order, CG Docket No. 02-278, 30 F.C.C. Rcd. 7961 (Rel. July 10, 2015)....................................................24

Joint Motion for Entry of Proposed Stipulated Order, United States v. Fluent, L.L.C., No. 9:23-cv-81045 (July 17, 2023) ............................................19

Letter from FCC Gen. Counsel to Clerk, Second Circuit Ct. of Appeals, in *Nigro v. Mercantile Adjustment Bureau*, 2014 WL 2959062 (F.C.C. June 30, 2014) .......25

Press Release, Fed. Trade Comm'n, FTC, Law Enforcers Nationwide Announce Enforcement Sweep to Stem the Tide of Illegal Telemarketing Calls to U.S. Consumers (July 18, 2023) ..........................................18, 19

Reply Comments of 28 State Attorneys General, CG Docket Nos. 21-402 & 02-278 (June 6, 2023)....................................................................5

Reply Comments of National Consumer Law Center *et al.*, CG Docket Nos. 21-402 & 02-278 (June 6, 2023) ................................................5

Report and Order, CG Docket No. 02-278, 27 FCC Rcd 1830 (2012) ..................24

*Second Report and Order, Second Further Notice of Proposed Rulemaking in CG Docket Nos. 02-278 and 21-402, and Waiver Order in CG Docket No. 17-59, CG Docket Nos. 21-402, 02-278, & 17-59 (Rel. Dec. 18, 2023)................................9

**Legislative Material**

137 Cong. Rec. S16206 (1991) (statement of Sen. Warner) ...................................26

Pub. L. No. 102–243, § 2.........................................................................................26

S. Rep. No. 102-178 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1972–1973...26

**Comments of Individuals**

Comment of Chris Robinson, CG Docket No. 02-278 (Mar. 11, 2024)..................11

Comment of David A. Bramblett, CG Docket No. 02-278 (Mar. 7, 2024) .............10

Comment of Donna Miller, CG Docket No. 02-078 (Mar. 8, 2024) .......................10

Comment of Edmond Pain & David Stodolak, Partners, Connection Holdings L.L.C., CG Docket Nos. 21-402, 02-278 (May 8, 2023)......................................8

Comment of James Connors, CG Docket Nos. 21-402, 02-278 (Apr. 17, 2023)......7

Comment of Joe Shields, CG Docket Nos. 21-402, 02-278 (May 8, 2023).............6

Comment of Martha White, CG Docket No. 02-278 (Mar. 7, 2024) ......................11

Comment of Richard Presley, CG Docket Nos. 21-402, 02-278 (Apr. 11, 2023) .....7

Comment of William Messenger, Theology or Work Project, Inc., CG Docket No. 02-278 (Mar. 11, 2024) ........................................................................................12

**Other Authorities**

Bill Chappell, *A Lost Hiker Ignored Rescuers' Phone Calls, Thinking They Were Spam*, NPR (Oct. 26, 2021)...................................................................................5

Leads Hook, Blog post, *How to Make Money Selling Leads in 2023 (& How Much to Charge)* (Jan. 23, 2023) .......................................................................6

Motion to Stay Pending Appeal, Dkt. 20 (filed Apr. 3, 2024).................................20

Opening Brief of Petitioner Insurance Marketing Coalition Limited, Dkt. 27 (filed May 15, 2024)................................................................................................14, 15

Sasha Warren, *The Robocalls Problem is So Bad That the FCC Actually Did Something*, Scientific American (Aug. 5, 2022) ....................................................5

**Other Sources Relied Upon**

Rate Pro, LLC, https://best.ratepro.co/ (last visited July 22, 2024) .......................13

Esurance, https://www.esurance.com/ (last visited July 22, 2024) .........................13

Google Flights, https://www.google.com/travel/flights (last visited July 22, 2024) ......................................................................................................................13

NerdWallet, https://www.nerdwallet.com (last visited July 22, 2024)....................13

**STATEMENT OF INTEREST OF THE *AMICI CURIAE***

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(D), *Amici Curiae* submitting this brief are consumer protection organizations that work to safeguard consumers from unwanted robocalls and to ensure the enforceability of consumer rights under the Telephone Consumer Protection Act (TCPA) and other consumer protection statutes. Amici have advocated extensively for strong protections against unwanted telemarketing and scam calls before the Federal Communications Commission, and have filed numerous amicus curiae briefs promoting the TCPA as the primary means to protect Americans from these unwanted robocalls.

All parties have consented to the filing of this amicus brief.

# ARGUMENT

## <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

This case concerns Congress's decades-old mandate to the Federal Communications Commission (FCC) to protect Americans from unwanted robocalls, and a recent rule amendment promulgated by the agency requiring "one-to-one" consent for telemarketing robocalls. This amendment ensures that a phone subscriber's consent to receive telemarketing robocalls from one seller cannot be sold and used as the basis of dozens of additional robocalls, and requires that those robocalls must be logically and topically related to the website visited by the consumer when consenting to the telemarketing robocalls. For example, shopping for car insurance cannot produce the consent for calls about cruise lines.

The amended rule will substantially reduce the unwanted telemarketing robocalls that bombard individuals and small businesses. Yet lead generators will still be able to connect consumers with desired offers. The amendment cannot plausibly be a significant burden on businesses as it mirrors regulations enacted by the Federal Trade Commission in its Telemarketing Sales Rule over a decade ago.

