No. 24-10277

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

INSURANCE MARKETING COALITION LIMITED,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

---

## REPLY BRIEF OF PETITIONER
## INSURANCE MARKETING COALITION LIMITED

---

Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
Sameer Aggarwal
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
kking@cov.com

*Counsel for Insurance Marketing
Coalition Ltd.*

August 2, 2024

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), counsel for Petitioner Insurance Marketing Coalition Ltd. (IMC) hereby certifies that the certificates of interested persons included in IMC's opening brief and the brief of amici curiae National Consumer Law Center (NCLC), et al. are complete.

*/s/ Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

August 2, 2024

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ................................................. C-1

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 4

I.    THE COMMISSION'S STATUTORY INTERPRETATION ARGUMENTS FAIL. ......................................................................... 4

      A.    The *Order* Impermissibly Redefines "Prior Express Consent" to Mean Two Different Things. ............................................... 5

      B.    The *Order* Conflicts with the Ordinary Meaning of "Prior Express Consent." ............................................................... 9

II.   THE *ORDER* VIOLATES THE FIRST AMENDMENT. ........................... 17

      A.    The *Order* Is Subject to Strict Scrutiny. .............................. 17

      B.    The *Order* Fails Intermediate Scrutiny. ................................ 19

III.  THE *ORDER* IS ARBITRARY AND CAPRICIOUS. ............................... 22

      A.    The *Order* Does Not Offer a Reasoned Response to Alternative Proposals. ......................................................... 22

      B.    The Commission Overreaches in Characterizing the Evidence. ......... 26

      C.    The *Order* Ignores Its Impact on Small Businesses. .................. 28

CONCLUSION ................................................................................... 29

CERTIFICATE OF COMPLIANCE ........................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases*

*Baisden v. Credit Adjustments, Inc.*,
   813 F.3d 338 (6th Cir. 2016) ...............................................................15

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
   591 U.S. 610 (2020)...............................................................3, 18, 19

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)...............................................................6

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980)...............................................................3, 19

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
   596 U.S. 61 (2022)...............................................................18, 19

*Clark v. Martinez*,
   543 U.S. 371 (2005)...............................................................2, 5, 7

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   587 U.S 262 (2019)...............................................................8

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017) ...............................................................21

*Fober v. Mgmt. & Tech. Consultants, LLC*,
   886 F.3d 789 (9th Cir. 2018) ...............................................................12, 15, 26

*Gorss Motels, Inc. v. Safemark Sys., LP*,
   931 F.3d 1094 (11th Cir. 2019) ...............................................................16

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regul.*,
   512 U.S. 136 (1994)...............................................................20

*Kennecott Utah Copper Corp. v. Dep't of the Interior*,
   88 F.3d 1191 (D.C. Cir. 1996)...............................................................9

---

* The authorities on which IMC primarily relies are identified with an asterisk.

ii

*Loper Bright Enter. v. Raimondo,
    144 S.Ct. 2244 (2024).....................................................................1, 2, 7, 8, 9, 10

Mais v. Gulf Coast Collection Bureau, Inc.,
    768 F.3d 1110 (11th Cir. 2014) ...............................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983)...............................................................................22, 27

Nat'l Ass'n of Mfrs. v. SEC,
    800 F.3d 518 (D.C. Cir. 2015)................................................................9

Nat'l Tel. Coop. Ass'n v. FCC,
    563 F.3d 536 (D.C. Cir. 2009)...............................................................28

*Ocheesee Creamery LLC v. Putnam,
    851 F.3d 1228 (11th Cir. 2017) .........................................................4, 20, 21

*Ohio v. EPA,
    144 S.Ct. 2040 (2024)....................................................................4, 8, 22, 23

Reed v. Town of Gilbert,
    576 U.S. 155 (2015).........................................................................17, 18, 19

Regions Bank v. Legal Outsource PA,
    936 F.3d 1184 (11th Cir. 2019) .............................................................13

Schweitzer v. Comenity Bank,
    866 F.3d 1273 (11th Cir. 2017) .............................................................14

SEC v. Chenery Corp.,
    332 U.S. 194 (1947).............................................................................6, 17

This That & the Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.,
    285 F.3d 1319 (11th Cir. 2002) .............................................................21

U.S. Dep't of the Treasury v. FLRA,
    739 F.3d 13 (D.C. Cir. 2014)................................................................12

United States v. Philip Morris USA, Inc.,
    855 F.3d 321 (D.C. Cir. 2017)...............................................................3, 19

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) .................................................................2, 8, 13

*West Virginia v. EPA,*
597 U.S. 697 (2022) .........................................................................7

*In re Woolsey,*
696 F.3d 1266 (10th Cir. 2012) .......................................................8

**Statutes**

5 U.S.C. § 604 ..................................................................................28

47 U.S.C. § 227 ............................................................................1, 6

47 U.S.C. § 503 ...............................................................................13

Telephone Consumer Protection Act of 1991,
105 Stat. 2394 ..................................................................................5

**Regulations**

47 C.F.R. § 64.1200 ...................................................................18, 28

**Regulatory Materials**

89 Fed. Reg. 30,448 (Apr. 23, 2024) ...............................................16

FCC, *Report to Congress on Robocalls and Transmission of
Misleading or Inaccurate Called Identification Information,*
2022 WL 17958839 (Dec. 23, 2022) ...........................................14, 26

FTC, *Q&A for Telemarketers & Sellers About DNC Provisions in TSR*
(May 2023), https://perma.cc/KUM3-S8F2 .....................................16

## INTRODUCTION

The Commission's defense of the *Order* boils down to a policy argument—
that the problem posed by unwanted automated calls is so severe that any regulatory
response should be upheld.[1] Rather than showing that the *Order* comports with the
statutory text and binding precedent, the Commission argues that its paternalistic
new consent restrictions are necessary to protect consumers.

