No. 24-10277

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

INSURANCE MARKETING COALITION LTD.
*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

## MOTION OF NATIONAL CONSUMERS LEAGUE, MARK SCHWANBECK, MICAH MOBLEY, CHRISTOPHER K. MCNALLY, AND CHUCK OSBORNE TO INTERVENE IN SUPPORT OF RESPONDENTS

Jennifer S. Wagner
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
(617) 542-8010
jwagner@nclc.org

*Counsel for National Consumers
League*

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
LNicholls@publicjustice.net

*Counsel for Proposed
Intervenors*

*Insurance Marketing Coalition Ltd. v. FCC*, **Case No. 24-10277**

**CERTIFICATE OF INTERESTED PERSONS**

Under Eleventh Circuit Rules 26.1-1, 26.1-2(c), and 27-1(a)(10), undersigned counsel for Intervenors certifies that the following is a full and complete list of all persons, firms, associations, partnerships, and corporations, including subsidiaries, conglomerates, affiliates, parent corporations, and other legal entities having an interest in the outcome of this case:

1. Aggarwal, Sameer, Covington & Burling LLP, counsel for Petitioner;

2. Boeglin, John A., Covington & Burling LLP, former counsel for Petitioner;

3. Carter, Carolyn, National Consumer Law Center, counsel for *Amicus Curiae* National Consumer Law Center;

4. Citrin, Sarah E., Federal Communications Commission, counsel for Respondent;

5. Covington & Burling LLP, counsel for Petitioner;

6. Dori, Yaron, Covington & Burling LLP, counsel for Petitioner;

7. Dunne, Matthew J., Federal Communications Commission, counsel for Respondent;

8. Electronic Privacy Information Center, *Amicus Curiae*;

*Insurance Marketing Coalition Ltd. v. FCC*, Case No. 24-10277

9. Ellison, P. Michele, Federal Communications Commission, counsel for Respondent;

10. Federal Communications Commission, Respondent;

11. Garcia, Nicholas, Public Knowledge, counsel for *Amicus Curiae* Public Knowledge;

12. Glover, Matthew J., Covington & Burling LLP, counsel for Petitioner;

13. Greenburg, Sally, Intervenor National Consumers League;

14. Insurance Marketing Coalition Limited, Petitioner;

15. Iorio, Megan, Electronic Privacy Information Center, counsel for *Amici Curiae*;

16. King, Kevin F., Covington & Burling LLP, counsel for Petitioner;

17. Lewis, Jacob Matthew, Federal Communications Commission, counsel for Respondent;

18. McNally, Christopher K., Intervenor;

19. Mobley, Micah, Intervenor;

20. Murray, Teresa, *Amicus Curiae* U.S. PIRG;

21. National Consumer Law Center, *Amicus Curiae* and counsel for Intervenor National Consumers League;

22. National Consumers League, Intervenor;

*Insurance Marketing Coalition Ltd. v. FCC*, **Case No. 24-10277**

23. Nicholls, Leah M., Public Justice, counsel for Intervenors;

24. Nicholson, Robert B., U.S. Department of Justice, counsel for Respondent;

25. Osborne, Chuck, Intervenor;

26. Public Justice, counsel for Intervenors;

27. Public Knowledge, *Amicus Curiae*;

28. Saunders, Margot, National Consumer Law Center, counsel for *Amicus Curiae* National Consumer Law Center;

29. Schwanbeck, Mark, Intervenor;

30. United States of America, Respondent;

31. U.S. PIRG, *Amicus Curiae*;

32. Wagner, Jennifer S., National Consumer Law Center, counsel for Intervenor National Consumers League;

33. Wiggers, Robert J., U.S. Department of Justice, counsel for Respondent;

34. Witte, Erin, Consumer Federation of America, counsel for *Amicus Curiae* Consumer Federation of America.

***Insurance Marketing Coalition Ltd. v. FCC*, Case No. 24-10277**

In accordance with Rule 26.1(a) of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-3(b), the undersigned further certifies that there is no publicly traded company or corporation with an interest in the outcome of this case.

February 19, 2025

*/s/ Leah M. Nicholls*

Leah M. Nicholls

*Counsel for Proposed Intervenors*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

INTRODUCTION AND BACKGROUND ...............................................................2

A.    Proposed Intervenors ................................................................3

B.    The Need for the One-to-One Rule.................................................6

C.    The Telemarketing Industry Challenge to the One-to-One Rule and the Panel's Decision...............................................................9

ARGUMENT ......................................................................................11

PROPOSED INTERVENORS SHOULD BE PERMITTED TO INTERVENE TO SEEK REHEARING TO REINSTATE THE ONE-TO-ONE RULE. ....................11

A.    Proposed Intervenors Should Be Permitted to Appeal as of Right................13

    1.    Proposed Intervenors have an interest in the subject matter of the suit that will be adversely affected if the panel's decision stands................13

    2.    The FCC and United States are no longer defending the Rule, and Proposed Intervenors' interests will no longer be protected. ................15

    3.    Proposed Intervenors' motion is timely.................................................17

B.    Proposed Intervenors Also Satisfy the Requirements for Permissive Intervention. ......................................................22

CONCLUSION ......................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

EXHIBITS

National Consumers League (NCL), Mark Schwanbeck, Micah Mobley, Christopher McNally, and Chuck Osborne (collectively, individual intervenors) move to intervene under Federal Rule of Appellate Procedure 15(d) to seek rehearing of the panel's January 24, 2025, opinion that the Federal Communication Commission's (FCC's) 2023 Order providing that a consumer cannot consent to a telemarketing or advertising robocall unless they consent to calls from one entity at time (One-to-One Rule, Rule, or Order) exceeded the FCC's statutory authority under the Telephone Consumer Protection Act (TCPA). NCL participated in the FCC's proceedings relating to the Rule. NCL advocates on behalf of consumers and victims of unwanted telemarketing and scam calls and provides individual assistance to those victims. The individual intervenors, small business owners, each filed comments in support of the FCC's Rule because the Rule would provide relief from incessant prerecorded telemarketing calls to their business cell phone lines, which interfere with their ability to run their businesses and impose real costs. Proposed Intervenors have a strong ongoing interest in regulation that reduces the costly burden of unwanted telemarketing calls. Because the FCC is unlikely to seek rehearing, permitting movants to intervene to do so is appropriate here.

