No. 24-10277

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

INSURANCE MARKETING COALITION LTD.
*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

# PROPOSED BRIEF OF AMICI CURIAE ELECTRONIC PRIVACY INFORMATION CENTER, CONSUMER FEDERATION OF AMERICA, PUBLIC KNOWLEDGE, AND NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES IN SUPPORT OF PROPOSED INTERVENORS' PETITION FOR REHEARING EN BANC

*Counsel for Proposed Amici Curiae*
Megan Iorio
**Electronic Privacy Information Center**
1519 New Hampshire Ave NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

Dated: Mar. 14, 2025

*Insurance Marketing Coalition Ltd. v. FCC*, Case No. 24-10277

## CERTIFICATE OF INTERESTED PERSONS

Under Eleventh Circuit Rules 26.1-1, 26.1-2(c), and 27-1(a)(10), undersigned counsel for *amici curiae* certifies that the following is a full and complete list of all persons, firms, associations, partnerships, and corporations, including subsidiaries, conglomerates, affiliates, parent corporations, and other legal entities having an interest in the outcome of this case:

1. Aggarwal, Sameer, Covington & Burling LLP, counsel for Petitioner;

2. Bergmayer, John, Public Knowledge, *Amicus Curiae* at *en banc* stage;

3. Boeglin, John A., Covington & Burling LLP, former counsel for Petitioner;

4. Carter, Carolyn, National Consumer Law Center, counsel for *Amicus Curiae* National Consumer Law Center;

5. Citrin, Sarah E., Federal Communications Commission, counsel for Respondent;

6. Covington & Burling LLP, counsel for Petitioner;

7. Dori, Yaron, Covington & Burling LLP, counsel for Petitioner;

8. Dunne, Matthew J., Federal Communications Commission, counsel for Respondent;

9. Electronic Privacy Information Center, *Amicus Curiae*;

*Insurance Marketing Coalition Ltd. v. FCC*, **Case No. 24-10277**

10. Ellison, P. Michele, Federal Communications Commission, counsel for Respondent;

11. Federal Communications Commission, Respondent;

12. Garcia, Nicholas, Public Knowledge, counsel for *Amicus Curiae* Public Knowledge;

13. Glover, Matthew J., Covington & Burling LLP, counsel for Petitioner;

14. Greenburg, Sally, Intervenor National Consumers League;

15. Insurance Marketing Coalition Limited, Petitioner;

16. Iorio, Megan, Electronic Privacy Information Center, counsel for *Amici Curiae*;

17. King, Kevin F., Covington & Burling LLP, counsel for Petitioner;

18. Lewis, Jacob Matthew, Federal Communications Commission, counsel for Respondent;

19. McNally, Christopher K., Intervenor;

20. Mobley, Micah, Intervenor;

21. Murray, Teresa, *Amicus Curiae* U.S. PIRG;

22. National Association of State Utility Consumer Advocates, *Amicus Curiae* at *en banc* stage;

23. National Consumer Law Center, *Amicus Curiae* and counsel for Intervenor National Consumers League;

24. National Consumers League, Intervenor;

25. Nicholls, Leah M., Public Justice, counsel for Intervenors;

26. Nicholson, Robert B., U.S. Department of Justice, counsel for Respondent;

27. Osborne, Chuck, Intervenor;

28. Public Justice, counsel for Intervenors;

29. Public Knowledge, *Amicus Curiae*;

30. Saunders, Margot, National Consumer Law Center, counsel for *Amicus Curiae* National Consumer Law Center;

31. Schwanbeck, Mark, Intervenor;

32. United States of America, Respondent;

33. U.S. PIRG, *Amicus Curiae*;

34. Wagner, Jennifer S., National Consumer Law Center, counsel for Intervenor National Consumers League;

35. Wiggers, Robert J., U.S. Department of Justice, counsel for Respondent;

36. Witte, Erin, Consumer Federation of America, counsel for *Amicus Curiae* Consumer Federation of America.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, *Amici Curiae* the Electronic Privacy

Information Center, Consumer Federation of America, Public Knowledge, and the

National Association of State Utility Consumer Advocates state that they have no

parent corporations and that no publicly held corporation owns 10% or more of

their stock.