The requirement that consent be logically and topically related to the mechanism used to obtain consent is consistent with the FCC's rules and with case law limiting the scope of consent for non-telemarketing calls. Congress enacted the Telephone Consumer Protection Act (TCPA) as a remedial statute, requiring

liberal construction. Given the amendment's profound positive impact on consumers, the Court should reject the Petitioner's challenge to the FCC's rule.

I.    **The record includes ample evidence supporting the amendments to the FCC rule.**

    **A. Tightening consent requirements for telemarketing calls is essential to limit the onslaught of unwanted telemarketing calls to U.S. telephones.**

The record on which the Federal Communication Commission ("FCC" or "Commission") based the amendment to the regulation at issue in this appeal—the requirement that a caller have "prior express written consent" for telemarketing robocalls in 47 C.F.R. § 64.1200(f)(9)—is brimming with proof that the number of unwanted telemarketing calls has been steadily climbing; the practices of online lead generators—such as those companies represented by Petitioner—significantly contribute to the volume of these unwanted calls; and limiting each prior express written consent transaction agreed to by consumers would significantly reduce the number of unwanted telemarketing calls made on behalf of American businesses.

The FCC's record in this docket (implementing the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA")) includes comments from national consumer and privacy groups showing that the number of telemarketing robocalls has continued to grow in recent years, *averaging over one billion each month*. *In re* Targeting and Eliminating Unlawful Text Messages; Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991, Comments of

National Consumer Law Center *et al*. Relating to the Report and Order and Further

Notice of Proposed Rulemaking Issued March 17, 2023, CG Docket Nos. 20-402

& 02-278, at 5 (filed May 8, 2023), Dkt. 39, FCC Supplement Appendix (SA) at

SA 58.

These billions of monthly telemarketing calls undermine the value of the

American communications system:

> Many of us no longer answer calls from unknown numbers and, when
> we do, all too often find them annoying, harassing, and possibly
> fraudulent. Consumers are not the only losers when this happens;
> legitimate callers have a hard time completing the calls consumers do
> want to receive.

*In re* Advanced Methods to Target and Eliminate Unlawful Robocalls and

Call Authentication Trust Anchor, Seventh Report and Order in CG Docket

17-59 and WC Docket 17-97, Eighth Further Notice of Proposed

Rulemaking in CG Docket 17-59, and Third Notice of Inquiry in CG Docket

17-59, CG Docket No. 17-59 and WC Docket No. 17-97, 38 F.C.C. Rcd.

5404, at ¶ 1 (Rel. May 19, 2023). Indeed, hatred of unwanted telemarketing

calls causes most Americans not to answer when an unknown number

appears in the caller ID. *See* Sasha Warren, *The Robocalls Problem is So*

*Bad That the FCC Actually Did Something*, Scientific American (Aug. 5,

2022),[1] causing some to miss critical calls. *See* Bill Chappell, *A Lost Hiker*

*Ignored Rescuers' Phone Calls, Thinking They Were Spam*, NPR (Oct. 26,

2021).[2]

Twenty-eight state Attorneys General summarized how online consent forms

are supplied by lead generators ("LGs") to telemarketers to form the purportedly

legal basis of billions of unwanted telemarketing calls:

> Telemarketers (and some voice service providers) typically rely on the
> purported consent provided through data brokers, bots, or weblinks on
> websites. Various parties create marketing websites with consent
> forms and then sell the data (i.e., names and phone numbers) to
> intermediary 'aggregators,' who compile the lead data from multiple
> website publishers and then sell the data to other aggregators, and so
> on, until the telemarketers purchase the leads for solicitation purposes.

Reply Comments of 28 State Attorneys General, CG Docket No. 21-402 & 02-278,

at 5 (filed June 6, 2023), SA 126.[3]

As noted in the record, LGs are a common feature on the internet. *See* Reply

Comments of National Consumer Law Center *et al.* Relating to the Report and

Order and Further Notice of Proposed Rulemaking Issued March 17, 2023, CG

Docket Nos. 21-402 & 02-278, at 10 (June 6, 2023),[4] SA 175 (citing Fed. Trade

Comm'n, Follow the Lead Workshop—Staff Perspective (Sept. 2016), SA 184-

---

[1] https://www.scientificamerican.com/article/the-robocalls-problem-is-so-bad-that-the-fcc-actually-did-something/.

[2] https://www.npr.org/2021/10/26/1049252333/lost-hiker-mount-elbert-colorado-ignored-rescuers-phonecalls.

[3] https://www.fcc.gov/ecfs/search/search-filings/filing/10606091571575.

[4] https://www.fcc.gov/ecfs/document/10606186902940/1.