That is not how judicial review works, particularly after the Supreme Court's
landmark decision in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024),
which directs courts to exercise "independent judgment" in interpreting statutes.
The Commission has authority to regulate automated calls, but it must exercise that
authority in a lawful manner. The rules defining "prior express consent" under the
Telephone Consumer Protection Act (TCPA) may not amend that provision—by
requiring something *more* than prior express consent—simply because doing so is,
in the Commission's view, desirable as a policy matter.

The Commission argues that the *Order*'s restrictions are needed because a few
bad actors abused the prior framework and misled consumers into consenting to a
deluge of calls. According to the Commission, "consent" given through that outlier
approach—which differs substantially from the means employed by IMC's

---

[1] As in IMC's opening brief, we use "calls" as shorthand for telephone calls and text
messages and "automated calls" as shorthand for calls placed "using any automatic
telephone dialing system or an artificial or prerecorded voice." 47 U.S.C.
§ 227(b)(1)(A).

members—is not consent at all.  Even if the Commission is correct about when consent *is not* validly granted, it does not follow that consent *is* valid only when the *Order*'s mandates are satisfied.  The TCPA requires "prior express consent" and the ordinary meaning of that term—which governs under *Loper Bright*—simply requires permission freely and unmistakably given.  That meaning does not require consent to be granted one entity at a time or limit consent to calls "logically and topically related" to the place where it is given.  The Commission argues that those additional restrictions are necessary, but its job is to implement the statute Congress enacted, not "rewrite" the TCPA "to suit its own sense of how the statute should operate."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The Commission's remaining defenses of its interpretation are equally faulty.  Although the Commission contends that context allows it to interpret "prior express consent" differently for marketing and informational calls, *Clark v. Martinez*, 543 U.S. 371 (2005), which the Commission ignores entirely, forecloses that argument.  Under *Clark*, agencies may not "give th[e] same words" of a statute "a different meaning for each category" of cases, because doing so would involve "invent[ing] a statute rather than interpret[ing] one."  *Id.* at 378.  The Commission implies that a Congressional finding overrides *Clark* by stating that the Commission "should have the flexibility to design different rules" for particular "types of" calls.  But that

finding is not self-executing and the separate provision that implements it grants authority to issue exemptions, a step the Commission concedes it did not take here.

The *Order* also violates the First Amendment as applied to IMC's members— businesses that work hard to comply with the TCPA while providing rate quotes and other information expressly requested by comparison shoppers. The Commission asserts that strict scrutiny is inapplicable, but that argument fails because the *Order* singles out marketing calls for disfavored treatment, and because the Supreme Court applied strict scrutiny to a related TCPA provision in *Barr v. American Ass'n of Political Consultants, Inc.*, 591 U.S. 610 (2020).

Even under intermediate scrutiny, the Commission must show that the *Order*'s requirements are "not more extensive than is necessary," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980), and that "less restrictive means would fail," *United States v. Philip Morris USA, Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017). The Commission has not satisfied those requirements. IMC and others proposed alternatives that would have tightened the rules for obtaining consent, for example by limiting the number of businesses that could rely on the consumer's consent, and by requiring clear and conspicuous disclosure of those businesses in advance. Those steps would have addressed what the Commission characterizes as the most pressing aspects of the problem. But the *Order* nevertheless brushes the alternatives aside, speculating that they are not

sufficiently protective. That argument is insufficient because the *Order* does not provide "evidence to support" the Commission's conclusions. *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1236 (11th Cir. 2017).

Finally, the *Order* flunks the duty of reasoned decisionmaking imposed by the Administrative Procedure Act (APA). Among other shortcomings, the *Order* does not provide a substantive, "reasoned response" to IMC's comments. *Ohio v. EPA*, 144 S.Ct. 2040, 2054-55 (2024). The *Order* notes the Commission's disagreement with IMC's concerns and counterproposals, but it does not adequately explain its basis for rejecting them.

IMC agrees that consumers receive too many unwanted calls and that the Commission should address that problem, for example by enforcing its rules against overseas bad actors and others who make no effort to comply. But the existence of a genuine problem is not a license for the Commission to do whatever it wants. Part III.D of the *Order* should be set aside because it stretches the statutory text past the breaking point, violates the First Amendment, and does not grapple with alternative approaches and other concerns raised by commenters.