Petitioner opposes this motion. On February 12, 2025, counsel for Proposed Intervenors contacted counsel for Respondents to request their consent to this motion, but they have not responded with their position.

## INTRODUCTION AND BACKGROUND

Decades ago, Congress mandated that the FCC work to protect Americans from unwanted robocalls. *See* 47 U.S.C. § 227. As part of that ongoing obligation, in 2023, the FCC issued an order amending its regulations, requiring that for a consumer to consent to telemarketing robocalls and texts, that consent must be given to one entity at a time. *In the Matter of Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, *Second Report and Order*, CG Docket Nos. 21-402, 02-278, 17-59, 38 FCC Rcd. 12247, 12258-69 (Rel. Dec. 18, 2023) (Order).[1]

If permitted to go into effect, the FCC's One-to-One Rule will substantially reduce the unwanted telemarketing robocalls that bombard individuals and small businesses. It will mean that consumer consent to receive prerecorded calls with a clear understanding of which entities may call. And, critically, it will also prohibit the consumer's consent from being sold to other callers.

The bright line standard established by the FCC's Rule would enable telecommunications providers to prevent telemarketers from flooding the system with calls. Moreover, by substantially reducing the number of unwanted

---

[1] https://docs.fcc.gov/public/attachments/DOC-408396A1.pdf.

telemarketing calls, telephone service providers will be better able to identify and block scam calls—which, on an annual basis, cause billions of dollars in losses.

In ruling on a telemarketing industry challenge to the One-to-One Rule, the panel held that the FCC exceeded its authority under the TCPA. With the change in presidential administration, the FCC is no longer defending the Rule and is unlikely to seek rehearing of that decision. Proposed Intervenors now seek to do so.[2]

### A. Proposed Intervenors

Proposed Intervenors are NCL and four small business owners who suffer concrete burdens from the proliferation of unwanted telemarketing robocalls.

NCL, a participant in the FCC's proceeding relating to the amended Rule, advocates on behalf of consumers and victims of unwanted telemarketing and scam calls and provides individualized assistance to victims. Greenberg Decl. ¶¶ 2, 5-8. NCL expends considerable resources advocating on behalf of consumers before the FCC and other agencies to address the problem of unwanted telemarketing and scam calls and to provide redress for victims of these unwanted calls. *Id.* ¶¶ 3-4. For example, NCL employs a counselor to assist victims of scam calls with complaints to law enforcement and consumer protection agencies and guide them through other

---

[2] Proposed Intervenors do not seek to seek rehearing on the panel's ruling as to the component of the FCC order providing that consumer consent is consent only as to calls about matters "logically and topically" related to the interaction that prompted the consent. *See* Order ¶ 36.

steps in the recovery process. *Id.* ¶ 8. Since 2012, NCL has assisted 77,000 victims. *Id.* ¶ 8. NCL believes that the One-to-One Rule would substantially reduce unwanted telemarketing and scam calls, reducing the need for NCL to expend resources advocating for improved regulation and assisting victims. *Id.* ¶¶ 9-13.

Mark Schwanbeck owns and operates a small business that provides tax preparation, small business accounting and consulting, and retirement planning services. Schwanbeck Decl. ¶ 1. His ability to operate his business is made much more difficult because he is continually interrupted by unwanted, prerecorded telemarketing calls on his business cell phone. *Id.* ¶¶ 3-4. To reduce these interruptions, Mr. Schwanbeck purchases a subscription at a cost of $179.88 annually for a service that blocks calls from numbers not in his contacts and diverts them to voicemail—in 2024 alone, Mr. Schwanbeck had 1,587 calls blocked by the service. *Id.* ¶¶ 6, 10. But even with the service, Mr. Schwanbeck must waste substantial time wading through telemarketing voicemails for any voicemails from potential clients. *Id.* ¶ 7. Further, the inability to reach him directly can be off-putting for current and potential clients, and because the service requires callers to navigate a system to prove they are human, some potential clients—particularly elderly ones—and vendors hang up out of frustration, leading Mr. Schwanbeck to miss wanted calls important to his business. *Id.* ¶¶ 8-9.

4

Micah Mobley owns and operates a company that provides timing services for running events. Mobley Decl. ¶ 1. His business requires that he be immediately available to clients when they call, which requires that he answer all calls to his cell phone, even those from unknown numbers. *Id.* ¶¶ 2-3. He estimates that he receives between five to ten unwanted robocalls every week, and sometimes more, none of which he consented to receive. *Id.* ¶ 5.

Christopher McNally is a lawyer with a solo law practice who uses his cell phone to communicate with clients and others necessary to conduct his practice. McNally Decl. ¶¶ 1-2. As he does not employ anybody to screen calls, he must answer all calls himself or listen to them on his voicemail. *Id.* ¶ 2. Dealing with these unwanted telemarketing calls diverts his time and energy from necessary work for clients. *Id.* ¶ 3. Telemarketers routinely ignore his requests to stop calling. *Id.* As telemarketers consistently use fake caller-IDs, he cannot determine which calls are related to his practice and which are unwanted telemarketing calls. *Id.* He estimates that he receives one to three telemarketing robocalls every business day on his cell phone, all of which are intrusive and cost him time and money. *Id.* ¶ 5.

Chuck Osborne owns and operates a business selling stop-loss insurance to self-funded medical plans. Osborne Decl. ¶¶ 1-2. He relies on his cell phone to communicate with customers, suppliers, insurance company underwriters, and others to conduct his business. *Id.* ¶ 3. Telemarketers routinely send unwanted,

unconsented-to calls that include a prerecorded voice to his cell phone. *Id.* ¶¶ 4-5. These robocalls tie up his cell phone, preventing him from connecting with business-related calls. *Id.* ¶ 6. To ease the burden of unwanted calls, he engages a service to screen the calls, at an annual cost of approximately $145.00. *Id.* ¶ 7. The service diverts telemarketing calls to his voicemail, which requires that either he or his employees listen to the voicemail to determine which calls are from business callers and which are unwanted calls from telemarketers. *Id.* ¶¶ 8-9. The time it takes to deal with these unwanted robocalls costs time, and "time is money for a small business." *Id.* ¶ 10.