March 14, 2025                                    */s/ Megan Iorio*
                                                          Megan Iorio

                                                          *Counsel for Proposed Amici Curiae*

# INTERESTS OF AMICI AND SUITABILITY FOR EN BANC REVIEW

Electronic Privacy Information Center and other consumer advocates[1] regularly advocate in TCPA cases in support of consumer privacy and file comments with regulatory agencies such as the Federal Communications Commission (FCC) to better protect consumers from unwanted calls, as they did in the FCC proceeding and 11ᵗʰ Circuit panel regarding this FCC rule.

Amici believe, based on a reasoned and studied professional judgment, that the panel decision contradicts the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024). The full circuit court must review the panel decision to ensure uniformity of precedent.

Amici believe, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance:

1.      Whether a court, in evaluating whether a consumer protection agency exceeded its statutory authority in promulgating a rule grounded in a consumer protection statute, can disregard the factual underpinnings of the rule and the real-

---

[1] No party's counsel authored this brief in whole or in part. No entity other than amici curiae contributed money that was intended to fund preparing or submitting the brief. As EPIC noted in its motion requesting the court's leave to file this amicus brief, the submission of this brief is conditionally unopposed.

world consequences of vacating the rule where vacating the rule would negatively impact consumers.

2.      Whether a court, in evaluating whether an agency exceeded its statutory authority in promulgating a rule, can interpret statutory language so as to simultaneously: (a) require that agency to implement the statute and (b) prohibit that agency from interpreting an undefined term in that statute.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................C-1

CORPORATE DISCLOSURE STATEMENT...........................................................i

INTERESTS OF AMICI AND SUITABILITY FOR EN BANC REVIEW........... ii

TABLE OF AUTHORITIES......................................................................................v

STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION......1

STATEMENT OF FACTS........................................................................................2

ARGUMENT ...........................................................................................................3

    I. The FCC's Rule Effectively Curbs Robocalls, without Ruinous Consequences for Business, Because it Targets One Practice: Selling TCPA Consents. ......................................................................................................3

        A. Lead generators are responsible for a large portion of the billions of unwanted robocalls that harass American consumers and small businesses every month.............................................................................................3

        B. The FCC's rule is tailored to address the harms caused by lead generators. ............................................................................................5

    II. The Panel's Reasoning Sets the Stage to Unravel Longstanding Consumer Protections, Like Written Consent for Telemarketing Robocalls. ...................9

CONCLUSION .....................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Leckler v. Cashcall, Inc.,* 554 F. Supp. 2d 1025 (N.D. Cal. 2008) _____9

*McCurley v. Royal Seas Cruises, Inc.*, 2022 WL 1012471 (9th Cir. Apr. 5, 2022)_5

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014) _____7

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) _____9

**Statutes**

47 U.S.C. § 227 _____9, 11

**Regulations**

*In re: Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830 (2012) _____11

*In re: Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991, Report and Order and FNPRM*, CG Dkt. Nol. 02-278 (Feb. 16, 2024) _____7

*In re: Targeting and Eliminating Unlawful Text Messages, Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Report and Order*, CG Docket Nos. 21-402, 02-278, 17-59, 38 FCC Rcd. 12247 (Dec. 18, 2023) _____5, 7, 10

**Administrative Materials and Filings**

Comments of EPIC and NCLC, CG Dkt. No. 17-59 (Aug. 17, 2022)_____10

Comments of USTelecom (May 8, 2023) _____8

*In re John C. Spiller*, 36 FCC Rcd 6225, 6228-29 (Mar. 18, 2021)_____6

Notice of Apparent Liability for Forfeiture, *in re: Telnyx LLC* (Feb. 4, 2025) ____3

Reply Comments of EPIC, NCLC, Public Knowledge, CG Dkt. No. 17-59 (Sept. 8, 2023)_____10