197).[5] Consumers are invited to enter their contact information into a form on the LG's site. The "leads"—this personal contact information—are collected by the LGs and sold directly to sellers of products or services (such as lenders or insurance companies) or to other lead aggregators that then sell the leads to sellers. *Id*. It is often not apparent that LG-operated websites are run by LGs, rather than actual lenders or seller of products or services. Misrepresentations on LG websites are not uncommon. *Id.* Leads can be sold for as much as $600 each. *See* Leads Hook, Blog post, *How to Make Money Selling Leads in 2023 (& How Much to Charge)* (Jan. 23, 2023).[6]

The record includes many comments from individual consumers illustrating how the resale of consumer data by LGs significantly contributes to the onslaught of unwanted calls:

- [T]he 'lead' number is sold under the pretense of healthcare but intentionally sold to auto insurers, financial advisors, senior benefits companies, remodelers, banks, retailers, telecoms, auto warranty companies, travel companies and most importantly marketers for just about anything to name just a few. Comment of Joe Shields, CG Docket Nos. 21-402, 02-278, at 4 (May 8, 2023).[7]

- [H]ere's just three of the too numerous to count lead generation sources that create the day-in and day-out frustration to the hundreds of millions of law-abiding citizens that are bombarded daily without any concern for our privacy, while ignoring the fact that 246+ million of us have long since registered on the National Do Not Call Registry indicating we DO NOT

---

[5] https://www.ftc.gov/reports/follow-lead-workshop-staff-perspective.
[6] https://www.leadshook.com/.
[7] https://www.fcc.gov/ecfs/document/10509289758317/1.

WANT these calls! Comment of James Connors, CG Docket Nos. 21-402, 02-278, at 1 (Apr. 17, 2023).[8]

- This is exactly why the [lead generation] industry has never followed the rules and nor will it ever police itself…. Comment of Richard Presley, CG Docket Nos. 21-402, 02-278, at 2 (Apr. 11, 2023).[9]

The organization R.E.A.C.H., filing in the FCC proceeding on behalf its "direct-to-consumer marketing, *lead generation* and performance marketing members," explained exactly how the practices of LGs contribute to the plethora of telemarketing robocalls:

> [O]nce the consumer has submitted the consent form the company seeks to profit *by reselling the "lead" multiple—perhaps hundreds— of times over a limitless period of time*. Since express written consent does not expire, the website is free to sell the consent forever.

Comment of Responsible Enterprises Against Consumer Harassment, CG Docket Nos. 21-402, 02-278, at 3 (May 9, 2023), SA 100 (*emphasis added*).[10]

R.E.A.C.H. stated that LGs and aggregators are likely to sell each record of a consumer's consent to receive calls from one seller to "multiple buyers . . .(or) to other aggregators who hope that they can sell the [consent to be called] to others within its network." *Id.* at 3. The result of all these sales: "*Each time the website operator—or an intermediary "aggregator" . . . sells the consumer's data a new set of phone calls will be made to the consumer.*" *Id.* (*emphasis added*).

---

[8] https://www.fcc.gov/ecfs/document/10418203276092/1.
[9] https://www.fcc.gov/ecfs/document/10411157882365/1.
[10] https://www.fcc.gov/ecfs/document/10509951114134/1.

The degree to which the new requirement of one-to-one consent will effectively reduce the number of unwanted telemarketing calls is demonstrated by the industry comments opposing the rule. One LG noted that "one click can sign up a consumer to thousands of businesses, related or not, . . . . Aged leads are also problematic because, currently, consent never expires." Comment of Drips, CG Docket Nos. 21-402, 02-278 (May 8, 2023).[11] Comments from the telemarketing industry and lead generators defended the sharing of consumer consents with hundreds, and even thousands, of callers. For example, one callers' trade association—PACE—argued against the proposal, saying "It is easy to say that 1,000 companies are too many but there are many markets, such as insurance, where hundreds of relevant companies provide differentiated products." Comment of Professional Associations for Customer Engagement, CG Docket Nos. 21-402, 02-278, at 9 (May 8, 2023).[12] Another LG said:

> The partner link shouldn't have 5000 companies on it, but our view is that it should in fact have hundreds. We sell to hundreds of small solar companies for instance. . . . . Since we market to over 20,000 zip codes, there are indeed hundreds of companies represented within this scope.

Comment of Edmond Pain & David Stodolak, Partners, Connection Holdings L.L.C., CG Docket Nos. 21-402, 02-278 (May 8, 2023).[13]

---

[11] https://www.fcc.gov/ecfs/document/10509043191182/1.
[12] https://www.fcc.gov/ecfs/document/1050879833281/1.
[13] https://www.fcc.gov/ecfs/search/search-filings/filing/10508986600825.

These comments demonstrate the extent of the LG industry's misuse of the FCC's existing written consent procedure, the reasons reform is necessary, and the likely impact of the FCC's amendment to its rule.

## B. Invasive telemarketing calls harm small businesses.

Petitioner's claims that small businesses will be ruined if its members must comply with the FCC's amended rule ignore the fact that many small businesses will *benefit* from the amended rule. Comments submitted in this same docket in response to the rule's announcement confirm the FCC's conclusions that many small businesses will benefit. *See* Second Report and Order, Second Further Notice of Proposed Rulemaking in CG Docket Nos. 02-278 and 21-402, and Waiver Order in CG Docket No. 17-59, CG Docket Nos. 21-402, 02-278, & 17-59, at ⁋ 44 (Rel. Dec. 18, 2023) ["FCC Order"].[14]

As part of the FCC's order adopting the amendments at issue, and in direct response to the concern voiced by the Small Business Administration about the potential impact of the rule on small businesses, the FCC called for comments "on whether and how it can further minimize any potential economic impact on small businesses in complying with the one-to-one consent requirement for prior express written consent under the TCPA." FCC Order at ⁋ 87.

---

[14] https://docs.fcc.gov/public/attachments/FCC-23-107A1.pdf.