## ARGUMENT

## I. THE COMMISSION'S STATUTORY INTERPRETATION ARGUMENTS FAIL.

The Commission's brief confirms that the *Order* cannot be reconciled with the statutory text. Because the Commission impermissibly defines "prior express

4

consent" to have multiple meanings and because the *Order*'s restrictions are not encompassed within that term's ordinary meaning, the *Order* is unlawful.

### A. The *Order* Impermissibly Redefines "Prior Express Consent" to Mean Two Different Things.

The Commission does not dispute that it defines "prior express consent" differently depending upon the substance of a call. Under the *Order*, automated marketing calls require one form of consent (obtained on a one-to-one basis and logically-and-topically related to the originating website), while automated informational calls, such as calls from political entities or commercial calls that do not contain marketing content, are subject to more flexible rules. The *Order* thus does what Supreme Court precedent prohibits: it "gives th[e] same words" of a statute "a different meaning for each category" of cases. *Clark*, 543 U.S. at 371; *see* Blue Br. 22-25.

The Commission's brief does not mention *Clark*, much less explain how the *Order* complies with the *Clark* rule. The closest the Commission comes is an argument that the *Order* is supported by an uncodified legislative finding stating that the Commission "should have the flexibility to design different rules" for calls that "are not considered a nuisance or invasion of privacy, or for noncommercial calls." TCPA § 2(13), 105 Stat. 2394, 2395. This finding, the Commission suggests, allows it to interpret "prior express consent" differently for marketing and non-marketing calls. Red Br. 23-24. That argument fails for three reasons.

*First*, the *Order* does not invoke the finding as a reason for defining "prior express consent" in two different ways. That omission is fatal: "[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Instead, the *Order* can only be upheld "on the same basis articulated in the order." *Id.* at 169.

*Second*, the Commission's argument fails on the merits. The finding is not self-executing; it states that the Commission "should have … flexibility" but does not *grant* that flexibility. Instead, a separate provision operationalizes the finding by authorizing the Commission to exempt certain calls from the "prior express consent" requirement. *See* 47 U.S.C. § 227(b)(2)(B). This Court recognized the connection between the "flexibility" finding and the exemption authority in § 227(b)(2)(B) when it explained that "*[a]s a result*" of the finding, the TCPA "permits the FCC to create exemptions 'by rule or order' for certain automatically dialed or prerecorded calls." *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1117 (11th Cir. 2014) (emphasis added). But the Commission acknowledges that the *Order* does not rely on this exemption authority, Red Br. 24 n.3, so it cannot provide a basis to uphold the *Order*, *see Chenery*, 332 U.S. at 196.

The connection noted in *Mais* also matters because it illuminates the extent of the Commission's authority. Flexibility in granting exemptions is worlds apart from

flexibility to redefine statutory terms. There is no evidence that Congress authorized the Commission to flout the ordinary rules of statutory interpretation—including the *Clark* rule—regarding the TCPA's substantive requirements, which apply to all calls (marketing and informational alike). That understanding comports with the principle that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). Linking the "flexibility" finding to the exemption authority causes the statute's provisions to work together as a harmonious whole; the Commission's approach, in contrast, would cause the "flexibility" concept to swallow the exemption provision, rendering it surplusage.

*Third*, the Commission's interpretation is at odds with the Supreme Court's admonition that statutes "do—in fact, must—have a *single*, best meaning." *Loper Bright*, 144 S.Ct. at 2266 (emphasis added). Courts use the tools of statutory interpretation to determine that best meaning, and once they do, it is controlling. *See id.* "In the business of statutory interpretation, if [an interpretation] is not the best"— the single best—"it is not permissible." *Id.* As described below, the *Order*'s newfound interpretation of "prior express consent" does not come close to the best reading of that term. *See* Part I.B, *infra*.

*Loper Bright* also emphasizes the important role the traditional tools of statutory construction play in identifying the best interpretation of any statute. 144 S.Ct. at 2266. One of those tools is the "fundamental rul[e]" that courts must "avoid interpretations that would 'attribute different meanings to the same phrase.'" *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S 262, 268 (2019). Yet the Commission's brief fails to address that rule, including authority explaining that the Commission's approach is "categorically prohibited." *In re Woolsey*, 696 F.3d 1266, 1277 (10th Cir. 2012).[2]

The Commission does not have authority to update the TCPA; only Congress can do that. *Util. Air*, 573 U.S. at 328. Yet if the "flexibility" finding sweeps as broadly as the Commission claims, there is seemingly no limit on the Commission's authority, and the agency could redefine terms like "prior express consent" at will without any tether to the statutory text. That approach would be tantamount to allowing the Commission to rewrite the TCPA, rather than implement it.

The Commission also suggests (at 24-25) that the *Order* is justified by the *2012 Order*, which requires prior express *written* consent for automated marketing calls. The *2012 Order* cannot insulate the *Order* from review because the latter

---

[2] Congress' "flexibility" finding is not a delegation of discretionary authority that warrants deference. *See Loper Bright*, 144 S.Ct. at 2263. While some statutes use terms like "appropriate" to confer discretion upon an agency, *id.*, the provisions at issue here are not worded in that way. Because the *Order* does not argue that Congress delegated discretionary authority to determine the meaning of "prior express consent," any such argument is forfeited. *See Ohio*, 144 S.Ct. at 2057.