Each of the individual intervenors filed comments with the FCC in support of the Rule.

### B. The Need for the One-to-One Rule

Under the One-to-One Rule, consumer consent to receive telemarketing robocalls can be given only to one entity at a time. In adopting the Rule, the FCC explained that "[l]ead generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts." Order ¶ 30. It found that "requiring one-to-one consent will end the current practice of consumers receiving robocalls . . . from tens, or hundreds, of sellers—numbers that most reasonable consumers would not expect to receive." *Id.* ¶ 31. The FCC determined that this requirement would "[stop]

the practice of buried, barely visible disclosures that, as USTelecom explains, appear in fine print on a website or only accessible through a hyperlink, burdening the consumer with yet another step to be fully informed." *Id.* ¶ 32.

A bipartisan group of twenty-eight state Attorneys General explained how one lead generator's website illustrated these problems. Reply Comments of 28 Attorneys General, CG Docket Nos. 21-402, 02-278 (June 6, 2023).[3] After answering questions and entering their contact information on the website, a consumer is presented with a button saying, "View My Quote," ostensibly to receive a quote for health insurance. Below the button, in a tiny font, it stated that, by clicking the button, the user would

> expressly consent by electronic signature to receive marketing communication, including via calls using an automatic telephone dialing system and artificial or pre-recorded messages, emails, and text messages (SMS), *from insurance companies or their agents, the owner of this website and its agents, representatives and affiliates, and partner companies*[.]

*Id.* at 3 (emphasis added). As the AGs explained, the website did not make clear that, by clicking the quote button, not only did the user agree to receive marketing calls from insurance companies, but also from *2,100 other companies. Id.* at 3-4.

Along those same lines, the FCC had taken an enforcement action against a lead generator whose websites "included TCPA consent disclosures whereby the

---

[3] https://www.fcc.gov/ecfs/document/10606091571575/1.

7

consumer agreed to receive robocalls from 'marketing partners'. . . [that] were only visible to the consumer if the consumer clicked on a specific hyperlink to a second website that listed the names of *5,329 entities*." Order ¶ 32 (emphasis added).

The abusive nature of these purported consents is multiplied by the practice of selling them—indeed, selling them many times over. An association representing lead generators explained that "once the consumer has submitted the consent form the company seeks to profit by reselling the 'lead' multiple—perhaps hundreds—of times over a limitless period of time. Since express written consent does not expire, the website is free to sell the consent forever." Comment of Responsible Enterprises Against Consumer Harassment, CG Dockets Nos. 21-402, 02-278, at 3 (May 9, 2023).[4] The result of all these sales: "Each time the website operator—or an intermediary 'aggregator' . . . sells the consumer's data a new set of phone calls will be made to the consumer." *Id.* at 3.

USTelecom, the trade association representing telecommunications carriers, also urged the Commission to close this lead generator loophole: "Lead generation calls make up a disproportionate portion of unwanted robocalls, and create more hurdles for enforcers and the traceback process as callers obfuscate the legality of their unwanted robocalls by claiming they have valid consent." Comments of USTelecom – The Broadband Association, CG Docket Nos. 21-402, 020278 (May

---

[4] https://www.fcc.gov/ecfs/document/10509951114134/1.

8, 2023).[5]

### C. The Telemarketing Industry Challenge to the One-to-One Rule and the Panel's Decision

Insurance Marketing Coalition Ltd. (LMC), an insurance industry marketing consortium, petitioned this Court challenging the One-to-One Rule. It contended that, in promulgating the Rule, the FCC exceeded its authority under the TCPA; the part of the Rule requiring logical and topical relatedness violates the First Amendment; and the Rule is arbitrary and capricious. Slip. Op. 3-4. The panel's January 24, 2025, decision vacated the FCC One-to-One Rule on the basis that the FCC exceeded its authority under the TCPA and did not reach IMC's other arguments. *Id.* The panel reasoned that the Rule's "consent restrictions impermissibly conflict with the ordinary statutory meaning of 'prior express consent.'" *Id.*

The panel's decision is the first court decision addressing whether requiring consumer consent on an entity-by-entity basis is consistent with the meaning of "prior express consent" in the TCPA. As the FCC determined, the One-to-One Rule would be a powerful tool to effectuate the promise of the TCPA—to end the scourge of unwanted telemarketing calls—that directly result from the practices of lead generators to gather consents. The panel's vacatur of the One-to-One Rule

---

[5] https://www.fcc.gov/ecfs/document/10508915228617/1.

9

substantially impacts the issue of whether congressional intent to end unwanted calls can be achieved.

The panel's decision ignored both the purpose of the TCPA (to stop unwanted calls), and the FCC's determination that the Rule was necessary to accomplish that purpose, and conflicts with the approaches of two other circuits in interpreting the TCPA. The panel here explicitly "beg[an] and end[ed] with the text" of the statute. Slip Op. 15. In contrast, the Third Circuit's "analysis of the scope of the TCPA is guided by the text of the statute, the FCC's interpretation of the statute, the statute's purpose, and our understanding of the concept of consent as it exists in the common law." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013). *See also Daubert v. NRA Group, LLC*, 861 F.3d 382, 389 (3d Cir. 2017). Likewise, the Ninth Circuit has stressed that its interpretation of the statute is shaped by "the purpose of the TCPA" and the FCC's "persuasive guidance." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017). And only the Third and Ninth Circuit approaches are consistent with the Supreme Court's recognition that an agency's guidance can be useful in interpreting a statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Taking into account the purpose of the TCPA and FCC's interpretation of the statute, the FCC did not exceed its authority here.