*Urth Access* Order, Dec. 8, 2022 _____8, 12

**Other Authorities**

Complaint, *State of Ohio ex rel. Attorney General Dave Yost v. Jones*, No. 2:22-cv-2700 (S.D. Ohio July 7, 2022) _____5

https://robocallindex.com/ _____3

Josh Sternberg, Digiday, *Confessions of a Lead-Gen Specialist* (June 4, 2012) ___8

Statement of Material Facts, *Office of the Attorney General, State of Florida, Department of Legal Affairs v. Smartbiz Telecom LLC*, No. 22-cv-23945 (S.D. Fl. Oct. 16, 2023) _____3

PR Newswire, *Robocalls Top 50.3 Billion in 2022, Matching 2021 Call Volumes Despite Enforcement Efforts* (Jan. 5, 2023) _____4

*YouMail Observes Dramatic Rise in Harmful Robocalls in February 2025*, (Mar. 13, 2025). _____4

**STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION**

1.      Whether a court, in evaluating if the Federal Communications Commission (FCC) exceeded its statutory authority in promulgating a rule under the Telephone Consumer Protection Act (TCPA), can disregard the factual context under which the rule was enacted.

2.      Whether the FCC exceeded its statutory authority under the TCPA in interpreting the manner in which companies must comply with the "prior express consent" (PEC) provisions of the statute where the TCPA does not define PEC.

# STATEMENT OF FACTS

More than three decades ago, Congress enacted the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, to balance consumer privacy with streamlining business communications, and tasked the Federal Communications Commission (FCC) with implementing corresponding regulations. Today, Americans are bombarded with billions of unwanted robocalls every month; many of these calls are the result of lead generators collecting and reselling consumers' consent to be robocalled. The FCC recognized this pernicious problem and, and after undergoing notice and comment rulemaking in which stakeholders expressed a desire for the FCC to step in, the agency enacted a rule restricting how TCPA consents can be obtained and prohibiting their resale. The rule, if it were to go into effect, would greatly reduce the volume of unwanted and illegal robocalls, redounding to the benefit of consumers, telecommunications providers attempting to mitigate scam robocalls, and small businesses victimized by these calls. The Court should grant the proposed petition of National Consumer League, *et al.* for *en banc* review because the panel decision erroneously vacates a useful mechanism for mitigating the scourge of robocalls and lays the groundwork to eviscerate consumer protections beyond the rule at issue.

## ARGUMENT

### I. The FCC's Rule Effectively Curbs Robocalls, without Ruinous Consequences for Business, Because it Targets One Practice: Selling TCPA Consents.

The panel's decision to vacate the FCC's one-to-one consent rule will have negative repercussions for millions of Americans—indeed available data suggest that it already has—as the FCC's rule was tailored to curtail a specific, leading source of unwanted robocalls: calls resulting from consumer consents resold by lead generators.

#### A. Lead generators are responsible for a large portion of the billions of unwanted robocalls that harass American consumers and small businesses every month.

Consumers receive more than 4 billion robocalls each month; more than half of these are telemarketing or outright scam robocalls. *See February 2025 Nationwide Robocall Data.*[2] YouMail has noted: "calls initially viewed as telemarketing are eventually recognized as illegal telemarketing or scam calls, so it's important to measure the overall quantity of scam and spam calls combined."

---

[2] https://robocallindex.com/ (visited on Mar. 5, 2025). YouMail is a voicemail and robocall blocking service that enforcement agencies have relied upon for analysis of robocall campaigns, *see, e.g.*, Notice of Apparent Liability for Forfeiture, *in re: Telnyx LLC*, at 4 fn. 16 (Feb. 4, 2025), https://docs.fcc.gov/public/attachments/FCC-25-10A1.pdf; *Office of the Attorney General, State of Florida, Department of Legal Affairs v. Smartbiz Telecom LLC*, No. 22-cv-23945 (S.D. Fl.), Dkt. 50 at 10-11.