There are 397 Express Comments filed by small business owners or managers responding to the FCC's question about the potential impact of the one-to-one consent rule by the closing date,[15] and an additional 191 comments afterward.[16]

These comments reveal a uniform level of frustration about the burdens of repeated prerecorded telemarketing calls to small business telephone lines. The comments demonstrate that these calls are bad for business, costly, and terrible for morale. A few excerpts from the hundreds of small businesses supportive of the Commission's order include:

- I work in mortgage. I rely on my cell phone to communicate with clients and the amount of telemarketing calls is horrible. I have to answer each one as it MIGHT be a client. This ties up SO MUCH of my time and is so annoying. **. . .** We need to get rid of telemarketing AND trigger leads. Comment of Donna Miller, CG Docket No. 02-078 (Mar. 8, 2024).[17]

- I am a small business owner (Real estate). My phone is my lifeline. All of my business is either generated or facilitated on my phone. *In the current climate, I get more spam calls in a day than I get business calls. . . .* As a real estate professional, I have to answer these calls for fear of it being a lead or customer call. In the recent past, I've left calls unanswered. . . . As a sales professional, I understand the need for free-market practices, but this has gotten out of hand. There is no regard for people and their lives. . . . Please help the small business owners of the nation from this plague. Comment of David A. Bramblett, CG Docket No. 02-278 (Mar. 7, 2024).[18]

---

[15] *See* Express Filings in Docket 02-278, on the FCC's electronic website, filed between December 28, 2023 and March 11, 2024: https://www.fcc.gov/ecfs/search/search-filings/results?q=(express_comment:(%221%22)+AND+proceedings.name:(%2202-278%22)+AND+date_received:[2023-12-18%20TO%202024-03-11]).

[16] *See* https://www.fcc.gov/ecfs/search/search-filings/filing/10606131079987.

[17] https://www.fcc.gov/ecfs/search/search-filings/filing/103081094124655.

[18] https://www.fcc.gov/ecfs/search/search-filings/filing/1030748480268 (*emphasis added*).

- I own a small locksmith business. We provide an "express service" that primarily helps people locked out of car, home or business. These persons need fast help so they don't wait for a callback if you miss their call. The customer loses, my business loses... and even the obnoxious telemarketer has wasted his time because I never buy anything from them. . . . Please stop whatever the telemarketers are doing to get my number. I consider all telemarketer calls to be harassment. Comment of Chris Robinson, CG Docket No. 02-278 (Mar. 11, 2024).[19]

- I am the owner of a small business. We rely on our phone lines to communicate with customers, suppliers and others. . . . For 10 years, our company was proud of our record of having a live person answer every call within 3 rings. Three years ago, we were forced by the telemarketing calls to use an "auto-attendant" phone tree to weed out the robo-calls. These calls cost us time, and time is money for small businesses. They are also incredibly annoying, and *damage the morale and attitudes of our employees. . . . The telemarketing calls and robo-calls have made our cell phones nearly useless for business purposes*. The FCC must close the lead generator loophole and stop telemarketers from harassing small business owners and cell phone users. Comment of Martha White, CG Docket No. 02-278 (Mar. 7, 2024).[20]

- I am the chief executive of a small business that collects input from experts and influencers around the world on behalf of our clientele. To do our work, we must be in rapid contact with hundreds of individuals each month by mobile phone. . . . *Because we have to answer all calls, the increasing number of telemarking calls that we are receiving are [a] severe economic burden on our business.* Each telemarketing call requires one of our small staff to interrupt what they are doing, answer the call, waste time listening long enough to determine that it is telemarketing call, hang us, and refocus on the task they were doing. There is also the possibility that they will miss an important call while dealing with the telemarketing call. . . . A crucial aspect is the economic asymmetry of telemarketing calls. The telemarketer uses a robocaller that costs them virtually nothing per call. But we have to spend actual human staff time dealing with each telemarking call**.** *Robocalls cause [telemarketers] not merely to transfer economic value from small businesses to telemarketers, but actually to inflict costs on small businesses*

[19] https://www.fcc.gov/ecfs/search/search-filings/filing/10308034167226.
[20] https://www.fcc.gov/ecfs/search/search-filings/filing/10306101225033 (*emphasis added*).

*far out of proportion to whatever economic gains they themselves receive.*
They are huge net value-destroying mechanism for the national economy
and especially for small businesses. Comment of William Messenger,
Theology or Work Project, Inc., CG Docket No. 02-278 (Mar. 11, 2024).[21]

These comments are part of the continuous flood of pleas to the FCC for

stronger protections against unwanted robocalls that document the ongoing nature

of the abuses. They undermine Petitioner's claim to be speaking for all small

businesses, and demonstrate how the amended rule will benefit small businesses.

### C. One-to-one consent will enhance consumers' privacy and end the use of abusive consent farms, while still allowing lead generators to match consumers with products and services they seek.

The benefits of the FCC's rule for consumers are clear: it will protect

consumers from unwanted calls that invade their privacy and degrade the usability

of their telephones. It will end the use of abusive consent farms and the sale of

consent to the highest bidder. LGs will not be able to obtain a consumer's consent

to receive prerecorded telemarketing calls through a single agreement that applies

to multiple potential callers, nor be able to sell or transfer a consumer's consent to

others besides the identified seller.

Nonetheless, LGs will still be able to facilitate consumers' consent to

receive telemarketing calls. Compliance with the new regulation will simply mean

that consumers will give knowing consent to receive calls from each specific seller.