"change[d]" the Commission's "interpretation" of the statute by adding new consent requirements. *Kennecott Utah Copper Corp. v. Dep't of the Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996). While the *2012 Order* prescribed written consent, the *Order*'s one-to-one consent and logically-and-topically-related requirements alter the nature of "prior express consent" and make it more difficult for consumers to consent to calls that they wish to receive. The Commission does not cite any court ruling upholding the *2012 Order*'s interpretation, and that order is largely irrelevant under *Loper Bright*.[3] Put differently, the Commission's argument rests of the flawed assumption that "'whatever is is right'; an aphorism that would be as final as it is lazy, did it not include the troublesome consequence, that nothing that ever was, was wrong." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 521 (D.C. Cir. 2015) (quoting Charles Dickens, *A Tale of Two Cities* 65 (1859)).

## B. The *Order* Conflicts with the Ordinary Meaning of "Prior Express Consent."

The Commission has no compelling response to IMC's argument that the *Order*'s one-to-one consent and "logically and topically related" requirements conflict with the ordinary meaning of "prior express consent." That phrase

---

[3] Contrary to the Commission's suggestion (at 15), *Skidmore* deference does not apply because the Commission's interpretation was not contemporaneous with the TCPA's enactment and has not been consistent over time. *See* A185 n.37 (noting Commission's previous failure to adopt one-to-one consent requirement).

encompasses consent that is voluntary and unmistakably stated.  Blue Br. 26-27.  It does not include the *Order*'s additional requirements.

Even though the TCPA only requires "prior express consent," the *Order* prevents several types of consent that otherwise satisfy the statute's ordinary meaning.  For instance, under the *Order*, a consumer could not consent to receive automated calls from two lenders at once, as in the manner depicted below, even though that consent would clearly be voluntary and unmistakably stated—and therefore permitted under the TCPA.



This Court must exercise its independent judgment to determine whether the ordinary meaning of "prior express consent" encompasses the *Order*'s additional restrictions on marketing calls.  *See Loper Bright*, 144 S.Ct. at 2266.  To evade the ordinary meaning, the Commission argues that consumers' consent to performance

marketers is somehow "unwittin[g]." Red Br. 27-28. But there are several problems with the Commission's maneuver.

*First*, the Commission concedes (at 28) that "there may be particular instances … in which it would be reasonable to conclude that a consumer provides willing, informed agreement" to receive automated calls from "multiple" service providers at once. In other words, the Commission acknowledges that consumers *can* provide valid consent even if it is not given one business at a time. Yet, the *Order* would negate these consumers' consents, simply because they were not made on a one-to-one basis. It therefore impermissibly prohibits calls that the statute permits.

*Second*, the Commission overreaches in relying (at 27) on the notion that some bad actors mislead consumers into consenting to calls from many businesses—for example by using "buried, barely visible disclosures." The consent obtained in these circumstances, the Commission argues, is not valid. Perhaps so. But even if the Commission is right about what *is not* enough to establish valid consent, it does not follow that the *Order* properly explicates what *is* necessary to establish valid consent. The two issues, though related, are separate—and the Commission is incorrect about the latter. As the Commission concedes, and as the graphic above shows, consent *can* be voluntarily and unmistakably given to calls from multiple businesses in a single act. Clear and conspicuous disclosures (as opposed to buried, barely visible disclosures) are one way to do that. Placing an *ex ante* numerical limit

on how many businesses can rely on a consumer's consent is another. The TCPA "does not require any one method for obtaining 'prior express consent,'" *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018); any method qualifies as long as the consent is voluntary and unmistakable. Thus, the Commission cannot require more than that, even if additional restrictions are (from the Commission's perspective) desirable as a policy matter. *Cf. U.S. Dep't of the Treasury v. FLRA*, 739 F.3d 13, 20-21 (D.C. Cir. 2014) ("[W]hatever the validity of the [agency's] policy rationale, it has failed to justify its atextual construction," and "[t]he agency's policy preferences cannot trump the words of the statute." (citation omitted)).

It is up to Congress—not the Commission—to amend the TCPA if, for whatever reason, "prior express consent" does not go far enough. In setting that standard, Congress struck a balance that provides clear expectations to consumers and callers alike: automated calls must have "prior express consent," but once that consent is provided, calls are permitted. IMC's members take that requirement seriously: they have made significant investments in compliance mechanisms that ensure there is express consent for every automated call they place. *See, e.g.*, A90;

A123.  The Commission may not "'tailor' [the] legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."  *Util. Air*, 573 U.S. at 325.[4]

*Third*, the Commission cannot justify its overreach by citing a handful of bad actors.  The Commission argues that the *Order*'s expansive new rules are justified because some websites deceive consumers by including "hundreds or thousands of entities" in a buried list.  Red Br. 27.  IMC has always acknowledged that consent may not be valid when websites hide information or lure consumers into receiving more calls than reasonably expected.  *See* A96.  But the Commission's observations about abusive entities does not say anything about the ordinary meaning of "prior express consent" and what showing *is* necessary to comply with the TCPA.  Indeed, the Commission does not cite any authority showing that the ordinary meaning of "prior express consent" encompasses the *Order*'s new restrictions.