But even under the strict textualist approach of the panel, the FCC's One-to-One Rule is consistent with the statutory grant of authority to the agency. *See id.* at

394-95. To protect telephone subscribers from unwanted calls, the TCPA prohibits calls containing an artificial or prerecorded voice to cell phones without "prior express consent." 47 U.S.C. § 227(b)(1)(A). Congress's mandate to the FCC in § 227(b)(2) is that it "shall prescribe regulations to implement the requirements" dealing with automated calls. 47 U.S.C. § 227(b)(2). With the language in § 227(b)(2), Congress did not just provide the FCC with *authority* to add definitions and other requirements to accomplish the goals of the TCPA, but by using the word "shall" Congress *required* the FCC to do so. The extent to which Congress intended the FCC to exercise its regulatory discretion in accomplishing this task is also evident in the statutory provision in § 227(b)(3), which mandates the award of statutory damages for violations of the FCC's regulations, as well as of the statute. If the FCC lacked authority to impose requirements different from those under the statute, that part of § 227(b)(3) would be surplusage.

Proposed Intervenors now seek to intervene for the purpose of seeking rehearing on the panel's holding that the portion of the One-to-One Rule requiring consent for one entity at a time exceeds the FCC's authority.

## ARGUMENT

### PROPOSED INTERVENORS SHOULD BE PERMITTED TO INTERVENE TO SEEK REHEARING TO REINSTATE THE ONE-TO-ONE RULE.

Proposed intervenors should be permitted to intervene because their motion was filed promptly—less than thirty days—after it became evident that the FCC is

11

no longer defending the One-to-One Rule, and they have a strong interest in seeing the Rule in effect. Under Federal Rule of Appellate Procedure 15(d), a party seeking to intervene in a petition for review proceeding must file a motion that contains "a concise statement of the interest of the moving party and the grounds for intervention." Because Rule 15(d) does not provide standards for intervention, courts of appeal look to the standards governing intervention in the district courts under Federal Rule of Civil Procedure 24. *See, e.g.*, *Richardson v. Flores*, 979 F.3d 1102, 1104-05 (5th Cir. 2020); *Sierra Club, Inc. v. E.P.A.*, 358 F.3d 516, 517 (7th Cir. 2004).

Under Rule 24(a), a party may intervene as of right via a timely motion if it can show that "it has an interest in the subject matter of the suit, that its ability to protect that interest may be impaired by the disposition of the suit, and that existing parties in the suit cannot adequately protect that interest." *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1250 (11th Cir. 2002). Under Rule 24(b), permissive intervention "is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties." *Id.* "Rule 24 is to be construed liberally, and doubts resolved in favor of the proposed intervenor." *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1326 (S.D. Ala. 2003)

(quoting *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081 (8th Cir. 1999)).

Proposed Intervenors here easily meet the standard for intervention as of right under the Rule 24(a) standard, but even if they did not, the Court should permit them to intervene under the permissive intervention standard in Rule 24(b).

### A. Proposed Intervenors Should Be Permitted to Appeal as of Right.

#### 1. Proposed Intervenors have an interest in the subject matter of the suit that will be adversely affected if the panel's decision stands.

Proposed Intervenors each have a tangible interest in the One-to-One Rule being reinstated. As explained, the Rule would dramatically decrease the prevalence of unwanted telemarketing calls by requiring consumer consent to be to given to one entity at a time, eliminating the buying and selling of consumer consent to thousands of callers unknown to the consumer. *See supra* pp. 6-9.

The individual intervenors are small business owners who have a direct financial interest in a decrease in unwanted telemarketing calls to their business cell phones. *See supra* pp. 4-6. They spend valuable time answering, reviewing, and sorting through unwanted calls and voicemails that impact their ability to do their work, run their business, and reach current and prospective clients. *Id.* The barrage of unwanted calls is so problematic that two of the individual intervenors spend between $145 and $180 annually to screen their incoming calls for telemarketing

calls to keep their phone lines available for legitimate business calls and reduce constant interruption. *Id*. But even with the screening services, the intervenors must spend time reviewing voicemails, and the screening services themselves may be off-putting for clients. *Id*. In the context of operating a small business, "time is money," Osborne Decl. ¶ 10, and dealing with the onslaught of unwanted calls costs individual intervenors both time and literal money. For that reason, they have a tangible interest in seeing the One-to-One Rule implemented and unwanted calls thereby greatly reduced.

NCL, too, has an interest in seeing the One-to-One Rule implemented. NCL is a non-profit advocacy group that works on behalf of consumers, and it has been a leader in advocacy efforts before the FCC to persuade the agency to take action to reduce unwanted telemarketing robocalls. Greenberg Decl. ¶¶ 2-3. NCL was a particularly strong advocate for the creation of the One-to-One Rule precisely because it restricts consent to single, identifiable entities and eliminates the sale and resale of consumer consent, and therefore greatly limits who can make telemarketing calls in compliance with the TCPA. *Id.* ¶ 7. NCL employs a counselor who assists victims through the steps to recover from scam calls. ¶ 8. If the One-to-One Rule goes into effect, NCL would no longer need to spend as many resources advocating for the FCC to limit unwanted telemarketing calls, and as there would be fewer victims of telemarketing scam calls, it would save resources on assisting consumer

14

victims of these calls. *Id.* ¶¶ 8-9, 11. However, if the Rule remains vacated, it will need to continue to dedicate substantial resources to these issues. *Id.* ¶ 12.

### 2. The FCC and United States are no longer defending the Rule, and Proposed Intervenors' interests will no longer be protected.

While the Government zealously defended the FCC One-to-One Rule through its briefing and argument before the panel, all indications are that, given the change in administration, the Government has ceased defending the Rule and will decline to seek rehearing of the panel's decision. Without government defense of the Rule, the interests of Proposed Intervenors in seeing the Rule in place will no longer be protected at all—much less adequately.

The previous leadership of the FCC—which had been responsible for crafting the One-to-One Rule—had repeatedly resisted calls from the telemarketing and lead generator industries to unwind it and instead provided ample time to implement the Rule. Order ¶ 46 ("While we find that our rule does not unduly burden callers or comparison shopping websites, we nonetheless give sellers, texters, and callers, and any third-party websites they obtain consent through, a 12 month implementation period[.]"). The FCC provided a strong defense of the One-to-One Rule from the initiation of this case through oral argument in December 2024—including strongly opposing IMC's motion to stay the Rule's effective date. *See* Dkt. No. 24.