PR Newswire, *Robocalls Top 50.3 Billion in 2022, Matching 2021 Call Volumes Despite Enforcement Efforts* (Jan. 5, 2023).[3] As EPIC and others offered in an amicus brief to the panel, these unwanted calls not only hurt consumers but also negatively impact entrepreneurs. *See, e.g.*, ECF 41 at 9.

The panel's vacatur of the FCC's rule has already hurled the doors back open to these calls; for example, YouMail indicates that weekly volumes of robocall campaigns targeting low income individuals (e.g. offering easy loans) increased substantially starting Monday, January 27th, the first full business day after the panel issued its opinion. *YouMail Observes Dramatic Rise in Harmful Robocalls in February 2025*, (Mar. 13, 2025).[4] Indeed, the monthly count of these calls surged from 296 million in December to more than 440 million in January and an estimated 477 million in February. *Id.* America's robocall problem is poised to get even worse with the injection of artificial intelligence (AI) into robocall campaigns; an analysis of confidential data performed for EPIC and NCLC by YouMail has uncovered significant use of AI in robocalls in 2025 already. *Id.*

This Court should reconsider the panel's vacatur order, which leaves consumers and small businesses vulnerable to an onslaught of unwanted robocalls.

---

[3] https://www.prnewswire.com/news-releases/robocalls-top-50-3-billion-in-2022–matching-2021-call-volumes-despite-enforcement-efforts-301714297.html.
[4] https://epic.org/youmail-observes-dramatic-rise-in-harmful-robocalls-in-february-2025/.

**B. The FCC's rule is tailored to address the harms caused by lead generators.**

The FCC found that "[l]ead-generated communications are a large percentage of unwanted calls and texts." *In re: Targeting and Eliminating Unlawful Text Messages, Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Report and Order* ¶ 30, CG Docket Nos. 21-402, 02-278, 17-59, 38 FCC Rcd. 12247 (Dec. 18, 2023) (Order).[5] This is unsurprising, as the industry is premised upon proliferating telemarketing communications. Moreover, the lead generator industry is notorious for unscrupulous behavior resulting in illegal robocalls. *See, e.g.*, *Complaint*, State of Ohio *ex rel.* Attorney General Dave Yost v. Jones, No. 2:22-cv-2700, at ¶ 69 (S.D. Ohio July 7, 2022) ("…Sumco Panama needed to 'buy some time' before responding in order to *add* 'auto services' language to the list of opt-in websites in the terms and conditions *after* many VSC robocalls were made based on the alleged 'opt in' from these websites." (emphasis in original)); *In re John C. Spiller*, 36 FCC Rcd 6225, 6228-29, ¶¶ 6-9 (Mar. 18, 2021) (lead generator made more than 1,000,000,000

---

[5] https://docs.fcc.gov/public/attachments/FCC-23-107A1.pdf.

robocalls in six months, specifically targeting seniors and phone numbers on the Do Not Call Registry because those calls were more profitable).

As a business model, online lead generators (LGs) find consumers who are purportedly interested in receiving information about products or services available for purchase, such as automobile or health insurance, as the panel described. *See* ECF 60 at 5-6. The customer companies ("sellers") of the LG pay the LG for each potentially interested consumer ("lead"); these leads may be sold and resold repeatedly. Moreover, LGs often make multiple rounds of calls to a single consumer's phone over the course of several weeks, with each round designed to sell a different seller's products or services. The consumer almost never expects that the LG understood the completed webform to constitute express consent to receive calls from so many entities, indefinitely. The FCC's rule does not prevent a seller from obtaining *leads*; it merely requires that consent for a seller to *robocall* a consumer be obtained either (1) by the LG on a one-to-one basis for each seller or (2) by the seller from each phone subscriber directly.

The FCC's rule makes it more likely that a consumer's consent to be robocalled reflects their actual desire to receive robocalls from a specific company rather than being forced or duped into opening the flood gates to a deluge of robocalls every time they fill out a webform. As USTelecom noted in the rulemaking proceeding below:

lead generation robocall campaigns often rely on flimsy claims of consent where a consumer interested in job listings, a potential reward, or a mortgage quote, unknowingly and unwillingly "consents" to telemarketing calls from dozens – or hundreds or thousands – of unaffiliated entities about anything and everything.