---

[21] https://www.fcc.gov/ecfs/search/search-filings/filing/10309038626825 (*emphasis added*).

Given the regulation's requirement that consent be in the form of an agreement between the consumer and *the seller*, a LG that is an agent of the seller can obtain the consumer's consent on behalf of the seller. A LG that is not an agent can refer the consumer directly to the seller's website to give consent directly to the seller, as many LGs currently do.

Many online LGs do not require the entry of a telephone number to refer a consumer to a seller. *See, e.g.,* https://www.google.com/travel/flights; https://best.ratepro.co/; https://www.esurance.com/; https://www.nerdwallet.com. These LGs provide an overview of the products and services, and the costs involved. Their request for the shopper's personal information, if at all, is minimal—perhaps only a zip code. They then refer the consumer directly to a seller's website. No personal information like name, address, email address, telephone number, or other confidential data, is required before the LG provides consumers with a list of relevant sellers, including weblinks. Consumers then peruse the information offered by the sellers and choose which to engage further with and receive calls from. These direct referrals are completely unaffected by compliance with the FCC's rule.

Despite the fact that this system works well in the current marketplace, Petitioner argues that the one-to-one consent rule will be *unworkable* for the lead generation industry. We agree that the industry will have to change its method of

gathering and selling leads. But, as discussed in Section II(A), the Federal Trade Commission ("FTC") already requires that LGs use this method to provide consent for prerecorded telemarketing calls. Petitioner does not explain whether the LGs it represents are complying with the FTC rule, or regularly flouting it. Regardless, the FTC's one-to-one consent requirement is already the standard for a vast number of telemarketers, so it cannot be the death knell that Petitioner describes simply because it will now be required by the FCC for the same calls.

Moreover, Petitioner's descriptions of the problems with one-to-one consent are unconvincing. Petitioner objects that consumers will be unwilling to "wait on a loading screen" to see what sellers they are matched with. Opening Brief of Petitioner Insurance Marketing Coalition Limited, Dkt. 27 at 7, 18, 37 (filed May 15, 2024) ("Pet. Brief"). But widely used shopping websites—such as airfare and hotel websites—already do exactly that. The comment that Petitioner cites for this claim includes no evidence that waiting for a screen to load that will show consumers their exact choices is "an inconvenience that will lead to many fewer consumers ultimately giving consent." Pet. Brief at 18. Yet, it is only this process that provides shoppers with the opportunity to give true, knowing consent to receive calls from the specific entities they want to hear from, rather than the LG controlling which callers will have supposed authority to call because they were willing to pay for the consent.

Petitioner complains that the FCC rejected its proposal for collecting consents. Pet. Brief at 39. But that proposal simply adds disclosures and provides no meaningful assurance that consumers can knowingly consent to receive calls from specific sellers. Petitioner also criticizes the FCC for rejecting an industry proposal to allow LGs to "collect TCPA consent at an initial step (when the consumer submits an inquiry) and disclose the specific service providers after performance marketers have completed the matching process." *Id.* Under this proposal, an LG would produce a list of the proposed callers, just as mainstream shopping websites now do. The "consent" would be collected before the consumer sees the name of the callers and the number of callers to whom "consent" has been provided. This system seems designed to keep consumers ignorant of the callers whose calls they are purportedly consenting to receive.

The FCC specifically addressed all these alternatives in its Order. It had good reason to reject them, and we urge the court to do so as well.

## II. The FCC's amendments merely reinforce requirements with which lead generators and callers are already required to comply.

Petitioner's brief portrays the FCC's amendments as a devastating change that will drive its members to ruin. In fact, the FTC's Telemarketing Sales Rule ("TSR") has already required one-to-one consent for prerecorded telemarketing calls for the past fourteen years. *See* 75 Fed. Reg. 48,458, 48,520 (Aug. 10, 2010)

(adopting this language). In addition, on April 4, 2024, the Centers for Medicare and Medicaid Services (CMS) issued a rule, effective October 1, 2024, requiring one-to-one consent for all telemarketing calls relating to the sale of Medicare Advantage or Part D. CMS explicitly designed the consent process for these calls to be "consistent with Federal Trade Commission (FTC) and Federal Communications Commission (FCC) regulations." Centers for Medicare & Medicaid Services, Contract Year 2025 Medicare Advantage and Part D Final Rule (CMS-4205-F) (Apr. 4, 2024) ("Medicare Final Rule").[22] Unless Petitioner's members are violating the FTC's rule and plan to violate the CMS rule, it strains credulity to argue that an FCC rule that merely reiterates the same standards as those two rules will cause devastating consequences.

### A. The FTC already requires one-to-one consent for prerecorded telemarketing calls.

The first rule that already requires one-to-one consent is the FTC's TSR. It prohibits:

> (v) Initiating any outbound telephone call that delivers a prerecorded message, . . . unless:
>
> > (A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

---

[22] https://www.cms.gov/newsroom/fact-sheets/contract-year-2025-medicare-advantage-and-part-d-final-rule-cms-4205-f.

(i) *The seller obtained* only after a clear and conspicuous disclosure that the purpose of the agreement is *to authorize the seller to place prerecorded calls* to such person;

(ii) *The seller obtained* without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that *deliver prerecorded messages by or on behalf of a specific seller*; and

(iv) Includes such person's telephone number and signature; . . . .