So long as performance marketers obtain consent that is voluntary and unmistakably stated, the TCPA allows them to make automated calls.  And when entities deviate from the "prior express consent" standard by deceiving consumers, the Commission retains the full scope of its enforcement powers.  *See* 47 U.S.C. § 503(b)(1).  It can also use those powers against fraudulent overseas entities and

---

[4] *Amici* argue (at 25-26) that the TCPA is a remedial statute that should be liberally construed, but this Court has rejected that "so-called canon because of its dubious value," labeling it "the last redoubt of losing causes."  *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1195 (11th Cir. 2019) (cleaned up).

others who place automated calls without making any attempt to obtain consent—entities the Commission has acknowledged account for "a significant portion, if not the majority," of unwanted automated calls. FCC, *Report to Congress on Robocalls and Transmission of Misleading or Inaccurate Called Identification Information*, 2022 WL 17958839, at *6 (Dec. 23, 2022). But what the Commission may not do is establish prospective rules that exceed the statute's limits and prohibit conduct that Congress has allowed.

The Commission dips its toe into embracing the ordinary meaning of "prior express consent" (Red Br. 26), but then pivots to a discussion of inapposite cases. Those cases did not adopt a general-purpose interpretation of "prior express consent," much less the atextual interpretation adopted by the *Order*. *See, e.g.*, *Schweitzer v. Comenity Bank*, 866 F.3d 1273 (11th Cir. 2017). Instead, they resolved summary judgment motions that turned on the particular facts of each dispute, including the circumstances surrounding a consumer's alleged consent. In *Schweitzer*, for example, this Court reviewed statements to determine whether the plaintiff did, in fact, partially revoke her consent, and it concluded that summary judgment was improper because "[t]he issue of consent is ordinarily a factual issue." 866 F.3d at 1279-80 (cleaned up). But this Court did not suggest that the rule of

decision—the *legal definition* of "prior express consent"—varies from one TCPA context to another.[5]

The Commission also errs in attempting to distinguish the cases cited by IMC as evidence of the TCPA's ordinary meaning. For example, the Commission argues that *Fober* turned solely on its facts and is therefore not relevant. Red Br. 29. But (unlike the cases the Commission cites) the Ninth Circuit preceded its factual assessment with a discussion of the proper interpretation of the TCPA, including that the statute "does not require any one method for obtaining 'prior express consent'" and "omits from its ambit those calls that a person agrees to receive." *Fober*, 886 F.3d at 792. The court thus reasoned that consent can be given to multiple unnamed intermediaries at once. *See id.* at 791-92. The Commission does not even try to reconcile the *Order* with these principles. Nor could it. The *Order* forbids all marketing calls that lack one-to-one consent or are not logically-and-topically-related, despite *Fober*'s conclusions that multiparty consent is permissible and that there is more than one valid method for obtaining consent.

---

[5] The other cases cited by the Commission are similar. For example, in *Baisden v. Credit Adjustments, Inc.*, the court held that consumers may provide "prior express consent" by giving their phone number to one entity, which then provides the number to another related entity. 813 F.3d 338, 346 (6th Cir. 2016). Then, the court reviewed the factual circumstances of the plaintiffs' authorizations and held that they consented to receive automated calls. *Id.* at 348-49. *Baisden* did not address the question presented here or suggest that "prior express consent" can have multiple meanings depending on the "context." Red. Br. 27 n.6.

The Commission also tries to diminish this Court's decision in *Gorss Motels, Inc. v. Safemark Systems, LP*, 931 F.3d 1094 (11th Cir. 2019), by saying that it is "very different" from this case, Red Br. 29. But the Commission does not explain these purported differences, and they are not apparent from the opinion itself. *Gorss Motels* first determined the ordinary meaning of the statutory phrase "prior express … permission." 931 F.3d at 1101. It then applied that meaning and held that the fax recipients' provision of "express permission to receive fax advertisements from affiliates" satisfied the TCPA. *Id.* at 1100-01. Under that same reasoning, the TCPA is also satisfied when consumers provide consent on comparison shopping sites to receive calls from multiple businesses in a single transaction, not just when they consent separately for each business, as the *Order* requires. Blue Br. 28-29.

In sum, both the tools of statutory construction and the applicable case law confirm that the *Order*'s one-to-one consent and logically-and-topically related requirements contravene the ordinary meaning of "prior express consent."[6]

---

[6] *Amici* incorrectly suggest (NCLC Br. 15-16) that the *Order* is valid because two other agencies have taken similar action. They cite the Federal Trade Commission's guidance regarding its Telemarketing Sales Rule, which the FTC recently reinterpreted (via a website post) to require direct consent to receive certain prerecorded calls. *See* FTC, *Q&A for Telemarketers & Sellers About DNC Provisions in TSR* (May 2023), https://perma.cc/KUM3-S8F2. That interpretation is immaterial because it concerns a different statutory framework than the TCPA. *Amici* also cite a Centers for Medicare and Medicaid Services rule adopting a one-to-one consent requirement for certain marketing calls. *See* 89 Fed. Reg. 30,448, 30,600 (Apr. 23, 2024). But that rule relies on the *Order* to justify its validity (*id.* at 30,600-01), so invoking it here to support the *Order* is circular reasoning.