Telemarketers and lead generators have applied pressure on the incoming and now-current administration to abandon the One-to-One Rule, or at least substantially

water it down. The current FCC has acquiesced to the requests of the telemarketers and lead generators, *see* Responsible Enterprises Against Consumer Harassment Emergency Petition for Commission to Consider Stay of Effective Date of One-To-One Rule in Light of Executive Order, CG Docket Nos. 02-278, 17-59, 21-402 (Jan. 20, 2025);[6] Responsible Enterprises Against Consumer Harassment Reply in Support of Emergency Petition for Commission to Consider Stay of Effective Date of One-To-One Rule in Light of Executive Order, CG Docket Nos. 02-278, 17-59, 21-402 (Jan. 23, 2025),[7] and—unlike the FCC under the previous administration—agreed on January 24, 2025, to delay the effective date of the amended Rule for either a year or until this Court's decision was issued. *See In the Matter of Targeting and Eliminating Unlawful Text Messages Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1001, Advance Methods to Target and Eliminate Unlawful Robocalls, Order*, CG Docket Nos. 21-402, 02-278, 17-59 (Rel. Jan. 24, 2025).[8] Although the FCC has not made a public announcement that it is abandoning the defense of the One-to-One Rule, its decision to delay the effective date when such delay had been resisted by the previous administration indicates that it is highly unlikely that the FCC will seek rehearing.

---

[6] https://www.fcc.gov/ecfs/document/10121419311212/1.
[7] https://www.fcc.gov/ecfs/document/10123855116804/1.
[8] https://docs.fcc.gov/public/attachments/DA-25-90A1.txt.

A failure to seek rehearing here would be consistent with the current administration's pattern of declining to defend the prior administration's regulatory actions. The current administration has already indicated that is not defending numerous rules issued by administrative agencies during the Biden administration. *See, e.g.*, Jonathan Stempel, Reuters, *US Consumer Bureau Won't Defend Biden-Era Rules in Court After Chief Was Fired* (Feb. 3, 2025);[9] Rebecca Rainey, Bloomberg Law, *Trump DOL Pauses Biden Independent Contractor Rule Defense* (Jan. 27, 2025).[10] The pattern remains unbroken here.

### 3. Proposed Intervenors' motion is timely.

Proposed Intervenors' motion is timely because they have "sought to intervene 'as soon as it became clear' that [their] interests 'would no longer be protected' by the parties in the case." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279 (2022) (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)). In assessing the timeliness of a motion to intervene, a court considers "(1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before he petitioned for

---

[9] https://www.reuters.com/business/us-consumer-bureau-wont-defend-biden-era-rules-court-after-chief-was-fired-2025-02-03/?utm_source (consumer bureau will not defend Biden-era rules in court after chief was fired).

[10] https://news.bloomberglaw.com/daily-labor-report/trump-dol-backs-off-of-biden-independent-contractor-rule-defense (administration plans to withdraw its legal defense of a Biden-era Department of Labor rule concerning the classification of independent contractors).

leave to intervene; (2) the extent of prejudice to the existing parties as a result of the would-be intervenor's failure to apply as soon as he knew or reasonably should have known of his interest; (3) the extent of prejudice to the would-be intervenor if his petition is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely." *United States v. Jefferson County*, 720 F.2d 1511, 1516 (11th Cir. 1983). Timeliness under Rule 24 "is to be determined from all the circumstances, and the point to which a suit has progressed is not solely dispositive." *Cameron*, 595 U.S. at 279 (internal quotation marks omitted); *see also Georgia*, 302 F.3d at 1259 ("The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice.").

First, it did not become evident in this proceeding that Proposed Intervenors' interests would not be protected by the parties in the case until it became apparent that the new administration would no longer defend the One-to-One Rule. The length of time before intervenors seek to intervene is measured not from the start of the case, but from "the moment that the prospective intervenor knew that his interests would no longer be protected." *United States ex rel. Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 578 (5th Cir. 2023) (internal quotation marks omitted); *see also Cameron*, 595 U.S. at 279. As explained *supra*, while the previous administration staunchly defended the Rule, particularly in proceedings before this Court, all public

information indicates that the new administration will decline to seek rehearing to defend the Rule. In particular, this is evident from the FCC's January 24, 2025, decision to delay the effective date of the One-to-One Rule—a delay the previous administration had strongly opposed. Proposed Intervenors' motion is filed just a few weeks following the change in administration and the subsequent announcement of the delay. This Court has granted motions for intervention after "delays" much longer than the few weeks at issue here. *See Georgia*, 302 F.3d at 1259 (six months); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (seven months).

Indeed, Proposed Intervenors could not have met the standard for intervention as of right earlier. *See Federal Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 215 (11th Cir. 1993) (intervention by right permitted only when "the existing parties to the lawsuit inadequately represent the interests"). And while Rule 15(d) and Eleventh Circuit Rule 15-4 contemplate motions for intervention in petitions for review being filed within thirty days of the petition for review being filed, at that time the FCC was vigorously defending the Rule and the interests of Proposed Intervenors, and a motion for leave to file as of right would have been properly denied. Only now can they meet the standard for intervention by right— and they have sought to intervene consistent with the spirit of the thirty-day time period in Rule 15(d).

Further, that the panel has issued a decision does not necessarily mean that intervention is untimely. In similar procedural circumstances—where a government entity declined to seek rehearing or Supreme Court review to defend a statute after the appellate panel issued a decision striking down a law—the Supreme Court permitted another party to intervene to take up defense of the law to seek additional review. *Cameron*, 595 U.S. at 279.