Comments of USTelecom at 2 (May 8, 2023).[6]

Consumers typically have minimal visibility into those with whom LGs share their information. As the FCC has noted, clear and conspicuous disclosure is necessary for prior express written consent, meaning that a consumer cannot be said to meaningfully consent if they do not know to whom they are providing that consent. *See, e.g.*, *Order* at ¶ 32 (citing to *Urth Access Order*, Dec. 8, 2022[7]). There are also obvious issues with revocation of consent when consumers are not aware of every business with whom a LG may have shared that consumer's contact information. *See, e.g.*, *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014) (noting revocation of consent is consistent with TCPA's legislative history); *In re: Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991, Report and Order and FNPRM* ¶ 1, CG Dkt. Nol. 02-278 (Feb. 16, 2024) (noting that a "consumer's right to revoke consent after deciding they no longer want

---

[6] https://www.fcc.gov/ecfs/search/search-filings/filing/10508915228617.
[7] https://docs.fcc.gov/public/attachments/DA-22-1271A1.pdf at ¶ 16 ("We find that listing more than 5,000 "marketing partners" on a secondary website is not sufficient to demonstrate that the called parties consented to the calls from any one of these 'marketing partners.'").

robocalls or robotexts is essential to the right of consent").[8] Additionally, as a practical matter, unwittingly granting consent with a single click to thousands of businesses should not then take thousands of calls from the consumer to revoke that one-click consent. This is especially true where that consumer may never have actually filled out that webform in the first place. *See, e.g.*, Josh Sternberg, Digiday, *Confessions of a Lead-Gen Specialist* (June 4, 2012) ("I have seen thousands of leads come through in a matter of hours from one source. All were fraud, and none of the leads had ever opted in or had any memory of visiting the site/offer.").[9] The FCC's rule accounts for these unfortunate realities and mitigates the consumer harm by requiring each LG to obtain consent to robocall per individual seller.

The rule is also tailored to address the health of America's phone network and more grievous consumer harms. The prodigious volume of unwanted telemarketing robocalls makes it difficult for enforcement agencies and private actors to identify and mitigate outright scam traffic. *See, e.g.*, Reply Comments of EPIC, NCLC, Public Knowledge, CG Dkt. No. 17-59 at 4, 6 (Sept. 8, 2023).[10] Calls often pass through multiple voice service providers between the caller and the consumer-being-called; each "hop" between providers allows for scam call traffic to mix in with other

---

[8] https://www.fcc.gov/document/fcc-adopts-rules-empower-consumers-stop-robocalls-robotexts-0.
[9] https://digiday.com/marketing/confessions-of-a-lead-gen-specialist/.
[10] https://www.fcc.gov/ecfs/search/search-filings/filing/1090831416629.

call traffic, making it increasingly difficult for voice service providers farther from the source of scam calls to detect and block those scams. *See, e.g.*, Comments of EPIC and NCLC, CG Dkt. No. 17-59 at 18 (Aug. 17, 2022).[11] A reduction in unwanted telemarketing robocalls would make mitigating scam traffic easier.

## II.    The Panel's Reasoning Sets the Stage to Unravel Longstanding Consumer Protections, Like Written Consent for Telemarketing Robocalls.

Congress delegated clear and unequivocal authority to the FCC to define the contours of "prior express consent" (PEC) in the robocall context to give American cell phone subscribers—both consumer and business alike—a meaningful choice as to which robocalls they want to receive. 47 U.S.C. § 227. The FCC's one-to-one consent rule is *consistent* with prior express consent; it is the panel's decision that "conflict(s) with" PEC, including with commonsense notions like revoking consent. The panel's reasoning has additional negative downstream consequences, for example: (1) it invites line-drawing about how many companies a consumer can expressly consent to receive robocalls from at once, without offering any guidance and precluding the FCC from offering any, and (2) it potentially lays the groundwork