16 C.F.R. § 310.4(b)(1)(v)(A) (*emphasis added*).

The TSR's requirements that "the seller" obtain the consumer's consent, and that the consent allow delivery of prerecorded messages "by or on behalf of a specific seller," make it clear that consent can be given only to calls from "a" specific seller. The requirement that "the seller" obtain consent also means that consent must be obtained by the seller itself or its agent, not by a third-party LG. These requirements also mean that a consent for calls cannot be transferred or sold, because the consent itself cannot authorize calls by any party other than the seller that obtained it. The exact behavior explicitly banned by the FCC's one-to-one consent rule has been explicitly banned by the FTC since the TSR went into effect in 2010. *See* 75 Fed. Reg. 48,458 (Aug. 10, 2010).

17

If the rule itself were not clear enough, the FTC has explicitly reiterated these points in its Business Guidance:

> **Does a consumer's written agreement to receive prerecorded message calls from a seller permit others, such as the seller's affiliates or marketing partners, to place such calls?** No. The TSR requires that the written agreement *identify the single "specific seller"* authorized to deliver prerecorded messages. The authorization does not extend to other sellers, such as affiliates, marketing partners, or others.
>
> **May a seller obtain a consumer's written permission to receive prerecorded messages from a third-party, such as a lead generator?** No. The TSR requires the seller to obtain permission directly from the recipient of the call. *The seller cannot rely on third-parties* to obtain permission.

Fed. Trade Comm'n, Business Guidance, Complying with the Telemarketing Sales Rule (*emphasis added*).[23]

These TSR requirements have been enforced in highly visible cases brought by the FTC along with "more than 100 federal and state law enforcement partners nationwide, including the attorneys general from all 50 states and the District of Columbia." Press Release, Fed. Trade Comm'n, FTC, Law Enforcers Nationwide Announce Enforcement Sweep to Stem the Tide of Illegal Telemarketing Calls to U.S. Consumers (July 18, 2023) ("FTC Press Release").[24]

---

[23] https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#prerecordedmessages.

[24] https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-law-enforcers-nationwide-announce-enforcement-sweep-stem-tide-illegal-telemarketing-calls-us.

The FTC characterized Fluent as a "consent farm lead generator" that purported "to collect, through a single click of a button or checkbox on their websites, consumers' broad agreement to receive marketing solicitations, including robocalls and other telemarketing calls, from dozens or even hundreds of third parties." *Id.* The case settled when Fluent agreed to pay a civil penalty and, among other things, to cease engaging in, assisting or facilitating robocalls. *See* Joint Motion for Entry of Proposed Stipulated Order, United States v. Fluent, L.L.C., No. 9:23-cv-81045 (July 17, 2023).[25]

The overlap between the TSR and the FCC's rule is close but not perfect. For example, the TSR does not apply to insurers if state law regulates telemarketing of insurance and enforcement of the TSR would conflict with and effectively supersede those state laws. 68 Fed. Reg. 4580, 4581 n.19 (Jan. 29, 2003); Fed. Trade Comm'n, Complying with the Telemarketing Sales Rule, Exemptions to the TSR (May 2023).[26] In contrast, the TCPA applies to all callers. But even with this uneven application of the TSR to calls made by Petitioner's members, it is hard to argue that a rule in effect for fourteen years without crippling the industries to which it applies would be devastating to anyone. Even if the telemarketers supplied with consents from LGs are flouting the TSR,

[25]https://www.ftc.gov/system/files/ftc_gov/pdf/1923230fluentjointmotionforentryofproposedstipulatedfinalorder.pdf.
[26] https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#bofinsurance.

that should not justify rolling back the FCC's imposition of the same requirements

under its TCPA rule.

### B. Telemarketing calls for Medicare Supplemental Insurance also must comply with one-to-one consent requirements.

The second rule that imposes a one-to-one consent requirement for

telemarketing calls is the Medicare Final Rule that unquestionably applies to

insurance agents.[27] This new regulation will apply to telemarketers of health

insurance, specifically Medicare supplemental insurance, which is likely to apply

to Petitioner and its members for at least some of their telemarketing activities.

(Petitioner describes itself as furnishing "leads to insurance providers, and small

insurers who depend on such leads to reach new customers and compete for

business." Motion to Stay Pending Appeal, Dkt. 20 at 13 (filed Apr. 3, 2024)).

CMS, which refers to LGs in this space as "third-party marketing

organizations" ("TPMOs"), noted:

> Some TPMOs have been selling and reselling personal beneficiary
> data, which can undermine existing rules that prohibit cold calling
> people with Medicare and result in other aggressive marketing tactics
> for Medicare Advantage and Part D plans. Individuals may be
> unaware that by placing a call or clicking on a generic-looking web

---

[27] https://www.cms.gov/newsroom/fact-sheets/contract-year-2025-medicare-advantage-and-part-d-final-rule-cms-4205-f. A trade association challenged the Rule's requirement that patient data collected by a third-party marketing organization (TPMO) for marketing or enrollment purposes could be shared only with another TPMO when prior express written consent is given by the beneficiary, a federal district court declined to grant a stay of that portion of the Rule. Americans for Beneficiary Choice v. United States Dep't of Health & Human Servs., 2024 WL 3297527, at *6 (N.D. Tex. July 3, 2024) ("ABC's current briefing does not demonstrate a substantial likelihood of success at this stage to warrant the extraordinary measure of a section 705 stay on this claim").

link, they are unwittingly agreeing and providing consent for their personal beneficiary data to be collected and sold to other entities for future marketing activities. To curtail this practice, in this final rule, *CMS is codifying the requirement that personal beneficiary data collected by a TPMO for marketing or enrolling the individual into a Medicare Advantage or Part D plan may only be shared with another TPMO when prior express written consent is given by the individual.*

Medicare Final Rule (*emphasis added*).