## II.    THE *ORDER* VIOLATES THE FIRST AMENDMENT.

The Commission's brief advances several reasons why, in its view, the *Order* complies with the First Amendment.  But these rationales were not presented in the *Order*.  Instead, the *Order* merely said that the one-to-one consent rule is not a content-based speech restriction because it is a "logical and consistent measure of consumer protection."  *Order* ¶ 30 n.71.  That is not correct: there is no consumer protection exception to the First Amendment.  Once again, the Commission is bound by the reasoning it gave in the *Order*, rather than appellate counsel's *post hoc* rationalizations.  *Chenery*, 332 U.S. at 196.

In its brief, the Commission now argues that the *Order* passes First Amendment muster because (1) strict scrutiny does not apply and (2) the *Order*'s restrictions satisfy intermediate scrutiny.  Even if these belated arguments were properly before the Court, the Commission is mistaken.

### A.    The *Order* Is Subject to Strict Scrutiny.

The Commission does not attempt to show that the *Order*'s speech restrictions satisfy strict scrutiny and instead argues (at 35-37) that strict scrutiny does not apply.  That is incorrect.  The *Order* is a content-based restriction on IMC members' speech and therefore must satisfy strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Barr*, 591 U.S. at 621 (plurality opinion).

The Commission's grounds for distinguishing *Reed* and *Barr* fall short. Although *Reed* did not discuss commercial speech (Red Br. 38), it nevertheless concluded that a regulation is content-based if it applies "because of the topic discussed or the idea or message expressed." 576 U.S. at 163. The *Order* is content-based under that test because it subjects marketing calls to stricter rules based solely on the messages they communicate. Blue Br. 32.

*Barr*, which arose in the TCPA context, supports that conclusion. *See id.* at 33. The Commission asserts (at 38-39) that *Barr* does not apply because it involved a statute that preferred one subset of commercial speech over others, whereas the *Order* restricts all types of commercial speech. Not so. The *Order*'s restrictions apply only to marketing calls—i.e., calls made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(13). But other types of speech— whether commercial or noncommercial—escape regulation. Take, for example, the government-debt collection speech addressed in *Barr*, which serves a commercial purpose but does not fall within the definition of a "marketing call," meaning that the *Order*'s consent restrictions would not apply. The *Order*'s disparate treatment of particular types of commercial speech shows that it is a content-based restriction.

The Commission relies on *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), to argue that the Supreme Court has "disclaimed"

IMC's reading of *Reed* and *Barr*.  Red Br. 38.  But *Austin* never mentions *Barr*.

Blue Br. 33.  While *Austin* explains that a regulation could be considered content-

neutral if applied even-handedly to all solicitations, *see* 596 U.S. at 72-73, the *Order*

does not meet that standard; its restrictions only apply to marketing calls and not to

solicitations by non-profits, political campaigns, or other entities.  Blue Br. 32-33.

Unlike in *Austin*, then, the Commission could not administer the *Order* in a way that

is "agnostic as to content."  596 U.S. at 69.

###### B.     The *Order* Fails Intermediate Scrutiny.

The Commission's justification of the *Order* under intermediate scrutiny also

fails—primarily because the *Order* violates *Central Hudson*'s tailoring

requirements.

While intermediate scrutiny does not require the least restrictive means

available, it still demands that speech restrictions be "no more extensive than

necessary to further the State's interest."  *Central Hudson*, 447 U.S. at 569-70.

Satisfying that test requires, among other things, evidence that "less restrictive

means would fail."  *Philip Morris*, 855 F.3d at 327.  The Commission argues that

the *Order* meets those requirements because other approaches are "not sufficiently

protective of consumer[s]" and "would not close the lead generator loophole."  Red

Br. 37, 45-46 (quoting *Order* ¶ 34).  But the Commission cannot justify the *Order*

by presenting a false choice between the prior framework and its maximalist one-to-

one consent and logically-and-topically related restrictions when the record was replete with less-restrictive alternatives.

Here, the *Order*'s cursory discussion is insufficient to establish that its new requirements are "no more extensive than necessary" to further the Commission's interest. During the rulemaking proceedings, IMC and others proposed alternative measures that would have reduced the number of unwanted calls while still protecting marketers' rights to speak and consumers' rights to receive calls they desire. *See* Blue Br. 39-40 (describing alternatives); *Order* ¶¶ 33-34.

The Commission rejected these proposals based on its "belie[f]" that they would not provide consumers with sufficient control over the calls they receive. *Order* ¶ 34. But belief is not evidence. And in the First Amendment context, the requirement that the government "produce evidence to support its restriction" is "essential [because] otherwise a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Ocheesee Creamery*, 851 F.3d at 1236 (cleaned up); *see also Ibanez v. Fla. Dep't of Bus. & Prof'l Regul.*, 512 U.S. 136, 143 (1994) ("[m]ere speculation or conjecture [does] not suffice" (cleaned up)).