With regard to the second timeliness prong, intervention will cause no prejudice to the Court or the parties in this matter—the "most important consideration" in evaluating timeliness. *Commissioner, Ala. Dep't of Corrections v. Advance Local Media, L.L.C.*, 918 F.3d 1161, 1171 (11th Cir. 2019) (quoting *McDonald v. E. J. Lavino* Co., 430 F.2d 1065, 1073 (5th Cir. 1970)). Proposed Intervenors will not modify any pleading or briefing schedules or any deadlines in this matter. Proposed Intervenors will file all briefs, including their petition for rehearing, on the date the government's briefs would otherwise have been due— even if this Court has not yet ruled on the intervention motion at that time. But if Proposed Intervenors wait to move until the government fails to seek rehearing by the deadline, the briefing schedules would be delayed. If permitted now, the only consequences that intervention will have for IMC "are those commonly associated with defending a ruling or judgment on appeal." *Ross v. Marshall*, 426 F.3d 745, 756 (5th Cir. 2005). Such "inconveniences" do not constitute sufficient prejudice to

deny intervention. *Id. See also Meek v. Metropolitan Dade County*, 985 F.2d 1471, 1479 (11th Cir. 1993) ("mere delay in determining the rights of existing parties is not a relevant consideration" and "the court must focus on any additional prejudice arising from the applicant's delay in seeking intervention").

With regard to the third prong—prejudice to Proposed Intervenors if the motion is denied—Proposed Intervenors have explained, *supra*, that without the FCC One-to-One Rule in place, they will continue to suffer concrete financial harms resulting from the deluge of unwanted telemarketing calls they receive on their business lines or, in the case of NCL, the need to continue to pursue advocacy and provide direct services on this issue. If the FCC declines to seek rehearing and abandons the Rule, and Proposed Intervenors are not permitted to do so, they will have lost their opportunity to defend the Rule and protect their interests. This type of prejudice was sufficient in *Meek*, 985 F.2d 1471, where this Court permitted intervenors to defend their county's at-large voting system against a Voting Rights Act challenge after the county declined to defend the system on appeal. The Court explained that denying the motion would prejudice the intervenors because "no other parties remain in the case to pursue the objective of defending the at-large system, with the result that denial of intervention irrevocably condemns that system, to the intervenors' prejudice." *Id.* at 1479. The same reasoning applies here: without Intervenors, no party would remain in the case to defend the One-to-One Rule.

**B. Proposed Intervenors Also Satisfy the Requirements for Permissive Intervention.**

Even if Proposed Intervenors do not yet satisfy the requirements for intervention as of right because the FCC has not yet publicly stated it would not seek further review or permitted the deadline for seeking rehearing to pass, Proposed Intervenors meet the requirements for permissive intervention. "Permissive intervention under Fed. R. Civ. P. 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties." *Georgia*, 302 F.3d at 1250. Here, Proposed Intervenors' anticipated defense of the FCC One-to-One Rule shares every question of law and fact in common with the main action: They seek to defend the Rule as a lawful exercise of the FCC's authority under the TCPA. And, for the reasons already explained, the motion is timely and will not prejudice or delay the adjudication of the parties' rights.

## CONCLUSION

The motion to intervene should be granted.

22

February 19, 2025                    Respectfully Submitted,

                                    */s/ Leah M. Nicholls*
                                    Leah M. Nicholls
                                    PUBLIC JUSTICE
                                    1620 L Street NW, Suite 630
                                    Washington, DC 20036
                                    (202) 797-8600
                                    LNicholls@publicjustice.net

                                    *Counsel for Proposed Intervenors*

                                    Jennifer S. Wagner
                                    NATIONAL CONSUMER LAW CENTER
                                    7 Winthrop Square, 4th Floor
                                    Boston, MA 02110
                                    (617) 542-8010
                                    jwagner@nclc.org

                                    *Counsel for National Consumers League*

## CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the length limit of Fed. R. App. P. 27(d)(2) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5,195 words. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface, using Microsoft Word, in Times New Roman 14-point font.

February 19, 2025                    */s/ Leah M. Nicholls*
                                     Leah M. Nicholls

                                     *Counsel for Proposed Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2025, the foregoing motion was filed electronically with the Clerk of Court through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

February 19, 2025        */s/ Leah M. Nicholls*
                              Leah M. Nicholls

                              *Counsel for Proposed Intervenors*

# EXHIBIT 1

Declaration of Sally Greenberg,
National Consumers League

**DECLARATION OF SALLY GREENBERG**

I, Sally Greenberg, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am the Chief Executive Officer of the National Consumers League (NCL), where I have worked since 2007. I have testified multiple times before Congress and numerous federal agencies on consumer and privacy matters, including fraud, product safety, and data privacy. Previously, I worked for Consumer Reports, the U.S. Department of Justice, and members of Congress in both the Senate and the House of Representatives, among other positions. NCL's website is https://nclnet.org/

2. NCL, a private, non-profit advocacy group representing consumers on marketplace and workplace issues, is the nation's oldest consumer organization. It is NCL's mission to protect and promote social and economic justice for consumers in the United States. NCL provides government, businesses, and other organizations with the consumer's perspectives on a range of issues including consumer rights and privacy.

3. NCL has been a leader in the advocacy efforts before the Federal Communications Commission (FCC) to provide improved protections for consumers flooded by unwanted telemarketing robocalls and scam calls. In this effort we have worked closely with other national consumer and privacy groups, as well as with representatives of the telephone industry, such as CTIA (the trade association that represents the U.S. wireless communications industry, whose website is https://www.ctia.org).

4. This work has included the submission of dozens of comments and letters, along with meetings with staff, to encourage the FCC to adopt regulations and policies that will effectively reduce telemarketing calls and protect telephone subscribers from unwanted telemarketing and scam calls.

1

5. NCL was a strong advocate for the passage of the FCC's One-to-One Consent Rule that is the subject of this intervention. We recognize that the misuse of consumers' "consents" by lead generators and others is a major factor contributing to the continued flood of unwanted telemarketing calls.

6. In the FCC's proceeding leading up to the issuance of the rule, the lead generators themselves explained the dynamics that cause the torrent of unwanted telemarketing calls.  As they described, consumers who visit lead generators' websites advertising certain products or services are asked if they will consent to receive telephone calls from potential sellers by entering their contact information on a form. On many of these websites, the consent form includes a hyperlink to another website which often names hundreds—and sometimes thousands—of telemarketers, sellers, or other lead generators. The lead generator is requesting permission to sell the consumer's consent to receive telemarketing calls potentially to everyone on this hyperlinked list. Each consumer "consent" lead is then often sold multiple times, creating income for the seller, and triggering more telemarketing calls to the consumer. The consumer has no way to stop the flow of calls from telemarketers who are often far removed from the original website that the consumer visited. *See "*Comment of Responsible Enterprises Against Consumer Harassment, CG Docket Nos. 21-402, 02-278, at 1 (Fed. Communications Comm'n, May 9, 2023). https://www.fcc.gov/ecfs/document/10509951114134/1.