---

[11] https://www.fcc.gov/ecfs/search/search-filings/filing/10817350228611.

to unravel the FCC's requirement that prior express consent must be written for telemarketing robocalls.[12]

PEC in the TCPA is a term of art that courts have construed to mean that consent cannot be implied or transferred. *See, e.g.*, *Leckler v. Cashcall, Inc.*, 554 F. Supp. 2d 1025, 1029-30 (N.D. Cal. 2008) (holding consumer providing phone number in credit application was implied consent not express consent to be robocalled by debt collector, and finding FCC interpretation declaring it express consent unreasonable); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (noting consent to receive promotional material from one company cannot be read as expressly consenting to receive promotional material from another, unrelated company).

The FCC determined that consent in the robocall context must be one-to-one. And for good reason: a consumer's consent-to-be-robocalled cannot reasonably be considered *express* consent when the list of companies is 5,000 long or more. *See Order* (citing to *Urth Access Order) supra.* Similarly, LGs foisting a single checkbox for consent on consumers that applies to multiple companies—"take it or leave it"—rather than giving the consumer the opportunity for company-specific consent, is not

---

[12] Amici's view is that a requirement that consent be reduced to a writing signed by the consumer, authorizing the seller to robocall a particular telephone number, is wholly consistent with 47 U.S.C. § 227(b)(1)(A)'s requirement that consent be "express."

express consent in the context of robocalls. The FCC adopted a bright-line rule to give consumers and businesses clarity on what is expected and to ensure courts don't have to draw arbitrary lines about how many consents is too many in varying contexts. It is within the FCC's authority to make such a rule. The panel fundamentally misunderstood the purpose of the TCPA, as starkly evidenced by their framing of the law as a right to receive robocalls, *see* ECF 59, oral argument recording, at 13:28,[13] despite the plain text of the statute stating the purpose of the law as "*restrictions* on use of telephone equipment." 47 U.S.C. § 227 (*emphasis added*).

The panel's decision raises additional concerns to the extent that applying its logic could jeopardize the FCC's authority to require that PEC must be *written* in the context of telemarketing robocalls, a precedent established for more than a decade. *See in re: Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830 (2012).[14] In the context of telemarketing robocalls specifically, the FCC determined that non-written consent was not express consent because it did not reflect actual consumer choice. *See id.* If the panel's rule stands— that the FCC cannot interpret the word "express" to limit the scope of acceptable

---

[13] https://www.ca11.uscourts.gov/oral-argument-recordings?title=24-10277&field_oar_case_name_value=&field_oral_argument_date_value%5Bmin%5D=&field_oral_argument_date_value%5Bmax%5D=.

[14] https://www.fcc.gov/document/fcc-strengthens-consumer-protections-against-telemarketing-robocalls.

forms of consent—then industry may argue that the FCC was not authorized to interpret "express" to require written consent. *See, e.g.*, ECF 50 at 13-15, 18-19.

The FCC did not exceed its authority in interpreting "express" in either robocall context.

## CONCLUSION

For these reasons, the Court should grant proposed intervenors' petition for rehearing *en banc*.

March 14, 2025

Respectfully Submitted,

*/s/ Megan Iorio*
Megan Iorio
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave NW
Washington, DC 20036
(202) 483-1140

iorio@epic.org

*Counsel for Proposed Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the length limit of Fed. R. App. P. 29(b)(4) because, excluding the parts exempted by 11th Cir. R. 29-3, it contains 2,597 words. This brief complies with the requirements of Fed. R. App. P. 32 because it has been prepared in proportionally spaced typeface, using Microsoft Word, in Times New Roman 14-point font.

March 14, 2025                          */s/ Megan Iorio*
                                        Megan Iorio

                                        *Counsel for Proposed Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2025, the foregoing brief was filed electronically with the Clerk of Court through the appellate CM/ECF system. I further certify that all parties required to be served have been served.


March 14, 2025                          */s/ Megan Iorio*
                                        Megan Iorio

                                        *Counsel for Proposed Amici Curiae*