Specifically, pursuant to the new regulations:

the TPMO must obtain this written consent through a transparent, and prominently placed, disclosure from the individual to share the information and be contacted for marketing or enrollment purposes, separately for each TPMO that receives the data; i.e., one-to-one consent, which is generally consistent with Federal Trade Commission (FTC) and Federal Communications Commission (FCC) regulations.

*Id.*

CMS carefully designed its requirements for prior express written consent to be consistent with FCC and FTC regulations for these calls, knowing that compliance will be easier if common rules apply across the board:

By adopting the one-to-one consent requirement, we will prevent TPMOs from having to build a different consent and disclosure structure on their websites and systems because it aligns with the one-to-one consent structure in the FCC rules on consenting to telemarketing calls or texts using an automatic telephone dialing system or an artificial or prerecorded voice. . . . Thus, the shared one-to-one consent structure will make it easier for TPMOs to collect both consents at the same time; a consent to share the beneficiary's personal data with a specific entity and the consent for that entity to robotext, robocall, or call the beneficiary, as applicable.[28]

89 Fed. Reg. 30,448, 30602 (Apr. 23, 2024). The FCC's approach serves this same purpose, aligning its requirements with the FTC's so that a single standard governs all prerecorded telemarketing calls. FCC Order at ⁋ 30 n.71.

CMS's regulation rebuts Petitioner's claim that consumers value calls that result from LGs trading consents, referencing "complaints … from beneficiaries and their advocates and caregivers about receiving harassing and unwanted phone and email solicitations from individuals attempting to enroll them in MA and Part D plans." 89 Fed. Reg. at 30,449. Further, it states: ""[T]he overwhelming number of marketing calls beneficiaries receive from TPMOs are unwanted, confusing, and inhibit the beneficiary's ability to make an informed choice." *Id.* at 30,602 (footnotes omitted). It concludes that its rule would

> limit when a beneficiary's personal data can be shared and ensures that they know who will be contacting them, which we believe will lower the number of complaints, be less overwhelming, and will result in beneficiaries having a more meaningful discussion with fewer agents, and ultimately enrolling in a health plan that best meets their needs.

*Id.*

### III. The requirement that calls must be "logically and topically related to the interaction that prompted the consent" mirrors the FCC rule for consent for non-telemarketing calls.

Petitioner complains that the requirement that prerecorded telemarketing calls be "logically and topically related to the interaction that prompted the consent" differs from the rules for non-telemarketing calls, thereby violating the

First Amendment. Respondents' brief thoroughly exposes the flaws in Petitioner's legal analysis. Amici here supplement that discussion by addressing the flawed factual underpinnings of Petitioner's argument: in fact, the "logical and topical relationship" requirement between a call and the interaction that prompted the consent is substantially the same for both telemarketing and non-telemarketing robocalls.

The FCC's rule—both in its current and amended form—requires "prior express written consent" for telemarketing calls that are prerecorded (or, in the case of cell phone calls, autodialed). 47 C.F.R. § 64.1200(a)(2)(3). "Prior express written consent" is a defined term that specifies various formal requirements of the written agreement.

For other robocalls, FCC regulations require only "prior express consent"— without any requirement that consent be written. While the FCC has not promulgated a regulation defining "prior express consent," both it and the courts have explicitly and repeatedly required that the content of non-telemarketing calls be closely related to the context in which the consumer provided the consent, or the consumer must separately expressly consent to the non-related calls. For example, in its 2015 Omnibus Order, the Commission emphasized its requirement that calls must be "within the scope of consent given." It held:

> We clarify, therefore, that provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls subject

> to HIPAA by a HIPAA-covered entity and business associates acting
> on its behalf… if the covered entities and business associates are
> making calls *within the scope of the consent given*, and absent
> instructions to the contrary.

*In re* Rules & Regulations Implementing the Telephone Consumer Protection Act

of 1991, Declaratory Ruling and Order, CG Docket No. 02-278, 30 F.C.C. Rcd.

7961, at ¶ 141 (F.C.C. July 10, 2015) (*emphasis added*). It elaborated in a footnote:

> By "within the scope of consent given, and absent instructions to the
> contrary," we mean that *the call must be closely related to the purpose
> for which the telephone number was originally provided.*

*Id.* at ¶ 141 n.474 (*emphasis added*).[29]

In a 2016 Declaratory Ruling explaining the legality of non-telemarketing

calls made by schools and utilities, the Commission restated that calls must relate

to the *scope of the consent* when the telephone number was provided. *In re* Rules

& Regulations Implementing the Tel. Consumer Prot. Act of 1991, Blackboard,

Inc. Petition for Expedited Declaratory Ruling *et al.*, Declaratory Ruling, CG

Docket No. 02-278, 31 F.C.C. Rcd. 9054, at ¶¶ 17, 18, 19 (Rel. Aug. 4, 2016)

(citing in part to Report and Order, CG Docket No. 02-278, 27 FCC Rcd 1830, at

1842, ¶ 29 (2012)).[30] Regarding calls from schools, the Commission instructed:

> [W]hen a parent/guardian or student provides only their wireless
> number as a contact to a school, the scope of consent includes
> communications from the school closely related to the educational

---

[29] https://docs.fcc.gov/public/attachments/FCC-15-72A1.pdf.
[30] https://docs.fcc.gov/public/attachments/FCC-16-88A1.pdf (*emphasis added*).

mission of the school or to official school activities absent instructions to the contrary from the party who provides the phone number."