The *Order* does not carry that burden. It simply asserts that the proposed alternatives would not solve the problem, without citing any data, studies, research, or real-world attempts showing the alternatives would not be effective. *Order* ¶ 34;

20

Red Br. 37.[7]   Instead, the Commission effectively argues "Trust us; we're the experts."  *See* Red Br. 37, 45-46.

The First Amendment demands more.  The record here shows that there were several ways for the Commission to strike a middle ground that would have substantially limited bad actors' ability to use abusive practices, while also protecting marketers' speech.  Blue Br. 39-40.  Yet, the Commission makes no effort to provide evidence showing that its regulations strike an appropriate balance between furthering the government interest and protecting speech rights.  In similar circumstances, where the government has not provided evidence that less restrictive measures would fail, this Court has held that restrictions on commercial speech violate the First Amendment.  *See Ocheesee Creamery*, 851 F.3d at 1240 (restriction "was clearly more extensive than necessary to serve its interest in preventing deception"); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (likely success on merits due to "clear availability of obvious less-restrictive alternatives"); *This That & the Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.*, 285 F.3d 1319, 1324 (11th Cir. 2002) (similar).

---

[7] The Commission tackles a strawman when it says "'empirical data' are not required under the First Amendment."  Red Br. 33.  IMC has never suggested that empirical data is required, but rather has observed that, despite the Commission's burden to offer evidence, the *Order*'s rejection of alternatives is devoid of any evidence or substantive discussion of the alternatives' merit.

## III. THE *ORDER* IS ARBITRARY AND CAPRICIOUS.

The Commission has not shown that the *Order* comports with the APA's requirement of reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As Commissioner Simington explained, "the factual record on" the one-to-one consent requirement "is so thin, and the [*Order*] so impoverished in its reasoning … that it gives every appearance of an arbitrary and capricious action." A70. The Commission's brief nevertheless doubles down on the *Order*'s conclusory, "ill-considered[,] and unsupported" assertions. *Id.* Commissioner Simington was correct, and his reasoning is particularly compelling under the test the Supreme Court applied in *Ohio*, 144 S.Ct. at 2053-54.

### A. The *Order* Does Not Offer a Reasoned Response to Alternative Proposals.

Despite the *Order*'s cursory treatment of the alternatives proposed by IMC and other commenters, the Commission insists that the *Order* satisfies the APA's requirement that agencies consider and meaningfully respond to material comments. Red Br. 45. While the *Order*'s deficiencies were already clear under existing precedent (Blue Br. 48-50), they are especially clear now under *Ohio*.

In *Ohio*, the Court held that an EPA rule was likely arbitrary and capricious because the agency did not adequately respond to comments questioning one of the rule's premises. Commenters argued that the rule might not function properly if

22

litigation caused some states to be removed from its scope. *See id.* at 2053-54. EPA argued that it *did* consider this problem and included a "severability" provision to address the concern. *Id.* at 2054. That response was insufficient, the Court held, because mere "awareness" and consideration is not enough under the APA; agencies must provide a "reasoned response" consisting of a substantive "explanation" when they reject a commenter's argument. *Id.* In other words, "EPA needed to explain *why* it believed its rule would continue to offer cost-effective improvements … with only a subset of the States it originally intended to cover." *Id.* at 2055 n.11 (emphasis added). EPA's response failed that test because it "did not address the [commenters'] concern so much as sidestep it." *Id.* at 2055.

Here, too, the Commission did not offer a reasoned response to the concerns posed by IMC and others. IMC explained its concerns about the one-to-one consent restriction's effect on small digital advertisers (A97), and thus proposed several alternatives, including limits on the duration of a consumer's consent and on the total number of businesses that may call the consumer (A92). The *Order* summarily dismisses these alternatives without any meaningful explanation. *Order* ¶ 34 n.85. By relegating several alternatives to a cursory footnote, the Commission effectively "sidestep[ped]" IMC's concerns, *Ohio*, 144 S.Ct. at 2055.

The Commission did provide an explanation for its rejection of another proposal by several commentors—limiting consent to a small number of callers (say,

five or ten) from a list of potential callers—but that explanation was insufficient. The Commission asserts that this alternative would "forc[e]" consumers "to consent to all callers on the list without the ability to limit that list for purposes of their comparison shopping." Red Br. 46 (quoting *Order* ¶ 34). But it is not clear how a consumer could be "forced" to provide consent; when presented a list of clearly identified callers, the consumer could choose to withhold consent altogether. Nor does the *Order* explain how a consumer could be deceived if a website expressly states which businesses would be permitted to place automated calls if the consumer consents. The Commission's first rationale thus falls short of the reasoned response required under *Ohio*.

The Commission's second rationale fares no better. It faults IMC's proposal for not "prevent[ing] the daisy-chaining of consents" whereby callers continuously "resell" consents to other callers. Red Br. 46 (quoting *Order* ¶ 34). But this response is a non-sequitur. There is no connection between the proposed alternative approaches and the Commission's goal of limiting the resale of consents. Indeed, even if a consumer consented to receive calls from up to five or ten expressly identified callers, the Commission could still prohibit the resale of those consents to prevent daisy-chaining. And the Commission can already prevent daisy-chaining because subsequent purchasers can only place calls if they themselves have obtained

consent. This rationale does not come close to providing a "reasoned response" to the proposed alternatives.