7. NCL expends considerable resources advocating on behalf of consumers before federal and state agencies, as well as Congress, to prevent scams and provide redress for victims of these unwanted calls. Its work includes close analysis of types of scams, the vectors for scams (such as telemarketing calls), the cost of those scams on individual and

2

business victims, and engaging with policy makers to prevent scams and provide protections and redress to victims. A substantial portion of these scams are presented to consumers as telemarketing calls. *See, e.g,* https://nclnet.org/wp-content/uploads/2025/01/Top-Scams-of-2024.pdf.

8. NCL also employs a counselor who provides direct assistance to victims by filing complaints with appropriate law enforcement and consumer protection agencies, and walking their families through other steps in the recovery process. *See* https://fraud.org/about-us/. Indeed, since 2012, NCL has processed 77,000 complaints relating to fraud.

9. By substantially reducing the torrent of telemarketing calls, many of these scam calls will be prevented, and telephone service providers would be better able to identify and block true scam calls. As a result NCL's work assisting victims of unwanted telemarketing and scam calls will be directly impacted by the panel's order vacating the amended rule.

10. The FCC's One-to-One Consent Rule will prohibit the sale and resale of consumer consents by requiring that the consumer must check one box for calls from each seller or telemarketer. The rule does not limit the number of boxes that a consumer can check on a lead generator's website.

11. We believe that by prohibiting the resale of consumer consents, the FCC's rule will bring substantial benefits to both consumers and small businesses by significantly limiting the number of calls that may be generated as the result of each consent form signed by a consumer.

12. Conversely, if the rule is vacated as the panel decision has ordered, consumers and small businesses will continue to be harmed by the flood of unwanted telemarketing calls.

13. Implementation of the FCC's rule will also benefit NCL, because the reduction of unwanted telemarketing robocalls and scam calls will substantially relieve our workload on these two subjects. We will no longer have to provide written comments to the FCC, and attend meetings with FCC staff regarding protecting consumers from unwanted telemarketing robocalls. Additionally, our work aiding individual consumers who have been scammed by these calls should be reduced significantly.

14. However, if the rule is vacated, NCL will have to continue to expend considerable resources advocating for mechanisms that will protect telephone subscribers from these unwanted calls and providing assistance to individual consumers who have been directly harmed by these calls.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C. on this  18 day of February, 2025.

**Sally Greenberg**

4

# EXHIBIT 2

Declaration of Mark Schwanbeck

**DECLARATION OF MARK SCHWANBECK**

I, Mark Schwanbeck, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.  I am the owner of a business that provides tax preparation, small business accounting and consulting, and retirement planning services to clients in multiple states, including Massachusetts, Virginia, Maryland, District of Columbia, Texas, and Florida. I am an IRS Enrolled Agent, which means that I am a federally licensed tax practitioner with unlimited rights to represent taxpayers before the IRS. I am also a Certified Retirement Counselor. My business is located in Cohasset, Massachusetts. The website is https://mstaxprep.com/

2.  I have been in this business for nine years.

3.  I rely on my cell phone to make and receive calls from current and potential clients, as well as to handle various details related to running a business.

4.  The number of unwanted telemarketing calls that include an artificial or prerecorded voice that I receive on my cell phone continually interrupts my work, and makes it much more difficult for me to conduct my business.

5.  I say that these telemarketing calls are unwanted because I have not consented to receive them, and they provide no value to me whatsoever.

6.  To help me deal with these unwanted telemarketing calls and still conduct my business, I engage a service to block calls from telemarketers. That service diverts all calls from numbers that are not on my contact list to my voicemail. I pay an annual subscription fee of $179.88 for this service.

7. Even when these unwanted calls go to voicemail, it is a waste of my time and resources to have to listen to them and determine which calls are from clients or potential clients, or others that require a response, and which calls need to be deleted.

8. It upsets my clients, and likely causes potential clients to look elsewhere for services, when they are unable to reach me directly by calling me. Additionally, some senior citizens have a particularly difficult time navigating through the voicemail prompts, potentially causing me to lose additional business.

9. As I explained above, I invest nearly $200 each year in a service designed to help me combat the onslaught of unwanted calls. This system requires anyone not in my address book to complete an audio CAPTCHA, prompting them to enter specific information to verify their identity as human. Once the CAPTCHA is successfully navigated, the caller can connect with me directly or leave a message. While this innovative approach effectively blocks automated and many telemarketing calls, it inadvertently complicates communication with potential clients and vendors in my industry—individuals I genuinely want to engage with. Frustration often leads them to hang up, and I fear this hinders my revenue potential.

10. A recent analysis of my Verizon call records reveals that in 2024 alone, I had 1,587 calls blocked by this service.

11. Implementation of the Federal Communication Commission's One-to-One Consent regulation would save me time and money, because it would outlaw the current practice of selling my information to telemarketers and lead generators, which is the cause of many of these unwanted telephone calls.

12. It is my understanding that the Eleventh Circuit's panel found that the FCC exceeded its authority in issuing the regulation, which means that without a reversal, the rule cannot be implemented. It is also my understanding that the panel's decision may be reheard in some circumstances.

13. I have an interest in seeking rehearing of the court's ruling because I want the regulation to be implemented. Implementation would lead to a reduction of many of these unwanted robocalls and would save me time and money, and reduce the aggravation caused by these invasive calls.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Cohasset, Massachusetts on this 14th day of February, 2025.

**Mark Schwanbeck**

# EXHIBIT 3

Declaration of Micah Mobley

## DECLARATION OF MICAH MOBLEY

I, Micah Mobley, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. Since 2021, I have operated a small business named Above and Beyond Timing that provides timing services to track meets, road races, cross country meets, and trail runs. Our website is https://www.abtiming.com/home.