*Id.* at ¶ 23. Similarly, with respect to non-telemarketing calls from a utility:

> [C]onsumers who provide their wireless telephone number to a utility company when they initially sign up to receive utility service, subsequently supply the wireless telephone number, or later update their contact information, have given prior express consent to be contacted by their utility company at that number with messages that *are closely related to the utility service* so long as the consumer has not provided "instructions to the contrary."

*Id.* at ¶ 29 (*emphasis added*).

In *Nigro v. Mercantile Adjustment Bureau, L.L.C.*, 769 F.3d 804 (2d Cir. 2014), after a man provided his number to cancel his deceased mother-in-law's utility service, the utility made seventy-two collection robocalls. The Second Circuit held that where the man had provided his number only after the debt was incurred, the utility did not have consent to call him to collect it. The FCC sent a letter to the court to this effect. *See* Letter from FCC Gen. Counsel to Clerk, Second Circuit Ct. of Appeals, in *Nigro v. Mercantile Adjustment Bureau*, 2014 WL 2959062 (F.C.C. June 30, 2014).

Thus, the Commission and the courts have made it clear that, when a consumer gives prior express consent to receive robocalls, that consent extends only to calls "closely related" to the context in which the consumer gave consent. The Commission's amendments to the regulation for consent for telemarketing robocalls merely incorporate this position into the definition of "prior express

*written* consent." Indeed, it would be anomalous for the Commission's rules to strictly limit the subject matter for non-telemarketing calls, yet not provide the same protection for telemarketing calls.

## IV.    The TCPA is a remedial statute that must be liberally construed.

The TCPA is a remedial statute designed to protect consumers from the automated and prerecorded calls that Congress termed a "nuisance" and an "invasion of privacy." Pub. L. No. 102–243, § 2, at ¶¶ 5–6, 9–10, 13–14, 105 Stat. 2394 (1991); 137 Cong. Rec. S16206 (1991) (statement of Sen. Warner) ("Indeed the most important thing we have in this country is our freedom and our privacy, and this is clearly an invasion of that…."); S. Rep. No. 102-178, at 5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972–1973 ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services."). *See also* Barr v. Am. Ass'n of Political Consultants, Inc., 591 U.S. 610, 614, 615, 140 S. Ct. 2335, 207 L. Ed. 2d 784 (2020) ("In enacting the TCPA, Congress found that banning robocalls was 'the only effective means of protecting telephone consumers from this nuisance and privacy invasion.'" (citation omitted)).

Multiple circuits have held that the TCPA should be construed liberally to benefit consumers. *See* Breda v. Cellco P'ship, 934 F.3d 1, 10 (1st Cir. 2019); Parchman v. SLM Corp., 896 F.3d 728, 739–740 (6th Cir. 2018); Daubert v. NRA Group, L.L.C., 861 F.3d 382, 390 (3d Cir. 2017); Van Patten v. Vertical Fitness Group, 847 F.3d 1037, 1047–1049 (9th Cir. 2017). The impact of this regulation on telephone users, as opposed to the impact on callers and the telemarketing industry, is most relevant in this court's review. Evaluating the one-to-one requirement in the context of the TCPA's remedial nature clearly supports its legality.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to deny the Petitioner's challenge to the FCC's amended rule and protect consumers from unwanted telemarketing robocalls.

Respectfully submitted: /s Megan Iorio
                          Megan Iorio

This the 22nd day of July, 2024.

*Counsel for Amici Curiae*

Megan Iorio
**Electronic Privacy Information Center**
1519 New Hampshire Ave NW
Washington DC 20008
202-483-1140
iorio@epic.org

*On Brief*

Margot F. Saunders
Carolyn Carter
**National Consumer Law Center**
1001 Connecticut Ave, NW
Washington, D.C. 20036
202 452 6252
msaunders@nclc.org

*Additional Amici Curiae*

Nicholas Garcia
**Public Knowledge**
1818 N St. NW, Suite 410
Washington, DC 20036
nick@publicknowledge.org
Counsel for *Amicus Curiae*
*Public Knowledge*

Erin Witte
**Consumer Federation of America**
1620 I Street, NW, Suite 200
Washington, DC 20006
ewitte@consumerfed.org
Counsel for *Amicus Curiae*
*Consumer Federation of America*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font. This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(a) because, excluding parts of the documents are exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,368 words.

July 22, 2024                    /s/____Megan Iorio_____

                                 Megan Iorio
                                 Counsel for *Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I served the within Brief of *Amici Curiae*, the National Consumer Law Center, Electronic Privacy Information Center, Public Knowledge, U.S. Public Interest Research Group, and the Consumer Federation of America, on counsel for all parties, electronically through the ECF System, on this 22nd day of July 2024.

July 22, 2024                         /s/  Megan Iorio

Megan Iorio
Counsel for *Amici Curiae*