With respect to the logically-and-topically-related requirement, the *Order*'s explanation is similarly lacking. As IMC's comments explained, consumers sometimes want to learn about services even if they differ from the services offered on a comparison-shopping website. *See* A178. For example, someone browsing a loan-comparison site when buying a second car might be interested in consolidating the new loan with an existing auto loan. Yet according to the Commission, the *Order* prohibits that consumer from consenting to calls about loan consolidation, even if consumer accepts clear and conspicuous terms stating that automated calls could include loan-consolidation information, as shown below. *See Order* ¶ 36 n.93.[8]



---

[8] To make matters worse, the *Order* does not define "logically-and-topically" related, leaving regulated entities at the Commission's whim. *Order* ¶ 36.

The *Order*'s reasoning in support of its paternalistic restriction is paper thin. The Commission states that "the scope of consent … can be reasonably inferred from the purpose of the website at which [the consumer] gave that consent," *Order* ¶ 36, but never explains *why* consumers' ability to consent should be restricted in that way. That omission is particularly problematic because a website could adopt clear and conspicuous consent language whose scope goes beyond the website's main purpose, as illustrated above. In that scenario, the Commission's inference would be unjustified. The Commission's rigid requirement also conflicts with precedent holding that the scope of consent is a fact-specific inquiry. *See, e.g.*, *Fober*, 886 F.3d at 793. Given these shortcomings, the *Order*'s passing remark does not provide the reasoned explanation the APA requires.

### B. The Commission Overreaches in Characterizing the Evidence.

According to the Commission, the *Order*'s restrictions are justified based on comments describing the frequency with which consumers receive unwanted automated calls. Red Br. 40-41. IMC has never disputed that unwanted automated calls pose a problem or that the Commission should act to prevent them, for example by enforcing its rules against bad actors. IMC's point is that the *Order*'s response to the problem is incoherent. Instead of focusing on the overseas entities that account for "a significant portion, if not a majority" of unwanted automated calls,[9] the

---

[9] *Report to Congress*, 2022 WL 17958839, at *6.

Commission asserts that performance marketers place "a large percentage of" those calls, *Order* ¶ 30, without any evidence that the calls consumers actually receive stem from performance marketers, *see* Blue Br. 14-15.

The Commission cites several sources that purport to show that performance marketers are responsible for the proliferation of unwanted calls. But the Commission's conclusion does not follow from those sources. For example, the Commission cites its *Urth Access Order* as evidence that marketers abuse consumers' consent. Red Br. 20, 32-33, 43 n.9. But there, the automated calls were made "without consent" since the callers "fail[ed] to provide adequate disclosure that would constitute effective consent" under the pre-*Order* TCPA rules, and some of them advanced fraudulent schemes to steal personal information or money. SA204-05, ¶¶ 13-16 & n.38. The *Order* does not show that its new requirements would have deterred that misconduct, or that new rules are necessary to address it. Moreover, it makes no sense to equate the abusive practices in *Urth Access* with those of performance marketers that seek to obtain consumers' informed consent and match them with businesses that provide the services the consumers have expressly asked about.

All told, the evidence the Commission cites in support of the *Order* is too thin to satisfy the APA. *See* A70; *State Farm*, 463 U.S. at 52-53.

### C.    The *Order* Ignores Its Impact on Small Businesses.

The Commission's primary response to IMC's and the SBA's concerns about the *Order*'s adverse effects on small businesses is that the Commission alone "enjoys broad discretion" to strike a balance between policy objectives.  Red Br. 48.  The *Order* and the Commission's brief show, however, that the Commission did not understand or seriously consider this problem, as explained by the SBA.  The *Order* first denies the existence of a problem because there is no reason "to assume that consumers will never consent to receive telemarketing calls from small businesses." Red Br. 49 (quoting *Order* ¶ 45).  And even after acknowledging that the *Order*'s scheme will cause consumers to avoid granting consent to smaller, lesser-known businesses, the *Order* responds by saying that consumers "have the right to make th[e] determination." Red Br. 49 (quoting *Order* ¶ 45).  In other words, tough luck for small businesses.

This disregard for the *Order*'s effect on small businesses cannot be reconciled with the Regulatory Flexibility Act, 5 U.S.C. § 604, and underscores the arbitrary and capricious nature of the *Order*.  *See Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009); Blue Br. 50-51.

# CONCLUSION

The Court should grant IMC's petition for review and vacate Part III.D of the

*Order* and the corresponding revisions to 47 C.F.R. § 64.1200.

<div style="margin-left:40%">

Respectfully Submitted,

*/s/ Kevin King*
Yaron Dori
Kevin King
  *Counsel of Record*
Matthew J. Glover
Sameer Aggarwal
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488
kking@cov.com

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

</div>

August 2, 2024

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

|  |  |  |
|---|---|---|
| INSURANCE MARKETING COALITION LIMITED, | ) ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | No. 24-10277 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | ) ) ) ) | |
| *Respondents*. | ) ) ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief (including the words in the graphics on pages 10 and 25) complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 6,500 words. I further certify that the brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman font.

/s/ Kevin King
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

August 2, 2024