2. To run my business successfully, I need to be immediately available to my clients when they call. This means I must answer my cell phone for all calls. If I did not do so, I would not be responsive to my clients' needs as event hosts.

3. As a result, I try to answer all calls as they come in. Since I work with hundreds of different people, I often receive calls from unknown numbers. If I were to answer calls only from known numbers, current clients, potential clients, and other businesses with whom I coordinate would have difficulty reaching me.

4. The result of having to answer all calls, even those from unknown numbers, is that I answer many telemarketing calls that use an artificial or prerecorded voice. I call these robocalls. I have never received a robocall that I appreciated or that did anything other than waste my time and interrupt whatever else I might have been doing.

5. I estimate that I receive between 5 to 10 unwanted robocalls every week, and sometimes more. I did not consent to receive any of these telemarketing robocalls.

6. I worked as a telemarketer in college. I am not against telemarketing itself. But we only called people directly and did not send any robocalls. Telemarketing robocalls should only be permitted when the recipient has clearly provided their consent to receive these calls from that telemarketer.

7. I understand that the Federal Communication Commission's (FCC) One-to-One Consent regulation would prohibit lead generators and telemarketers from selling information about me to others. This would likely substantially reduce the number of these unwanted telemarketing robocalls. However, the regulation was disallowed by the court.

8. I had submitted a comment to the FCC in support of the rule.

9. I support a review of the court's ruling in the hopes that the regulation can be implemented, which would protect me and others from these unwanted telemarketing robocalls.

Executed in Elletsville, Indiana on this 17th day of February, 2025.

**Micah Mobley**

# EXHIBIT 4

Declaration of Christopher K. McNally

### DECLARATION OF CHRISTOPHER K. MCNALLY

I, Christopher K. McNally, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am an attorney engaged in the solo practice of law in West Mifflin, Pennsylvania. I represent clients before various state agencies and boards. I counsel individuals with state professional licensure issues. I have been practicing law since 1986, having previously worked in several capacities for the state, including as a state legislator. I have operated my own law practice since 2022. My law firm's website is https://www.attorneymcnally.com/.

2. Robocalls—calls that include a prerecorded or artificial voice—made by telemarketers to my cell phone, pose a serious cost to my business in terms of time and money. As I don't have a receptionist or other person to screen calls, I have to answer all the calls myself or listen to them on my voicemail.

3. Dealing with these unwanted and intrusive telemarketing calls increases my expenses and diverts my time and energy from necessary work for clients. These telemarketers routinely ignore my requests to cease and desist or to remove my telephone number from their lists. These telemarketers consistently use fake caller-IDs, so I cannot trust that any calls coming to my cell phone are correctly identified on the caller-ID.

4. I have not consented to receive these calls, and they provide me with nothing of value. These calls are imposing on my freedom. Telemarketers should not be permitted to invade my time and my privacy.

5. I estimate that I receive an average of between 1 to 3  telemarketing robocalls every business day on my cell phone, none of which are helpful or wanted, and all of which are intrusive and cost me time and money to deal with.

6. My understanding is that the Federal Communication Commission's (FCC) One-to-One Consent regulation would make it illegal for lead generators and telemarketers to sell information about me to others, which would significantly reduce the number of these unwanted calls, as the callers would no longer have the defense that I supposedly consented to receive these calls.

7. I previously expressed my support for this regulation in a comment submitted in response to the FCC's Second Further Notice on the rule.

8. It is my understanding that the Eleventh Circuit panel found that the FCC exceeded its authority by issuing the regulation. It is also my understanding that the panel's decision may be reheard in some circumstances.

9. I have an interest in seeking rehearing of the panel's ruling because I want the regulation to be implemented. Implementation would lead to elimination of many of these unwanted robocalls, which would save me time and money.

Executed in West Mifflin, Pennsylvania on this 14th day of February, 2025.

Christopher McNally

# EXHIBIT 5

# Declaration of Chuck Osborne

**DECLARATION OF CHUCK OSBORNE**

I, Chuck Osborne, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.  I am the founder and owner of Excess Risk Solutions, a small business that sells Medical Stop-loss Insurance for Self-funded Medical Plans, in Lutz, Florida. Our website is https://excessrisksolutions.com/

2.  I have been in this business for 40 years, and I established Excess Risk Solutions, Inc. in 2004, and I have run it since that time.

3.  In my capacity as President, I rely on my cell phone to communicate with customers, suppliers, insurance company underwriters, and others to conduct my business.

4.  Telemarketers routinely send unwanted calls that include either a prerecorded or artificial voice to my cell phone. I refer to these calls as robocalls.

5.  I refer to these calls as "unwanted" because I have not consented to receive these telemarketing calls.

6.  When telemarketers send robocalls to my cell phone they tie up the line, preventing important calls necessary for me to run my business from connecting.

7.  As one method of dealing with these unwanted telemarketing robocalls, I have engaged a service provider to screen the calls, so that my cell phone is not ringing all day from these robocalls. The annual cost for this service provider is approximately $145.00.

8.  The service provider's assistance is helpful, but the calls that it captures then go to my voice mail. According to the service provider's records, in 2024 it diverted 1091 unwanted robocalls to voice.

9.  When these unwanted telemarketing robocalls go directly to my voicemail, they clog up my voice mailbox and take up my time and my employees' time listening to them to

determine which calls are from customers, suppliers, insurance companies, and other callers which need to be returned, and which calls are unwanted calls from telemarketers that need to be deleted.

10. Dealing with these unwanted robocalls costs me my time, and that of my employees, and time is money for a small business.

11. I have a strong interest in seeing the successful implementation of the Federal Communication Commission's One-to-One Consent regulation, because I understand that it will forbid telemarketers and lead generators from selling information that the telemarketers use as the basis for calling my cell phone.

12. Anything that will eliminate, or even just reduce, the number of unwanted telemarketing robocalls, will save me time and money in the operation of my business.

Executed in Lutz, Florida on this 14th day of February, 2025.

/s/ Chuck Osborne

Chuck Osborne